**Volume 1**

**Pages 1 - 39**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable P. Casey Pitts, Judge

FAROOQ KHAN, Individually and     )
on behalf of All Others           )
Similarly Situated,               )
                                  )
            Plaintiffs,            )
                                  )
  VS.                             )    **NO. 23-CV-6172-PCP**
                                  )
CHARGEPOINT HOLDINGS, INC.,       )
ET AL.,                           )
                                  )
            Defendants.           )
_____   )

San Jose, California
Thursday, March 14, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES** (via Zoom):

For Plaintiffs:
                GLANCY PRONGAY AND MURRAY, LLP
                1925 Century Park East, Suite 2100
                Los Angeles, California 90067
            BY:  **CHARLES HENRY LINEHAN, ATTORNEY AT LAW**

**(Appearances continued next page.)**

REMOTELY REPORTED BY:  Jennifer Coulthard, CSR# 14457, RMR, CRR
                Official U.S. District Court Stenographer

**APPEARANCES (Cont'd) (via Zoom):**

For Plaintiffs:

        HAGENS BERMAN SOBOL SHAPIRO, LLP
        715 Hearst Avenue, Suite 202
        Berkeley, California 94710
  BY:  **LUCAS E. GILMORE, ATTORNEY AT LAW**

        KAHN SWICK FOTI, LLP
        580 California Street, Suite 1200
        San Francisco, California 94104
  BY:  **RAMZI ABADOU, ATTORNEY AT LAW**

        BLEICHMAR, FONTI & AULD LLP
        7 Times Square, 27th Floor
        New York, New York 10036
  BY:  **ROSS M. SHIKOWITZ, ATTORNEY AT LAW**

        BLEICHMAR FONTI & AULD, LLP
        1330 Broadway, Suite 630
        Oakland, California 94612
  BY:  **LESLIE ELIZABETH WEAVER, ATTORNEY AT LAW**

        THE SCHALL LAW FIRM
        2049 Century Park East, Suite 2460
        Los Angeles, California 90067
  BY:  **IVY NGO, ATTORNEY AT LAW**

For Defendant:

        SIDLEY AUSTIN LLP
        555 California Street - Suite 2000
        San Francisco, California  94104
  BY:  **JAIME ALLYSON BARTLETT, ATTORNEY AT LAW**
       **CHADDY GEORGES, ATTORNEY AT LAW**

**Thursday - March 14, 2024**                          **11:03 a.m.**

                    **P R O C E E D I N G S**

                         --oOo--

THE CLERK:  All right.  Calling our next matter for this morning, 23-CV-6172, Khan versus ChargePoint Holdings, Incorporated, et al., on for the motions to consolidate cases and motions to appoint lead counsel.

Will the parties please approach and state their appearances for the record beginning with plaintiff's counsel?

MR. GILMORE:  Good morning, Your Honor; Lucas Gilmore of Hagens Berman Sobol and Shapiro on behalf of the Afshani movants.

THE COURT:  Good morning.

MR. LINEHAN:  Good morning, Your Honor, Charles Linehan from Glancy Prongay and Murray on behalf of Movant Schneeweiss.

THE COURT:  Good morning.

MR. ABADOU:  Good morning, Your Honor; Ramzi Abadou from the firm Khan Swick Foti in San Francisco on behalf of Collin Sekas.

THE COURT:  Good morning.

MR. SHIKOWITZ:  Hi.  Good morning, Your Honor; Ross Shikowitz from the law firm of Bleichmar Fonti & Auld on behalf of lead plaintiff movant John Pignataro.  I'm here with my partner Leslie Weaver and my cocounsel Ivy Ngo from The Schall

Law Firm.

THE COURT:  Good morning.

MS. BARTLETT:  Jaime Bartlett from Sidley Austin on behalf of defendants along with my colleague Chaddy Georges.

THE COURT:  Good morning.

I don't know that we'll have a lot of matters to discuss with you today, but welcome.  Thank you for being here.

Okay.  So we have the four -- I think four still-pending motions to consolidate and motions to appoint lead counsel pending before the Court.

I think obviously the folks over here are sort of the primary folks to argue that issue.  What I thought would make sense is probably to give each -- each party about ten minutes to sort of address their position and the positions of the other parties, and so that's what we'll do, and I will start -- I'm kind of going in order of reported value of financial interest at stake, so we'll start with the Afshanis, then we'll turn to Mr. Pignataro and Mr. Schneeweiss and then Mr. Sekas.  So I hope -- unless anyone has any -- is that okay with everyone as an approach to today's hearing?

Okay.  Thank you.

MR. GILMORE:  Good morning, Your Honor.  Cognizant of the Court's comments earlier, you start with the statutory interpretation.  We're here on a statute, the PSLRA.  The PSLRA states that the Court is to appoint the most adequate plaintiff

to serve as lead plaintiff, and it provides a two-step process. The first is to determine which movant has the largest financial interest in the relief sought by the class and whether that movant has made a prima facie showing that is typical and adequate.

And the Afshanis submit that they are the most adequate plaintiff. First, they have the largest financial interest in the relief sought by the class. While there are several factors the Court can view, in the Ninth Circuit the most important factor and often dispositive factor is losses. The Afshanis have suffered approximately 1.76 million in combined losses on their investments in ChargePoint Securities during the alleged class period, the longest alleged class period.

