1    Lucas E. Gilmore (SBN 250893)11214
     Reed R. Kathrein (SBN 139304)
2    HAGENS BERMAN SOBOL SHAPIRO LLP
3    715 Hearst Avenue, Suite 300
     Berkeley, California 94710
4    Telephone: (510) 725-3000
     Facsimile: (510) 725-3001
5    lucasg@hbsslaw.com
     reed@hbsslaw.com
6

7    *Lead Counsel and Counsel for Lead Plaintiffs*
     *Shahram Afshani and Paulina Afshani Schwartz*

8                    **UNITED STATES DISTRICT COURT**
9                  **NORTHERN DISTRICT OF CALIFORNIA**

10

11   FAROOQ KHAN,                        Case No. 5:23-cv-06172-PCP

12                    Plaintiff,         **FIRST AMENDED CLASS ACTION**
                                         **COMPLAINT FOR VIOLATIONS OF**
13        v.                             **THE FEDERAL SECURITIES LAWS**

14   CHARGEPOINT HOLDINGS, INC., et al.,
                                         **DEMAND FOR JURY TRIAL**
15                    Defendants.

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                          Case No. 5:23-cv-06172-PCP

**TABLE OF CONTENTS**

<u>Page</u>

I. INTRODUCTION ............................................................................................ 1

II. JURISDICTION AND VENUE ...................................................................... 6

III. PARTIES ........................................................................................................ 7

    A. Lead Plaintiffs ..................................................................................... 7

    B. Corporate Defendant ........................................................................... 7

    C. Executive Defendants........................................................................... 7

IV. FORMER CHARGEPOINT EMPLOYEES .................................................. 10

V. SUMMARY OF FRAUD .............................................................................. 11

    A. ChargePoint and Its Business.............................................................. 11

    B. ChargePoint Misrepresented and Concealed the Effects of Supply
       Constraints from the Beginning ........................................................... 15

       1. ChargePoint faced severe supply constraints........................... 15

       2. Executives were informed that outsourcing to Mexico
           hindered ChargePoint's ability to complete orders.................... 16

       3. ChargePoint provided false assurances on supply chain
           issues. ....................................................................................... 17

    C. ChargePoint's False and Misleading Financial Reporting.................... 18

       1. ChargePoint violated revenue recognition rules. ..................... 20

       2. ChargePoint used resellers to sell chargers before customers
           were ready to receive them. ...................................................... 25

    D. ChargePoint Improperly Accounted for Its Inventory .......................... 26

    E. ChargePoint's Decision to Outsource Accounting to India Severely
       Disrupted Its Operations ...................................................................... 28

    F. The Executive Defendants Profited Off of ChargePoint's
       Artificially Inflated Stock Price by Engaging in Massive Insider
       Sales During the Class Period ............................................................... 30

VI. MATERIALLY FALSE AND MISLEADING STATEMENTS MADE
    DURING THE CLASS PERIOD .................................................................. 30

    A. Defendants' False Statements Associated with the Announcement
       of ChargePoint's Q3 2022 Financial Results ....................................... 31

B.  Defendants' False Statements Associated with the Announcement of ChargePoint's Q4 2022 Financial Results ........................................ 34

C.  Defendants' False Statements Associated with the Announcement of ChargePoint's Q1 2023 Financial Results ........................................ 37

D.  Defendants' False Statements Associated with the Announcement of ChargePoint's Q2 2023 Financial Results ........................................ 39

E.  Defendants' False Statements Associated with the Announcement of ChargePoint's Q3 2023 Financial Results ........................................ 42

F.  Defendants' False Statements Associated with the Announcement of ChargePoint's Q4 2023 Financial Results ........................................ 45

G.  Defendants' False Statements Associated with the Announcement of ChargePoint's FY 2023 Financial Results ........................................ 46

H.  Defendants' False Statements Associated with the Announcement of ChargePoint's Q1 2024 Financial Results ........................................ 47

I.  Defendants' False Statements Associated with the Announcement of ChargePoint's Q2 2024 Financial Results ........................................ 50

VII.  THE TRUTH EMERGES ........................................................................ 51

A.  September 6, 2023: ChargePoint Discloses Revenue Deceleration and $28 Million Inventory Impairment Charge ..................................... 51

B.  November 16, 2023: ChargePoint's Pre-Announcement of Certain F3Q24 Results; Executive Leadership Changes ..................................... 56

C.  Post Class Period Events: Materialization of Defendants' Fraud ........................ 59

VIII.  ADDITIONAL ALLEGATIONS OF SCIENTER ............................................. 62

A.  Defendants' Motive and Opportunity to Commit the Alleged Fraud .................. 63

1.  ChargePoint's executive compensation supports scienter. ....................... 63

2.  The Executive Defendants' insider sales during the Class Period were unusual and suspicious in both timing and amount ........................................................................... 66

IX.  THE INAPPLICABLITY OF THE SAFE HARBOR PROVISION ............................... 69

X.  APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ....................................................... 70

XI.  CLASS ACTION ALLEGATIONS .................................................................... 72

XII.  UNDISCLOSED ADVERSE FACTS .................................................................. 73

XIII.  CAUSES OF ACTION .................................................................................... 74

COUNT I  VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND
    RULE 10B-5(B) PROMULGATED THEREUNDER (AGAINST
    CHARGEPOINT, ROMANO, AND JACKSON)............................................... 74

COUNT II  VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND
    RULE 10B-5(A) AND (C) PROMULGATED THEREUNDER
    (AGAINST ALL DEFENDANTS) ....................................................................... 76

COUNT III  VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT
    (AGAINST THE EXECUTIVE DEFENDANTS, DEFENDANTS
    ROMANO AND JACKSON)............................................................................... 78

XIV.    PRAYER FOR RELIEF .................................................................................... 79

XV.     JURY TRIAL DEMANDED ............................................................................. 79

Lead Plaintiffs Shahram Afshani and Paulina Afshani Schwartz, by and through their undersigned counsel, bring this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all other persons or entities who purchased or otherwise acquired securities of ChargePoint Holdings Inc. ("ChargePoint" or the "Company") during the period from December 7, 2021, to November 16, 2023, inclusive (the "Class Period") and were damaged thereby (the "Class"). Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the ongoing independent investigation of their undersigned counsel, including from the following sources: (i) ChargePoint's public filings with the SEC; (ii) research reports from securities and financial analysts; (iii) Company press releases and reports; (iv) Company website and marketing materials; (v) news and media reports concerning the Company and other facts related to this action; (vi) price and volume data for ChargePoint securities; (vii) consultation with subject matter experts; (viii) accounts from former ChargePoint employees; and (ix) additional materials and data concerning the Company and industry as identified herein.

## I.    INTRODUCTION

1.    This securities fraud class action arises from Defendants' misleading statements concerning ChargePoint's effective management of its supply chain, sustainable revenue growth, and the value of the Company's inventory.

2.    ChargePoint provides networked solutions for charging electric vehicles, including the ChargePoint cloud subscription platform and charging hardware. ChargePoint claims its goods and services are designed for an array of charging scenarios from home to workplace, parking, hospitality, retail, and transport fleets of all types. Just months before the Class Period, on March 1, 2021, ChargePoint went public via a Special Purpose Acquisition Company ("SPAC") transaction.

3.    Throughout the Class Period, ChargePoint emphasized its ability to successfully manage post-COVID-19 pandemic supply constraints and deliver "outstanding" revenue growth,

often meeting or exceeding the Company's quarterly and annual guidance. Defendants attributed the accelerating revenues to organic factors such as the "growth in charging demand from accelerated EV adoption."[1]

4.      In truth, however, ChargePoint was hiding severe supply chain constraints caused not only by the pandemic, but also by ChargePoint's nearshoring of certain manufacturing operations to Mexico and overseas outsourcing of its accounts payable operations to India. ChargePoint's changing of these practices resulted in a spiral of adverse impacts on the Company's business never disclosed to investors, including production delays, strained supplier relationships, increased supply costs, order backlogs, inability to satisfy existing customer orders, loss of customer contracts, and fines.

5.      Given these severe undisclosed supply constraints, ChargePoint had no legitimate way to meet the lofty financial projections given to the market and maintain sequential 75%+ quarter-on-quarter revenue growth. So, Defendants did what fraudsters do: they cheated. ChargePoint secretly engaged in a practice of improperly recognizing revenue early to artificially inflate ChargePoint's reported revenue and other dependent financial metrics.

6.      Statements from multiple former ChargePoint employees (five overall) detail the brazen improper revenue recognition practices conducted at quarter end during the Class Period at the direction of ChargePoint management. For instance, ChargePoint routinely shipped out chargers to customers who had pre-ordered the product, but had not yet authorized delivery of the chargers. FE-1, a former Sales Operations Specialist, stated that ChargePoint shipped out all pending orders in the summer and fall of 2022, including orders that should not have been released, to recognize revenue prematurely. FE-2, a former Sales Manager, reported that ChargePoint shipped products to vacant lots and construction sites not ready to receive them, and sent out incomplete or incorrect chargers, solely to recognize revenue.

7.      To make matters even worse, former employees discussed a pattern of ChargePoint shipping incomplete or inoperable chargers to prematurely recognize revenue, despite knowing the

---

[1] *See* March 2, 2022 ChargePoint earnings call (statements by CEO Pasquale Romano).

chargers could not be used by customers in that condition. FE-2 stated that ChargePoint shipped out "charger shells without complete components" to recognize revenue, knowing they would be returned. FE-2 described this as creating "a nightmare of accounting problems, invoicing, and returns." FE-3, a former East Region Account Executive, corroborated this, stating that starting in the second half of 2021, ChargePoint "prematurely recognized revenue and shipped out empty charger frames to end user customers, without the internal components or charging modules installed, which rendered the unit unusable." FE-3 estimated that, based on FE-3's knowledge alone, there were more than 20 to 30 empty frames valued around $30K each shipped nationwide.

8.      The scale of ChargePoint's fraudulent practices was material. For instance, FE-1, the Sales Operations Specialist, estimated that roughly between $1 million to $5 million of product from the orders FE-1 was responsible for were improperly released for shipment in a single quarter. FE-2 stated that millions of dollars of product were returned every quarter by customers due to improper shipments. The duration of the scheme was similarly substantial. According to FE-2, **_only when rumors of the lawsuit and articles began circulating were ChargePoint employees told to stop shipping partial and on hold orders_**.

9.      Apart from falsely reporting revenue and engaging in unsustainable sales practices with its channel partners, during the Class Period ChargePoint also materially overstated the value of its inventory. Former employees confirmed that in early 2023, ChargePoint knew that it had purchased excess numbers of CPE Charger 250 models and that there was not a sufficient demand for these chargers. In violation of its own inventory policy, which requires a write down to their "net realizable valuable if they have become obsolete, have a cost basis in excess of expected net realizable value, or are in excess of expected demand," ChargePoint failed to timely write down the inventory "at the point of loss recognition." To the contrary, in response to inquiry in June 2023 on the very issue, Defendant Jackson lied to analysts by saying that that the Company had made significant progress over the last year in addressing inventory issues caused by COVID-19 supply constraints and was "well past the worst of it."

10.      As all such practices often end, however, ChargePoint's improper revenue recognition, changed sales practices, and inventory valuation were unsustainable and could only

conceal poor revenues and declining product demand for so long. On September 6, 2023, after the market closed, ChargePoint reported its second quarter fiscal year 2024 financial results, including decelerating revenue growth and a "$28.0 million, or 19 percentage point, inventory impairment charge." Consistent with the former employees' accounts concerning the over procurement of the CPE Charger 250 chargers, the Company stated that the "inventory impairment charge was taken to address legacy supply chain-related costs and supply overruns on a particular DC product." As a result, the Company reported a second quarter GAAP gross margin of 1%, down from 17% in the prior year's same quarter.

11.     On this news, the Company's share price fell $0.77, or 11%, to close at $6.29 per share on September 7, 2023, on unusually heavy trading volume. The stock continued to decline the following day, closing at $5.72 on September 8, 2023.

12.     Then, on November 16, 2023, after the market closed, ChargePoint pre-announced its third quarter results, which included an additional $42 million inventory impairment charge, expected negative gross margins of 21-23%, and revenue of only $108-113 million (compared to previous guidance of $150-165 million). As a result, the Company expected to report "GAAP gross margin of negative 23% to negative 21%."

13.     Coinciding with the November 16, 2023 disclosure of poor financial results and significant inventory impairment charges, ChargePoint announced the immediate departures of Defendants President/Chief Executive Officer Pasquale Romano and Chief Financial Officer Rex Jackson. The Company failed to provide detailed reasons for the abrupt leadership change.

14.     On this news, the Company's share price fell $1.11, or 35%, to close at $2.02 per share on November 17, 2023, on unusually heavy trading volume. In total, from its Class Period high of $9.78 on June 7, 2023, to its post-disclosure low of $2.02 on November 17, 2023, ChargePoint's stock price declined by approximately 79%, wiping out hundreds of millions of dollars in market capitalization.



15.     Defendants had several motives to commit fraud and hide the truth from investors. After going public and throughout the Class Period, ChargePoint changed its executive compensation structure to pay the Executive Defendants primarily through ChargePoint equity. As a result of the lucrative stock-option-heavy compensation offered by the Company, the Executive Defendants were highly motivated to artificially inflate the price of ChargePoint stock by making false and misleading statements. The Executive Defendants then capitalized on stock option compensation by engaging in significant insider trading during the Class Period, benefiting from ChargePoint's artificially inflated stock price. Defendant Romano sold 1,175,802 shares (20% of his holdings) for over $14 million and CFO Jackson sold 670,269 shares (over 23% of his holdings) for $4.6 million. These sales coincided with the inflated stock price before the truth was revealed and were inconsistent with the Executive Defendants' light prior trading histories before the Class Period. As noted from their statements, Defendants were driven to inflate revenue and meet growth targets to maintain investor confidence, especially crucial as ChargePoint had recently gone public via a SPAC merger. Defendants also sought to present ChargePoint as a market leader in the rapidly growing EV charging industry to attract customers and maintain a competitive edge.

16.     ChargePoint's false narrative of the "inevitability" of EV growth, and its executive's self-serving interest in pushing this narrative, was captured by *The Motley Fool*'s assessment on October 13, 2023, which observed ChargePoint's insiders "heading for the exits" before disclosing the truth:

### 3. Its insiders are heading for the exits

> During ChargePoint's last conference call, Pasquale Romano said he remained confident in the company's future because the "conversion of the world's vehicle fleet to EVs remains inevitable, as does the need for infrastructure to charge them." Yet, over the past 12 months, ChargePoint's insiders have sold 10 times as many shares as they bought. Over the past three months, they dumped 7 times as many shares as they bought. That's not a good look for a stock that has already lost nearly three-quarters of its value over the past 12 months.[2]

17.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and other Class members have suffered significant losses and damages. By this action, Lead Plaintiffs seek redress for losses they and other ChargePoint investors suffered after purchasing securities during the Class Period at artificially inflated prices.

## II.     JURISDICTION AND VENUE

18.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in

---

[2] "3 Red Flags for ChargePoint's Future," *The Motley Fool* (Oct. 13, 2023), available as of July 19, 2024 at https://www.fool.com/investing/2023/10/13/3-red-flags-for-chargepoints-future/.

substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

21.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

### A.    Lead Plaintiffs

22.    Lead Plaintiffs Shahram Afshani and Paulina Afshani Schwartz, as set forth in their previously filed certifications (ECF No. 27-1), incorporated by reference herein, purchased ChargePoint securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B.    Corporate Defendant

23.    Defendant ChargePoint is incorporated under the laws of Delaware with its principal executive offices located in Campbell, California. ChargePoint's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "CHPT." As of December 1, 2023, ChargePoint had approximately 418 million shares of stock available for trading, owned by at least hundreds or thousands of investors. Throughout the Class Period, ChargePoint disseminated SEC filings, press releases, investor presentations, marketing materials, product descriptions, and other reports containing material misrepresentations and omissions about its business practices, including its sales of charging stations.

### C.    Executive Defendants

24.    Defendant Pasquale Romano ("Romano") was the Company's President and Chief Executive Officer ("CEO") at all relevant times. During the Class Period, Romano made materially false statements and omissions about ChargePoint's revenue and profitability in the Company's public filings, at investor presentations, and during conference calls. Romano also was present when other Defendants made statements or omissions on these subjects without correcting them.

Romano executed Sarbanes Oxley certifications (pursuant to rules 13a-14(a) and 15d-14(a) under the Securities Exchange act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley act of 2002) relating to ChargePoint's false and misleading reports filed with the SEC, including ChargePoint's Prospectus filed on Form S-1, quarterly reports for each quarter during the Class Period on Forms 10-Q, and the Annual Report for fiscal years 2021 to 2023 filed on Form 10-K. Romano directly participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and products. Romano also shared primary responsibility for ensuring that the Company's SEC and other public statements or releases were complete, accurate, and did not omit material information necessary under the circumstances to make them not misleading. Because of this position of control and authority, his ability to exercise power and influence over ChargePoint's conduct, and his access to material inside information about ChargePoint during the Class Period, Romano, at the time of the wrongs alleged herein, was a controlling person within the meaning of Section 20(a) of the Exchange Act.