THE COURT: The longest period, right.

MR. GILMORE: Yeah.

THE COURT: I mean, I think we heard it zero out if we used the class percent set forth or negligible if you're using the class periods set forth in the original complaint, the Khan complaint, correct?

MR. GILMORE: Well, my understanding is they would have approximately 250- to this 270,000 under --

THE COURT: But no longer.

MR. GILMORE: Right.

THE COURT: -- the top financial --

**MR. GILMORE:**  Understood.

And the Afshanis have made a prima facie showing that they're adequate -- they're typical and adequate.  They're typical in that they, like other class members, will -- their claims will proceed that they suffered losses as a result of their ChargePoint securities that they purchased at artificially inflated prices, inflated by defendant's misrepresentations and omissions and they're adequate.  We put forth their highly sophisticated real estate investors. Mr. Afshani has 40 years of experience.  Ms. Afshani is a portfolio manager.  They understand the obligations of lead plaintiff.  They're dedicated to complying with that.

**THE COURT:**  Let me ask you a question about this, and this is -- as some of you know, this is -- I'm relatively new to the bench.  This is actually my first PSLRA lead counsel motion decision.  You know, one thing I've been trying to understand is what is the role of the lead plaintiff?  Is the role and do we apply the statutory text and the requirements of adequacy?  I know they're not in light of an obligation really to -- to choose lead counsel and to direct the litigation until the point of class certification.  Do we -- am I prejudging who will be a named -- you know, actually be a class representative at the time that a motion for class certification actually is filed in this case?  You know, what is the relationship between what I'm choosing now as lead plaintiff and what -- you know,

what I will choose down the road if we get to the point -- if it survives the motion to dismiss and we have a motion for class certification and I actually have to at that point -- you know, give someone the formal designation of class representative.

MR. GILMORE: Yeah. I -- I -- the lead plaintiff was enacted in order to put forward the proper people that should be the class representative. There's -- there's a presumption that those with the largest financial interests, so long as they're -- make a prima facie case of adequacy and typicality are the investor to lead the case.

The idea is that the PSLRA was adopted to address prior abuses of where cases were driven, attorney driven. And by putting forth a lead plaintiff at the initial stage who has the highest financial interest, they're going to have the -- or they're going to have the incentive to manage and direct the litigation and be at the forefront. And the idea is, is that because many of these cases the motion dismiss is so important that you want to have that investor because many -- many times these cases will get resolved earlier or prior to trial even before class certification.

THE COURT: Okay. I mean, that's -- that's interesting because I can also see -- I guess I'm not -- you know, I could see circumstances where the person best situated to lead the proceedings through a motion to dismiss and

potentially early settlement, you know, when it comes time to a contested motion for class certification, you may want, you know, a couple of class representatives.  You may want, you know -- you may want to break out instead of, you know -- I know in this instance we have common stock, short sales, option sales, you know, I could -- you know, is it -- is there -- am I -- you know, would you -- if someone is designated lead plaintiff, are they committed to being one of those class representatives or, you know, if you were chosen as lead counsel could you come in with a class certification motion that has, you know, different named -- I mean, I suppose they need to be named plaintiffs in the consolidated complaint, but what's your flexibility in terms of structuring your motion for class certification down the road?

        **MR. GILMORE:**  Yes.  There certainly is.  That's part of the authority and discretion of the lead plaintiff and lead counsel to add additional representative plaintiffs to provide additional and more robust representation.

        **THE COURT:**  Presumably that your opposing counsel would be upset if they'd never heard of the person beforehand and had no opportunity to conduct discovery on that person.

        **MR. GILMORE:**  Understood, and that's not the way typically it works.  As you mentioned, typically they're named in an amended complaint or disclosed, you know, during the course of litigation, but we would submit in this case it's --

the additional representation, unlike some other cases where you might have a lead plaintiff who moves solely with option trading and had no losses or nominal losses in common stock, maybe that would be the case.

Here the Afshanis have over $250,000 in open market stock trades irrespective of options and then have, you know, 75 percent of their bulk in options.  So they cover the full gamut.  That is the class definition of ChargePoint Securities, and they provide robust representation there.  Go ahead.

**THE COURT:**  No.  I -- I mean, I guess at the same time, though, you know, there's a question for me, you know, obviously that I know that one of the other proposed lead plaintiffs has raised -- has introduced some complaints that have been filed against Mr. Afshani as a basis for arguing that that would be a unique challenge to Mr. Afshani's ability to serve as the class representative in this case.  And I know the merits arguments on that, but I think part of the reason I was thinking about this issue is trying to think about the extent to which that would be -- you know, presumably, as plaintiff's counsel and as class counsel that you would think when it comes time to decide who you're going to put forward as your proposed class representatives, you would consider those facts among others, you know.  You'd do your due diligence on the background of any named -- proposed named plaintiff and evaluate whether that's going to provide a potential -- you

know, what method of attack to our friends on the other side of the room here.  So it does seem -- it seems like what you're telling me is that is, you know, relevant at this stage.

Now, whether they've put forth appropriate proof or what -- or what, you know, the specifics here are but you seem -- under this analysis it would be appropriate to consider, you know, whether there are facts in the background of a proposed lead plaintiff that could make them, you know, subject to a strong attack from defense counsel when we get to a, you know, contested motion for class certification.