25.     Defendant Rex S. Jackson ("Jackson") was the Company's Chief Financial Officer ("CFO") at all relevant times (from May 2018 to January 2024). During the Class Period, Jackson made materially false statements and omissions about ChargePoint's revenue and profitability in the Company's public filings, at investor presentations, and during conference calls. Jackson also was present when other Defendants made statements or omissions on these subjects without correcting them. Jackson also executed Sarbanes Oxley certifications relating to ChargePoint's false and misleading reports filed with the SEC, including ChargePoint's Prospectus filed on Form S-1, quarterly reports for each quarter during the Class Period on Forms 10-Q, and the Annual Report for fiscal years 2021 to 2023 filed on Form 10-K. Jackson directly participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and products. Jackson also shared primary responsibility for ensuring that the Company's SEC and other public statements or releases were complete, accurate, and did not omit material information necessary under the circumstances to make them not misleading. Because of this position of control and

authority, his ability to exercise power and influence over ChargePoint's conduct, and his access to material inside information about ChargePoint during the Class Period, Jackson, at the time of the wrongs alleged herein, was a controlling person within the meaning of Section 20(a) of the Exchange Act.

26.    Defendants Romano and Jackson (collectively the "Executive Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors (*i.e.*, the market). The Executive Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material, non-public information available to them, the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and/or misleading. The Executive Defendants are liable for the false statements pleaded herein.

27.    The Sarbanes-Oxley certifications signed by ChargePoint's top executives, including CEO Romano and CFO Jackson, provide strong evidence of scienter. In these legally mandated certifications, the executives personally attested to the accuracy and completeness of ChargePoint's financial reports. They explicitly certified that the reports contained no false or misleading statements, that the financial statements fairly presented the Company's financial condition in all material respects, and that they had designed and evaluated effective internal controls over financial reporting. Moreover, they certified that they had disclosed any fraud or significant deficiencies in internal controls to the Company's auditors and audit committee. By making these certifications, Romano and Jackson assumed personal responsibility for the integrity of ChargePoint's financial reporting and internal controls. Given the alleged widespread improper revenue recognition practices and inventory mismanagement described below by former employees, these certifications were either knowingly false when made or signed with reckless disregard for their truth.

## IV.    FORMER CHARGEPOINT EMPLOYEES

28.    FE-1 was a Sales Operations Specialist who worked for ChargePoint from 2019 until March 2023. FE-1 was responsible for processing sales orders from shipping (Salesforce software) and sending them to shipping, which utilized NetSuite software. FE-1 worked alongside 23 other Sales Operations Specialists, 17 of whom were located in India. FE-1 reported to the Sales Operation Manager, who in turn reported to the VP of Revenue Operations, who reported to Michael Hughes, Chief Commercial and Revenue Officer. Hughes reported to CEO Pasquale Romano.

29.    FE-2 was a Sales Manager from 2019 until March 2023. FE-2 was responsible for entering and processing sales orders, addressing shipping issues, and preparing the end of month sales reports for North America and Canada. FE-2 oversaw a team of 24 sales operations specialists that reported directly to FE-2. FE-2 reported to the VP of Revenue Operations, who in turn reported to Michael Hughes, Chief Commercial and Revenue Officer. Hughes reported to CEO Pasquale Romano. FE-2 was responsible for preparing a monthly sales report that documented sales and tracked orders that were shipped, which was used to determine monthly and quarterly revenue. The report was prepared on an Excel spreadsheet and was submitted up the chain of command, through FE-2's supervisor. The reports were discussed in meetings held by FE-2's supervisor and the supervisor's superiors.

30.    FE-3 worked as East Region Account Executive for several years prior to the Class Period, up until early 2022. FE-3 reported to the Vice President of Channel Sales, who in turn reported to Michael Hughes, Chief Commercial and Revenue Officer, and Hughes reported to CEO Pasquale Romano.

31.    FE-4 was employed by ChargePoint and worked in the purchasing/procurement department several years prior to Class Period up until September 2023. FE-4 was responsible for non-inventory-related invoices and purchases worldwide, which included NPI (New Product Introduction), testing equipment, and any other materials not required for product lines. FE-4 was previously involved with handling product inventory invoices. FE-4 reported to the Director of NPI

Materials and Strategic Sourcing, who reported to the Senior Vice President of Operations and Support, who in turn reported to CEO Pasquale Romano.

32.    FE-5 was employed by ChargePoint from late spring 2022 until early 2024. FE-5 was responsible for sales to major national fleet sales customers. FE-5 reported to the Senior Director of Commercial Sales, who in turn reported to the Senior Vice President - North America.

33.    For ease of reference, below is a table summarizing the former employees cited in this Complaint:

| FE No. | Position | Period of employment | Topics covered |
|--------|----------|----------------------|----------------|
| FE-1 | Sales Operations Specialist | 2019 to March 2023 | Improper revenue recognition (¶¶ 65-66)<br><br>Supply chain constraints (¶ 45) |
| FE-2 | Sales Manager | 2019 to March 2023 | Improper revenue recognition (¶¶ 64, 67-68)<br><br>Supply chain constraints (¶ 44)<br><br>Outsourcing difficulties and customer tensions (¶¶ 47-49) |
| FE-3 | East Region Account Executive | Several years prior to Class Period, through early 2022 | Improper revenue recognition (¶ 69)<br><br>Supply chain constraints (¶ 46)<br><br>Inventory impairment (¶¶ 80-81)<br><br>Outsourcing difficulties and supplier tensions (¶ 87) |
| FE-4 | Worked in purchasing/procurement department | Several years prior to Class Period up until September 2023 | Improper revenue recognition (¶¶ 70-71)<br><br>Outsourcing difficulties and supplier tensions (¶¶ 82-86) |
| FE-5 | Responsible for sales to major national fleet sales customers | Late spring 2022 to early 2024 | Inventory impairment (¶¶ 75, 79) |

## V.    SUMMARY OF FRAUD

### A.    ChargePoint and Its Business

34.    ChargePoint was founded in 2007 as Coulomb Technologies, before the appearance of EVs on the market, and a year before Tesla offered its first electric vehicle into the market.

According to ChargePoint, at that time, "there was not a single mass-market battery electric vehicle on the road." Yet by June 2022, every major automobile manufacturer, and "born electric rivals," were producing EVs. Several brands, including General Motors, Mercedes-Benz, and Volvo have committed to become fully electric between 2022 and 2040. According to ChargePoint, "[th]at increased availability, combined with zero-emission vehicle mandates and fossil fuel bans targeting climate change across the globe, signals [sic] the tipping point for the mass-adoption of EVs within the decade." According to online magazine Utility Drive, "[c]urrent projections suggest electric vehicles will account for a quarter of car sales by 2035, and will achieve cost parity with gas-powered vehicles by 2025."[3]

35.     ChargePoint provides networked solutions for EVs, including the ChargePoint cloud subscription platform and charging hardware. ChargePoint claims its goods and services are designed for an array of charging scenarios from home to workplace, parking, hospitality, retail, and transport fleets of all types. ChargePoint's customers include individual drivers, fleets, and businesses, including Kohler, United Airlines, UC San Diego, and Best Western hotels. ChargePoint's website describes its business as follows:[4]

> **How we help**
>
> Since 2007, we've pioneered EV charging solutions that work with every make and model of EV on the road. Our software platform is designed to empower organizations from auto manufacturers to workplaces and fleets of all types and sizes to maximize the benefits of their EV charging operations and deliver an enhanced driver experience.

36.     ChargePoint went public on March 1, 2021, following a merger with Switchback Energy Acquisition Corporation, a Special Purpose Acquisition Company ("SPAC"). At that time, it was the world's first publicly traded global EV charging network.[5] At the start of the Class Period, ChargePoint reported that approximately 75% of its revenue came from sales of its charging

---

[3] *See* https://andthewest.stanford.edu/2021/ev-charging-stations-multiply-but-are-often-out-of-reach-for-disadvantaged-populations/ (last accessed July 19, 2024).

[4] *See* https://www.chargepoint.com/ (last accessed July 19, 2024).

[5] *See* ChargePoint press release dated March 1, 2021.

systems, with 20% derived from its software-based subscription services.[6] By the end of the Class Period, ChargePoint's sales of charging systems constituted 67% of its revenue, with 28% earned from subscription services. When the Company first went public, the vast majority (68%) of billings were to commercial clients, with 17% from fleet and 12% residential (with 3% classified as "other").[7] The share of billings for commercial customers from its inception to the present fluctuated between 67% and 75%.[8]

37.    In terms of the scope and direction of its business plan, ChargePoint described it as follows in its opening Amended Prospectus dated March 9, 2021: "ChargePoint is currently a market leader in North America in the commercial Level 2 AC chargers. ChargePoint also offers Level 1 power chargers for use at home or multifamily settings, and high-power Level 3 DC Fast chargers for urban fast charging, corridor or long-trip charging and fleet applications. ChargePoint intends to expand its market share over time in its product categories, leveraging the network effect of its products and Cloud Services software."

---

[6] *See* ChargePoint 10-Q for 3Q2022.

[7] *See* ChargePoint earnings call transcript dated March 11, 2021.

[8] The specific portions of commercial customers are as follows: June 2, 2021 (73%); September 3, 2021 (75%); December 7, 2021 (69%); March 2, 2022 (74%); June 1, 2022 (67%); December 2022 (69%); March 2023 (69%); June 2023 63%); September 2023 (75%); December 2023 (70%); March 2024 (64%).

38.     For commercial businesses, it sells the following Level 2 AC charging stations:



39.     ChargePoint reports its financial results on a fiscal year basis. ChargePoint's fiscal year ends on the last day of January. As an example, fiscal year 2022 ran from February 1, 2021, to January 31, 2022.

40.     During the relevant period, ChargePoint repeatedly emphasized revenue growth. At the beginning of the Class Period (December 7, 2021), ChargePoint announced revenue of $65M, a 79% increase over the same quarter in the previous year. For the next five quarters, ChargePoint claimed revenue growth in the range of 90 to 102% over the same respective quarter in the previous year.

41.     ChargePoint went public when the U.S. and world economy were deep in the throes of a supply chain crisis due to COVID-19 restrictions. According to a March 21, 2021 article in the *Guardian* titled "Global Shortage in Computer Chips 'Reaches Crisis Point,'"[9]

> The shortage in chips, the "brain" within every electronic device in the world, has been steadily worsening since last year. Initially the problem was only a temporary delay in supplies as factories shut down when the coronavirus pandemic first hit. However, although production is back to normal, a new surge in demand driven by changing habits fueled by the pandemic means that it is now

---

[9] https://www.theguardian.com/business/2021/mar/21/global-shortage-in-computer-chips-reaches-crisis-point.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS – 14                          Case No. 5:23-cv-06172-PCP

reaching crisis point. Car manufacturers investing in tech-heavy electric vehicles, the boom in sales of TVs and home computers and launch of new games consoles and 5G-enabled mobile phones have all driven demand.

42.    As a result, ChargePoint was keen to emphasize to investors and the market that it was managing and overcoming these supply chain difficulties.

**B.    ChargePoint Misrepresented and Concealed the Effects of Supply Constraints from the Beginning**

43.    Throughout the Class Period, Defendants created the materially misleading impression that ChargePoint was managing COVID-19 supply chain constraints effectively and generating record revenues due to the increased demand for the Company's chargers. In reality, however, the supply constraints brought on by the COVID-19 pandemic had a materially adverse impact on ChargePoint's operations. In particular, Defendants were experiencing acute supply shortage problems that caused it to lose customers and face contractual penalties based on its failure to deliver the products as promised. In response to these pressures, ChargePoint engaged in a practice of improperly recognizing revenue at the end of each quarter, solely in order to meet its projections and maintain its position in the market.

**1.    ChargePoint faced severe supply constraints.**

44.    According to interviews with former ChargePoint employees, the supply constraints brought on by the COVID-19 pandemic had a materially adverse impact on ChargePoint's operations. According to FE-2, a former Sales Manager, these supply chain issues began at the start of the COVID-19 pandemic (February 2020). In particular, there was a deficit of parts that were available to complete the builds on the charging stations. Parts for certain fast chargers were manufactured by an Italian corporation called ABB. Italy had numerous plant closures due to COVID-19, and ABB was unable to ship stations from 2020 through 2023. Other products that were manufactured in Mexico (CT 4000) were also delayed. As a result, ChargePoint had to refuse hundreds of thousands of dollars of orders for residential charging stations from customers, including from Amazon, who was trying to sell them to its customers. One year prior to the COVID-19 pandemic, home station units (CPH50s), which were being sold through Amazon and manufactured in Mexico, were delayed due to a lack of parts availability. ChargePoint had to deny

hundreds of thousands of dollars of orders for the home stations. The sales team would take about 10,000 orders, but they would only receive 2,000 units from manufacturing. Weekly meetings were held to discuss this issue and determine how many units they could ship.

45.    According to another former employee, FE-1, the Sales Operations Specialist, supply chain issues started in 2021, when ships were delayed at ports due to COVID-19, and continued through 2023. The backlog of charger orders occurred around early 2022, with a chip shortage being one of the key issues causing it in late 2021 and early 2022. According to FE-1, the DC fast chargers had issues where they were missing handles, which occurred in mid-2022.

46.    A third employee, FE-3, the former East Region Account Executive, stated that there was a severe backlog of orders due to the COVID-19 supply chain issues that started in 2021 and rolled into 2022, finally getting caught up in late October when FE-3 left. Suppliers were essentially trying to extort customers (ChargePoint and others) by offering to prioritize their orders to the front of the line if they paid more. ChargePoint was unwilling to pay more, which resulted in a severe backlog of orders for the CP Express 250 chargers.

**2.    Executives were informed that outsourcing to Mexico hindered ChargePoint's ability to complete orders.**

47.    According to FE-2, the former Sales Manager, ChargePoint also decided to outsource manufacturing from the United States to Mexico in late 2019 and early 2020. This included the CT4000, CPE250s, and home charging units (CPH50s). FE-2 advised the executives that this was a bad idea and would create additional supply chain delays, adding three additional weeks, as they would have to deal with cross-border issues such as trucking from Guadalajara and customs delays. Customs delays sometimes added four to six additional weeks of delay. FE-2's advice was not heeded and ChargePoint went forward with outsourcing the manufacturing to Mexico in late 2019 and early 2020. ChargePoint had difficulty fulfilling orders of charging stations manufactured in Mexico in all of 2021, 2022, and the first part of 2023.

48.    According to FE-2, in response to this shortage, auto dealerships such as BMW, Mercedes, Mazda, Toyota, Nissan, Hyundai, Kia, and others put immense pressure on ChargePoint to deliver charging stations they had ordered. Auto dealerships wanted to stock EVs, but were

waiting on chargers to be installed at the dealerships. ChargePoint scrambled to fulfill orders from auto dealerships, and prioritized them over other customers, but still fell short, resulting in the loss of contracts. ChargePoint eventually lost the contract with Mercedes-Benz. According to FE-2, the CEOs of Hyundai, Nissan, and possibly Kia met with Michael Hughes and other high-level ChargePoint executives, and threatened to cancel their orders if ChargePoint did not fulfill them. FE-2 heard that the meeting was extremely intense and the CEOs were very upset with ChargePoint.

49.     According to FE-2, Walmart, which was converting their fleet vehicles to EVs and installing chargers at all their locations, was also ordering DC fast charger stations from ChargePoint under contract. ChargePoint was unable to fulfill orders according to their contract obligations to Walmart. As a result, Walmart threatened to issue contract fines to ChargePoint, according to FE-2. According to FE-2, this occurred all throughout 2022 and at least through the first part of 2023 until FE-2 resigned.

**3.     ChargePoint provided false assurances on supply chain issues.**

50.     Despite the ongoing supply chain issues occurring throughout the Class Period, ChargePoint's Executive Defendants continually falsely assured the market that these issues were being addressed and resolved satisfactorily. For example, in an earnings call right at the start of the Class Period (December 7, 2021), CEO Romano had the following exchange:

> **Q:** And just, secondly, on the supply chain and pricing, are you seeing the need to redesign products or particular subsystems in order to help the resiliency of the supply chain and how active have you guys been in terms of passing additional cost to customers?
>
> **Romano:** Yeah. So, I was chuckling as you said that. ***We're incredibly proud of what our engineering and supply chain teams have had to do***. ***As you've seen, we turned in upside results now over several quarters.*** And if you can imagine how hard that is in a supply chain constrained environment, because, obviously, we're laying forecast into our supply chain even under normal circumstances with significant percentage of a year's worth of visibility because that's just what you need to do, especially as you're scaling. So to then come up with upside, when you get, obviously, surprised decommits which is happening everywhere in the industry, means that your organization is responding by rapid qualification of substitute components and rapid adjustment in software to enable that. So, it is definitely happening inside our organization. ***They are doing a tremendous job keeping things moving through our supply chain***, and yes, it is having – it is a drag. We could have put those resources in different places.