**MR. GILMORE:**  Yeah.  And that's what the beauty of this process is.  While it's adversarial among the plaintiffs, at least you're doing it at the early stage.

We provided extensive information about our movants. Our movants are successful real estate investors.  It's not surprising that over the course of 40 years they've been involved in litigation.  They pointed to two cases.  One case had to do with a real estate property transaction with one of the movant's sister in the 1990s.  It was settled in I think 2001 and one of the stipulations in the settlement was that Mr. Afshani engaged in no wrongdoing.

The second action, again, pure allegations that -- and resolve, no judicial finding.  The typical at either the class certification or lead plaintiff stage of where a court would find it troubling is where you have a regulatory entity like

the SEC or the IRS and there's been a finding, either judicial or a consent judgment, that this individual has acted wrongfully.

Pure allegations without any kind of evidentiary support are insufficient under, you know, either class certification or by the very terms of the statute -- of the PSLRA, words they have come forward with proof, and these are just unsupported allegations.

**THE COURT:** So I think we've gone a little bit over, so I do want to give your colleagues an opportunity.

**MR. GILMORE:** Sure.

**THE COURT:** We'll hear from Mr. Pignataro's counsel next.

The other thing I did realize I wanted to say earlier but forgot to say is that I did receive a notice of the proposed settlement in the National Realtors Association real commercial litigation, which Hagens Berman I understand to be one of the proposed class counsel in that matter. I understand, at least my understanding is that this was a class on behalf of individuals who have sold homes in the last four years and that the class does not, unlike many instances, the proposed class does not exclude court officers and their employees. I have gone through the process to submit an opt-out both for myself and for my husband, so we are not members of that class.

My understanding from reviewing the material on judicial ethics is that that's sufficient to avoid any recusal obligation that might otherwise attach, but I wanted to be transparent with everyone here about the facts and that I have, you know, opted myself out of that case in order to preserve -- in order to not have an ethical obligation to recuse.  And obviously something for plaintiffs' counsel to be considering in the future, but if anyone, you know, reviews the facts and believes otherwise, they're certainly entitled to, you know, submit a motion seeking recusal on that basis.  But my best read of the judicial opinions on the issue is that that's sufficient to avoid an ethical issue.

Put that on the record.  Feel free to address it if you'd like, otherwise you can also take a look at the issue if you feel you need to come back and I won't be offended by -- if someone has a different position.

Okay.  So I'll welcome counsel for Mr. Pignataro.

**MR. SHIKOWITZ:**  Thank you, Your Honor.

So cognizant this is the Court's first PSLRA case I just want to talk about the PSLRA very quickly.

When appointing a lead plaintiff the court acts as a gatekeeper for absent class members to help ensure that they'll be adequately represented and the case proceeds as smoothly as possible from the outset with as few tangential impediments as possible.

You know, as I can gather from your questions, Your Honor recognizes that if there's a problem with a class representative later on, it will cause the Court and the parties to incur additional costs and delay and will create risks for the class.  That's why, consistent with the Court's role as gatekeeper, it has a wide amount of discretion when appointing a lead plaintiff under the PSLRA consistent with its statutory text.

So turning to what we raised in our briefing, you know, the Afshanis do claim losses that are larger than Mr. Pignataro, but that's only during the broader period, but they're not adequate for two reasons.

First, Mr. Afshani does have a documented history of engaging in fraudulent --

**THE COURT:**  I mean, but the issue with that I took as that is -- the statutory language talks about proof, you know, their requirement to provide proof.  And I think what I have are, you know, unverified complaints, so that -- you know, that's not proof.  That's -- that's, you know, these two instances where someone's been willing to file an unverified complaint, but I don't think -- you know, that wouldn't be admissible for any of the truth of the matter as a general matter, so I'm -- you know, certainly if that was the basis for a motion to have them declared -- you know, by defense counsel to have them declared inadequate, I would say they hadn't borne

their burden of, you know, even providing admissible evidence that I could consider with respect to that issue.

So why -- why is that not dispositive of thinking about this question?

**MR. SHIKOWITZ:** So just taking that in stride, when one looks to the text of the PSLRA, it use uses the word "proof." It does not use the word "prove." The PSLRA does not require judicial findings.

We cite a litany of cases in our briefing that explain this. I would suggest the Court consider the *Hecla Mining* case we cite in the Southern District of New York. There's a quotation "Many courts have rejected appointments of lead plaintiffs based on potential risks and potential credibility issues, including settlements and unproven allegations."

So there's a number of courts that have rejected appointments of lead plaintiffs based on -- based on issues like these, the *Hecla* case, the *Surebeam* case we cite to the Southern District of California and also from the Southern District of California and also the *Longtop* case, which is a Southern District of New York case, and they are just to address one of the points my friend raised from Hagens Berman. There, in the *Longtop* case that was also just allegations and a complaint. There the Court refused to appoint a movant who was alleged to have participated in a fraudulent scheme and said that whether or not the claims were eventually proven to be

true is irrelevant.