51.     During that same earnings call, CEO Romano and CFO Jackson were asked again by someone named Gabe about supply chain issues affecting inventory. Romano and Jackson responded as follows:

> **Jackson:** We extensively use CMs[10] so not all inventory sits on our books. Our inventory actually – like I said this last quarter, keep wanting it to go up because of the supply chain challenges, but it actually slightly declined quarter-on-quarter here, but I'd just tell you, if we can build inventory going forward, we will. We just haven't done that yet. . . .
>
> **Romano:** Gabe, that's not weakness, that's just continued upside materializing. . . .
>
> **Romano:** And that's a – in our opinion, it's a happy problem I wish we didn't have the supply chain constraints. But nonetheless, it's on the good side of the problem balance sheet.
>
> **Jackson:** Yeah. And, Gabe, one of [sic] the comment . . . . because it's kind of odd to have a CFO say, hey, let's increase our inventory level. We have, obviously, a broad portfolio, but *we have very minimal obsolescence risk*. So, if you're trying to ramp the business and you got supply chain challenges that you're trying to meet, *building inventories as fast as Pat says is a smart thing to do*. So, that's what we're trying to do.

52.     In sum, ChargePoint failed to disclose risks that had already materialized as a result of supply chain disruptions adversely affecting its operations. Although it acknowledged supply chain disruptions as a potential risk, it failed to disclose that these disruptions were in fact occurring and causing ChargePoint to decline business from key customers, including from Amazon, who was trying to sell them to customers. Walmart also issued fines to ChargePoint for contract violations based on its failure to supply chargers, which were not disclosed.

## C.     ChargePoint's False and Misleading Financial Reporting

53.     In addition to misrepresenting and concealing supply constraints, ChargePoint secretly engaged in a practice of improperly recognizing revenue early, solely in order to meet its revenue projections and maintain the appearance of growth. As a result, ChargePoint was violating

---

[10] In this context, "CMs" likely means contract manufacturers. *See* https://www.arenasolutions.com/resources/glossary/contract-manufacturer/ #:~:text=Contract%20Manufacturer%20Definition,to%20produce%20parts%20or%20products.

Generally Accepted Accounting Principles ("GAAP") and its own publicly stated revenue recognition policy.

54.    The accounting profession and the SEC recognize GAAP as the uniform rules, conventions, and procedures necessary to define and reflect accepted accounting practices. GAAP rules are primarily promulgated by the Financial Accounting Standards Board ("FASB") and have been codified since 2009 in its Accounting Standards Codifications. These rules, referred to as ASCs, represent the source of authoritative GAAP for nongovernmental entities such as ChargePoint. (ASC 105, Generally Accepted Accounting Principles, section 10-05-1).

55.    Separately, SEC Regulation S-X states that financial statements filed with the SEC that are not prepared and presented in accordance with GAAP "will be presumed to be misleading or inaccurate, despite footnote of other disclosures[.]" 17 C.F.R. § 210.4-01(a)(1). Violations of GAAP, therefore, bear on whether SEC Regulations (for publicly traded companies) have been properly followed and satisfied.

56.    The FASB has also issued guidance in the form of Statements of Financial Accounting Concepts ("FASCON"s), which set forth the conceptual framework underlying GAAP, as well as its objectives, qualitative characteristics, and other concepts used in the development of GAAP.

57.    As the FASB has explained, the "objective of general-purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity." (FASCON No. 8, Conceptual Framework for Financial Reporting ("FASCON No. 8") as amended in August 2018, OB2[1]). FASCON No. 8 continues in relevant part:

> Investors', lenders' and other creditors' expectations about returns depend on their assessment of the amount, timing and uncertainty of (the prospects for) future net cash inflows to the entity…. Consequently, existing and potential investors, lenders and other creditors need information to help them assess the prospects for future net cash inflows to an entity. To assess an entity's prospects for future net cash inflows, existing and potential investors, lenders, and other creditors need information about the resources of the entity, claims against the entity, and how efficiently and effectively the entity's management and governing board have discharged their responsibilities to use the entity's resources…. Many existing and

1
2
3

potential investors, lenders, and other creditors cannot require reporting entities to provide information directly to them and must rely on general purpose financial reports for much of the financial information they need. Consequently, they are the primary users to whom general purpose financial reports are directed. (FASCON No. 8, OB3–OB5).

4
5
6

58.    FASCON No. 8 also notes that for financial information to be useful "it must be relevant and faithfully represent what it purports to represent," and its usefulness "is enhanced if it is comparable, verifiable, timely, and understandable." (FASCON 8, QC4). It elaborates:

7
8
9

Relevant financial information is capable of making a difference in the decisions made by users. Information may be capable of making a difference in a decision even if some users choose not to take advantage of it or already are aware of it from other sources.

10

*        *        *

11
12
13
14

Financial reports represent economic phenomena in words and numbers. To be useful, financial information not only must represent relevant phenomena, but it also must faithfully represent the phenomena that it purports to represent. To be a perfectly faithful representation, a depiction would have three characteristics. It would be complete, neutral, and free from error. (FASCON No. 8, QC6, QC12).

15

**1.    ChargePoint violated revenue recognition rules.**

16
17

59.    On March 1, 2021 (the date that ChargePoint went public), ChargePoint announced its revenue recognition policy as follows:[11]

18
19
20
21
22
23

On February 1, 2019, ChargePoint adopted ASU No. 2014-09 Revenue from Contracts with Customers (Topic 606), as amended, using the modified retrospective method applied to contracts which were not completed as of that date. During fiscal year 2020, ChargePoint recognizes revenue using the five-step model in determining revenue recognition: (a) identification of the contract, or contracts, with a customer; (b) identification of the performance obligations in the contract; (c) determination of the transaction price; (d) allocation of the transaction price to the performance obligations in the contract; and (e) recognition of revenue when, or as, it satisfies a performance obligation.

24
25

60.    This policy stayed the same throughout the Class Period and is the policy that ChargePoint purports to adhere to today.[12]

26

27

[11] *See* Form S-1 Registration Statement dated March 1, 2021.

28

[12] *See, e.g.*, ChargePoint 10-K for FY2024, issued on April 1, 2024.

61.     ASC 606 also identifies additional conditions upon which each principle's criteria would be considered met. Specifically, "identifying a contract" for Step 1 requires that all the following criteria be satisfied (ASC 606-10-25-1):

- The parties to the contract have approved the contract and are committed to perform their respective obligations.

- The entity can identify each party's rights regarding the goods or services to be transferred.

- The entity can identify the payment terms for the goods or services to be transferred.

- The contract has commercial substance.

- It is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer … [and] the amount of consideration to which the entity will be entitled may be less than the price stated in the contract if the consideration is variable because the entity may offer the customer a price concession.

62.     As for determining when "the entity satisfies a performance obligation" (for Step 5 above), ASC 606 explains that such performance obligation is satisfied when a "promised good or service (that is, an asset)" is transferred "to a customer" and that "[a]n asset is transferred when (or as) the customer obtains control of that asset." ASC 606-10-25-23.

63.     Based on statements from several former ChargePoint employees, throughout the Class Period, ChargePoint routinely violated ASC 606 and GAAP revenue recognition principles by booking revenue on transactions where ChargePoint did not satisfy its performance obligation and did not consider the actual economics of the transaction.

**a.      ChargePoint sent out chargers before customers were ready to receive them in order to improperly recognize revenue early.**

64.     According to former employee FE-2, the former Sales Manager, sales teams were burdened with huge goals that were unattainable and created pressure to place orders knowing they did not have the product available. When sales reached $125 to $130 million, management had the sales operations team ship out orders that were on hold or partial orders so that they could increase revenue recognition. The Salesforce software was reconfigured to allow on hold or partial orders to be shipped instead of whole charger units. Some on hold products were shipped to vacant lots

and construction sites that were not completed, which is why the purchasing company requested holds on shipping. ChargePoint shipped the products anyway, so that they could recognize revenue. The chargers were dropped off at vacant lots with no security, at sites still under construction. It resulted in products being weather damaged, vandalized, or stolen. This resulted in huge write-offs.

65.    This practice accelerated in the year 2022. According to FE-1, the Sales Operations Specialist, between summer and fall of 2022, which would have been late July/early August, FE-1's supervisor told the sales operations team (including FE-1 that the supervisor was being told by their superiors to ship all pending orders. All orders that were in the "queues" in Salesforce were to be released to NetSuite (warehouse) to be shipped. There was a "heavy handed push" to ship at the end of August/end of quarter. FE-1 recalls that roughly between $1 million and $5 million of product from the orders FE-1 was responsible for were released for shipment. FE-1 estimated that at least 10% of these orders in FE-1's Salesforce database should not have been released for shipment as the customers were not prepared to receive them.

66.    According to FE-1, products were stored in four different warehouses, three in the U.S. and one in Mexico. U.S.-based warehouses had a transit/shipping time of three to four days, while products in the Mexico warehouse would take up to two weeks due to distance and cross-border regulations. Customers that were aware that products had shipped prematurely requested pullbacks. According to FE-1, a few were able to be pulled back prior to shipping, but the majority had to be reversed by having the shipping company reverse the shipments, which was handled by the CP logistics department and accounted for about 80% of the orders in FE-1's area of responsibility. Twenty percent of the prematurely shipped orders were delivered to customers. FE-1 saw the invoices and reconciliation for these shipments in Salesforce and confirmed that CP had recognized revenue for them. FE-1 was not aware how the pulled back units (those not actually shipped) were accounted for. Normally in any given week, FE-1 had 20 to 45 orders totaling $200K to $500K, that would be shipped. The order to ship everything in FE-1's queue was double or triple the normal amount. FE-1 confirmed that this was ordered by management and had to be approved at the executive level, which would have been Michael Hughes or above. The finance department

also had to be aware and approve so that revenue could be recognized for these shipments. Customers were not notified about the shipments and some of the orders had to be pulled back.

**b.    ChargePoint sent out chargers with missing parts or sent the wrong chargers to customers, simply to improperly recognize revenue early.**

67.    According to FE-2, ChargePoint was desperate to recognize as much revenue as possible, to the point that they would ship the wrong products to customers. FE-2 said that, for example, if customers had ordered a double port charger and only single port chargers were available, they would ship the single port charger to that customer to recognize revenue, knowing it would be returned. Products with missing or incomplete parts were also shipped out. They knew they would be shipped back but used the opportunity to recognize revenue. Charger "shells" without complete components were also shipped, which only angered customers. As FE-2 stated, "[t]his created a nightmare of accounting problems, invoicing, and returns, and made us look like idiots to the customers." FE-2 remembered some of the products that were shipped, including CT4000, 4010, 4025, and 4027 units. Millions of dollars of product were returned every quarter by customers. This practice occurred for the last three quarters FE-2 was at ChargePoint, and after FE-2 left, through April 2024, which FE-2 learned from FE-2's colleagues who are still employed there.

68.    The order to ship products came from FE-2's supervisor, who (according to FE-2) was hesitant to issue this directive, but FE-2's supervisor said FE-2 was following orders from FE-2's supervisors. The premature product shipping was always directed at the end of quarters, and FE-2 remembers it happened for at least three quarters: July 2022, October 2022, and January 2023, and through March 2023 until FE-2 resigned. FE-2 was advised by colleagues currently working that it continued through April 2024. When the rumors of the lawsuit and articles began circulating, employees were told to stop shipping partial and on hold orders.

69.    Several former employees have provided accounts that confirm and corroborate that ChargePoint was improperly recognizing revenue early. For example, according to FE-3, the former East Region Account Executive, starting in the second half of 2021, in a direct attempt to minimize the financial repercussions of the backorder situation, ChargePoint prematurely

recognized revenue and shipped out empty charger frames to end user customers, without the internal components or charging modules installed, which rendered the unit unusable. Customers were not aware of this ahead of time, and the sales team, at the direction of the Regional Vice President of Sales or Vice President of Sales, had to respond to customer inquiries after the fact. They were advised to placate customer concerns, advising the customers to install the station on the ground and then they could easily add the internal components later as soon as they were received. The sales personnel also advised customers to hold off paying the invoices until all the components were received. FE-3 estimated there were more than 20 to 30 empty frames, which were valued at around $30K for each frame shipped nationwide. Each frame required two power modules valued at $10K each. In the second half of 2021, FE-3 attended weekly sales meetings, led by the Southeast Regional Director, Sales (Currently Region Vice President, East), to discuss these issues. The decision to prematurely ship out the frames was made by Michael Hughes and the Vice President of Revenue Operations. This decision was made from the top down so that revenue could be recognized.

70.    Another former employee, FE-4, who worked in the purchasing/procurement department, corroborates the accounts of the other three former employees. According to FE-4, FE-4 heard some "scuttlebutt" about the wrong products being shipped to the wrong customers or the wrong products being shipped to the right customers and that some "bogus" orders were shipped out. FE-4 knew there were a lot of products being returned and FE-4 asked about it during a meeting, but management would not answer FE-4's questions. FE-4 remembered consistently seeing one or two pallets of returned finished good material products sitting in the shipping department at the end of each month and every quarter since ChargePoint went public in 2021, an amount that was much more than usual. There were many products being returned (back to the shipping department) and they did not know where to put them. FE-4 learned this from two shipping/receiving employees. Products were from various customers, but FE-4 specifically recalled seeing that some of the return labels were from Rexel Energy. Return Material Authorizations (RMAs) were required to be authorized by the sales department. Orders that were shipped and/or returned were documented on a Materials Authorization Report, which noted when

products were sent and why they were returned. The report was sent to Patricia Fagundes, Director of Supply Chain.

71.    As a member of the accounting department, FE-4 had attended quarterly employee meetings lead by CFO Jackson and CEO Romano. During these meetings, the employees were always told that ChargePoint was doing great and are "in the black." But FE-4 received a letter in September 2023 indicating that FE-4 would be "on the books" for 60 days (meaning FE-4 was laid off but paid for 60 days). FE-4 was locked out from selling employee stock.

72.    Just as described by FE-2, during 3Q23 (covering the July to October 2022 period), ChargePoint had previously issued guidance for $125M to $130M in revenue, but barely made its projections by recognizing $125.3M in revenue for 3Q23. During the next quarter, 4Q23 (November 2022 to February 2023), ChargePoint had previously issued guidance of $160M to $176M, but its 4Q23 revenue ***was only $152.8M***, and its annual revenue fell short of its $475M to $485M guidance and came in at ***$468M.***

**2.    ChargePoint used resellers to sell chargers before customers were ready to receive them.**

73.    As alleged herein, ChargePoint also engaged in significant undisclosed quarter-end pull-in sales transactions to artificially inflate its publicly reported quarterly revenue from charging system sales and overstate its actual customer demand.

74.    ChargePoint accomplished these pull-in sales by using value-added resellers (VARs), or channel sellers. The channel sales method allowed ChargePoint to realize sales even before customers were ready to receive them.

75.    According to FE-5, who was responsible for sales to major national fleet sales customers, ChargePoint would offer distributors like Rexel financial incentives like buy one, get one free, so they would store excess chargers until the customers were ready for them or until they could find customers to buy them. As FE-5 described, "[t]here's a company called Rexel. They were a ChargePoint Value Added Reseller. They called them a VAR. What they would do is, let's say a customer wanted chargers but the site wasn't going to be ready until October, we would work

out a deal. Hey, we're going to bill it and invoice it to Rexel. They were going to store and hold it there until the site is ready."

76.    Consistent with all of these accounts, for 3Q24 (time period of August 1, 2023, to October 31, 2023), ChargePoint had previously issued guidance for $150M to $165M, but its actual revenue fell far short of that at ***$108M to $113M***.

**D.    ChargePoint Improperly Accounted for Its Inventory**

77.    Similar to its violation of its revenue policy, ChargePoint also violated its own inventory policy by not writing down the fast DC chargers at the time when they lost their value. ChargePoint's Amended Prospectus explains its inventory policy as follows:

> Inventories are stated at the lower of cost or net realizable value. Cost is computed using standard cost, which approximates actual cost, on a first-in, first-out basis. Inventory levels are analyzed periodically and written down to their net realizable value if they have become obsolete, have a cost basis in excess of expected net realizable value or are in excess of expected demand. ChargePoint analyzes current and future product demand relative to the remaining product life to identify potential excess inventories. These forecasts of future demand are based upon historical trends and analysis as adjusted for overall market conditions. Inventory write-downs are measured as the difference between the cost of the inventory and its net realizable value, and charged to inventory reserves, which is a component of cost of revenue. At the point of the loss recognition, a new, lower cost basis for those inventories is established, and subsequent changes in facts and circumstances do not result in the restoration or increase in that newly established cost basis.

78.    ChargePoint failed to disclose that its inventory was overvalued. According to former employees, as of early 2022, ChargePoint knew that it had purchased excess numbers of CPE Charger 250 models and that there was not a sufficient demand for these chargers. In violation of its own inventory policy, which requires a writedown to their "net realizable valuable if they have become obsolete, have a cost basis in excess of expected net realizable value, or are in excess of expected demand," ChargePoint failed to timely writedown the inventory "at the point of loss recognition."

79.    Although ChargePoint did not specify which inventory was being discounted, FE-5, who was responsible for sales to major national fleet sales customers, stated that the product at issue was the CPE 250 Charger, ChargePoint's first DC Fast Track product. According to FE-5,

during the COVID-19 pandemic, ChargePoint executives saw an opportunity to capitalize on supply and demand issues and over-ordered the CPE 250 chargers, hoping to have an excess of inventory that no one else would have. But ChargePoint compounded the problem of over-supply by coming out with a better product, the Express Plus, which put out more kilowatts, had a more diverse architecture, was more versatile, and had greater scalability. Salespersons accordingly pushed the Express Plus over the CPE 250 Charger. According to FE-5, the market demand softened, inventory sat, and they got stuck with a lot of extra inventory. Beginning in 2023, FE-5 participated in bi-weekly calls where the excess supply of CPE 250s was discussed (among other topics). Although the executives did not attend, FE-5's understanding was that they were apprised of the discussions, because the Senior Vice President for North America stated that FE-5 had to report the contents of the meeting to "Paq [Romano] and Michael [Hughes]."