Turning quickly to the Court's point about admissible evidence, it does not need to be admissible evidence. Judge Alsup and -- I believe it was Judge Alsup in the *Networks Associates* case -- it's an older case but it was at the outset of PSLRA. Judge Alsup is a judge we look to very closely. Judge Alsup writes that "Even if this evidence were excluded at trial at this case, and it probably would be, the Court is unwilling to install an enterprise under such a cloud in a position of trust and confidence. KBC" -- which was the movant in that case -- "is otherwise preoccupied with its own legal problems," so --

**THE COURT:** I mean, I guess I take your point that there could be circumstances where the existence of a lot of complaints, a lot of legal problems, you know, is sufficient to give rise.

Now, two lawsuits filed 15 years apart, you know, of most recent of which was 8 years ago I think, you know, that -- you know, from -- I'm reluctant to think that, you know, going forward I'm going to write a decision that -- you know, and every time I see a contested motion for class certification where, you know, everything that's ever happened to a person -- in every single named plaintiff's, you know, litigation history is suddenly going to be sufficient to declare them inadequate as a class representative so, you know, there's obviously a

wide range of considerations here, you know, whether two lawsuits over a 15-year period, the most recent of which was quite a bit -- long ago is sufficient to declare someone inadequate, that seems like a dangerous position even from the position of plaintiffs' counsel who presumably wants people to be willing to continue to serve as class representatives in the future.

**MR. SHIKOWITZ:**  I understand that, Your Honor, and I know my time is limited, so I'll move to the options point right now.

**THE COURT:**  Uh-huh.

**MR. SHIKOWITZ:**  So we also discussed how the Afshanis are not adequate because they incurred the bulk of their losses on stock options.

Now, on reply, what the Afshanis essentially claim is that because the class definition covers all ChargePoint securities, including options traders, they're typical, but that misses the point.  That's not the point.

To have such a large and concentrated and unusual position and stock options, much of their trading -- they were the only people that traded that day in that option, which just shows they had a very unique strategy that defendant -- defendants are in the room here -- they know this now, you know, it's not a secret.  They'll seek to exploit it during class certification.

And one -- one point I do want to focus on is that their primary case in support of this, they focus on this -- the Afshanis focus on this on pages 8 and 9 of their reply brief is this *Musk* case.  That case actually very strongly supports Mr. Pignataro, so to the actual case citation there -- although Judge Chen appointed a movant with a relatively large loss in options, he did not address the specific issues with respect to duration, maturity and unique trading -- unique concentration and options trading that we identify here.

And the Afshanis know that the case was actually affirmed twice, once by Judge Chen on a motion for reconsideration and then once by the Ninth Circuit on a petition for writ of mandamus.  But if one looks to the actual litigation, the investors lost at trial.

And I have a news article here that summarizes information from an expert that suggests that it may have been because of the options trading.  May I share this with the Court and with counsel?

**THE COURT:**  If you -- eh, that seems questionable.  I -- you know, that the outcome of the trial is judicially noticeable.  So I can certainly, within our internal systems, find that --

**MR. SHIKOWITZ:**  Okay.

**THE COURT:**  -- and evaluate for myself, you know, whether -- how much relevance to give that, so opinions on, you

know, the outcome of trials are going to be of limited significance here.

Now, to what extent was Mr. Pignataro engaged in short selling the stock?

**MR. SHIKOWITZ:** Virtually none. He was long for 99 percent of the class period. I believe he was short only 11 days during the broader class period, and he was long, i.e., he would lose money when the stock went down over both of the corrective disclosures. So he was just like every other investor.

You know, typically the issue with short sellers is when the stock price drops, the short seller will actually make money. That was not the case for Mr. Pignataro here.

**THE COURT:** Okay. Okay. Thank you.

**MR. SHIKOWITZ:** Thank you very much.

**THE COURT:** I'll hear from counsel for Mr. Schneeweiss.

**MR. LINEHAN:** Thank you, Your Honor. I would just like to start by pointing out this facet of the PSLRA: When it comes to rebutting the presumption that those with higher -- with larger losses are the most adequate plaintiff, the statutory language is that there must be proof that they're subject to a unique defense, not proof that that defense will ultimately be effective.

And the cases that we've cited in our briefs that look

at this issue, they're concerned with whether this unique defense will become a distraction at class certification or trial.  If there's proof that there will be a distraction, I mean something that the defendants can exploit, that distracts from other central class-wide issues and they're not an appropriate lead plaintiff at the outset, they're not the most adequate plaintiff at the outset.

**THE COURT:**  I mean, this is where I was struggling a little bit because, you know, that -- they're, you know -- you could see -- again, you could see someone who's incredibly adequate to lead the litigation through to the point of a -- through the briefing on a motion to dismiss, you know, filing of a consolidated complaint, a briefing on a motion to dismiss. You could also see -- but also say probably they will decide with their counsel in the best interests that, you know, we have three cleaner people who we will put forth as our named plaintiffs for purposes of class certification and, you know, that would be the right decision.  And how much I have to make this decision now as opposed to sort of focusing on what they -- their real job, which is going to be leading this case through to the point of a motion for class certification and presumably, you know, most importantly doing an adequate job of providing class counsel -- lead counsel and preparing a consolidated complaint opposing the presumed motion to dismiss that will follow and, you know, potentially engaging in

preclass certification settlement negotiations in a manner that will protect the absent class members, I mean, you know, by focusing on -- primarily it seems to me -- there's an argument at least -- that the focus really should be on their adequacy and in those steps of the process.