80.    Former East Region Account Executive FE-3 confirmed that the product referenced in the September 6 announcement was the CP Express 250 charger. The chargers had to be backordered and were behind at least four to six months through 2021 and into 2022, which led to an overstock by 2023. Customers were buying them in 2023 at clearance prices. They had so much extra inventory that they were also offering it to Rexel at cost, a much lower margin that the other customers. FE-3 had separated from ChargePoint by 2023, but knew this information as FE-3 continued to work within the industry and had conversations with ChargePoint employees and their resellers. Senior ChargePoint leaders explained the backlog to the employees by saying that the suppliers were essentially trying to extort the company by offering quicker delivery times if they paid more than their contracted prices, which they were unwilling to do.

81.    According to FE-3, part of the overstock was due to assumptions regarding announcements by Hyundai and Mercedes outlining an auto dealer charging program, where they planned to have one to two charging stations installed at each dealership nationwide. FE-3 explained that there were at least 60 dealerships in FE-3's sales area of responsibility. ChargePoint executives, including ChargePoint's former SVP of Operations and Support, assumed this type of program would spread to city governments, utility companies, retailers, condominium complexes,

et cetera, but it did not spread like they assumed and, as a result, they overbought and undersold product.

**E.    ChargePoint's Decision to Outsource Accounting to India Severely Disrupted Its Operations**

82.    A separate impediment to the business was the decision of ChargePoint executives, including CFO Rex Jackson, to outsource IT and accounts payable to India. According to FE-4, who formerly worked in the purchasing/procurement department, "that's when all hell broke loose." Employees were not notified of the outsourcing, and FE-4 only learned of it, literally overnight, in or about June 2020, when FE-4 came to work and realized FE-4 had lost access to the system and had to ask what happened. Within two weeks of the outsourcing being established, problems arose with accounts payable not paying inventory and non-inventory bills on time. FE-4 had been entering new suppliers into ChargePoint's "supplier portal system" since FE-4 had started working there. When the outsourcing to India happened, the supplier portal was not properly maintained. FE-4 repeatedly complained about this to management. FE-4's first complaint was within two weeks of the outsourcing to India for which FE-4 was given a verbal warning. The second time FE-4 complained about it, FE-4 was issued a written warning. According to FE-4, "they were out of control and had no idea what they were doing." ChargePoint was not paying on time and not getting the parts they needed.

83.    According to FE-4, numerous suppliers placed credit holds on ChargePoint. DigiKey placed credit holds at least three to four times in one year on ChargePoint. According to FE-4, other companies where ChargePoint lost credit terms or had credit holds placed on them included SunPe, Edsas, Intertek, Powerhouse, Comemso Electronics GmbH, Vectrails, S.A de C.V., Reelcraft (Changzhou) Co., Ltd., Arrow Electronics, McMaster-Car, and Farnell.

84.    According to FE-4, the deterioration of supplier relationships based on payment problems, and the fact that the outsourced buyers failed to build relationships with suppliers, contributed to ChargePoint's supply chain issues. FE-4 raised this issue several times with management, but was ignored, and management did not appear to have a good understanding of how the system worked. FE-4 participated in regular team meetings lead by management and

attended by all the buyers worldwide and contract managers. According to FE-4, the supply chain inventory and accounting issues were openly discussed during these meetings. FE-4 repeatedly told management, throughout the Class Period in regular weekly team meetings (virtual by Zoom) that the supply issue was more of an accounting department issue and a lack of establishing relationships with the suppliers

85.    In addition, according to FE-4, FE-4 had daily interactions with the newly outsourced accounts payable department, which included video conference meetings. According to FE-4, new suppliers were previously entered into a "supplier portal system," but when the work was outsourced to India, the supplier portal was not properly maintained. In the previous system, accounts payable team members were each assigned to specific suppliers. After outsourcing, the invoicing process was changed and any team member could work on any supplier invoice; they eliminated the assignment of team members to specific suppliers. This led to disorganization and resulted in invoices being duplicated and triplicated, and payment accounts became jumbled. According to FE-4, some payments were sent to the wrong accounts, which resulted in unpaid invoices. According to FE-4, "It's not like they didn't have the money to pay the bills, it was just that the accounts payable was so disorganized that bills did not get paid."

86.    According to FE-4, the unpaid invoices grew progressively worse. In 2020, there were 600 unpaid invoices; in 2021 there were 800 unpaid invoices; in 2022, there were 1,600 unpaid invoices; and in 2023, there were 2,400 unpaid invoices. FE-4 stated that numerous suppliers did not want to continue conducting business with ChargePoint and at least half of them started requiring payment in advance. ChargePoint's Amazon E-commerce account was shut down three times in 2022 for non-payment.

87.    FE-3, the former East Region Account Executive, confirmed that several departments were outsourced to India, in or around June 2020, including accounts payable, receivables, and sales operations. The actual salespeople remained in the U.S. Outsourcing led to delays in the sales process, requiring at least three-days processing time, which became a big concern when trying to get deals out at the end of the quarters. FE-1, the former Sales Manager,

stated that the outsourcing created more logistical issues due to language and culture barriers, distance, and extreme time zone differences.

88.    ChargePoint also failed to disclose the internal control deficiencies and business risks stemming from its outsourcing of its accounts payable functions to India in 2021. ChargePoint's outsourcing of its accounts payable functions to India led to strained relations with key suppliers as a result of their failure to timely pay invoices. According to FE-4, the unpaid invoices problem became progressively worse over time, increasing by 50% to 100% every year from 2021 to 2023. As a result of the strained relations with key suppliers, ChargePoint incurred higher supply costs or were shut off from key suppliers, leading to higher costs of sales, or they missed sales altogether.

**F.    The Executive Defendants Profited Off of ChargePoint's Artificially Inflated Stock Price by Engaging in Massive Insider Sales During the Class Period**

89.    As a result of Defendants' fraud, the Company's share price was artificially inflated. The Executive Defendants, while in possession of material, non-public information, capitalized on the artificially inflated stock price by selling significant portions of their holdings of ChargePoint common stock, thereby allowing the Executive Defendants to pocket substantially more than what they would have banked had investors known the truth about ChargePoint's business operations. For example, Defendant Romano sold 1,175,802 shares of Company stock, or approximately 20% of his personally held ChargePoint shares, receiving over $14 million in proceeds. Similarly, Defendant Jackson sold a total of 670,269 shares between December 21, 2021, and September 21, 2023, or over 23% of his personally held ChargePoint shares, earning $4.6 million in proceeds.

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

90.    Throughout the Class Period, ChargePoint reported and consistently touted the Company's growing revenue to investors as indicative of the strength of customer demand, the Company's sales execution, and other organic factors. Analysts and other market participants focused heavily on ChargePoint's reported net revenue, revenue growth relative to past quarters, and other reported financial metrics such as gross margin. By inflating ChargePoint's reported net revenues and failing to timely write down inventory impairments, ChargePoint was not only able

1    to meet guided numbers, but also provide a misleading impression of the state of ChargePoint's

2    business operations and prospects.

3    **A.    Defendants' False Statements Associated with the Announcement of ChargePoint's**
       **Q3 2022 Financial Results**

4

5    91.    The Class Period begins on December 7, 2021.[13] On that day, ChargePoint issued a

     press release filed with the SEC on Form 8-K, which announced its financial results for the third

6    quarter of the fiscal year 2022 ended October 31, 2021. The press release stated, in relevant part:

7

8              "ChargePoint has delivered another strong quarter, as we have
               continued to scale our commercial, fleet and residential verticals
9              across two continents," said Pasquale Romano, President and CEO
               of ChargePoint. "***The investments we have made over many years***
10             ***have enabled us to capture charging demand from customers***
               ***preparing for an electric future. This quarter we added more***
11             ***customers at an accelerated rate, while also successfully closing***
               ***two acquisitions***."

12   92.    ChargePoint further reported third quarter revenue of $65 million, an increase of

13   79% from $36.4 million in the prior year's same quarter. It also reported a quarterly gross margin

14   of 25%, "up from 20% in the prior year's same quarter primarily as a result of product cost

15   improvements and the impact of acquisitions."

16   93.    In a December 7, 2021 earnings call hosted by Defendants Romano and Jackson,

17   Defendant Romano promoted and highlighted ChargePoint's reported financial quarterly

18   performance, attributing the "strong financial performance" to organic factors such ChargePoint's

19   "execution," favorable EV market conditions, and customer demand for ChargePoint's products:

20             I'll provide a business update, including details of our strong Q3
               execution against plan before turning it over to Rex for financials.
21             As I stated previously, our success is tied to the arrival of electric
               vehicles, and this quarter we saw continued momentum in EV sales
22             in both the passenger and fleet categories. According to
               BloombergNEF, as many as 2.9 million electric vehicles are
23             expected to be sold across North America and Europe this year, an
               increase of approximately 67% from 2020. And accordingly, we are
24             seeing strong demand from auto dealers for charging infrastructure,
               an indicator that they are prepping for high volume EV sales.
25
               Our strong financial performance throughout this year is the result
26             of investments in a product and go-to-market strategy we have made
               over many years to be able to capture associated demand across
27

28             [13] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

commercial, fleet and residential verticals in both North America and Europe. Historically, our revenue has only been limited by a sufficient breadth of and quantity of vehicle options available to consumers and fleets. And this further reinforces that ChargePoint is the equivalent of an index for the electrification of mobility.

Our Q3 revenue of $65 million was at the high end of the guidance range we provided on September 1. This positions us to raise our expectations for the fourth quarter and full year, despite what continues to be a dynamic supply chain environment.

94.     In response to an analyst inquiry concerning ChargePoint's supply chain and pricing, Defendant Romano further stated, "We're incredibly proud of what our engineering and supply chain teams have had to do. . . . They are doing a tremendous job keeping things moving through our supply chain, and yes, it is having – it is a drag."

95.     Analysts asked Defendants Romano and Jackson what "the actual drivers of the revenue increase from last quarter were" and "[w]hat's kind of shaken out better than planned in the last quarter?" Defendant Jackson responded, "***New customer acquisition was super strong in the quarter and then the distribution of what they buy, again, consistent. So, it's just really good growth across the board***."

96.     The analyst then asked Defendant Romano and Jackson whether given supply chain issues, there was a potential for the Company to prioritize the sale of products in stock to its customers, including ChargePoint's higher margin segments. Defendant Romano refuted this notion, assuring investors that ChargePoint's sales practice takes the long view with the customer, selling them the product they want today, and that the Company does not "financially engineer our margin":

We tend not to. We don't financially engineer our margin. And the reason is, our customer today is a customer for a very long time because of the re-buy nature of this. So, shaping is dangerous. We try to take all the business we can service, and obviously, inventory levels and lead times may impact our ability to win a deal in the future, who knows, but so far so good and not having an impact on things (00:54:41). But remember, a customer's initial buy is usually a fraction of their ongoing buys and you have a lot of time over the life of that customer to mature and evolve the product they need to buy today. So if they buy a product today that's under, say, supply chain pressure, well, you want that customer anyway, because most of the products they're going to buy is going to be well past when all of this clears.

97.     Analysts responded positively to the news. On December 8, 2021, JP Morgan Research reported on ChargePoint's "solid results and guide with revenues exceeding expectations despite supply constraints . . . . ChargePoint is navigating supply chain issues well, in our view, with a 2 percentage point impact to gross margin in F3Q (down from 3 PP in F2Q). While we see continued supply chain issues well-into FY23, ChargePoint should see an upward bias to gross margin as demand from Work customers improves and through the higher margin software businesses the team acquired." It further stated that "ChargePoint is a clear leader in the North American commercial Level 2 market with increasing emerging growth opportunities in DCFC in North America and in L2/DCFC in Europe. We anticipate ChargePoint driving significant growth over the next 5-10 years, with revenues outpacing the growth range of EVs in the US and Europe driven by new opportunities in commercial and fleet operations."[14]

98.     But ChargePoint's statements in ¶ 92 that it earned $65 million in revenue for 3Q 2022 were materially false and misleading when made and omitted to disclose material facts. ChargePoint's revenue figures were based on an undisclosed and unsustainable revenue recognition scheme, whereby ChargePoint was recognizing revenue prematurely in violation of its own revenue recognition policy, before the revenue satisfied a performance obligation. ChargePoint was improperly recognizing revenue by, among other things, shipping out and invoicing for: (a) pre-ordered chargers to customers who had not authorized delivery of the chargers; (b) incomplete, non-functioning chargers (with missing parts); (c) chargers different from the model the customer ordered; and (d) using resellers to store chargers for customers that were not ready to receive the chargers. *See supra* § V.C.

99.     ChargePoint's statements in ¶ 91 were also materially false and misleading when made and omitted to disclose material facts because it attributed its growth to "the investments we have made over many years [which] have enabled us to capture charging demand from customers preparing for an electric future," and claimed to have "added more customers at an accelerated rate, while also successfully closing two acquisitions." In reality, at least part of its purported growth

---

[14] "ChargePoint : Solid Results and Guide with Revenues Exceeding Expectations Despite Supply Constraints," JPMorgan Research (Dec. 8, 2021).

was not related to its investments, increased charging demand, or adding new customers, but instead was the result of the undisclosed and unsustainable revenue recognition scheme described in the preceding paragraph. *See supra* § V.C.

100.    ChargePoint's statements in ¶ 94 about the supply team doing a "tremendous job of keeping things moving through our supply chain" were also materially false and misleading when made and omitted to disclose material facts. Far from doing a "tremendous job," ChargePoint's executives created internal control deficiencies and business risks stemming from its outsourcing of its accounts payable functions to India in 2021. ChargePoint's outsourcing of its accounts payable functions to India led to strained relations with key suppliers as a result of their failure to timely pay invoices. The unpaid invoices problem became progressively worse over time, increasing by 50% to 100% every year from 2021 to 2023. As a result of the strained relations with key suppliers, ChargePoint incurred higher supply costs or were shut off from key suppliers, leading to higher costs of sales or missed sales altogether. *See supra* § V.E.

**B.    Defendants' False Statements Associated with the Announcement of ChargePoint's Q4 2022 Financial Results**

101.    On March 2, 2022, ChargePoint issued a press release filed with the SEC on Form 8-K, which announced its financial results for the fourth quarter and full fiscal year 2022, ended January 31, 2022. The press release stated, in relevant part:

> "***ChargePoint delivered another outstanding quarter, exceeding the high end of both our quarterly and annual revenue guidance and advancing our technology leadership in our commercial, fleet and residential verticals across North America and Europe***," said Pasquale Romano, President and CEO of ChargePoint. "We had numerous successes in our first year as a publicly traded company, including a 65 percent year over year increase in annual revenue, two strategic acquisitions, expansion of our activated port count by over 60 percent, and growing our team of world class talent."

102.    In the press release, ChargePoint reported fourth quarter revenue of $80.7 million, an increase of 90% from $42.4 million in the prior year's same quarter. It further reported "fourth quarter GAAP gross margin was 22%, up from 21% in the prior year's same quarter primarily due to the impact of acquisitions."

1    103.    In a March 2, 2022 earnings call with analysts hosted by Defendants Romano and

2    Jackson, Romano stated that "[t]he investments we made over nearly 15 years set us up to capture

3    the demand we are seeing today across commercial fleet and residential verticals in both North

4    America and Europe. And these results further cement ChargePoint as the equivalent of an index

5    for the electrification mobility. ***Our strong performance and record revenue throughout the year***

6    ***was fueled by growth in charging demand from accelerated EV adoption***."

7    104.    CFO Rex Jackson further stated that "Q4 revenue was $81 million, up 90% year-

8    on-year, above our previously announced guidance range of $73 million to $78 million, and up

9    24% sequentially. ***We're particularly pleased with this performance, given continuing supply***

10   ***chain challenges***. We've managed this well relative to our guidance commitments."

11   105.    Analysis applauded to this report and these statements. JP Morgan Research

12   immediately raised its price target for ChargePoint from $20.00 to $22.00 per share, explaining:

13
14   **Strong Revenue Growth & Investments to Support "Land and Expand"; Margin Headwinds to Abate – Remain [Overweight]**

15   ChargePoint reported better than expected 4Q revenue on strong
16   execution in the quarter amid persistent supply dislocations and
     exited the quarter with record levels of backlog. The company has
17   been facing margin headwinds from elevated costs from COVID-
     related supply constraints as we previewed, as well as from new
18   product rollouts that are likely to impact margins through the year
     before improving in the following years. Despite these near-term
19   challenges, ChargePoint has been managing the constrained
     environment well, in our view, and continues to invest in expanding
     its customer base, capacity, and offerings.[15]

20   106.    Investors also responded favorably, as the price of ChargePoint stock immediately

21   rose $0.97 per share, or 6.5%, from a close price of $14.07 per share on March 2, 2022, to $15.01

22   at close of market on March 3, 2022.

23   107.    But ChargePoint's statements in ¶ 102 that it earned $80.7 million in revenue for 4Q

24   2022 were materially false and misleading when made and omitted to disclose material facts.