**MR. LINEHAN:**  Yeah, so the PSLRA does kind of direct the Court to look at class certifications early on a preliminary basis.  That's why the PSLRA, you know, has you look at adequacy and typicality.

And the rebuttal is, you know, is there -- are they going to be subject to unique defenses, you know, usually regarding typicality or adequacy, because I think the eye here of the -- or what the PSLRA is looking to the future, they want the class representative to be, you know, certified as a class representative -- or they want the lead plaintiff to be certified as a class representative down the line.

**THE COURT:**  I mean, I guess you could -- the other thing you could say -- I mean, this is the point is that the -- you know, is it more important not to consider the kinds of things that, undoubtedly, will get raised, you know, by defense counsel in opposing a motion for class certification on adequacy and typicality?  Is it more important to focus on the kinds of unique defenses and risks that would, you know, undermine or -- class members interests when it comes to preparing a consolidated complaint, when it comes to opposing a

motion to dismiss, when it comes to, you know, engaging in the possibility of preclass certification settlement negotiations.

I mean, that -- yeah, I could see an argument that that's the most important kinds of unique defenses that I -- that would be at issue would be the ones that really would draw -- and adequacy and typicality that would really, you know, lead me to question -- to have concerns about how this person is going to operate in those phases and to ensure that they are protecting -- you know, doing their fundamentally role, which is representing absent class members and not just their own interests.

**MR. LINEHAN:** Sure.  I'm trying to think back to other cases.  There have been cases where lead plaintiffs are -- for whatever reason don't -- don't go through to class certification.  I think oftentimes courts will at that point reopen the lead plaintiff appointment process and not simply, you know, accept the clients that the now absent lead plaintiff presents as these should be the lead plaintiff -- the new class representatives, so I think that, you know, the PSLRA is trying to avoid that by selecting someone at the outset that would be --

**THE COURT:** But it doesn't -- I have looked.  I mean, I wasn't -- you know, I obviously went to the statute myself to figure this out and it doesn't -- as far as I can tell, there's nothing that says this person will be a class representative

that -- you know, for purposes of Rule 23 when -- if and when such a motion is filed.

MR. LINEHAN:  Right.  So just moving down to then some issues with the Afshanis and Pignataro, there actually is an issue with the Afshanis that would be an issue even before class certification, which was implicit in this class period dispute between Mr. Sekas and the Afshanis, which is -- but the Afshanis don't have any purchases within that shorter period, so if we were to reach a point in the case where the class period were narrowed on a motion to dismiss, they would not have standing at that point.  And I think typically there that the lead plaintiff appointment process would be reopened or that's usually a prudent thing.  And that's even before class certifications.  So that's kind of a defense that applies to them, doesn't apply to any of the other lead plaintiff applicants here today.  It doesn't apply to many --

THE COURT:  No.  I think they suggested there were losses in the class period, but I guess it's -- I mean, what's -- there was a difference of opinion as to that issue as I understood, because I asked about that issue.

MR. LINEHAN:  Yeah.  Even if they had losses in that earlier period, it's -- you know, I have to check that.

THE COURT:  Okay.

MR. LINEHAN:  Now as I stand I'm not -- I thought the answer was that they didn't have any losses in the larger

period, but they said otherwise.  I might have to double check that I'm looking at that correctly.

**THE COURT:**  Okay.

**MR. LINEHAN:**  Either way, though, even if that -- I think that they did at least admit to having smaller losses in the shorter period, in which case you would then have a lead plaintiff going forward who has the smallest financial interest of the applicants.

And then with respect to their options trading and this previous litigation, while you may not disqualify them based on the previous litigation, the character of the class representative is going to be an issue, it is something that can be looked into by defendants and it's going to become a sideshow and a distraction as the case moves forward, and that would be a basis, at the outset, to disqualify them.

With respect to Mr. Pignataro, he didn't sell shares short, as I read his certification.  He purchased shares, held them to the first disclosure, sold them after the first disclosure, sold short massively then went back to zero, sold short massively again, went back to zero and then on November 3rd massively brought and sold, probably bought then sold -- I think it's not clear in which order the buys and sells happened, but this is -- this type of trading behavior is consistent with the other case law, with the case law that we've cited.  This is short selling.  And what you'll see in

some of the case law like the *Draft Kings* decision we cite, though I should say this type of short selling and day trading which was that -- he was doing on November 3rd would be disqualifying.

Mr. Schneeweiss is the only applicant that is not -- that is not subject to any unique defenses. He purchased during the class period, the short class period, held through both corrective disclosures.

There was some argument as to his adequacy. Mr. Sekas was demanding that he provide more information about himself beyond his occupational status and his investing experience in his initial motion. Our position is that that's not required at this early stage. The PSLRA requires the certification, not more than that.

We did provide more in the motions so they could look him up if they wanted to and provide any unique defenses they think would apply. They didn't. They just said that he didn't provide enough information, they wanted more information, so Mr. Schneeweiss provided a declaration attesting to his adequacy and with his reply. That's at docket 61- or 65-1.

And if the Afshanis and Mr. Pignataro are eliminated, Mr. Schneeweiss is next in line for appointment as lead plaintiff. And we think since they should be disqualified, Mr. Schneeweiss should be appointed.