25   ChargePoint's revenue figures were based on an undisclosed and unsustainable revenue recognition

26   scheme, whereby ChargePoint was recognizing revenue prematurely in violation of its own revenue

27
28   [15] "ChargePoint : Strong Revenue Growth & Investments to Support "Land and Expand";
     Margin Headwinds to Abate - Remain OW," JPMorgan Research (Mar. 3, 2022)

recognition policy, before the revenue satisfied a performance obligation. ChargePoint was improperly recognizing revenue by, among other things, shipping out and invoicing for: (a) pre-ordered chargers to customers who had not authorized delivery of the chargers; (b) incomplete, non-functioning chargers (with missing parts); (c) chargers different from the model the customer ordered; and (d) using resellers to store chargers for customers that were not ready to receive the chargers. *See supra* § V.C.

108.    ChargePoint's statements in ¶¶ 101 and 103 were also materially false and misleading when made and omitted to disclose material facts because it attributed its growth to "two strategic acquisitions, expansion of our activated port count by over 60 percent, and growing our team of world class talent," and claimed that "[o]ur strong performance and record revenue throughout the year was fueled by growth in charging demand from accelerated EV adoption." In reality, at least part of its purported growth was not related to its acquisitions, expansion of activated port count, or increased charging demand, but instead was the result of the undisclosed and unsustainable revenue recognition scheme described in the preceding paragraph. *See supra* § V.C.

109.    ChargePoint's statements about "being particularly pleased with this performance, given continuing supply chain challenges" were also materially false and misleading when made and omitted to disclose material facts. ChargePoint should not have been "particularly pleased," because ChargePoint's executives created internal control deficiencies and business risks stemming from its outsourcing of its accounts payable functions to India in 2021. ChargePoint's outsourcing of its accounts payable functions to India led to strained relations with key suppliers, as a result of their failure to timely pay invoices. The unpaid invoices problem became progressively worse over time, increasing by 50% to 100% every year from 2021 to 2023. As a result of the strained relations with key suppliers, ChargePoint incurred higher supply costs or were shut off from key suppliers, leading to higher costs of sales or missed sales altogether. *See supra* § V.E.

**C.**     **Defendants' False Statements Associated with the Announcement of ChargePoint's Q1 2023 Financial Results**

110.     On May 31, 2022, ChargePoint issued a press release filed on Form 8-K which announced its financial results for the first quarter of fiscal year 2023, ended April 30, 2022. The press release stated, in relevant part:

> "*Positive first quarter results, despite expected significant headwinds due to global supply constraints, are a testament to the strength of our business*," said Pasquale Romano, president and CEO of ChargePoint. "*Our investments in a comprehensive portfolio for all verticals we serve continue to set us apart when customers seek a charging solution*."

***111.***     ChargePoint reported first quarter revenue of $81.6 million, an increase of 102% from $40.5 million in the prior year's same quarter. It also reported 1Q GAAP gross margin of 15%, which was "down from 23% in the prior year's same quarter as newer, currently lower margin, products performed strongly relative to more mature, higher margin offerings, and due to supply chain disruptions, which affected both cost and supply availability."

112.     In a May 31, 2022 earnings call, Romano emphasized the Company's year-over-year quarterly growth the Company's "remarkable" ability to overcome supply chain headwinds, exclaiming that "[o]ur operations team did a great job assuring supply this quarter to deliver our top line":

> We are happy to report that our first quarter revenue of $82 million exceeded the high end of the quarterly guidance provided on the last call. Consistent with recent quarters, we've performed well from a demand perspective across all verticals, which achieved record growth in Europe with 67% sequential quarterly revenue growth, a great indicator that our strategy to establish ourselves as a leader in that geography is working.
>
> Our year-over-year quarterly growth was 102%, and we grew sequentially from Q4 to Q1, beating the seasonal revenue decline we typically see between Q4 and Q1. ***Even more remarkable is we overcame supply chain headwinds to achieve that level of growth***. We remain steadfast in prioritizing assurance of supply amidst the challenging macro environment. The increased inventory level on our balance sheet reflects our critical raw materials acquisition program, we are not accumulating finished product, having shipped what we could build during the quarter.
>
> Our operations team did a great job assuring supply this quarter to deliver our top line, but supply shifted mix to a degree and demand

again outstripped supply, with backlog up 35% over the prior quarter.

113.    On the earnings call, an analyst asked Defendants Jackson and Romano "what drove the revenue beat in the first quarter." Defendant Jackson responded by identifying all organic factors, claiming strong demand across the board including for higher margin product mix:

> So, from a numerical perspective, obviously, we did a little bit better than we expected. From a mix perspective, it shifted even a little bit more in the direction it's been for the last two or three quarters, which is strongly in the direction of some of the quarter and fast-charging things that we're doing. Obviously, fleet was strong, Europe was strong, home was strong, which is part of residential, obviously. But some of the commercial was impacted by, first, supply, couldn't get it out the door, and also people aren't back to work yet. So, it wasn't meaningfully different than what we expected. It was just a slight product mix shift in a direction that you've seen over the last two quarters.

114.    Analysts were receptive to the public statements. According to a June 1, 2022 report from Fox Advisors, ChargePoint's "Growth story [is] more than intact," and concluded that:

> CHPT expects: (1) a recovery in recent sales mix pressures as it already reduced constraints that limited mature product sales; (2) margin improvements on newer products derived from technology roadmaps; and (3) a more noticeable impact from passing through higher costs to customers per agreements in recent months. Shipment volume targets can provide some organic operating leverage, especially since CHPT reiterated targets to basically double sales in F2023E, which is also supported by recent inventory increases. We think it is likely CHPT's gross margins have bottomed, albeit in a still uncertain supply chain environment.

115.    But ChargePoint's statements in ¶ 111 that it earned $81.6 million in revenue for 1Q 2023 were materially false and misleading when made and omitted to disclose material facts. ChargePoint's revenue figures were based on an undisclosed and unsustainable revenue recognition scheme, whereby ChargePoint was recognizing revenue prematurely in violation of its own revenue recognition policy, before the revenue satisfied a performance obligation. ChargePoint was improperly recognizing revenue by, among other things, shipping out and invoicing for: (a) pre-ordered chargers to customers who had not authorized delivery of the chargers; (b) incomplete, non-functioning chargers (with missing parts); (c) chargers different from the model the customer ordered; and (d) using resellers to store chargers for customers that were not ready to receive the chargers. *See supra* § V.C.

116.    ChargePoint's statements in ¶ 112 were also materially false and misleading when made and omitted to disclose material facts because it attributed its growth to the fact that "we've performed well from a demand perspective across all verticals, which achieved record growth in Europe with 67% sequential quarterly revenue growth, a great indicator that our strategy to establish ourselves as a leader in that geography is working." In reality, at least part of its purported growth was not related to its investments, increased charging demand, or adding new customers, but instead was the result of the undisclosed and unsustainable revenue recognition scheme described in the preceding paragraph. *See supra* § V.C.

117.    ChargePoint's statements in ¶ 112 that "we overcame supply chain headwinds to achieve that level of growth" and that "[w]e remain steadfast in prioritizing assurance of supply amidst the challenging macro environment" were also materially false and misleading when made and omitted to disclose material facts. Far from overcoming supply chain headwinds, ChargePoint's executives created internal control deficiencies and business risks stemming from its outsourcing of its accounts payable functions to India in 2021. ChargePoint's outsourcing of its accounts payable functions to India led to strained relations with key suppliers as a result of their failure to timely pay invoices. The unpaid invoices problem became progressively worse over time, increasing by 50% to 100% every year from 2021 to 2023. As a result of the strained relations with key suppliers, ChargePoint incurred higher supply costs or were shut off from key suppliers, leading to higher costs of sales or missed sales altogether. *See* § V.E.

**D.    Defendants' False Statements Associated with the Announcement of ChargePoint's Q2 2023 Financial Results**

118.    On August 30, 2022, ChargePoint issued a press release filed with the SEC on Form 8-K, which announced its financial results for the second quarter of fiscal year 2023, ended July 31, 2022. The press release stated, in relevant part:

> "*ChargePoint delivered another strong quarter, with continued growth across all verticals and geographies*," said Pasquale Romano, President and CEO of ChargePoint. "*We continue to execute on our strategy, as demand continues to grow for our portfolio of industry-leading charging solutions for every vertical and in both North America and Europe*."

1        *119.*    ChargePoint reported second quarter revenue of $108.3 million, up 93% from $56.1

2    million in the prior year's same quarter. It further reported that "second quarter GAAP gross margin

3    was 17%, down from 19% in the prior year's same quarter primarily due to supply chain

4    disruptions, which affected both cost and supply availability as well as increasing new product

5    introduction and transition costs."

6        120.    Later on August 30, 2022, Defendants Romano and Jackson hosted an earnings call

7    with analysts. On the call, Defendant Romano emphasized the Company's revenues meeting the

8    high end of their previous guidance and attributed the success to the Company's "strong execution"

9    and EV market demand:

10       I am pleased to report another strong execution quarter as we posted
    Q2 revenue of $108 million, above the high end of the guidance
11       provided on our Q1 call. Notably, Q2 is our first $100 million
    quarter, another major milestone in the company's 15-year history.
12       And according to BloombergNEF, combustion vehicle sales peaked
    in 2017, and as we've said before and proven in historic attach rates,
13       our growth closely tracks the arrival rate of vehicles.

14       As consumers embrace the transition to EVs at an accelerating rate,
    the future of this business is incredibly strong. Year-over-year
15       revenue growth of 93% and sequential revenue growth of 33%
    continue to demonstrate the company's strength across verticals and
16       geographies. We've improved gross margin from Q1 and realized
    the operating leverage as forecasted.
17
    121.    Romano also emphasized how the Company was able to produce these results while
18
effectively managing supply constraints, stating that "[r]esidential demand remains remarkably
19
strong. Billings for residential were up over 125% from the second quarter of last year and a
20
sequential increase of 11% versus the first quarter. The growth would have been significantly
21
higher if not for supply chain constraints."
22
    122.    In response, on August 31, 2022, Morningstar Equity Research raised its target price
23
and reported as follows:
24
    We're raising our fair value estimate for no-moat ChargePoint to
25       $14.50 per share from $13 following the company's second-quarter
    results. The drivers of the fair value estimate increase are higher
26       long-term profitability and increased long-term revenue growth
    following recent policy tailwinds. At current prices, we view the
27       shares as fairly valued.

28

ChargePoint reported revenue of $108 million, above the high end of its guidance range. Non-GAAP gross margins of 19% represented sequential improvement from the 17% generated in the first quarter. For the full year, ChargePoint reiterated non-GAAP gross margin guidance of 22%-26%, with management pointing to the lower half. The company expects a combination of average selling price increases and cost improvements for its direct current products to drive the implied improvement in gross margins in the second half of the year.[16]

123.    On this news, ChargePoint's stock surged, rising $1.78 per share, from a close price of $14.49 per share on August 30, 2022, to $16.27 per share at the close of market on August 31, 2022.

124.    But ChargePoint's statements in ¶ 119 that it earned $108.3 million in revenue for 2Q 2023 were materially false and misleading when made and omitted to disclose material facts. ChargePoint's revenue figures were based on an undisclosed and unsustainable revenue recognition scheme, whereby ChargePoint was recognizing revenue prematurely in violation of its own revenue recognition policy, before the revenue satisfied a performance obligation. ChargePoint was improperly recognizing revenue by, among other things, shipping out and invoicing: (a) pre-ordered chargers to customers who had not authorized delivery of the chargers; (b) incomplete, non-functioning chargers (with missing parts); (c) chargers different from the model the customer ordered; and (d) using resellers to store chargers for customers that were not ready to receive the chargers. *See supra* § V.C.

125.    ChargePoint's statements in ¶ 120 were also materially false and misleading when made and omitted to disclose material facts because it attributed its growth to "strong execution" and "our growth closely tracks the arrival rate of vehicles," and that "consumers embrace the transition to EVs at an accelerating rate." In reality, at least part of its purported growth was not related to its strong execution or the penetration of EVs into the market, but instead was the result of the undisclosed and unsustainable revenue recognition scheme described in the preceding paragraph. *See supra* § V.C.

---

[16] "Raising ChargePoint Fair Value Estimate to $14.50 on Improved Outlook; Shares Fairly Valued," Morningstar Equity Research (Aug. 31, 2022).

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS – 41                          Case No. 5:23-cv-06172-PCP

126.    ChargePoint's statements in ¶ 121 about significantly higher growth but for the supply chain constraints were also materially false and misleading when made and omitted to disclose material facts. In truth, ChargePoint's executives created internal control deficiencies and business risks stemming from its outsourcing of its accounts payable functions to India in 2021. ChargePoint's outsourcing of its accounts payable functions to India led to strained relations with key suppliers as a result of their failure to timely pay invoices. The unpaid invoices problem became progressively worse over time, increasing by 50% to 100% every year from 2021 to 2023. As a result of the strained relations with key suppliers, ChargePoint incurred higher supply costs or were shut off from key suppliers, leading to higher costs of sales or missed sales altogether. *See supra* § V.E.

**E.    Defendants' False Statements Associated with the Announcement of ChargePoint's Q3 2023 Financial Results**

127.    On December 1, 2022, ChargePoint issued a press release, which announced its financial results for the third quarter of fiscal year 2023, ended October 31, 2022. The press release stated, in relevant part:

> "*ChargePoint delivered another quarter of growth exceeding 90% year-over-year, as we continue to scale the business to meet strong demand for our solutions across North America and Europe,*" said Pasquale Romano, President and CEO of ChargePoint. "*Our networked, asset-light business model continues to enable our growth as we strive to deliver improved margins and operating leverage.*"

128.    ChargePoint reported third quarter revenue of $125.3 million, up 93% from $65.0 million in the prior year's same quarter. Third quarter GAAP gross margin was "18%, down from 25% in the prior year's same quarter primarily due to supply chain disruptions, which affected both cost and supply availability, and increased new product introduction and transition costs."

129.    In a December 1, 2022 earnings call with analysts, Romano emphasized the Company's 93% year-over-year revenue growth and ability to manage supply constraints:

> We had another record quarter with strong growth yielding $125 million in revenue at the low-end of our guidance range up 93% year-over-year and 16% sequentially. The difference between $125 million in revenue and our guidance midpoint was largely made up of production constraints on our most mature AC product as a result of supply driven redesign.

1

2

3

4

> The delay in shipping this high margin product held our margin improvement for the quarter to one point. We have now shipped the shortfall and more in November. Demand again exceeded supply for the quarter resulting in additional growth in backlog. We are on track to achieve our revenue target for the year and Rex will provide more color on revenue and particularly on gross margin in his comments.

5

6

7

8

9

> As we manage the revenue and gross margin challenges presented by supply chain constraints, logistics disruptions and new product introductions, I'd like to comment on operating expenses. As our OpEx this year shows, we've significantly slowed our operating expense trajectory. We are managing OpEx as a key driver of turning cash flow positive in the fourth quarter of calendar 2024. And think we have made and are making the right choices in investing to achieve our market position.

10

11

12

> As we have commented previously, we have invested ahead of the market for many years and our revenue growth has been and continues to be correlated with the availability of electric vehicles. With the continuing announcements by manufacturers of new EVs for consumers and fleets, we believe the global vehicle industry has passed the point of no return.

13

14

15

130. During the call, Defendant Romano highlighted that the Company has seen a steady increase in the number of bookings exceeding $1 million within a quarter, which Romano claimed was a reinforcing trend supporting ChargePoint's land and expand strategy:

16

17

18

19

> A useful growth indicator in this area is the number of bookings in a quarter that exceed $1 million. Last year, we averaged one booking over $1 million per quarter. This year, we have seen steady increases in the number of bookings exceeding $1 million within a quarter, which is a reinforcing trend supporting our land and expand strategy. In the third quarter alone, we had 11 bookings to end customers of over $1 million.

20

21

22

131. During the call, CFO Rex Jackson further stated that "we have supply chain constraints, but our growth rate is fairly astounding. ***So, I think we're banging through this pretty well***."

23

132. In response, on December 2, 2022, Oppenheimer & Co. reported as follows:

24

25

26

27

28

> Given CHPT delivering on the low end of its range as component availability limited revenue, we are encouraged by several elements of CHPT's results. First, we believe commentary on incremental component supply and completion of product redesigns points to improving GM. Second, lower OpEx spend suggests better operational efficiency and a strong validation of management's fiscal discipline. Third, CHPT indicated important signs of growth in key commercial vehicle markets, notably last-mile delivery and transit. As we rationalize our PT to $26 (from $40) driven by a lower

1

2

multiple to reflect current equity risk premiums, we note our estimates are essentially unchanged as we see the company executing well against a compelling opportunity set. We remain constructive on shares, especially given evidence of cost controls.[17]

3

4

133.    But ChargePoint's statements in ¶ 128 that it earned $125.3 million in revenue for 3Q 2023 were materially false and misleading when made and omitted to disclose material facts. ChargePoint's revenue figures were based on an undisclosed and unsustainable revenue recognition scheme, whereby ChargePoint was recognizing revenue prematurely in violation of its own revenue recognition policy, before the revenue satisfied a performance obligation. ChargePoint was improperly recognizing revenue by, among other things, shipping out and invoicing for: (a) pre-ordered chargers to customers who had not authorized delivery of the chargers; (b) incomplete, non-functioning chargers (with missing parts); (c) chargers different from the model the customer ordered; and (d) using resellers to store chargers for customers that were not ready to receive the chargers. *See supra* § V.C.