THE COURT: Thank you. I will hear from counsel for

Mr. Sekas.

**MR. ABADOU:**  Good morning, Your Honor; almost afternoon.  It's been a long morning.  May it please the Court.

Your Honor, your instincts about the role of a lead plaintiff are right on point.  The last thing the Court wants is to go through this pros, pen an opinion, go through the motion to dismiss stage, as you suggested.  The case survives or survives in part.  You get to class certification and you have to start all over again.  That's the last thing the Court wants and so the role of a lead plaintiff is to be the most capable representative for the class.  That's the language the statute uses, that's the language that the PSLRA uses.  And what Congress did in enacting the PSLRA over Bill Clinton's veto, President Clinton's veto in 1995 was say:  We're going to use these factors to determine who's most capable of adequately representing the class; who is the most adequate plaintiff.  And it has two standards in the PSLRA, the largest financial interest in the relief sought by the class, which, by the way, Congress didn't define, right?  So courts have used different approaches, and we discuss these in our papers.  Loss is certainly one of them.  But retained shares or net shares purchased has been adopted by numerous courts in this district.  Judge Patel in *Verifone*; Judge Orrick, the Senior Judge Orrick, in *Critical Path*; Judge Alsup in *Network Associates*; and most recently, I think Judge Chen in *Impax Labs*, which has just a

very elegant, robust discussion of why retained shares should be used instead of losses for this proxy to determine who's most capable of adequately representing the class.

In the short class period, I don't think anybody disputes that Mr. Sekas, by far, has the most retained shares.

In the longer class period, Mr. Sekas has the most retained shares after what we view as the highly atypical and inadequate Afshani Group.  The Afshani Group should be completely out of the running in this case.  They were long, they were short, but most importantly they invested -- the vast majority of their investments were in options, which is going to provide a prize target for defense counsel to completely derail this litigation at class certification were the Afshanis appointed.

Leaving aside the Court's kind of "meh" perspective on the fraud allegations, that's what should trouble the Court the most about the Afshanis is their huge investment in options. And if you eliminate that investment in options or those losses in options, they fall towards the bottom.

So while I was last, Your Honor, my client was last here, I think based on the authorities that we cited on retained shares, it should have been Collin Sekas first, Mr. Schneeweiss second and then the atypical Afshani Group and potentially inadequate Afshani Group and Mr. Pignataro also who engaged in short selling and who is also a net seller I think

are disqualified.  And so what the -- I'm sorry.

**THE COURT:**  May I just questioned -- you know, you've cited -- there was a couple of SDNY opinions about this option being, I think, kind of exclusively options.  You know, there's a difference between exclusively in options and primarily in options, but I didn't understand.  There was no reasoning that accompanied that.  It was just set forth, posited --

**MR. ABADOU:**  Sure.

**THE COURT:**  -- as disqualifying.  So what is it?  I mean, I could understand if someone was substantially short on a stock, you know, I could understand the conflict created by saying, "Look, you took the position that you would benefit."  Now, maybe you inadequately estimated how much you should short it and so you still ended up losing --

**MR. ABADOU:**  Sure.

**THE COURT:**  -- but -- but you had taken -- you had bet on this stock losing value, you know.  The claim in this case is about the negative impact on the stock's value as a result of this, you know, omissions or fraudulent statements.  So I can see how that's a conflict.

How does option -- I mean, is it just that instead of -- instead of relying on -- you know, the direct reliance on the market to price it that there's -- you have to sort of figure out a relationship between the market?  Presumably the market is still informing the price of the options, it's just a

little bit less direct.  Is it solely that?

        **MR. ABADOU:**  It's not, Your Honor --

        **THE COURT:**  Okay.

        **MR. ABADOU:**  -- and it's a great question.

        So options are contracts -- okay? -- so you have an investor, like Mr. Sekas, who buys on the open market, prototypically typical and adequate.  He hasn't been attacked for any reason in terms of his typicality and adequacy.  He bought and hold -- held and was long, the company stock.

        You're correct.  A short seller, on the other hand, is betting that the company's share price is going to go down, which is why courts, including many courts in this district, have held that short sellers just shouldn't be appointed lead plaintiff.  Again, defense counsel are going to have a field day with a short seller, even a moderate short seller, at class certification.

        **THE COURT:**  Maybe I should ask them this question. They may be the best situated to explain the inadequacy of all of these folks.

        **MR. ABADOU:**  Yeah.  I mean, this is always probably the best part of litigation for defense counsel.  They get to watch us plaintiffs' lawyers attack each other and their clients and so I think Ms. Brody would agree with what I'm saying.

        **THE COURT:**  Okay.

**MR. ABADOU:** And I personally wouldn't put forward a short seller as a potential lead plaintiff because of the risk to the absent class members.

But with respect to options, probably the best place to start, Your Honor, in thinking about options and why options are such a peculiar security is the end of the case. At the end of the case when you hopefully resolve the case or you get through trial, get a jury verdict, you get to the question of damages and how to allocate damages to the class.

And I can tell you, and I think counsel will confirm, that in a plan of allocation at settlement, options are the most difficult kind of conversation that you have with your damages expert because it's almost impossible to pin down and figure out precisely how much an options holder -- leaving aside one that's long and short and all over the place like the Afshanis -- what the reliance issue is. Do they rely on the integrity of the market? The maturity date? The volume?