5

6

7

8

9

10

11

12

13

134.    ChargePoint's statements in ¶ 129 were also materially false and misleading when made and omitted to disclose material facts because it attributed its growth to the availability of electric vehicles; as it stated, "[w]ith the continuing announcements by manufacturers of new EVs for consumers and fleets, we believe the global vehicle industry has passed the point of no return." In reality, at least part of its purported growth was not related to its investments, increased charging demand, or adding new customers, but instead was the result of the undisclosed and unsustainable revenue recognition scheme described in the preceding paragraph. *See supra* § V.C.

14

15

16

17

18

19

20

135.    ChargePoint's statements in ¶ 131 about growth rate being "fairly astounding" and that, in regards to supply chain challenges, "I think we're banging through this pretty well," were also materially false and misleading when made and omitted to disclose material facts. Contrary to those representations, ChargePoint's executives created internal control deficiencies and business risks stemming from its outsourcing of its accounts payable functions to India in 2021. ChargePoint's outsourcing of its accounts payable functions to India led to strained relations with

21

22

23

24

25

26

27

28

---

[17] "CHPT: Solid Performance; Adjusting PT in Line with Current Risk Premiums," Oppenheimer & Co. (Dec. 2, 2022).

key suppliers as a result of their failure to timely pay invoices. The unpaid invoices problem became progressively worse over time, increasing by 50% to 100% every year from 2021 to 2023. As a result of the strained relations with key suppliers, ChargePoint incurred higher supply costs or were shut off from key suppliers, leading to higher costs of sales or missed sales altogether. *See supra* § V.E.

F.    **Defendants' False Statements Associated with the Announcement of ChargePoint's Q4 2023 Financial Results**

136.    On March 2, 2023, ChargePoint issued a press release filed with the SEC on Form 8-K, which announced its financial results for the fourth quarter and full fiscal year 2023 ended January 31, 2023. The press release stated, in relevant part:

> "***ChargePoint delivered its largest sequential revenue growth to date and another record quarter, although below our guidance range as supply challenges for our DC solutions and quarter end shipment challenges at this growth rate persisted***," said Pasquale Romano, President and CEO of ChargePoint. "***We continued to extend our technology and market leadership position across North America and Europe this year while driving 94% year-over-year growth and delivering improving gross margin and better operating expense leverage as we progress toward profitability***."

137.    ChargePoint reported fourth quarter revenue was $152.8 million, up 93% from $79.3 million in the prior year's same quarter. For the full year, revenue was $468.1 million, an increase of 94% from $241.0 million in the prior year. In addition, "fourth quarter GAAP gross margin improved sequentially to 22%, but was flat to the prior year's same quarter." Full year GAAP gross margin was 18%, down from 22% in the prior year.

138.    ChargePoint released the following guidance for 1Q 2024:

> For the first fiscal quarter ending April 30, 2023, ChargePoint expects revenue of $122 million to $132 million. At the midpoint, this represents an anticipated increase of 56% as compared to the prior year's same quarter.

139.    In response, on March 3, 2023, Needham & Co. reported as follows:

> We reinstate coverage of CHPT with a Buy rating and a $14 target. We view CHPT's market leadership position in EV charging and improving margins as compelling when considering the likely backdrop of high industry growth as US EV penetration grows. We expect 1QF24 revenue guidance to have a short-term negative impact on the stock, but we view the guidance as more of a one time communication issue vs a company momentum issue, and note that

1
2

it didn't materially impact our long-term estimates. Our $14 price target is based on a 35x EV/adj. EBITDA multiple on our FY27 (Jan '27) estimate discounted back, or a 5x EV/revenue multiple on our FY25 (Jan '25) estimate.

3
4
5
6
7

CHPT reported 4QF23 revenue that missed company guidance and consensus estimates, blaming the miss on timing, as it was unable to build and ship enough product to meet demand. 1QF24 revenue guidance was ~15% below consensus, with CHPT citing seasonal factors for the shortfall, namely 4QF23 orders showing a typical seasonal lull around the holidays. We view this as a negative surprise and an example of underwhelming company communication, but view it as a one-time issue that doesn't materially affect our long-term projections.[18]

8
9
10
11
12
13
14
15
16
17

140.    But ChargePoint's statements in ¶ 137 that it earned $152.8 million in revenue for 4Q 2023 were materially false and misleading when made and omitted to disclose material facts. ChargePoint's revenue figures were based on an undisclosed and unsustainable revenue recognition scheme, whereby ChargePoint was recognizing revenue prematurely in violation of its own revenue recognition policy, before the revenue satisfied a performance obligation. ChargePoint was improperly recognizing revenue by, among other things, shipping out and invoicing for: (a) pre-ordered chargers to customers who had not authorized delivery of the chargers; (b) incomplete, non-functioning chargers (with missing parts); (c) chargers different from the model the customer ordered; and (d) using resellers to store chargers for customers that were not ready to receive the chargers. *See supra* § V.C.

18
19

## G.    Defendants' False Statements Associated with the Announcement of ChargePoint's FY 2023 Financial Results

20
21

141.    On April 3, 2023, ChargePoint released its annual 10-K for Fiscal Year 2023. In its submission, ChargePoint stated as follows:

22
23
24

The change in operating assets and liabilities was mainly driven by increases in accounts receivable of $94.6 million, inventory of $39.4 million, prepaid expenses and other assets of $38.0 million and operating lease liabilities of $5.0 million, offset by increases in deferred revenue of $51.8 million, accounts payable of $31.5 million and accrued and other liabilities of $29.4 million.

25
26

142.    It also reported its total FY23 revenue as $468,094,000.

27
28

[18] "Fully Charged, Reinstate Coverage With a Buy, $14 Target," Needham & Co. (Mar. 3, 2023).

143.    But ChargePoint's statements in ¶¶ 141-142 that it earned $130.0 million in revenue for 1Q 2024 and $468,094,000 for FY23 were materially false and misleading when made and omitted to disclose material facts. ChargePoint's revenue figures were based on an undisclosed and unsustainable revenue recognition scheme, whereby ChargePoint was recognizing revenue prematurely in violation of its own revenue recognition policy, before the revenue satisfied a performance obligation. ChargePoint was improperly recognizing revenue by, among other things, shipping out and invoicing for: (a) pre-ordered chargers to customers who had not authorized delivery of the chargers; (b) incomplete, non-functioning chargers (with missing parts); (c) chargers different from the model the customer ordered; and (d) using resellers to store chargers for customers that were not ready to receive the chargers. *See supra* § I.C.

144.    The above statements identified in ¶ 141 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) the Company was experiencing higher component costs and supply overruns for first generation DC charging products; (2) that, as a result, the Company was likely to incur impairment charges; and (3) that, as a result of the foregoing, the Company's profitability would be adversely impacted. *See supra* § V.D.

**H.    Defendants' False Statements Associated with the Announcement of ChargePoint's Q1 2024 Financial Results**

145.    On June 1, 2023, ChargePoint issued a press release filed on Form 8-K with the SEC which announced its financial results for the first quarter of fiscal year 2024, ended April 30, 2023. The press release stated, in relevant part:

> "***ChargePoint delivered strong results in the first quarter, growing at nearly 60% year-over-year***. We focused on delivering our broad portfolio of charging solutions across North America and Europe, while continuing to improve gross margins, and managing operating expenses," said Pasquale Romano, President and CEO of ChargePoint. "***The positive first quarter results are a testament to the strength and diversity of our business***. As the only charging network to operate across all verticals in North America and Europe, we believe we remain well positioned to take advantage of the inevitable long-term growth opportunity ahead."

146.    ChargePoint reported first quarter revenue of $130.0 million, up 59% from $81.6 million in the prior year's same quarter. First quarter GAAP gross margin was 23%, up from 15% in the prior year's same quarter.

*147.*    On June 1, 2023, Defendants Romano and Jackson hosted an earnings call with analysts. During the call, Defendant Romano emphasized ChargePoint's "strong first quarter" that included $130 million revenue at the high end of ChargePoint's previous guidance range in face of a challenging macroeconomic environment:

> ***We delivered a strong first quarter. Revenue was at the high-end of our guidance range at $130 million, and non-GAAP gross margin sequentially improved 2 points to 25%. To put these results into perspective, we achieved a 59% year-over-year growth rate in the first quarter and had the second largest quarter in ChargePoint's history.*** We did that while the EV installed base in North America and Europe are still in single-digits and the EV market is only at the beginning of a decades-long growth cycle. We also achieved this growth in the midst of a challenging macroeconomic environment. Diversification across verticals and geographies continues to contribute resilience to our business. So, while we saw less growth in North American commercial and residential than we would have liked due to what we believe is a delay in discretionary purchases, we continue to see overall growth and margin improvement.

*148.*    On the earnings call, an analyst asked Defendants about the impact of supply chain issues on ChargePoint's first quarter results and how it may affect ChargePoint's shipment targets for the balance of the year. In response, Defendant Jackson explained that that the Company had made significant progress over the last year in addressing these issues and is well past the worst of it:

> Yeah. So, thanks for the question, Mark. So, to start, the PPV/supply chain impact that we've been talking about is probably closer to 5 points or 6 points per quarter. There's logistics charges. We could take it up another quarter or two. And then, we have had a couple of write-offs that we did last year that impacted us. So, I just want to frame that the percentage points there it's really closer to 5 points or 6 points that are specifically supply chain.
>
> No question that that's gotten much, much better from a supply perspective. So, we really snapped through this quarter. And I was glad to see – ***I think I actually said in prior calls, geez, I'd love to build some inventory, right, because we've had to leave business on the table in prior quarters and backlog got out of whack, everything else. So, we're back to a nice rhythm now I think from***

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*a build perspective. As you can imagine, there are some prior deals that we had to cut to get supply that's now sitting in inventory.*

So, you won't see 100% of the supply chain impact disappear overnight. We obviously have to work that through inventory and sell that through. But I would say from an operational perspective, logistics are pretty much back to normal, which is a real time thing, you either pay it or you don't. And then the supply chain thing also back to a really good place. *So, once we work through any existing inventory that had those higher prices previously, we'll be hitting our stride. But I think it's fair to say that we are well past the worst of it.*

149.     On June 1, 2023, Finbold reported the overall positive coverage ChargePoint had received thus far from securities analysts, stating that "ChargePoint [] is a US company that manages the largest online network of independently owned EV charging stations across 14 countries around the world. As auto manufacturers race to reduce their carbon footprint and shift toward EVs, ChargePoint is well-positioned to tackle the ever-growing demand for EV charging stations. . . . Meanwhile, 23 analysts offered their views on CHPT in the past three months, giving it a consensus rating of 'buy.' This is based on 17 financial experts seeing the stock as a 'strong buy,' 5 believing it is a 'hold,' while only 1 rated it as a 'strong sell.'"[19]

150.     But ChargePoint's statements in ¶ 146 that it earned $130.0 million in revenue for 1Q 2024 were materially false and misleading when made and omitted to disclose material facts. ChargePoint's revenue figures were based on an undisclosed and unsustainable revenue recognition scheme, whereby ChargePoint was recognizing revenue prematurely in violation of its own revenue recognition policy, before the revenue satisfied a performance obligation. ChargePoint was improperly recognizing revenue by, among other things, shipping out and invoicing for: (a) pre-ordered chargers to customers who had not authorized delivery of the chargers; (b) incomplete, non-functioning chargers (with missing parts); (c) chargers different from the model the customer ordered; and (d) using resellers to store chargers for customers that were not ready to receive the chargers. *See supra* § V.C.

---

[19] "3 battery stocks to keep on your watchlist in June, 2023," *Finbold* (June 1, 2023), available as of July 19, 2024 at https://finbold.com/3-battery-stocks-to-keep-on-your-watchlist-in-june-2023/.

151.    The above statements identified in ¶¶ 147-148 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) the Company was experiencing higher component costs and supply overruns for first generation DC charging products; (2) that, as a result, the Company was likely to incur impairment charges; (3) that, as a result of the foregoing, the Company's profitability would be adversely impacted; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. *See supra* § V.D.

**I.    Defendants' False Statements Associated with the Announcement of ChargePoint's Q2 2024 Financial Results**

152.    On August 8, 2023, the Company filed its quarterly report for the period ended July 31, 2023, with the SEC on Form 10-Q (the "2Q24 10-Q"). For the first time since going public, ChargePoint's press release issued on the same day made no mention of revenue or revenue growth.

153.    The 2Q24 10-Q stated, in relevant part:

> Disruptions in the manufacturing, delivery and overall supply chain of vehicle manufacturers and suppliers have resulted in additional costs and, to a lesser extent, component shortages, and have led to fluctuations in EV sales in markets around the world. Increased demand for personal electronics and trade restrictions that affect raw materials have contributed to a shortfall of semiconductor chips, which has caused additional supply challenges both within and outside of ChargePoint's industry. Ongoing supply chain challenges, component shortages and heightened logistics costs have adversely affected ChargePoint's gross margins in recent quarters and ChargePoint expects that gross margins may continue to be adversely affected by increased material costs and freight and logistic expenses in the future.

154.    The above statements identified in ¶ 153 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) the Company was experiencing higher component costs and supply overruns for first generation DC charging products; (2) that, as a result, the Company was likely to incur impairment charges; (3) that, as a result of the foregoing, the Company's profitability would be adversely impacted; and (4) that, as

a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## VII.    THE TRUTH EMERGES

### A.    September 6, 2023: ChargePoint Discloses Revenue Deceleration and $28 Million Inventory Impairment Charge

155.    The truth began to emerge on September 6, 2023, when after the market closed, ChargePoint issued a press release announcing worse-than-expected financial results for the second quarter of fiscal year 2024 ended July 31, 2023, which was filed on Form 8-K with the SEC. The Company reported Q2FY24 revenue of only $150.5 million. While the Company attempted to spin the quarterly revenue as a 39% year-over-year increase, the reported revenues were below analyst consensus of $153.2 million, barely within the Company's previous guidance of range of $148 million to $158 million and showed a continued sales deceleration.

156.    ChargePoint also posted a large operating loss and margin miss, which the Company blamed on a $28.0 million inventory impairment charge the Company took in the quarter "to address legacy supply chain-related costs and supply overruns on a particular [direct current] DC product." Specifically, the Company reported a second quarter GAAP net loss of $125.3 million, a widening of 35% from the prior year's same quarter, as well as adjusted earnings per share of -35 cents, almost three times worse than analysts estimated (-13 cents per share). The Company also reported a GAAP gross margin of only 1%, significantly below analyst consensus of 24.9% due to the $28 million inventory impairment charge (19% impact).

157.    Responding to this loss dynamic, ChargePoint revealed a restructuring plan aiming to cut its operating expenses by $30 million annually, in part by laying off 10% of its workforce.

158.    ChargePoint's guidance foreshadowed further reduced revenue growth rate. The Company announced that revenues would essentially be flat in the third quarter fiscal 2024 revenue guiding to $150 to $165 million, well below the consensus estimate of $180.9 million and signifying that management believed there could not be sequential growth in the next quarter. The Company guided full fiscal year 2024 revenue guidance of $605 to $630 million, signaling an annual revenue growth rate of at or below 30%. Nevertheless, the Company estimated a non-GAAP

1   gross margin of 22% to 25% and reaffirmed its plan to achieve positive non-GAAP Adjusted

2   EBITDA in the fourth quarter of calendar year 2024.

3       159.    On September 6, 2023, Defendants Romano and Jackson led a conference call with

4   analysts to discuss ChargePoint's second quarter of fiscal year 2024 earnings. In his opening

5   remarks, Defendant Romano explained the inventory impairment charge stating, "we've taken an

6   inventory impairment charge on our first generation DC charging products. During the supply chain

7   crisis, we saw assurance of supply versus costs and are now adjusting our stranded costs to current

8   values, given inventory levels."

9       160.    Defendant Jackson provided additional color on the gross margin headwind that

10  occurred within the quarter, explaining the quarter included a $28 million one-time impairment

11  charge associated with their first-generation DC charging product and $6 million charge associated

12  with sales of the first generation DC charging product at the pre-impairment cost structure:

13          Turning to gross margin, non-GAAP gross margin for Q2 was
            3%. As Pasquale indicated, this reflects a $28 million or 19 margin
14          point impairment to cost of goods sold. This was taken to address
            supply chain-related higher component costs and supply overruns
15          for our first generation DC charging product. In addition to this
            quarter-end impairments, our non-GAAP gross margin for the
16          quarter also included 3 points of headwind from selling this first
            generation product at the pre-impairment cost structure. We see
17          continued demand for this product.

18      161.    Defendant Jackson addressed the Company's growing inventory, noting that the

19  inventory build was associated with earlier supply commitments, but assured investors that it would

20  not increase significantly over the rest of the year:

21          We continued to build inventory during the quarter. As mentioned
            last quarter, we are working through inventory associated with
22          earlier supply commitments. We finished the quarter with $144
            million in inventory, which is net of the Q2 impairment discussed
23          earlier and up from $115 million at the end of Q1. We do not expect
            this level to increase significantly over the rest of this year. We're
24          managing through these commitments and vectoring in on our turns
            goals.
25
        162.    Defendant Jackson provided further assurance that ChargePoint's inventory issues
26
    were behind it when discussing the Company's guided gross margin for the third quarter:
27
            Regarding gross margin for the third quarter, we expect to be
28          between 22% and 25% on a non-GAAP basis as we work through

the inventory levels discussed earlier. **With the inventory issue behind us** and aggressive programs for improving our cost structure on supply and manufacturing, we would expect to resume continued improvement in gross margin next year.