All these things that go into the concept of damages are, I wouldn't say, anathema to options but make it very, very, very difficult to conceptualize how much you actually lost and suffered damages with respect to options because it's not an open market purchase. You bought for 50 bucks, you sold for 25. The math is relatively straightforward.

You know, with an option you're not buying on the market. You're in between two people buying and selling

contracts to kind of guess at, you know, whether the stock's going to go down, whether it's going to go up. And I think for the Afshanis, they've done both. I think they were straddling. So it makes it even more complex and more atypical to invest or to appoint an investor who's both long and short. There's a tension there and there's a conflict there that will be exploited down the road. And so I think as the Court tries to consider what to do here, the most important issues are as follows in our view: One, how is the Court going to define financial interest? Is it going to just use losses as it did to kind of structure this hearing, or is it going to focus on retained shares? And I urge the Court to read Judge Chen's *Impax* decision because there he squarely addresses an argument that some of my friends made about retained shares, which is that you've got to have a constant fraud premium throughout the class period.

In other words, you can't use the retained shares analysis if there's been a partial disclosure, and one was pled in the Khan complaint, also the Smith complaint, and he rejects that and says it's far too speculative at this point for me to make that decision, and so I'm going to use retained shares, that's the majority position in this district and I think it should be outcome determinative.

And I think the decisions that we cited on retained shares really give you a sense of why that matters. It matters

because you're holding shares at the end of the class period through the final fraud disclosure.  That person who's holding the bag at the end of the class period has the most to gain from the lawsuit.  So while the -- while the PSLRA doesn't --

**THE COURT:**  I guess the problem what I'm trying to think about is it creates a different problem, though, which is, you know, especially where you do have two -- partial disclosure and the final disclosure, you know, there -- presumably there are some people who are long on the stock before that and short after that.

**MR. ABADOU:**  Sure.

**THE COURT:**  I mean, and it's -- you know, is someone who did not respond to the initial disclosure actually able to be an adequate representative from those who did?  I mean, there's a conflict there, right?

**MR. ABADOU:**  There is, but it's one that the lead plaintiff and counsel -- in this case I think it should be Mr. Sekas and my firm -- have fiduciary duty to those absent class members to make sure they're protected at class certification.

So if I got to a point in preparing a consolidated complaint on behalf of the class and that survived, at class certification we have a fiduciary duty to make sure that all class members are represented, including options-holders -- right? -- so we --

**THE COURT:**  That's the other question I wanted to ask because, I mean, this is -- is this really an argument against the certifiability of a class that includes options-holders?  I mean, is that -- is that what the argument is going more to rather than really going to an argument about --

**MR. ABADOU:**  No.

**THE COURT:**  You know, I'm not -- again, what is -- it's -- I'm trying to imagine down the road the fact that the Afshanis are options-holders and what is that going to do to -- on adequacy or typicality.  I mean, they would say, no, make some -- they actually cover a number of different categories as opposed to just one of the categories within the class. They're sort of unique in that sense.

**MR. ABADOU:**  Right.

**THE COURT:**  But if the problem is that it's just inevitably individualized to focus on their damages, you know, that then that -- or if you have a case where, you know, they do have common market purchases here so that the standing issues aren't as complicated as they might be in the absence of that, but how does it still come in at the class certification hearing?

**MR. ABADOU:**  So I think -- I think it looks much like this, Your Honor, which is, you know, instead of another plaintiff's lawyer, you're going to have defense counsel making these arguments -- right? -- and so your instincts are right.

Better to do this now than do it now incorrectly and have to fix it down the road. And -- and I think the best way to think about it is, you know, anybody who's appointed in this case is going to bring this case on behalf of all securities, which includes options, including Mr. Sekas.

What you don't want is the leadership of the class to be somebody who's subject to these attacks. You want the leadership and the lead plaintiff, in other words, to be the most -- to quote you earlier, the cleanest of the proposed applicants to run this case; otherwise, you're just providing defendants a prize target to attack those options down the road, but if I understood --

**THE COURT:** So I -- what is the attack? Is it typicality?

**MR. ABADOU:** It's a typicality attack, correct.

The adequacy attack would be the one that you weren't moved by that -- I think a Pignataro raised defense about Afshanis, these lawsuits. This is a typicality attack, but it's also a subject to unique defense attack. Is this going to be -- is the investor who's long and short, has options and stock, you know, going to be subject to unique defenses that a prototypical investor, like Mr. Sekas, who bought on the open marketing and held is not going to be.

And you asked --

**THE COURT:** I guess the problem on that front, what's

confusing me, is like the class -- the proposed class as it stands includes these folks -- right? --

**MR. ABADOU:**  Correct.

**THE COURT:**  -- so it's not unique.  This is -- presumably they're taking notes and presumably if -- whether we have a certified class or an un -- both unclass certification. And if we certify a class that includes these people, presumably we'll see a summary judgment motion on this issue. I mean, so like I'm -- you know, I'm not sure -- it's unclear to me exactly what -- how it should play out.

**MR. ABADOU:**  It will be up to the Court to decide how to define the class based on the arguments that are raised at class certification.  It will be up to the Court to make that determination at that point.