163.    In response to analyst inquiry concerning the margin headwind created by the inventory impairment, Defendant Jackson assuaged concerns by stating that the margin headwinds were caused by an "in quarter item, specifically an impairment charge effective at the end of the quarter, which did not affect the underlying margin for that product during the quarter, and that with this charge accounted for margin headwinds would go away going forward":

> **Question – James West:** . . . And then maybe for Rex on the 3 points of headwind on the margin, is that – I guess, what are the main drivers of that? I believe it's just the new – getting ready for the new sales. But, are those just a this quarter issue? Do they go away the next couple of quarters or are they here for the rest of the fiscal year?

> **Answer – Rex S. Jackson**: So, James, those should go away going forward. It was a in-quarter item. But we only flagged it just because we did the impairment effective as of the end of the quarter and, therefore, it didn't affect any of the underlying margin for that product during the quarter. We just want people to understand what the impact was, but with the impairment that goes away

164.    ChargePoint's widening losses, inventory impairment woes, and decelerating revenue growth caught the attention of securities analysts. In noting that the "headline figures were disappointing" and the $28 million inventory impairment, Wolfe Research lowered its price target from $12 to $8 per share, stating, "[W]e think investors are increasingly questioning CHPT's fundamental value proposition. While there remains a sizable need for greater (and more reliable) charging infrastructure, Chargepoint's revenues are continuing to decelerate. FQ3 guidance implies a 24% y/y increase, and FQ4 is expected to rise by just ~18%."[20] Similarly, Fox Advisors downgraded ChargePoint, explaining, "We lower our rating on ChargePoint (CHPT; $7.06) from Outperform to Equal-Weight after FQ2 (July) results disappointed even if we exclude an unexpected inventory write-down. CHPT also provided weaker than expected top and bottom- line targets for the rest of F2024E (Jan), implying a severe growth deceleration despite still rapidly

---

[20] "CHPT Still Facing Challenges; EV Battery Costs Now Declining Quickly," Wolfe Research (Sep. 7, 2023).

1  expanding electric vehicle markets."[21] Pickering Energy echoed this sentiment, stating "It's hard to

2  find much to be positive about in CHPT's F2Q24 results, which included a material EBITDA miss,

3  disappointing revenue guidance, and a much worse-than-expected cash burn . . . Revenue growth

4  is decelerating rapidly – Revenue guidance was worse than expected and points to a sharp

5  deceleration in growth."[22]

6      165.    On this news, the Company's share price fell $0.77, or 11%, from a close price of

7  $7.06 per share on September 6, 2023, to close price of $6.29 per share on September 7, 2023, on

8  unusually heavy trading volume. Losses on ChargePoint shares extended the next trading day as

9  the market continued to digest the Company's disclosures, falling to a close price of $5.72 per share

10  on September 8, 2023.



27  [21] "CHPT: Reduce Rating to Equal-Weight," Fox Advisors (Sep. 7, 2023).

28  [22] "Fiscal 2Q24 Follow-Up - Cash Flow Challenges Continue and Top Line Growth is
    Decelerating," Pickering Energy Partners (Sep. 7, 2023).

1      ***166.*** On September 11, 2023, the Company filed its quarterly report for the period ended

2  July 31, 2023, with the SEC on Form 10-Q (the "2Q24 10-Q"). The 2Q24 10-Q provided an

3  additional breakdown on the inventory impairment charge:

> Inventory levels are analyzed periodically and written down to their
> net realizable value if they have become obsolete, have a cost basis
> in excess of expected net realizable value or are in excess of
> expected demand. ***During the three months ended July 31, 2023,
> the Company recorded an impairment charge of $28.0 million,
> consisting of $15.0 million charge to write down the carrying
> value of certain inventory on hand, as well as $13.0 million charge
> for losses on noncancelable purchase commitments for inventory
> to be received after July 31, 2023, to reduce the carrying value of
> certain DC fast charging products to their estimated net realizable
> value.*** The inventory impairment charge is included in the cost of
> revenue - networked charging systems in the condensed
> consolidated statements of operations.

11     167. Within days of having assured investors that the Company's margin headwinds were

12 behind the Company, Defendants and other ChargePoint insiders curiously began selling large

13 amounts of their personally held shares. This included Defendant Jackson selling 556,255 shares at

14 an average price of $5.8358 per share on September 08, 2023, and 16,799 shares at an average price

15 of $5.032 per share on September 21, 2023. Similarly, Chief Commercial and Revenue

16 Officer, Michael D. Hughs sold 13,729 shares at an average price of $5.0316 per share on

17 September 21, 2023.

18     168. Almost immediately after ChargePoint insiders dumped their shares, the Company

19 announced plans to raise $232 million in capital through a dilutive share sale. Specifically, on

20 October 13, 2023, ChargePoint announced that it had secured a commitment from institutional

21 investors to purchase its common stock worth $175 million. The Company also said that it had

22 already raised $57 million through a stock sale during the third quarter fiscal year 2024. In total, it

23 was raising $232 million by issuing 50 million additional shares. Moreover, ChargePoint also

24 revealed that it had modified the terms of an existing $300 million in convertible notes (a form of

25 debt) to extend their maturity, but that the move came at a cost. Although the Company had secured

26 another year through 2028 to repay the debt, it will also have to bear higher costs in between since

27 the interest rates on the notes have been revised higher as well, going from 3.5% to an alarming 7%

28 per year.

169.    With the Company having lost virtually 50% of its market capitalization over the past six months, investors were eagerly awaiting ChargePoint's upcoming earnings release for the third quarter fiscal year 2024 for the period ending October 31, 2024, expected to be released in early December 2023.

**B.    November 16, 2023: ChargePoint's Pre-Announcement of Certain F3Q24 Results; Executive Leadership Changes**

170.    On November 16, 2023, after the market closed, ChargePoint surprised the market by releasing selected preliminary unaudited financial results for the third quarter of fiscal year 2024. Significantly, the Company revealed a large revenue shortfall relative to prior guidance and consensus expectations, stating that it now expected to generate F3Q24 revenue of only $108 to $113 million—down 25-28% quarter-on-quarter and down 10% to 15% year-over-year and a whopping 30% percent cut compared to its previous revenue guidance of $150 to $165 million given on September 6, 2023. The Company blamed the revenue decline on developments in its core markets in both North America and Europe being impacted by the macro environment and fleet and commercial vehicle delivery delays, which in turn impacted expected deployments with government, auto dealership, and workplace customers.

> Our core markets of North America and Europe both came under pressure late in the third quarter, with ***revenue falling far short of expectations***. Overall macroeconomic conditions, along with fleet and commercial vehicle delivery delays impacted anticipated deployments with government, auto dealership and workplace customers." said Rick Wilmer, President and CEO of ChargePoint.

171.    In addition to the revenue shortfall, the Company also revealed that it expected to take another non-cash impairment charge of $42 million this quarter (on top of the $28 million from last quarter), resulting in GAAP gross margin of negative 23% to negative 21% and non-GAAP gross margin of negative 19% to negative 17%. ChargePoint explained that this impairment charge was again "related to product transitions" and that the decision to impair came as a result of an ***18-month*** analysis of ChargePoint's supply chain, manufacturing partnerships, and inventory management approach conducted by ChargePoint's Chief Operating Officer Rick Wilmer:

> Over the past 18 months in his prior role as Chief Operating Officer, Wilmer has completed a thorough analysis of ChargePoint's supply chain, manufacturing partnerships and inventory management

approach. "The ChargePoint board and I are committed to significantly improving operational execution to ensure that the Company is building a stronger, more resilient business for the benefit of all stakeholders. ***Our first steps are to take an additional non-cash inventory impairment charge related to product transitions and to better align inventory with current demand.*** We remain committed to our goal of generating positive adjusted EBITDA in the fourth quarter of calendar 2024," said Wilmer.

172.    In turn, ChargePoint's losses were ballooning, as it expected GAAP operating expenses of $129 million to $131 million. And even excluding the impact of the $42 million inventory impairment charge, the Company announced its adjusted gross margin were further deteriorating, as it expected non-GAAP gross margin of 19% to 21%, as compared to 22% to 25% as previously expected.

173.    Apart from the disastrous pre-release, the Company also announced that it would be replacing both its President/Chief Executive Officer, Defendant Romano, and Chief Financial Officer, Defendant Jackson, effective immediately. The Company said it had named Rick Wilmer as Chief Executive Officer and President, who had been COO since July 2022, and appointed Mansi Khetani (Senior Vice President of Financial Planning and Analysis) as interim Chief Financial Officer.

174.    The Company explained that it would report its full third quarter financial results and update full year revenue and fourth quarter fiscal 2024 guidance on an investor conference call to be held on Wednesday, December 6, 2023, at 1:30 p.m. PST (4:30 p.m. EST).

175.    Analysts' response to the F3Q24 pre-release were brutal. In a report to its clients, Pickering Energy Partners wrote, "Hard to Sugarcoat It – This is a Very Bad Update: CHPT's Q3 pre-announcement checked virtually every possible box for a spectacularly bad update including Q3 revenue ~30% below guidance, its first negative Y/Y growth quarter, the abrupt departure of both the CEO and CFO, and what looks to be another ~$100MM negative cash burn. . . .The hard reality is that with this update CHPT has morphed from a high-growth, money-losing enterprise to a negative-growth, money-losing enterprise, a combination that has limited investment appeal until it shows sustained signs of reversing."[23]

---

[23] "Q3 Update Very Negative On Multiple Levels," Pickering Energy (Nov. 17, 2023).

176.    Similarly, Fox Advisors connected the leadership resignations with the poor financial performance, and suggested the additional inventory impairment was a decisive action by the new executive management to deal with past inventory problems and prepare for a fresh start:

> Last night, ChargePoint (CHPT; $3.13; E/W) negatively pre-announced a big top and bottom line miss to its FQ3 (Oct) guidance, which comes after the company just raised $232mm through an at-the-market facility on October 11th. At the same time, the Board announced that CHPT's CEO Pasquale Romano and CFO Rex Jackson are leaving the company, which we assume is directly related to the significant disappointments of FQ3 as well as some prior, albeit less dramatic misses in prior quarters.

> *        *        *

> Given the lower sales projection, CHPT expects non-GAAP gross profits to be a loss of (19%-17%) of sales, which is before an unexpected and significant inventory write down of $42mm that relates to recent product transitions and a decision to better align its inventory with current demand. Recall, CHPT incurred a $28mm inventory impairment charge in FQ2 (Jul) related to its first-generation DC fast chargers. We note CHPT's prior gross margin outlook was 22-25% while we were modeling 23.8% and consensus was at 22.8% and assume this latest inventory charge is a "clear the decks" move by new CEO Wilmer.[24]

177.    Several other firms downgraded their rating of ChargePoint and slashed their target price. Needham cut its price target on ChargePoint's stock to $4 from $8. Oppenheimer cut its rating on ChargePoint to perform from outperform and removed its $13 price target for the stock saying, "We are stepping to the sidelines . . . given the management transition, choppy demand, and potential for further organizational changes." Roth Capital went even further, downgrading shares of ChargePoint to Neutral from Buy and cut the target price to $2 per share from $11 per share, representing an 81% decline.[25]

**178.**    On this news, the Company's share price fell $1.11, or 35%, from a close price of $3.13 per share on November 16, 2023, to close at a record low of $2.02 per share on November 17, 2023, on unusually heavy trading volume. ChargePoint's market capitalization fell to approximately $750 million from a peak of $11.2 billion in June 2021.

---

[24] "CHPT: Big Miss Leads to CEO & CFO Changes," Fox Advisors (Nov. 17, 2023).

[25] "CHPT: Downgrading to Neutral; F3Q24 Pre-Release Shows Material Deterioration," Roth Capital Partners (Nov. 17, 2023).



### C.   Post Class Period Events: Materialization of Defendants' Fraud

179.   On December 6, 2023, ChargePoint issued a press release announcing its 3QFY24 financial results. ChargePoint's financial results were relatively uneventful after the jarring mid-November pre-release, as the Company reported 3QFY24 (October) revenue of $110.3 million (down 27% quarter-on-quarter and down 12% year-over-year) which was about in line with the midpoint of the negative pre-announcement on November 16, 2023, for revenue to be in the range of $108 million to $113 million. By segment, ChargePoint reported Networked charging systems revenue of $73.9 million (down 36% quarter-on-quarter and down 24% year-over-year), and. Subscriptions revenue was $30.6 million (up on only 2% quarter-on-quarter).

180.   That same day, ChargePoint's new management team led an earnings call with analysts. On the earnings call, ChargePoint's new CEO Rick Wilmer stated that commercial demand had waned, which was a factor impacting Q3 top line revenue, explaining "In simple terms,

our channel has moved back to a model where they are carrying lower levels of inventory and placing smaller restocking orders as needed."

181.    Wilmer also provided additional color concerning the $42 million non-cash impairment charge and how it differed from the previous $28 million impairment charge in fiscal second quarter:

> Regarding the $42 million non-cash impairment charge, I'd like to outline what it was taken for and how it differs from the impairment taken in Q2. The impairment in the second quarter addressed the cost structure of a single first-generation DC charger. That product continues to sell and does so at margin. The non-cash impairment taken in the third quarter addresses executional issues related to multiple product transitions and better aligns inventory with current demand. This was a deliberate action that cleans the slate for the business moving forward. We did not execute these new product transitions well, and we have learned from our mistakes.
>
> Two factors that were at the center of these transitional issues, the extreme supply chain shortages brought on by the COVID pandemic and the surge in demand we experienced from 2022 through the first half of 2023, leaving us with surplus inventory at the end of Q3. These issues have been corrected, with supply and demand better balanced.
>
> To summarize, we have balanced our future supply commitments to realign with current demand and the current product range. We believe the non-cash impairment charge we took in the third quarter places us back on solid ground to build from. As I have said at the beginning of the call, we have had some execution challenges that I began to fix as COO and will finish addressing as CEO. We believe the non-cash impairments taken this quarter are conservative and comprehensive and that we are now in an excellent position to monetize our current inventory.

182.    New CFO Mansi Khetani further explained how the $42 million inventory impairment was accounted for on ChargePoint's balance sheet, stating "about half of the impairment impacted the inventory line. The other half, which was related to commitments, is reflected as a liability on the balance sheet. We expect inventory to decline in the future as we have slowed down our build rate to adjust for the current demand environment."

183.    Wilmer further explained the channel inventory normalization in response to analyst inquiry, but rather than admitting the overstocking of channel partners, the new CEO attempted to blame it on the COVID-19 pandemic extending purchase lead times:

[W]hile I hate to continue to use the excuse of the COVID pandemic, it's a real reason why we've experienced this.

During the COVID pandemic, we saw certain components that went into charters with two-year lead times. And the supply chain was driven hard due to those types of extended lead times along with very strong demand last year into early this year. That translated through into the channel. Our products were on lead times, so the channel bought ahead and they ended up with inventory. Our lead times for our components are largely back to normal, and we are now shipping with very short lead time into the channel, which has allowed the channel inventory to normalize.

184.    Defendants' story makes little sense in light of the immediate firing of CEO Romano and CFO Jackson, and the FE statements. In essence, the inventory impairment and new CEO Wilmer's explanation about channel inventory normalization are attempts to address the consequences of the alleged fraudulent practices without fully admitting to them. The write-off represents an acknowledgment that the value of ChargePoint's inventory and future inventory commitments needed to be adjusted to reflect economic reality, contrary to the company's previous optimistic statements about its financial condition and growth prospects.

185.    In layman's term, new CEO Wilmer and CFO Khetani are saying the $42 million inventory impairment charge was split into two parts: (a) about half (approximately $21 million) directly impacted the inventory line on the balance sheet (this likely represents a write-down of the value of existing physical inventory that ChargePoint had on hand) and (b) The other half was recorded as a liability on the balance sheet. This portion likely represents losses on non-cancelable purchase commitments for inventory that ChargePoint was obligated to buy in the future but now expects to be worth less than the committed purchase price.

186.    New CEO Wilmer and CFO Khetani's explanation suggests that during the COVID-19 pandemic: (a) component lead times were extremely long (up to two years for some parts); (b) to manage these long lead times and meet strong demand, ChargePoint and its channel partners (distributors and resellers) ordered more inventory than usual; and (c) as supply chain issues eased and lead times returned to normal, ChargePoint and its channel partners found themselves with excess inventory.

187.    But the former employees' statements show that ChargePoint's executives were aware of these inventory issues much earlier but concealed them from investors. The Company (a) pushed excess inventory onto channel partners to recognize revenue prematurely; (b) shipped incomplete or incorrect products to boost revenue numbers; and (c) used resellers to store inventory for customers not ready to receive products, allowing ChargePoint to recognize revenue earlier than appropriate.