What the Court wants to avoid --

**THE COURT:**  But I guess it's sort of -- and say if I -- say they make a really compelling argument and that this is only common stock purchasers are included in the class.  I mean, they -- they -- at least as we understand it now, the Afshanis would have standing to serve as those class representatives, correct?

**MR. ABADOU:**  All the plaintiffs here would have standing --

**THE COURT:**  Standing.

**MR. ABADOU:**  -- to represent -- whether they bought

options or not to represent options-holders.  That's not the question.

To the extent that there was an issue, Your Honor -- and you touched upon this earlier -- if Mr. Sekas was appointed -- again, he has fiduciary duty to the entire class, so if we needed --

**THE COURT:**  As all would.

**MR. ABADOU:**  Sure.

**THE COURT:**  As anyone who's certified here will.

**MR. ABADOU:**  So I need to add -- and I think this was your confusion earlier is what's the difference between a named plaintiff, a lead plaintiff and a class rep?  And this is an issue courts have struggled with because Congress didn't provide much guidance on this in the PSLRA.  But I can tell you from practical experience, over 20 years of practical experience doing this, the lead plaintiff will be put up as the class rep.

If there were, for instance, bonds in this case, which is, you know, kind of another unique security, I would have a responsibility to name a class representative or a named plaintiff on the complaint who had purchased bonds to deal with that standing issue.

All of this will be resolved and resolved for the benefit of the class I think, but the problem is -- and this is why this part of the process is adversarial and important is

you want the best, most adequate plaintiff now; not somebody who's short, not somebody who's subject to unique defenses, not somebody who's arguably atypical, you want the cleanest investor possible, and that's Mr. Sekas.

My last point, Your Honor, is -- and I think you're going to have to struggle with this issue, but I have two cases that I think are really helpful. One is from Judge Scheindlin in the Southern District of New York in a case called *Center Line*. I'm trying to think of the name of the other case. Oh, it's *Gelt Trading*, Your Honor, and they're cited in our papers -- is this issue of the class period.

The first case was filed here on November 29th, 2023, the Khan case. Counsel for the Afshanis then wait almost 60 days -- 55 days I think it is -- to extend the class period. It makes no sense why they would extend it backwards. If there had been another disclosure going forwards, I would understand why you would extend the class period out, but what changed to have them take the class period back in time a year and a half? I'll tell you what changed: They were contacted by the Afshanis. The Afshanis didn't have a significant loss in the short class period so they extended it and -- and I just want to put this in the record, Your Honor, because you should be curious about it. Was the class period here manipulated in order for a lead plaintiff applicant and their counsel to be appointed?

And the citation, Your Honor, is ECF271 at 7.  They took the class period back to December 7th, 2021.  Guess when the Afshani's first purchase was?  The next day, December 8th.  That's why they extended the class period.  Is it possible that you could take the class period back?  Sure.  But possible is not the standard; plausible is the standard, and there is absolutely nothing in the Smith complaint, nothing, to justify this extended class period.

The only thing you have is not an allegation that's plausible and must be accepted as true, Your Honor, is you have arguments from counsel in their brief as to why they extended the class period back.  But think about that --

**THE COURT:**  I did take a look at that, and they do identify statements that --

**MR. ABADOU:**  In their brief.

**THE COURT:**  No.  I thought I looked at the complaint and I saw an identification of statements that fell within the extended class period that they -- and were either misleading -- that were false or that contained fraudulent omissions.  I mean, that's --

**MR. ABADOU:**  Sure.

**THE COURT:**  -- the standard -- right? -- and we can -- we'll have the motion, presumably, if this is included in the consolidated complaint down the road.  We'll have a motion to that effect about the sufficiency of those from defense counsel

but --

**MR. ABADOU:**  If it's an adequacy argument, Your Honor, why are they focused on the Afshanis?  And if you're right that the arguments -- or some of the statements were similar -- and we dispute that -- why not take it back further?  Why not take it back to March where I looked at the press releases and I looked at the cues.  They could have taken it back to March 2021.  Why not?  Take it all the way back.

**THE COURT:**  I mean, maybe we'll do that.  You know, maybe whoever is appointed will do that.  I mean, you know, obviously this all happens extremely fast so I don't know.  I'll take a look at the decisions that you've cited, so --

**MR. ABADOU:**  All right.  Thank you, Your Honor.

**THE COURT:**  Thank you.

So I will take the motions under submission.  I don't think I've got a filing, but I'll say it did not appear there was an opposition to the motion to consolidate from defense?  Okay.  So I will be granting the motion to consolidate.  I will take the motion to appoint lead counsel under submission and will issue a written decision forthwith.

I know that there is also now before me a motion -- administrative motion to relate to derivative actions that have been filed.  I will not rule upon that, at the very least, until there has been -- the deadline for opposition has passed.  I don't know if we'll see any oppositions, but I will wait

that -- until that time and will then take -- decide that motion after full briefing is before me.

I don't think there's anything else we need to do today, so the motion is under submission.  We'll issue a decision soon.  Thank you.

(Concluded at 11:51 a.m.)

--oOo--

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____        March 25, 2024
JENNIFER L. COULTHARD, RMR, CRR                DATE
Official Court Reporter
CA CSR#14457