188.    The reality behind the write-offs are that while new CEO Wilmer and CFO Khetani blame the inventory issues on COVID-19 and long lead times, the real reasons for the excess inventory and subsequent write-off were: (a) declining demand for ChargePoint's products; (b) aggressive revenue recognition practices that led to an accumulation of unsold or returned inventory; and (c) overstocking of certain products (like the CPE 250 Charger) based on overly optimistic projections.

189.    ChargePoint's poor financial results in two subsequent quarters after the Class Period further substantiate the FEs' accounts. ChargePoint saw a collapse in sales in the fourth quarter fiscal year 2024, reporting revenue of only $115.8 million (-24.2% year-over-year). ChargePoint followed that up with another weak quarter when reporting first quarter fiscal year 2025 results in April 2024, reporting revenue of only $107.04 million (-17% year-over-year). ChargePoint's reporting of a decline in revenue growth for three consecutive quarters corroborates the FEs' account of Defendants' improper revenue recognition scheme. The scheme essentially "borrowed" revenues from future quarters, making it not only foreseeable, but inevitable that the subsequent periods from which the revenues were borrowed would suffer revenue shortfalls and resulting poor reported financial results.

## VIII.    ADDITIONAL ALLEGATIONS OF SCIENTER

190.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal

securities laws. As set forth elsewhere herein in detail, the Executive Defendants, by virtue of their receipt of information reflecting the true facts regarding ChargePoint, their control over, and/or receipt and/or modification of ChargePoint's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning ChargePoint, participated in the fraudulent scheme alleged herein.

**A.     Defendants' Motive and Opportunity to Commit the Alleged Fraud**

**1.     ChargePoint's executive compensation supports scienter.**

191.     Prior to the Class Period and going public, ChargePoint's compensated its most senior executives primarily through cash remuneration. For example, for the 2021 Fiscal Year (February 1, 2020 - January 31, 2021), Defendant Romano received $859,167 in total compensation from the Company (This included $454,167 in salary, and $405,000 in bonus), all of which was in cash.



192.    After going public and throughout the Class Period, ChargePoint changed its compensation structure to pay its most senior executives primarily through ChargePoint equity. For example, for the 2022 Fiscal Year (February 1, 2021 to January 31, 2022), Defendant Romano received $58,679,085 in total compensation from the Company, 75% of which was made up of stock option awards.[26] Similarly, for the 2022 Fiscal Year, Defendant Jackson received $13,188,729 in total compensation from the Company, 72% of which was comprised of stock option awards.[27]

---

[26] According to the Proxy, this included $500,000 in salary, $43,823,305 in option awards, and $14,355,780 in all other compensation

[27] This included $362,500 in salary, $90,000 in bonus, $9,555,000 in stock awards, and $3,181,229 in all other compensation.



193.    Likewise, for the 2023 Fiscal Year (February 1, 2022 – January 31, 2023), Defendant Romano received $16,755,533 in total compensation from the Company, 93% of which was comprised of stock awards.[28] For the 2023 Fiscal Year, Defendant Jackson received $8,541,031 in total compensation from the Company, 92% of which was in stock awards.[29]

[28] According to the Proxy, this included $562,500 in salary, $15,748,311 in stock awards, $431,250 in non-equity incentive plan compensation, and $13,472 in all other compensation

[29] This included $425,000 in salary, $7,874,156 in stock awards, and $241,875 in non-equity incentive plan compensation.



194.    As a result of the lucrative stock-option-heavy compensation offered by the Company, the Executive Defendants were highly motivated to artificially inflate the price of ChargePoint stock by making false and misleading statements that concealed material facts surrounding ChargePoint's management of its supply chain, revenue growth, and the value of the Company's inventory.

### 2.    The Executive Defendants' insider sales during the Class Period were unusual and suspicious in both timing and amount.

195.    During the Class Period, the Executive Defendants realized substantial benefits from their personal sales of ChargePoint stock at the same time that Defendants mispresented and concealed material facts from investors regarding ChargePoint's management of its supply chain, revenue growth, and the value of the Company's inventory.

### a.    Defendant Romano's Insider Sales

196.    During the Class Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Romano made the following sales of Company stock.[30]

---

[30] The "~" symbol means that the sale was effected pursuant to a Rule 10b5-1 trading plan adopted by Defendant Romano on an unspecified date. Each of the remaining sales was effected

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 04/22/2022~ | 250,000~ | $14.62~ | $3,655,125~ |
| 06/09/2022 | 250,802 | $15.49 | $3,885,097 |
| 06/15/2022~ | 250,000~ | $13.03~ | $3,257,800~ |
| 12/19/2022 | 125,000 | $9.6595 | $1,207,438 |
| 05/15/2023 | 40,000 | $8.3566 | $334,262 |
| 05/17/2023 | 40,000 | $8.1747 | $326,988 |
| 05/19/2023 | 20,000 | $7.9992 | $159,984 |
| 06/12/2023 | 10,000 | $8.1487 | $81,487 |
| 06/13/2023 | 10,000 | $9.5474 | $95,474 |
| 06/14/2023 | 30,000 | $9.0448 | $271,345 |
| 06/20/2023 | 30,000 | $7.9987 | $239,962 |
| 06/23/2023 | 20,000 | $7.4156 | $148,312 |
| 07/03/2023 | 15,000 | $8.7093 | $130,640 |
| 07/07/2023 | 15,000 | $8.8401 | $132,602 |
| 07/12/2023 | 15,000 | $8.8398 | $132,598 |
| 07/17/2023 | 15,000 | $8.68 | $130,201 |
| 07/20/2023 | 10,000 | $8.309 | $83,090 |

pursuant to a Rule 10b5-1 trading plan adopted by Defendant Romano on January 13, 2022, at a time when Defendant Romano possessed material non-public information concerning ChargePoint and knew the Company's stock was artificially inflated at the time of the transactions.

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 07/24/2023 | 15,000 | $8.2843 | $124,265 |
| 07/27/2023 | 15,000 | $8.2762 | $124,143 |
| 08/07/2023 | 30,000 | $7.9158 | $237,474 |
| 08/10/2023 | 30,000 | $7.8155 | $234,466 |
| 08/15/2023 | 30,000 | $7.4177 | $222,530 |
| 08/18/2023 | 10,000 | $7.1489 | $71,489 |

197.    Thus, in total, before the fraud was exposed, Defendant Romano sold 1,175,802 shares of Company stock, or approximately 20% of all of his personally held ChargePoint stock, on inside information, for which he received approximately $14,396,670 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

198.    Defendant Romano's stock sales during the alleged fraudulent period were not in line with his prior trading history. Prior to the Class Period, Defendant Romano had reportedly made one sale transaction in Company stock.

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 7/19/2021 | 315,000 | $23.50 | $7,402,500 |

**b.    Defendant Jackson's Insider Sales**

199.    During the Class Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Jackson made the following sales of his personal held Company stock.[31]

---

[31] The shares were nominally held by the Jackson 1997 Trust, dated November 6, 1997, of which Defendant Jackson is trustee.

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 12/21/2021 | 10,530 | $18.06 | $190,171 |
| 12/30/2021 | 11,000 | $18.78 | $206,529 |
| 3/10/2022 | 49 | $17.47 | $856 |
| 3/22/2022 | 8,100 | $17.92 | $145,143 |
| 6/22/2022 | 7,886 | $13.63 | $107,478 |
| 9/12/2022 | 63 | $17.79 | $1,121 |
| 9/21/2022 | 15,005 | $16 | $240,065 |
| 12/21/2022 | 13,805 | $9.53 | $131,562 |
| 3/10/2023 | 108 | $10.16 | $1,097 |
| 3/21/2023 | 14,476 | $9.40 | $136,074 |
| 6/21/2023 | 16,178 | $8.0308 | $129,922 |
| 9/8/2023 | 556,270 | $5.8358 | $3,246,279 |
| 9/21/2023 | 16,799 | $5.032 | $84,533 |

200.    Thus, in total, before the fraud was exposed, Defendant Jackson sold 670,269 shares of Company stock, or over 23% of his personally held ChargePoint shares, on inside information, for which he received approximately $4,620,830 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

201.    Defendant Jackson's stock sales during the alleged fraudulent period were not in line with his prior trading history. Prior to the Class Period, Defendant Jackson had reportedly made only two sales.

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 6/23/2021 | 22,311 | $32.22 | $718,901 |
| 9/22/2021 | 10,901 | $20.15 | $219,657 |

## IX.    THE INAPPLICABLITY OF THE SAFE HARBOR PROVISION

202.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statutory safe harbor or bespeaks caution doctrine does not apply to statements included in financial statements prepared in accordance with generally accepted accounting principles. Moreover, none of the statements complained of herein was a forward-

looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about ChargePoint's current and historical financial accounting practices, financial condition, and internal controls, among other topics.

203.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted ChargePoint's statements regarding ChargePoint's financial accounting practices, financial condition, and internal controls, among others. Given the then-existing facts contradicting ChargePoint's statements, any generalized risk disclosures made by ChargePoint were insufficient to insulate ChargePoint from liability for their materially false and misleading statements.

204.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, ChargePoint is liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of ChargePoint who knew that the statement was false when made.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

205.    The market for ChargePoint's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, ChargePoint's securities traded at artificially inflated prices during the Class Period. On June 7, 2023, the Company's share price closed at a Class Period high of $9.78 per share. Lead Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of ChargePoint's securities and market information relating to ChargePoint, and have been damaged thereby.

206.    During the Class Period, the artificial inflation of ChargePoint's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the

damages sustained by Lead Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about ChargePoint's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of ChargePoint and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

207.     At all relevant times, the market for ChargePoint's securities was an efficient market for the following reasons, among others:

        A.  ChargePoint shares met the requirements for listing and ChargePoint was listed and actively traded on the NYSE, a highly efficient and automated market;

        B.  As a regulated issuer, ChargePoint filed periodic public reports with the SEC and/or the NYSE;

        C.  ChargePoint regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services; and/or

        D.  ChargePoint was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

208.     As a result of the foregoing, the market for ChargePoint's securities promptly digested current information regarding ChargePoint from all publicly available sources and reflected such information in ChargePoint's share price. Under these circumstances, all purchasers

of ChargePoint's securities during the Class Period suffered similar injury through their purchase of ChargePoint's securities at artificially inflated prices and a presumption of reliance applies.

209.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.    CLASS ACTION ALLEGATIONS

210.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired ChargePoint securities between December 7, 2021, and November 16, 2023, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

211.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ChargePoint's shares actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of ChargePoint shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by ChargePoint or its transfer agent and may be notified of

the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

212.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

213.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

214.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: whether the federal securities laws were violated by Defendants' acts as alleged herein; whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of ChargePoint; and to what extent the members of the Class have sustained damages and the proper measure of damages.

215.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.    UNDISCLOSED ADVERSE FACTS

216.    The market for ChargePoint's securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, ChargePoint's securities traded at artificially inflated prices during the Class Period. Lead Plaintiffs and other members of the Class purchased or otherwise acquired ChargePoint's securities relying upon the integrity of the market price of the Company's securities and market information relating to ChargePoint, and have been damaged thereby.

217.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of ChargePoint's securities, by publicly issuing false and/or misleading

statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about ChargePoint's business, operations, and prospects as alleged herein.

218.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about ChargePoint's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

### XIII.   CAUSES OF ACTION

### COUNT I

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5(b) Promulgated Thereunder
(Against ChargePoint, Romano, and Jackson)**

219.    Lead Plaintiffs repeat and reallege each allegation contained above as if fully set forth herein.

220.    This cause of action is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5. This claim is asserted on behalf of all members of the Class against Defendants ChargePoint, Romano, and Jackson.

221.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to, and throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead

Plaintiffs and other members of the Class to purchase ChargePoint securities at artificially inflated prices.

222.    Defendants made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading during the Class Period in an effort to maintain artificially high market prices for ChargePoint securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

223.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal and misrepresent adverse material information about the business, operations, and financial results of ChargePoint as specified herein.

224.    Defendant ChargePoint is liable under Section 10(b) and SEC Rule 10b-5(b) for all materially false and misleading statements and omissions made during the Class Period, as alleged herein.

225.    Defendants Romano and Jackson, as top executives of the Company, are liable under Section 10(b) and SEC Rule 10b-5(b) as direct participants in the wrongs complained of herein. Defendants Romano and Jackson are liable for all of the materially false and misleading statements and omissions made during the Class Period, as alleged herein.

226.    During the Class Period, Defendants Romano, Jackson, and ChargePoint made or were responsible for the materially false and misleading statements and omissions alleged herein, which they knew, or were deliberately recklessness in disregarding, to be materially false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

227.    The allegations above establish a strong inference that ChargePoint, as an entity, acted with corporate scienter throughout the Class Period, as its officers and agents, including Defendants Romano and Jackson, had actual knowledge of the materially false and misleading statements and omissions specified above, or acted with severely reckless disregard for the truth.

228.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ChargePoint securities. Lead Plaintiffs and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for ChargePoint securities had been artificially inflated by Defendants' fraudulent course of conduct.

229.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

230.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

## COUNT II

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5(a) and (c) Promulgated Thereunder
### (Against all Defendants)

231.    Lead Plaintiffs repeat and reallege each allegation contained above as if fully set forth herein.

232.    This Count is brought under the provisions of Rule 10b-5(a) and (c). Accordingly, Lead Plaintiffs need not allege in this Count, nor prove in this case, that each of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

233.    During the Class Period, Defendants engaged in deceptive and manipulative acts in a scheme to defraud investors. Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the Class; (ii) artificially inflate the market price of ChargePoint securities; and (iii) cause Lead Plaintiffs and the Class to purchase ChargePoint securities at artificially inflated prices.

234.    In furtherance of this unlawful plan, scheme, and course of conduct, Defendants employed devices, schemes, and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business, including the dissemination of false and misleading statements, that operated as a fraud and deceit upon Lead Plaintiffs and the Class in

1    connection with their purchases of ChargePoint securities, in violation of Section 10(b) of the

2    Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

3        235.    Defendants' fraudulent devices, schemes, artifices, and deceptive acts, practices,

4    and course of business included engaging in an undisclosed and unsustainable revenue recognition

5    scheme, whereby ChargePoint was recognizing revenue prematurely in violation of its own revenue

6    recognition policy, before the revenue satisfied a performance obligation. As part of their scheme

7    to defraud investors in violation of SEC Rule 10b-5(a) and (c), Defendants directed ChargePoint to

8    improperly recognize revenue by, among other things, shipping out and invoicing for: (a) pre-

9    ordered chargers to customers who had not authorized delivery of the chargers; (b) incomplete,

10   non-functioning chargers (with missing parts); and (c) chargers different from the model the

11   customer ordered. Ultimately, this conduct resulted in the Company making false statements to the

12   market about the true financial performance of ChargePoint and the reasons for that performance.

13       236.    Lead Plaintiffs and the Class reasonably relied upon the integrity of the market in

14   which ChargePoint securities traded.

15       237.    During the Class Period, Lead Plaintiffs and the Class were unaware of Defendants'

16   fraudulent scheme and unlawful course of conduct. Had Lead Plaintiffs and the Class known of

17   Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased

18   ChargePoint securities, or if they had, would not have done so at the artificially inflated prices paid

19   for such securities.

20       238.    As a direct and proximate result of Defendants' scheme to defraud and such

21   unlawful course of conduct, Lead Plaintiffs and the Class suffered damages in connection with their

22   purchases of ChargePoint securities during the Class Period.

23       239.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act

24   and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Lead Plaintiffs and the Class

25   for damages suffered in connection with their purchases of ChargePoint securities during the Class

26   Period.

27

28

# COUNT III

### Violation of Section 20(a) of the Exchange Act
### (Against the Executive Defendants, Defendants Romano and Jackson)

240.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

241.    This Count is asserted on behalf of Lead Plaintiffs and all members of the Class against Defendants Romano and Jackson (collectively, the "Executive Defendants") for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

242.    The Executive Defendants acted as controlling persons of ChargePoint within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. Each of these Defendants was provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected

243.    Further, the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

244.    As set forth above, ChargePoint and the Executive Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead

1  Plaintiffs and other members of the Class suffered damages in connection with their purchases of

2  the Company's securities during the Class Period.

3                          XIV.   PRAYER FOR RELIEF

4        WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

5        A.      Determining that this action is a proper class action under Rule 23 of the Federal

6  Rules of Civil Procedure;

7        B.      Awarding compensatory damages in favor of Lead Plaintiffs and the other Class

8  members against all Defendants, jointly and severally, for all damages sustained as a result of

9  Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

10        C.      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred

11  in this action, including counsel fees and expert fees; and

12        D.      Such other and further relief as the Court may deem just and proper.

13                          XV.   JURY TRIAL DEMANDED

14        Lead Plaintiffs hereby demand a trial by jury.

15  DATED: July 19, 2024                    Respectfully submitted,

16
                                          */s/ Lucas E. Gilmore*
17                                         Lucas E. Gilmore (SBN 250893)
                                          Reed R. Kathrein (SBN 139304)
18                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                          715 Hearst Avenue, Suite 300
19                                         Berkeley, California 94710
                                          Telephone: (510) 725-3000
20                                         Facsimile: (510) 725-3001
                                          lucasg@hbsslaw.com
21                                         reed@hbsslaw.com
22
                                          *Lead Counsel and Counsel for Lead Plaintiffs*
23                                         *Shahram Afshani and Paulina Afshani Schwartz*

24

25

26

27

28