Sara B. Brody (SBN 130222)
sbrody@sidley.com
Jaime A. Bartlett (SBN 251825)
jbartlett@sidley.com
Matthew P. Henry (SBN 308878)
mhenry@sidley.com
Chaddy Georges (SBN 335546)
cgeorges@sidley.com
SIDLEY AUSTIN LLP
555 California Street
Suite 2000
San Francisco, CA 94104

*Attorneys for Defendants
ChargePoint Holdings, Inc., Pasquale Romano,
and Rex S. Jackson*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| FAROOQ KHAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CHARGEPOINT HOLDINGS, INC., et al.,<br><br>Defendants. | Case No. 5:23-cv-06172-EKL<br><br>**DEFENDANTS CHARGEPOINT HOLDINGS, INC., PASQUALE ROMANO, AND REX S. JACKSON'S NOTICE OF MOTION AND MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS; MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT THEREOF**<br><br>Assigned to: Hon. Eumi K. Lee<br><br>Date:   February 5, 2025<br>Time:   10:00 a.m.<br>Place:  Courtroom 7, 4th Floor |

## NOTICE OF MOTION AND MOTION TO DISMISS

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Please take notice that on February 5, 2025, at 10:00 a.m., defendants ChargePoint Holdings, Inc., Pasquale Romano, and Rex S. Jackson (collectively, "Defendants") will bring for hearing this Motion to Dismiss the First Amended Class Action Complaint for Violations of the Federal Securities Laws, before the Honorable Judge Eumi K. Lee, San Jose Courthouse, Courtroom 7, 4th Floor, 280 South First Street, San Jose, CA 95113.

As set forth in the attached memorandum, the Court should dismiss this action in its entirety under Rule 12(b)(6) because Lead Plaintiffs Shahram Afshani and Paulina Afshani Schwartz ("Plaintiffs") have failed to state a claim on which relief may plausibly be granted.

Plaintiffs assert claims against Defendants under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5(a), (b), and (c) promulgated thereunder. Plaintiffs fail, however, to plead those claims with the particularity required by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act. Specifically, Plaintiffs have (1) failed to plead with particularity that Defendants made any materially false or misleading statement; (2) failed to establish a strong inference of intentional fraud; (3) failed to adequately plead loss causation; and (4) failed to plead the existence of a scheme to defraud.

Plaintiffs also assert a control person claim against Romano and Jackson under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t. This claim fails because Plaintiffs have not established a primary violation under Section 10(b).

This motion is based on the attached memorandum, Defendants' Request for Judicial Notice and Consideration of Documents Incorporated by Reference in Support of Motion to Dismiss, the Declaration of Jaime A. Bartlett in Support of Defendants' Motion to Dismiss and all Exhibits attached thereto, and such argument as may be presented before or after the hearing on this matter.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT—CASE NO. 5:23-CV-06172-EKL

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................... 1

FACTS ........................................................................................................................... 3

    I.      DEFENDANTS ............................................................................................ 3

    II.     RELEVANT ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS ........... 3

          A.      During the Class Period ChargePoint Operated In a Supply Constrained Environment. ..................................................... 3

          B.      Notwithstanding Disclosed Supply Constraints, ChargePoint Experienced Growth and Met Revenue Projections ........................... 5

          C.      Supply Constraints and Demand Shifted in 2023 ................................ 5

    III.    RELEVANT PROCEDURAL HISTORY ........................................................ 6

ARGUMENT ................................................................................................................... 7

    I.      LEGAL STANDARDS ................................................................................ 7

          A.      Section 10(b) ....................................................................................... 7

          B.      Confidential Witnesses ........................................................................ 8

    II.     PLAINTIFFS CANNOT CHALLENGE PUFFERY, OPINIONS OR FORWARD LOOKING STATEMENTS. (Stmts. 3, 7, 10, 13, 15, 16, 21, 22, 23) ............................................... 9

          A.      Overcoming Supply Chain Issues (Stmts. 3, 7, 10, 13, 16) ............... 10

          B.      The Future of the Electric Vehicle Industry (Stmt. 15) ..................... 11

          C.      ChargePoint's Prospects (Stmts. 21, 22, 23) ..................................... 11

    III.    PLAINTIFFS FAIL TO PLEAD FALSITY OR SCIENTER UNDER THEIR SUPPLY CHAIN THEORY FOR THEIR SECTION 10(b) AND RULE 10b-5(b) CLAIM (Stmts. 3, 7, 10, 13, 16) ............................. 12

          A.      Plaintiffs Have Not Pled That the Supply Chain Statements Were False. .................................................................................................. 12

          B.      Plaintiffs Fail to Plead Scienter for the Supply Chain Statements ...... 14

    IV.    PLAINTIFFS FAIL TO PLEAD FALSITY OR SCIENTER UNDER THEIR REVENUE RECOGNITION THEORY FOR THEIR SECTION 10(b) AND RULE 10b-5(b) CLAIM (Stmts. 1, 2, 4-6, 8, 9, 11, 12, 14, 15, 17, 19, 20) ..................................... 15

i

A.     Plaintiffs Fail to Plead Premature Revenue Recognition in Violation of ASC 606 ........................................................................................... 15

1.     Attacks on revenue recognition must meet specific pleading requirements ......................................................................... 15

2.     Plaintiffs fail to allege the basic details of a revenue recognition scheme ................................................................. 16

3.     Post Class Period Events are not evidence of a scheme ......... 19

B.     Plaintiffs Fail to Plead the Challenged Statements Regarding Revenue Were False or Misleading. .................................................................. 20

C.     Plaintiffs Have Not Pled Facts Supporting a Strong Inference of Scienter for the Revenue Recognition Theory ..................................... 21

V.     PLAINTIFFS' REVENUE RECOGNITION THEORY FAILS TO STATE A CLAIM FOR VIOLATION OF SECTION 10(b) AND RULE 10b-5(a) and (c) ...................................................................... 22

VI.     PLAINTIFFS' INVENTORY VALUATION THEORY FAILS TO STATE A CLAIM FOR VIOLATION OF SECTION 10(b) AND RULE 10b-5(b) (Stmts. 18, 21, 22, 23) ............................................... 23

A.     Plaintiffs Have Not Pled That the Inventory Valuation Statements Were False ........................................................................ 23

B.     Plaintiffs Have Not Pled Facts Supporting a Strong Inference of Scienter for the Inventory Valuation Theory .................. 25

VII.     PLAINTIFFS HAVE NOT CREATED A COGENT AND COMPELLING INFERENCE OF INTENTIONAL WRONGDOING. ............................................. 26

A.     Generic Financial Motivation Does Not Support A Strong Inference of Scienter. ........................................................... 26

B.     Plaintiffs' Scienter Allegations Are Also Defective Under a Holistic Analysis. ................................................................. 28

VIII.     PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION ........................................... 29

IX.     PLAINTIFFS' SECTION 20(a) CONTROL PERSON LIABILITY CLAIM FAILS. ............................................................................... 30

ii

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ...................................................................................................9

*Borteanu v. Nikola Corp.*,
2023 WL 1472852 (D. Ariz. Feb. 2, 2023)........................................................................22

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ...................................................................................9, 11, 30

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2019 WL 6877195 (N.D. Cal. Dec. 17, 2019).....................................................................21

*Cooper v. Pickett*,
137 F.3d 616 (9th Cir. 1997) .............................................................................................23

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ..................................................................................9, 11, 12

*In re Daou Sys.*,
411 F.3d 1006 (9th Cir. 2005) ................................................................................16, 17, 18

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005).........................................................................................................29

*Kampe v. Volta Inc.*,
2024 WL 308262 (N.D. Cal. Jan. 26, 2024) ......................................................................17

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) .............................................................................................29

*Macomb Cty. Emps. Ret. Sys. v. Align Tech., Inc.*,
39 F.4th 1092 (9th Cir. 2022) .............................................................................................7

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ......................................................................................19, 27

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) .............................................................................................29

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) .............................................................................................9

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)...............................................................................................13

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION
COMPLAINT—CASE NO. 5:23-CV-06172-EKL

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) ...........................................................................7, 8

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014) ...........................................................................7, 8, 9

*Patterson v. Jump Trading LLC*,
  2024 WL 49055 (N.D. Cal. Jan. 4, 2024) ...........................................................22

*In re Plantronics, Inc. Sec. Litig.*,
  2021 WL 8572663 (N.D. Cal. Mar. 29, 2021)...................................................16, 18

*Plumley v. Sempra Energy*,
  2017 WL 2712297 (S.D. Cal. June 20, 2017)...................................................28

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) .........................................................................11, 27

*In re Radian Sec. Litig.*,
  612 F. Supp. 2d 594 (E.D. Pa. 2009) ...............................................................28

*In re Read-Rite Corp.*,
  335 F.3d 843 (9th Cir. 2003) ...........................................................................20

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ...........................................................................7, 27

*Simpson v. AOL Time Warner, Inc.*,
  452 F.3d 1040 (9th Cir. 2006) .........................................................................22

*In Re Solarcity Corp. Secs. Litig.*,
  274 F. Supp. 3d 972 (N.D. Cal. 2017) .............................................................11

*Steckman v. Hart Brewing, Inc.*,
  143 F.3d 1293 (9th Cir. 1998) .........................................................................16

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
  552 U.S. 148 (2008)..........................................................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..........................................................................................7, 16, 22

*In re Tibco Software, Inc.*,
  2006 WL 1469654 (N.D. Cal. May 25, 2006) ..................................................27

*Veal v. LendingClub Corp.*,
  423 F. Supp. 3d 785 (N.D. Cal. 2019) ............................................................. *passim*

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prod. Liab. Litig.*,
  2017 WL 6041723 (N.D. Cal. Dec. 6, 2017)....................................................29

iv

*Waterford Twp. Police & Fire Ret. Sys. v. Mattel, Inc.*,
  321 F. Supp. 3d 1133 (C.D. Cal. 2018), *aff'd*, 794 F. App'x 669 (9th Cir. 2020) ............15, 21, 26

*Wozniak v. Align Tech., Inc.*,
  850 F. Supp. 2d 1029 (N.D. Cal. 2012) ...............................................................................10, 11

*Yaron v. Intersect ENT, Inc.*,
  2020 WL 6750568 (N.D. Cal. June 19, 2020) ...................................................................16, 20, 21

*Zucco Partners v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ........................................................................................ *passim*

**Statutes**

15 U.S.C. § 78j(b) (Section 10(b) of the Securities Exchange Act of 1934) .............................. *passim*

15 U.S.C. § 78t(a) (Section 20(a) of the Securities Exchange Act of 1934) .....................................30

15 U.S.C. § 78u-5(c)(1)(B) ...............................................................................................10

**Other Authorities**

17 C.F.R. § 240.10b-5 (Rule 10b-5) ......................................................................................7

17 C.F.R. § 240.10b-5(a) (Rule 10b-5(a)) .............................................................................2, 22

17 C.F.R. § 240.10b-5(b) (Rule 10b-5(b))............................................................................ *passim*

17 C.F.R. § 240.10b-5(c) (Rule 10b-5(c)) .............................................................................2, 22

17 C.F.R. § 240.10b5-1 (Rule 10b5-1) ...............................................................................27

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION
COMPLAINT—CASE NO. 5:23-CV-06172-EKL

**INTRODUCTION**

ChargePoint is a market-leading provider of network solutions for electronic vehicles ("EVs"). The Company's longevity, market position, and business strategy allowed it to weather significant supply headwinds and navigate demand fluctuations in the still-evolving EV charging industry prior to 2023. In 2023, however, the company saw an easing of supply constraints alongside macroeconomic events that altered (and slowed) demand for its products, ultimately impacting ChargePoint's business in the later part of the calendar year. These impacts were reflected in ChargePoint's September 6, 2023 announcement of its Q2 2023 results and November 16, 2023 announcement of leadership changes and its preliminary results for Q3 2024. Following both announcements, ChargePoint's stock price declined.

A purported shareholder class action was filed against ChargePoint, Pasquale Romano (former CEO) and Rex Jackson (former CFO), within two weeks of the November 16, 2023 announcement. Ignoring the significant industry-wide events of 2023, the First Amended Class Action Complaint for Violations of the Federal Securities Laws ("AC") [1] attacks twenty-three statements made by Defendants dating back to December 7, 2021,[2] advancing three equally implausible and unsupported theories to assert that these challenged statements were materially false or misleading in violation of Section 10(b) and Rule 10b-5(b).

The first of these theories (the "**Supply Chain Theory**") is that statements concerning the Company's handling of supply chain issues (*e.g.*, that the supply team was doing a "tremendous job of keeping things moving through our supply chain") were materially false or misleading because they failed to disclose that internal control deficiencies and business risks were created when the accounts payable function was outsourced to India in 2021. *See, e.g.,* ¶ 100. The second of these theories (the "**Revenue Recognition Theory**") is that ChargePoint's disclosures concerning its revenue were materially false or misleading because the Company was engaged in a scheme to

---

[1] "¶ _" citations refer to the AC, Dkt. 99.
[2] Attachment A, hereto, is included for the Court's ease in tracking each of Plaintiffs' twenty-three challenged statements. Each challenged statement has been assigned a number and the chart identifies the challenged language, statement date and source, speaker, and alleged basis for falsity. References to "Stmt." or "Statement" in this motion refer to the numbered statements in Attachment A.

1

prematurely recognize revenue by prematurely shipping orders, shipping wrong or faulty product, or shipping to resellers in advance of client need. *See, e.g.*, ¶ 98. Plaintiffs' scheme liability claim (for alleged violations of Rule 10b-5(a) and (c)) is also based on this Revenue Recognition Theory. Finally, Plaintiffs' third theory (the "**Inventory Valuation Theory**") alleges that certain statements to the market in April, June and September 2023 discussed component shortages, ChargePoint's inventory, or ChargePoint's revenue, without disclosing that ChargePoint was allegedly experiencing higher component costs and supply overruns for its first generation DC charging products or disclosing that, as a result of the foregoing, ChargePoint was likely to incur impairment charges that would adversely impact ChargePoint's profitability. *See, e.g.*, ¶ 144.

Plaintiffs have failed to adequately plead a Section 10(b) claim under any of their theories. As an initial matter, Plaintiffs attack non-actionable corporate puffery, opinion and forward-looking statements, which is a standalone basis to dismiss the claims as to those statements. Plaintiffs also fail to plead falsity or scienter under any of their theories, including because: Plaintiffs improperly rely on allegations of confidential former employees ("FEs") who had no role in or expertise concerning the Company's accounting for revenue or financial reporting and for whom Plaintiffs fail to otherwise demonstrate reliability or knowledge pertaining to the allegations; Plaintiffs draw conclusions that are not supported by the former employee allegations; Plaintiffs' allegations do not demonstrate the timing, scope or impact on revenue of a purported scheme; and there is not a single allegation suggesting Romano or Jackson made any of the challenged statements knowing that they were false, nor do the allegations support a strong inference of scienter for any Defendant. Finally, with respect to the Supply Chain and Revenue Recognition Theories, Plaintiffs have not adequately pled a causal link between the challenged statements and the stock price declines following the Company's September 6, 2023 and November 16, 2023 announcements. Failure to adequately plead loss causation is a separate ground for dismissal.

For all of these reasons, addressed in more detail below, the Court should grant Defendants' Motion to Dismiss the First Amended Class Action Complaint for Violations of the Federal Securities Laws.

# FACTS

## I.    DEFENDANTS

ChargePoint is a market-leading provider of network solutions for electronic vehicles, offering both physical charging systems (hardware) and subscription services (software) to commercial, fleet, and residential customers. ¶¶ 34-38. In March 2021, ChargePoint became a publicly traded company. ¶ 36. Pasquale Romano was ChargePoint's President and Chief Executive Officer, and Rex Jackson its Chief Financial Officer, during the alleged Class Period.[3] ¶¶ 24-25. Romano and Jackson departed ChargePoint effective November 16, 2023, as announced by the company that same day. ¶ 173.

## II.    RELEVANT ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS

### A.    During the Class Period ChargePoint Operated In a Supply Constrained Environment.

ChargePoint went public in the middle of the COVID-19 global pandemic, amid the supply chain constraints and global challenges impacting a range of industries and market sectors. Throughout the Class Period, ChargePoint disclosed and updated the public on the effect of supply constraints on its business, including on revenue growth. In fact, in earnings calls throughout the Class Period, either Romano or Jackson (or both) spoke about the negative impact of supply constraints and ChargePoint's inability to keep up with customer demand. For example (emphasis added):

> **Q3 2022:** We are very pleased with this performance **despite a number of supply chain challenges and demand in the quarter we could not meet has given us a good start on Q4**. (Jackson) Ex. 1 at 5.[4]
>
> We estimate elevated logistical costs and **supply chain constraints cost us approximately 2% of additional networked charging system margin**. (Jackson) *Id.* at 6.
>
> I would tell you that there was a positive spillover from Q3 to Q4. It wasn't massive. I hesitate to give you a number. **But I would just tell you, what's important is to understand that there was demand in the quarter that we didn't meet. It was a big enough number that warranted mentioning it.** And it's set us up for a nice start here in Q4, but it wasn't a massive number, but it was a meaningful enough number that pushed us well above the high end of a range. (Jackson) *Id.* at 15.

---

[3] Capitalized terms not defined herein shall have the meaning ascribed to them in the AC.
[4] "Ex. _" citations refer to the exhibits to the concurrently-filed Declaration of Jaime A. Bartlett.

**Q4 2022:** We began the year with revenue guidance of $195 million to $205 million, and repeatedly raised guidance ending the year with over $242 million in revenue, **a number that could have been higher if it weren't for supply chain constraints**. (Romano) Ex. 2 at 4.

**We're particularly pleased with this performance given continuing supply chain challenges. We've managed as well relative to our guidance commitments, but with demand significantly exceeding supply, our exiting Q4 backlog was significantly higher than any prior quarter in the company's history**. (Jackson) *Id.* at 6.

**Q1 2023:** Our Operations Team did a great job assuring supply this quarter to deliver our top line, but supply shifted mix to a degree and **demand again outstripped supply, with backlog up 35% over the prior quarter**.

As we discussed on our previous earnings call, **we expected supply chain issues to continue to negatively impact gross margin. The impacts were higher than expected this quarter** for both newer products from a cost perspective and for higher margin mature products from both a cost and availability perspective, resulting in a 17% gross margin for the quarter. (Romano) Ex. 3 at 2-3.

**Q2 2023:** Residential demand remains remarkably strong. Billings for residential were up over 125% from the second quarter of last year and a sequential increase of 11% versus the first quarter, **the growth would have been significantly higher, if not for supply chain constraints**. (Romano) Ex. 4 at 4.

All verticals were strong from a demand standpoint with a healthy and welcome uptick in commercial AC business, but **supply constraints across all products persisted**. **As before, strong demand and supply constraints translated into higher backlog.** Though we worked down a meaningful percentage of our existing backlog during the quarter, our ending backlog grew 26% sequentially from Q1. (Jackson) *Id.* at 5.

**Q3 2023: Demand again exceeded supply for the quarter, resulting in additional growth in backlog.** (Romano) Ex. 6 at 3.

Following Q1 2024, which ended April 30, 2023, ChargePoint disclosed that supply constraints were lessening, but cautioned that the business impact would persist, including that supply obtained in the constrained environment was now sitting in inventory. *See* Ex. 9 at 17 ("No question that, that's gotten much, much better from a supply perspective. . . So we're back to a nice rhythm now, I think, from a build perspective, there -- as you can imagine, there are some prior deals that we had to cut to get supply that's now sitting in inventory. So you won't see 100% of the supply chain impact disappear overnight."). By Q2 2024, the second-to-last of the Class Period, ChargePoint disclosed that "thanks to the supply chain crisis not being upon us anymore whatsoever, we are not supply constrained." Ex. 11 at 25.

4

### B. Notwithstanding Disclosed Supply Constraints, ChargePoint Experienced Growth and Met Revenue Projections.

ChargePoint reports revenue along three lines: networked charging systems, subscriptions, and other. Ex. 1 at 5. The networked charging systems category reflects hardware sales. *Id.* The subscriptions category reflects cloud services, warranties, and other recurring subscription offerings. *Id.* The other category reflects energy credits, professional services, and certain non-material revenue streams. *Id.* The claims in the AC concern only hardware revenue, which represents the vast majority of ChargePoint's revenue. *See, e.g.*, Ex. 10 at 4 (disclosing $114.6 million in hardware revenue for the quarter, compared to $30.0 million for software).

From the start of the Class Period through Q4 2023, ChargePoint reported growth in hardware and overall revenue both year-over-year and between quarters for every single quarter. *See generally* Exs. 8, 10, 12, 13. For Q1 2024, ChargePoint reported year-over-year revenue growth but a decline from the previous quarter. Ex. 8. This was above the midpoint of ChargePoint's previously announced guidance, and "[d]own seasonally as expected from Q4." Ex. 9 at 6. For Q2 2024, ChargePoint again reported year-over-year and quarterly growth in hardware and overall revenue. Ex. 10. In preliminary results for Q3 2024, as discussed in more detail below, ChargePoint announced that revenue for the quarter would be lower than previously expected. Ex. 13 at 17.

### C. Supply Constraints and Demand Shifted in 2023.

In 2023, the company saw an easing of supply constraints alongside macroeconomic events that altered (and slowed) demand, ultimately impacting ChargePoint's business in the later part of the calendar year. These impacts were reflected in ChargePoint's September 6, 2023 announcement of its Q2 2024 results and inventory write-off, and November 16, 2023 announcement of leadership changes and its preliminary results for Q3 2024.

***September 6, 2023 impairment.*** When it announced its Q2 2024 results on September 6, 2023, ChargePoint disclosed that it was taking a $28.0 million inventory impairment charge to address legacy "supply chain-related costs and supply overruns on its first-generation DC charging product." Ex. 11 at 7. Revenue for the quarter was within guidance. *Id.* at 4. Following these announcements, ChargePoint's share price fell $0.77, from a closing price of $7.06 on September 6

to a closing price of $6.29 the following day. ¶ 165.

*November 16, 2023 announcements.* On November 16, 2023, ChargePoint announced that Romano and Jackson were departing, effective immediately, their respective positions as CEO and CFO. Ex. 13 at 2. Rick Wilmer, formerly Chief Operating Officer, was appointed President and CEO and Mansi Khetani was appointed interim CFO. *Id.* Also that day, ChargePoint released preliminary financial results for Q3 2024, including an expected revenue range of $108 to $113 million as compared to $150 to $165 million as previously forecast, and a non-cash impairment charge of $42 million. *Id.* at 17. Wilmer explained the preliminary results as follows:

> Our core markets of North America and Europe both came under pressure late in the third quarter, with revenue falling far short of expectations. Overall macroeconomic conditions, along with fleet and commercial vehicle delivery delays impacted anticipated deployments with government, auto dealership and workplace customers.

*Id.* Following these announcements, ChargePoint's share price fell $1.11, from a closing price of $3.13 on November 16 to a closing price of $2.02 the following day. ¶ 178.

In connection with its Q3 2024 earnings call on December 6, 2023, ChargePoint announced earnings of $110.3 million. ¶ 179. Wilmer reaffirmed the factors that were affecting demand (and thus revenue) stating, "We attribute the majority of this to three factors. First of all, the arrival of many commercial fleet vehicles has been delayed, or in other cases, these vehicles have been slow to ramp up production… The second factor impacting Q3 top line revenue can be summarized as a slowdown in commercial demand combined with supply chain normalization. . . . The third factor, which negatively impacted Q3 revenue was something we could not have predicted going into the quarter, hesitation related to the automotive labor disputes in the United States." Ex. 14 at 5; *see also* ¶ 180. Both Wilmer and Khetani also spoke to the inventory charge in Q2 2024 and the inventory impairment taken in Q3 2024. ¶¶ 181-83.

## III.    RELEVANT PROCEDURAL HISTORY

This action was first filed on November 29, 2023, thirteen days after the second alleged corrective disclosure. Dkt. 1. The initial complaint asserted claims covering a class period of June 1, 2023 through November 16, 2023. *Id.* at 1. Nearly two months later, on January 22, 2024, another plaintiff filed a second action asserting substantially identical claims, but with a class period starting

6

nearly a year and a half earlier, on December 7, 2021. *Smith v. ChargePoint Holdings, Inc. et al.*, Case No. 5:24-cv-00363-EKL, Dkt. 1 at 4. Seven candidates filed motions to be appointed lead plaintiff in this action; five movants adopted the longer *Smith* class period and two adopted the shorter class period, arguing that the longer class period was improper. Dkts. 18, 21, 22, 26, 40, 41, 50. On May 16, 2024, the Court, applying the longer class period solely to "evaluat[e] the movants' financial interests," entered an order consolidating the cases, and appointing Shahram Afshani and Paulina Afshani Schwartz as lead plaintiffs and Hagens Berman Sobol Shapiro LLP as lead counsel. Dkt. 87 at 4. Lead Plaintiffs filed their First Amended Complaint on July 19, 2024, challenging 23 statements across the longer class period of December 7, 2021 to November 16, 2023.

## ARGUMENT

## I.      LEGAL STANDARDS

### A.      Section 10(b)

A claim for securities fraud under Section 10(b) and Rule 10b-5 of the Securities Exchange Act is subject to the "[e]xacting pleading requirements" of both Rule 9(b) and the PSLRA. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). These "heightened pleading requirements . . . present no small hurdle," *Macomb Cty. Emps. Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1096 (9th Cir. 2022) (citation omitted), and plaintiffs must plead ***each*** element ***with particularity***. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014). To plead falsity, Plaintiffs must identify statements that are "capable of objective verification," *id*. at 606, and demonstrably "false or misleading at the time they were made." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012).

To plead a strong inference of scienter, Plaintiffs must allege that Defendants made false or misleading statements either intentionally or with deliberate recklessness, with the recklessness standard "much closer to one of intent." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014). A court should deny a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Plaintiffs must thus "plead with particularity facts that give rise to a 'strong'—*i.e.*, a powerful or cogent—inference." *Id.* at 323. Courts evaluate

scienter allegations both individually and holistically. *NVIDIA*, 768 F.3d at 1056. Plaintiffs must satisfy this standard, moreover, with respect to each of the two individual Section 10(b) defendants—Jackson and Romano. *Id.* at 1063.

Finally, to plead loss causation, Plaintiffs must show a "causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the [Plaintiffs]." *Apollo*, 774 F.3d at 608 (quoting *Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1027 (9th Cir. 1999).

## B.  Confidential Witnesses

Plaintiffs' allegations are based on statements attributed to five former ChargePoint employees. *See, e.g.* ¶ 33. Where, as here, Section 10(b) plaintiffs rely on confidential witness allegations to establish falsity or scienter, they must plead a "basis for determining that the witnesses in question have personal knowledge of the events they report." *Zucco Partners v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). Courts will consider information purportedly provided by confidential witnesses only where the witnesses are reliable and are "described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* (internal quotation marks and citation omitted). Plaintiffs must describe each witness's job title and responsibilities with "ample detail." *Id.* at 995-96. Ultimately, the information attributed to a confidential witness must, if credited, support the proposition for which it is cited—that a securities defendant has made an intentionally false or misleading statement. *See id.* at 995 ("those statements [that] are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter").

Consistent with these legal standards, the Court can—and should—disregard allegations of unnamed former employees who did not hold positions at ChargePoint that gave them first-hand knowledge of events relevant to the AC claims or who had no contact with Jackson or Romano and, thus, no basis to speak to those defendants' knowledge or intent. The Court can—and should—also reject *Plaintiffs'* interpretations, speculations, and conclusions purportedly drawn from the former employee statements, where Plaintiffs do not demonstrate that the employees had the requisite knowledge or show that those statements actually support Plaintiffs' ultimate conclusions.

8

**II.    PLAINTIFFS CANNOT CHALLENGE PUFFERY, OPINIONS OR FORWARD LOOKING STATEMENTS (Stmts. 3, 7, 10, 13, 15, 16, 21, 22, 23).**

More than one third of the statements challenged in the AC are legally non-actionable. They are merely generally positive comments, opinions and/or forward-looking statements about how the company has handled supply chain issues, the future of the electric vehicle industry, and ChargePoint's prospects.

The law is clear that "mildly optimistic, subjective assessment[s]" are non-actionable corporate puffery; they express opinions, not facts and are not "capable of objective verification," and therefore no reasonable investor would rely on them. *Apollo*, 774 F.3d at 606; *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 708 (9th Cir. 2021) ("[V]ague and generalized corporate commitments, aspirations, or puffery . . . cannot support statement liability under Section 10(b) and Rule 10b-5(b)."). Similarly, Plaintiffs cannot challenge opinion statements. There are only three narrow circumstances in which opinion statements are actionable (none of which are present here): (1) when the stated belief was "objectively incorrect," and also subjectively, the speaker did not "honestly hold the stated belief"; (2) plaintiff can challenge an embedded statement of fact within an opinion as untrue; and (3) where "omitted material facts" about the speaker's "inquiry into or knowledge concerning" the stated opinion "conflict with what a reasonable investor would take from the statement itself." *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017) (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015)).

Finally, a forward-looking statement (*i.e.*, "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues") is also protected from challenge. *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (internal quotations omitted). Forward-looking statements are not actionable if *either* they are "identified as forward-looking statements and accompanied by meaningful cautionary language" *or* the plaintiff fails to prove that they were made with "*actual* knowledge that they were materially false or misleading." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010)

(emphasis in original); 15 U.S.C. § 78u-5(c)(1)(B).

As addressed below, Plaintiffs attack nine statements in direct violation of these rules.

### A.    Overcoming Supply Chain Issues (Stmts. 3, 7, 10, 13, 16)

Plaintiffs challenge five statements by Romano and Jackson about how well they believed ChargePoint handled supply chain issues:

> **Statement 3 (Romano):** "We're incredibly proud of what our engineering and supply chain teams have had to do. . . . They are doing a tremendous job keeping things moving through our supply chain, and yes, it is having – it is a drag." ¶ 94.

> **Statement 7 (Jackson):** "We're particularly pleased with this performance, given continuing supply chain challenges." ¶ 104 (emphasis omitted).

> **Statement 10 (Romano):** "Even more remarkable is we overcame supply chain headwinds to achieve that level of growth." ¶ 112 (emphasis omitted).

> **Statement 13 (Romano):** "The growth would have been significantly higher if not for supply chain constraints." ¶ 121.

> **Statement 16 (Jackson):** "[W]e have supply chain constraints, but our growth rate is fairly astounding. So, I think we're banging through this pretty well." ¶ 131 (emphasis omitted).

These statements are classic examples of non-actionable puffing, as evidenced by the vague, positive opinion language used throughout these statements such as "incredibly proud," "tremendous job," "particularly pleased," "remarkable," and "astounding." *See Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) (expressions of pride that "we are very pleased" are non-actionable puffery). They also express opinions about ChargePoint's business, but Plaintiffs plead no facts showing these opinions were objectively incorrect.

Furthermore, Plaintiffs do not plead that Romano and Jackson did not believe any of the statements they made about how ChargePoint had overcome supply chain issues. For example, Plaintiffs do not claim that Jackson was not actually pleased with ChargePoint's performance or that Romano was not proud of ChargePoint's engineering and supply teams. Nor do Plaintiffs specifically plead facts showing that Romano and Jackson knew of alleged supply chain issues caused by ChargePoint's outsourcing of accounts payable to India. *See* § II.B, *infra*. Instead, Plaintiffs simply argue that they think Romano and Jackson should have had less optimistic

10

opinions. *See, e.g.*, ¶ 109 ("ChargePoint *should not have been* 'particularly pleased.'") (emphasis added). Plaintiffs' disagreement with the executives' corporate puffing and opinions is insufficient to state a claim. The Court should dismiss all claims based on these statements. *See Wozniak*, 850 F. Supp. 2d at 1038; *City of Dearborn Heights*, 856 F.3d at 615-16.

### B.    The Future of the Electric Vehicle Industry (Stmt. 15)

Plaintiffs also challenge Romano's statement that "our revenue growth has been and continues to be correlated with the availability of electric vehicles. . . . [W]e believe the global vehicle industry has passed the point of no return." ¶ 129 (Stmt. 15). This statement is another vaguely optimistic opinion that is "subjective" and "not capable of objective verification"—no reasonable investor would rely on an executive's claim that they believed their industry had "passed the point of no return." *See In Re Solarcity Corp. Secs. Litig.*, 274 F. Supp. 3d 972, 995 (N.D. Cal. 2017) (finding optimistic statements about growth to be non-actionable). And again, no facts are pled to trigger the narrow exceptions for challenging opinions. Moreover, the statement that revenue growth "continues" to be correlated with the availability of electric vehicles is a non-actionable forward-looking statement. *See* Ex. 6 at p. 3 (cautionary language); Ex. 5 ("[i]n some cases, you can identify forward-looking statements by terminology such as . . . . 'continue,'. . . "). Plaintiffs have not pled specific facts showing that Romano had actual knowledge that ChargePoint's growth would *not* continue to be correlated with the availability of electric vehicles, let alone that he knew about the alleged issues with revenue recognition. *See* § III.C, *infra*; *see also Cutera*, 610 F.3d at 1112; *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014).

### C.    ChargePoint's Prospects (Stmts. 21, 22, 23)

Plaintiffs also challenge three statements that they describe as "positive statements about the Company's business, operations, and prospects." ¶¶ 151, 154. While Plaintiffs do not specify exactly which parts of the block quotes in the AC they are challenging (which is itself a pleading failure), two of the three cited statements are once again replete with non-actionable corporate puffing and opinion, such as "[w]e delivered a strong quarter," "[d]iversification across verticals and geographies continues to contribute resilience to our business," "we continue to see overall growth and margin improvement," "we're back to a nice rhythm now," and "I think it's fair to say that we are well past

11

the worst of it." Stmts. 21, 22. The third statement, notwithstanding Plaintiffs' description, does not appear to be a positive statement at all, so it is unclear on what basis Plaintiffs challenge this statement, but in any event then it certainly does not rise to the level of being "capable of objective verification." *See* Stmt. 23.

In addition, to the extent Plaintiffs challenge parts of these three statements concerning the Company's "prospects," (*see* ¶¶ 147, 148, 153), those parts are inherently forward-looking and non-actionable. ChargePoint's 10-Qs identified statements about the Company's prospects as forward-looking, and all three statements come from a 10-Q or earnings call and so were accompanied by the same meaningful cautionary language discussed above, making them non-actionable. Ex. 12 at p. 3 ("[F]orward-looking statements could include . . . statements regarding . . . ChargePoint's . . . prospects."); *see also* Ex. 9 at p. 3.

Plaintiffs have also once again failed to plead that the speakers had "actual knowledge" that their forward-looking positive statements about ChargePoint's prospects were false or misleading, or even that they were aware of the alleged inventory valuation issues, making these three statements subject to dismissal on that basis as well. *Cutera*, 610 F.3d at 1112. *See* § V.B, *infra*.

## III.    PLAINTIFFS FAIL TO PLEAD FALSITY OR SCIENTER UNDER THEIR SUPPLY CHAIN THEORY FOR THEIR SECTION 10(b) AND RULE 10b-5(b) CLAIM (Stmts. 3, 7, 10, 13, 16).

Plaintiffs' Supply Chain Theory challenges five statements by Romano and Jackson about how well they believed ChargePoint handled supply chain issues. *See* ¶¶ 94, 100, 104, 109, 112, 117, 121, 126, 131, 135 (Stmts. 3, 7, 10, 13, 16). As discussed *supra*, all five of these statements are non-actionable corporate puffery. But, even if the statements themselves were actionable, the Supply Chain Theory fails because Plaintiffs also have not sufficiently pled falsity or scienter.

### A.    Plaintiffs Have Not Pled That the Supply Chain Statements Were False.

Plaintiffs' Supply Chain Theory fails at the outset because there is a complete mismatch between what the challenged statements say and why Plaintiffs claim those statements were false.

Perhaps in recognition of the weakness of their claims, Plaintiffs attempt to sow confusion by dedicating ten paragraphs early in the AC to describing alleged supply chain issues caused by Italian plant closures, outsourcing of manufacturing to Mexico, ships delayed at ports due to COVID-19,

12

and supposed extortion by suppliers, (*see* ¶¶ 43-52), but then they do not rely on *any* of these allegations to plead falsity for the five supply chain statements. Nor could Plaintiffs rely on these supply chain issues to show falsity, since they were all disclosed by ChargePoint. *See, e.g.*, Ex. 7 at 17 (disclosing risks from "prolonged port congestions . . . supplier shutdowns and delays . . . the COVID-19 pandemic . . . increased material costs and freight and logistics expenses . . . [and] [c]osts incurred to expedite delivery of components and replacement parts . . .").

Instead, Plaintiffs claim that the challenged supply chain statements were false or misleading because the outsourcing of accounts payable functions to India in 2021 allegedly caused other undisclosed supply chain issues. *See* ¶¶ 100, 109, 117, 126, 135. But every single one of the challenged supply chain statements explicitly acknowledged the existence of supply chain issues:

> **Stmt. 3:** "[I]f you can imagine how hard that is in a *supply chain constrained environment . . .*" ¶ 50 (emphasis altered from original).
>
> **Stmt. 7:** "[G]iven continuing *supply chain challenges . . .*" ¶ 104 (emphasis altered from original).
>
> **Stmt. 10:** "[W]e overcame *supply chain headwinds* to achieve that level of growth." ¶ 112 (emphasis altered from original).
>
> **Stmt. 13:** "The growth would have been significantly higher if not for *supply chain constraints*." ¶ 121.
>
> **Stmt. 16:** "[W]e have *supply chain constraints . . .*" ¶ 131 (emphasis added).

Ignoring these explicit acknowledgements of supply chain issues, Plaintiffs attack cherry-picked positive phrases that Romano and Jackson used about ChargePoint's results despite the supply chain issues. *See, e.g.*, ¶ 100 ("Far from doing a 'tremendous job,' . . ."); ¶ 109 ("ChargePoint should not have been 'particularly pleased,' . . ."). But, Plaintiffs' hindsight-based negative assessment of ChargePoint's handling of supply chain issues is not evidence of falsity. Having disclosed the supply chain issues, Romano and Jackson were not required to present an "overly gloomy" view of ChargePoint's ability to overcome those issues. *See, e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects.").

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT—CASE NO. 5:23-CV-06172-EKL

Moreover, there is simply no contradiction between Romano and Jackson's statements that they believed ChargePoint had handled supply chain issues well and the FEs' allegations about problems caused by outsourcing to India. All of Romano and Jackson's statements focused on the positive revenue numbers and/or growth that ChargePoint had achieved *despite* supply chain headwinds. *See* ¶¶ 50, 104, 117, 121, 131 (Stmts. 3, 7, 10, 13, 16). None of the FEs allege that the outsourcing problems impacted, let alone contradicted, those revenue or growth numbers. ¶¶ 82-88. Instead, the FEs simply describe ways in which outsourcing to India caused supply chain issues. *See id.* Even if the Court infers from the FEs that supply constraints impacted revenue and growth, that is *exactly* what Romano said. ¶ 121 (Stmt. 13) ("The growth would have been significantly higher if not for supply chain constraints."). Plaintiffs have therefore not pled falsity for these statements.

**B.      Plaintiffs Fail to Plead Scienter for the Supply Chain Statements.**

Even if Plaintiffs' theory of falsity wasn't flawed (which it is), Plaintiffs do not plead particular facts that give rise to a strong inference that *Romano* or *Jackson* knew, or were deliberately reckless in not knowing, that alleged supply chain issues were caused by outsourcing accounts payable to India. *Zucco*, 552 F.3d at 991.

The section of the AC dedicated to the outsourcing to India allegations, § V.E, does not allege *any* particular facts about Romano and Jackson's knowledge of the alleged supply chain issues caused by that outsourcing. ¶¶ 82-88. Instead, this section makes vague claims about what "management" was aware of, based solely on allegations made by former employees. *See, e.g.*, ¶ 82 ("FE-4 repeatedly complained about this to management."); ¶ 84 ("FE-4 raised this issue several times with management."). These assertions do not plead, with the requisite particularity, that Romano or Jackson were aware of the alleged supply chain issues caused by outsourcing accounts payable to India. *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 814 (N.D. Cal. 2019) ("[S]cienter cannot be established based on 'general awareness' and 'hands-on management style' or by lumping 'management' and 'executives' together.").

Notably, FE-4 was allegedly *three* levels below Romano, (*see* ¶ 31), meaning even if FE-4 did report these issues to the people FE-4 considered management (*e.g.*, FE-4's boss or even boss's boss), that does not mean anything was reported to Romano, let alone Jackson. Likewise, the other

14

two FE's cited in this section of the Complaint, FE-3 and FE-1, were also three or even *four* levels removed from Romano, so their alleged knowledge of these supply chain issues does not create a strong inference that Romano or Jackson was aware of them. ¶¶ 28, 30. *See, e.g.*, *LendingClub*, 423 F. Supp. 3d at 814 ("None of the CWs had any direct (or indirect) contact with any of the Individual Defendants and therefore cannot provide reliable insight into the Defendants' state of mind."); *Waterford Twp. Police & Fire Ret. Sys. v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1154 (C.D. Cal. 2018) (CWs not probative of defendants' state of mind because "Plaintiff does not allege that FE2 had any meaningful contact with Defendants"), *aff'd*, 794 F. App'x 669 (9th Cir. 2020). And, Plaintiffs admit FE-3 left ChargePoint sometime at the start of the Class Period, in "early 2022." ¶ 30. Accordingly, FE-3 cannot be a source from which to infer Romano and Jackson's state of mind for any of the statements made in 2022 or thereafter. *Mattel*, 321 F. Supp 3d. at 1154.

## IV. PLAINTIFFS FAIL TO PLEAD FALSITY OR SCIENTER UNDER THEIR REVENUE RECOGNITION THEORY FOR THEIR SECTION 10(b) AND RULE 10b-5(b) CLAIM (Stmts. 1, 2, 4-6, 8, 9, 11, 12, 14, 15, 17, 19, 20).

### A. Plaintiffs Fail to Plead Premature Revenue Recognition in Violation of ASC 606.

Under their Revenue Recognition Theory, Plaintiffs contend that fourteen statements concerning ChargePoint's revenue during the Class Period were materially false or misleading because those statements were purportedly based on "an undisclosed and unsustainable revenue recognition scheme" through which the Company prematurely recognized revenue in order to meet its growth and financial projections. *See, e.g.*, ¶¶ 5, 124. Plaintiffs allege that ChargePoint: shipped product before customers were ready to receive it, shipped partial or wrong orders to customers, and used resellers to ship early and hold product for customers until customers were ready to receive that product. ¶¶ 64-76. According to Plaintiffs, these tactics were used to enable ChargePoint to prematurely recognize its revenue. *Id.* Plaintiffs have not, however, met any of the pleading requirements to base their Section 10(b) claim on an alleged revenue recognition scheme.

#### 1. *Attacks on revenue recognition must meet specific pleading requirements.*

"When pleading irregularities in revenue recognition, plaintiffs should allege (1) such basic details as the approximate amount by which revenues and earnings were overstated; (2) the products involved in the contingent transaction; (3) the dates of any of the transactions; or (4) the identities of

15

any of the customers or [company] employees involved in the transactions." *In re Daou Sys.*, 411 F.3d 1006, 1016-17 (9th Cir. 2005), *abrogated in part on other grounds as recognized by Glazer Cap. Mgmt, L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (internal citation, quotation marks, and alterations omitted, cleaned up). Plaintiffs "must allege enough information so that a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue." *Id.*

Here, as described above, Plaintiffs purport to allege certain sales practices that they contend were used to prematurely recognize revenue. While they do not use the term "channel stuffing" in the AC, Plaintiffs nevertheless imply that ChargePoint engaged in "the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders while they deplete their excess supply." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998) (defining channel stuffing). Channel stuffing may be "the illegitimate kind (*e.g.*, writing orders for products customers had not requested) or the legitimate kind (*e.g.*, offering customers discounts as an incentive to buy)." *Tellabs*, 551 U.S. at 325. Thus, to the extent Plaintiffs' Revenue Recognition Theory relies on alleged channel stuffing conduct, Plaintiffs must also plead facts to demonstrate that conduct was not legitimate. *Id.* Channel stuffing may be actionable if "defendants knew that business was weak, falsely represented to investors that business was strong, and used channel stuffing to bolster their misrepresentations in the short-term. Alternatively, channel stuffing involving shipping unneeded or unordered product may also be actionable." *Yaron v. Intersect ENT, Inc.*, 2020 WL 6750568, at *7 (N.D. Cal. June 19, 2020); *see also In re Plantronics, Inc. Sec. Litig.*, 2021 WL 8572663, at *6 (N.D. Cal. Mar. 29, 2021) (channel stuffing allegations "are only probative of falsity if plaintiffs can (1) demonstrate defendants engaged in channel stuffing in order to artificially inflate sales, and (2) make a showing of specific transactions, specific shipments, specific customers, specifics times, or specific dollar amounts.") (citation omitted).

### 2.    *Plaintiffs fail to allege the basic details of a revenue recognition scheme.*

Plaintiffs' Revenue Recognition Theory allegations are based on statements that Plaintiffs attribute to five FEs, which Plaintiffs assert show that the Company: shipped product before

16

customers were ready to receive it, shipped partial or wrong orders, and used resellers to ship product out early. ¶¶ 64-76. As a threshold matter, none of the FEs meet the standard of reliability for a confidential witness used to support the conclusory allegation that Plaintiffs make—that revenue was allegedly recognized prematurely in ChargePoint's financial disclosures. These FEs had positions in sales, sales operations, and purchasing/procurement. ¶ 33. None of them served in finance or accounting functions with any responsibilities related to revenue accounting or the preparation of ChargePoint's financial disclosures. ¶¶ 28-33. Indeed, none of the FEs even claim to know about ChargePoint's accounting or financial reporting during the Class Period. *Id.*; *see also* ¶¶ 64-76. And, FE-3 departed the company at the start of the class period. ¶ 33. These FEs therefore lack the requisite knowledge and credibility necessary for the Court to rely on facts attributed to them concerning revenue recognition. *See Kampe v. Volta Inc.*, 2024 WL 308262, at *13 (N.D. Cal. Jan. 26, 2024) (court could not reasonably infer that a confidential witness from the sales group was in a position to have reliable information about the company's accounting practices and whether it prematurely recognized revenue); *Zucco*, 552 F.3d at 995.

Moreover, even if the Court were to consider the FE allegations, they do not allege the basic facts called for in *Daou*. None of the FEs allege facts to demonstrate how any scheme operated across the ten quarters in the Class Period in order to impact revenue. Indeed, the allegations of a "scheme" are not quotes from or even clearly attributed to the FEs and instead appear to be Plaintiffs' own conclusions. *See*, *e.g.*, ¶ 73 (claiming, without citation to any FE, that "ChargePoint also engaged in significant undisclosed quarter-end pull-in sales transactions to artificially inflate its publicly reported quarterly revenue from charging system sales and overstate its actual customer demand."). At most, the FE statements amount to a handful of incomplete examples of ChargePoint shipping practices:

- FE-1 purports to identify a single instance in "late July/early August" 2022 where there was a "push" to ship **pending orders** to clients early. ¶¶ 65-66. Neither the clients or products are identified in this single alleged instance. The AC leaves the Court to guess at the impacted revenue and FE-1 even admits they were not aware of how 80% of the shipped products were accounted for. *Id.*

- FE-2 purportedly speaks to the shipping of partial product for four product lines in three quarters, but does not identify how much product was shipped or say anything about revenue recognized for that product. ¶¶ 67-68.

17

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT—CASE NO. 5:23-CV-06172-EKL

- FE-3 describes the shipment of 20-30 empty charger frames, but acknowledges this was done in consultation with clients. ¶ 69. Again, FE-3 departed in early 2022 so nothing about practices for nearly all of the Class Period can be inferred from this.

- FE-4 merely refers to seeing unspecified amounts of returned product at unspecified points in time. ¶ 70.

- FE-5 refers to discount offers to value added reseller, Rexel, to take product ordered by a customer early, and hold it for the customer. No time frame, amount, or revenue impact is alleged. ¶ 75.

Even taking all of the FE allegations together, it is impossible to discern whether the alleged sales activities were widespread (these allegations are individual instances), whether these activities led to any actual financial statement mis-statements or improperly recognized revenue, whether these sales activities caused any inflation of revenue, much less significant inflation, or when such a purported scheme began. Critically, Plaintiffs never allege an approximate amount by which revenue was overstated, either across the entire Class Period or in any given quarter in which they contend ChargePoint falsely reported its revenue. *See Daou Sys.*, 411 F.3d at 1016-17. Plaintiffs' conclusory assertion that the "scale" of the shipping practices was "material" has no support. ¶ 8. Plaintiffs grossly mischaracterize the statements of FE-1 to imply an impact of as much as $5 million in a single quarter. FE-1 made no such statement. Rather, FE-1 allegedly spoke of a single instance in which approximately 10% of $1 to 5 million in product (*i.e.*, product valued at $100-500,000) was shipped before customers were ready, but FE-1 only had knowledge of revenue purportedly being recognized on the 20% of that shipped product that was delivered to customers (*i.e.*, $20-100,000). ¶ 66. Again, FE-1 was not in the accounting group and has no knowledge of whether the revenue observed in the Salesforce database was actually included in the Company's publicly reported revenue. Similarly, FE-2's statement that millions of dollars in product was returned every quarter, in addition to lacking sufficient specifications, does not reflect whether or how those returns were treated as an accounting matter for the publicly reported revenue.

The FE allegations also do not demonstrate a scheme to improperly inflate revenue by channel stuffing. *See Plantronics*, 2021 WL 8572663, at *6-7 (finding inadequate allegation attributed to a confidential witness of a single instance of channel stuffing that also failed to allege the amounts of sales at issue, that the customer did not want the products, or that lower purchases

18

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT—CASE NO. 5:23-CV-06172-EKL

were made in the future).

Finally, even if the Court credits the FE allegations, Plaintiffs' Revenue Recognition Theory is wholly implausible for several reasons. *First,* Plaintiffs contend that the alleged shipping practices were for the purpose of concealing poor growth and inability to meet revenue projections due to undisclosed supply constraints. *See* ¶ 5. But, ChargePoint disclosed ad nauseum that supply constraints were negatively impacting revenue. *See* § II.A, *supra*. And, Plaintiffs have not quantified how *undisclosed* supply constraints impacted revenue or shown that any such impact was concealed through alleged premature revenue recognition. *Second*, Plaintiffs' Supply Chain and Revenue Recognition theories contradict each other. Supply constraints lead to a lack of product to meet demand. Premature shipping or channel stuffing refers to putting more product into the market than demand requires. It cannot be true that ChargePoint *both* lacked sufficient product to meet demand *and* pushed into the market more product than demand required.

### 3.      *Post Class Period Events are not evidence of a scheme.*

The alleged "Post Class Period Events" (*i.e.*, ChargePoint's Q3 & Q4 2024 and Q1 2025 financial results) also do not demonstrate the existence of a scheme to prematurely recognize revenue. ¶¶ 179-83.

During ChargePoint's Q3 2024 earnings call on December 6, 2023, CEO Wilmer discussed the factors affecting the Company's financial results stating, "[w]e attribute the majority of this to three factors. First of all, the arrival of many commercial fleet vehicles has been delayed, or in other cases, these vehicles have been slow to ramp up production…The second factor impacting Q3 top line revenue can be summarized as a slowdown in commercial demand combined with supply chain normalization…The third factor, which negatively impacted Q3 revenue was something we could not have predicted going into the quarter, hesitation related to the automotive labor disputes in the United States." Ex. 14 at 5; *see also* ¶ 180. Plaintiffs have pled no facts to refute that these disclosed factors—and not a purported revenue scheme—were the drivers of the change in ChargePoint's financial performance in Q3 2024 and after. Plaintiffs' unfounded conclusions cannot be the basis for their claims. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1056-57 (9th Cir. 2008) (affirming dismissal with prejudice of claims regarding improper revenue recognition

practices where plaintiffs relied in part on post-class period events as evidence of the alleged fraudulent scheme during the class period); *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003), *abrogated in part on other grounds as recognized by Glazer Cap. Mgmt, L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (rejecting plaintiffs' reliance on post-class period statements because "[i]t is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood") (citation omitted).

### B.    Plaintiffs Fail to Plead the Challenged Statements Regarding Revenue Were False or Misleading.

In addition to failing to meet the specific pleading requirements for pleading an improper revenue recognition scheme, Plaintiffs' Revenue Recognition Theory also fails to meet the standard pleading requirements for a 10b-5(b) claim. Starting with falsity, as an initial matter, Plaintiffs' attack on ChargePoint's reported revenue numbers (Stmts. 1, 5, 8, 11, 14, 17, 19, 20) fails for the simple matter that there is not a single allegation in the complaint that the revenue amounts reported were false. These statements must therefore be dismissed. *See Yaron*, 2020 WL 6750568, at *7 (dismissing claim challenging financial results and earnings guidance based on alleged artificial revenue inflation through channel stuffing because allegations did not support that the reported revenue was false or misleading).

Separate from their attack on ChargePoint's disclosure of revenue numbers, Plaintiffs also challenge comments made by Romano in the Company's earnings press releases and earnings calls. *See e.g.* ¶ 91 (Stmt. 1) ("***The investments we have made over many years have enabled us to capture charging demand from customers preparing for an electric future. This quarter we added more customers at an accelerated rate, while also successfully closing two acquisitions.***" (Emphasis in AC)); *see also* ¶¶ 101, 103, 112, 120, 129 (Stmts. 4, 6, 9, 12, 15). As with the disclosures of ChargePoint's actual revenue numbers, Plaintiffs do not contend that these descriptions of the ChargePoint's business were themselves false—for example there is no dispute that the company successfully closed two acquisitions or added customers at an accelerated rate in the third quarter of 2022. *See* ¶¶ 99, 108, 116, 125, 134. Rather, Plaintiffs argue that each challenged statement was false or misleading because "at least part of its purported growth" was "the result of

20

the undisclosed and unsustainable revenue recognition scheme." *Id.* Because Plaintiffs have failed to adequately plead the existence of any such scheme, *see* § III.A, *supra*, they have also failed to plead that these statements are false or misleading.

Moreover, to the extent Plaintiffs argue that Romano's statements were misleading because they implied sustainable growth, when instead the growth was attributable to unsustainable channel stuffing, their allegations are still insufficient. Again, none of the FE allegations (taken separately or together) demonstrate that the revenue and Company growth in that quarter was not true and not sustainable such that Plaintiffs have adequately pled that each challenged statement across ten quarters was misleading.

### C. Plaintiffs Have Not Pled Facts Supporting a Strong Inference of Scienter for the Revenue Recognition Theory.

In addition to failing to plead falsity, Plaintiffs also fail to plead scienter because they do not plead particular facts supporting a strong inference that Romano or Jackson knew, or were deliberately reckless in not knowing, that the challenged revenue statements were false. *Zucco*, 552 F.3d at 991. None of the FE's allegations create a strong inference that Romano or Jackson knew of a scheme to prematurely recognize revenue. Indeed there is no allegation from any FE that Romano or Jackson knew about the product shipping practices described, issued any directive related to those shipping practices, or had any information to otherwise suggest that the revenue data they would have seen as CEO and CFO was artificially inflated. General statements that a practice for shipping was ordered "by management" or "had to be approved at the executive level" or that the finance department "would have been aware" (¶ 66) are not sufficient to plead scienter. *See, e.g.*, *LendingClub*, 423 F. Supp. 3d at 814; *Yaron*, 2020 WL 6750568, at \*9; *Waterford Twp. Police & Fire Ret. Sys.*, 321 F. Supp. 3d at 1154; *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at \*12 (N.D. Cal. Dec. 17, 2019). It is also not reasonable to infer corporate scienter from Plaintiffs' references to Michael Hughes (Chief Customer and Revenue Officer) and Patricia Fagundes (Dir. Supply Chain)'s purported knowledge of alleged shipping practices. *See* ¶¶ 66, 69-70. Because such sales practices may be done for legitimate reasons, mere allegations of a company leader knowing of the sales practices are insufficient to infer intent with respect to the

21

company's reported revenue. *See Tellabs*, 551 U.S. at 325 (differentiating between "legitimate" and "illegitimate" channel stuffing); *cf. Patterson v. Jump Trading LLC*, 2024 WL 49055, at *17 (N.D. Cal. Jan. 4, 2024) (dismissing scheme liability claims where the alleged conduct "could reflect a benign business decision as opposed to manipulative or deceptive conduct").

## V.    PLAINTIFFS' REVENUE RECOGNITION THEORY FAILS TO STATE A CLAIM FOR VIOLATION OF SECTION 10(b) AND RULE 10b-5(a) and (c).

Plaintiffs rely on their Revenue Recognition Theory to separately bring a claim for violation of Rule 10b-5(a) and (c). ¶¶ 231-39. Whereas Rule 10b-5(b) is concerned with liability for making untrue statements of material fact, subsections (a) and (c) make it unlawful "to employ any device, scheme, or artifice to defraud" or "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." As explained above, Plaintiffs' allegations of a scheme under their Revenue Recognition theory are deficient for myriad reasons. *See* § III, *supra*. The outcome is no different under Rule 10b-5(a) and (c): no scheme has been pled.

In addition, Plaintiffs fail to plead with particularity that Romano or Jackson's own acts, and not merely the alleged overarching scheme, were manipulative or deceptive. *See Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds*, 519 F.3d 1041 (9th Cir. 2008) ("It is not enough that a *transaction* in which a defendant was involved had a deceptive purpose and effect; the defendant's *own conduct* contributing to the transaction or overall scheme must have had a deceptive purpose and effect.") (emphasis in original). Indeed, there is not a single act attributed to Romano or Jackson that Plaintiffs contend contributed to the scheme, other than making the challenged statements. Again, because Plaintiffs have not adequately alleged Romano or Jackson made any challenged statement with the requisite scienter (or that those statements were false), Plaintiffs also fail to plead conduct contributing to the scheme.

Plaintiffs' vague assertions that directives and decisions in furtherance of the scheme came "from the top down" or from "management" or "supervisors" were insufficient under Rule 10b-5(b); they are also inadequate here. *See, e.g.*, ¶¶ 64, 68, 69. These nebulous references are sorely insufficient to establish that "*each defendant* committed their own deceptive act in furtherance of the scheme." *Borteanu v. Nikola Corp.*, 2023 WL 1472852, at *22 (D. Ariz. Feb. 2, 2023) (citing

22

*Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997)) (emphasis in original); *Cooper*, 137 F.3d at 624 (nonspecific group allegations are only sufficient to plead scheme liability "*as long as* each defendant committed a manipulative or deceptive act in furtherance of the scheme." (emphasis added)); *Borteanu*, 2023 WL 1472852, at *21-*26 (dismissing scheme liability claims because, among other reasons, the plaintiff failed to identify "*who* among the Individual Defendants" engaged in the allegedly deceptive conduct) (emphasis in original).

Plaintiffs must also plead scienter, reliance, and loss causation for their scheme liability claim to survive. *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 158 (2008). For the reasons explained elsewhere in this motion, Plaintiffs have failed to plead any of these elements as to their Revenue Recognition Theory generally, and their scheme liability claim should be dismissed.

## VI.   PLAINTIFFS' INVENTORY VALUATION THEORY FAILS TO STATE A CLAIM FOR VIOLATION OF SECTION 10(b) AND RULE 10b-5(b) (Stmts. 18, 21, 22, 23).

### A.   Plaintiffs Have Not Pled That the Inventory Valuation Statements Were False.

On September 6, 2023, ChargePoint disclosed that it was taking a $28 million inventory impairment charge to address legacy supply chain-related costs and supply overruns on its first-generation DC charging product. ¶¶ 156-63. On November 16, 2023, ChargePoint disclosed a non-cash impairment charge of $42 million. ¶ 171. Plaintiffs assert that four statements made by the Company prior to disclosing the impairments on September 6, and November 16, 2023,[5] were materially false or misleading. According to Plaintiffs, those statements discuss component shortages, ChargePoint's inventory, or ChargePoint's revenue, without disclosing that ChargePoint was allegedly experiencing higher component costs and supply overruns for its first generation DC charging products or disclosing that, as a result of the foregoing, ChargePoint was likely to incur impairment charges that would adversely impact ChargePoint's profitability. ¶¶ 144, 151, 154. Plaintiffs offer no facts, however, to show that any of the challenged inventory valuation statements

---

[5] The challenged inventory valuation statements were made on April 3, 2023 (Stmt. 18), June 1, 2023 (Stmts. 21 & 22) and September 11, 2023 (Stmt. 23). Plaintiffs claim that the last of these statements was made on August 8, 2023, in ChargePoint's 10-Q for the second quarter of FY 2024, ¶ 152, but that 10-Q was actually filed on September 11, 2023, *see* Ex. 12.

were false or misleading when made.

*First,* on their face, Statements 22 and 23 speak explicitly about the topics that Plaintiffs contend were omitted. Statement 22 refers to supply sitting in inventory and the need to work through existing inventory that had higher prices. ¶ 148 ("***As you can imagine, there are some prior deals that we had to cut to get supply that's now sitting in inventory***." (emphasis in AC)). Statement 23 specifically discusses disruptions in manufacturing, delivery and overall supply chain, component shortages and heightened logistics costs. ¶ 153. In other words, stating exactly what Plaintiffs contend was omitted. It is also entirely unclear what Plaintiffs contend is misleading about ChargePoint's accurate statements about the Company's operating assets and liabilities (Stmt. 18) and revenue (Stmt. 21).

*Second*, Plaintiffs ignore the additional disclosures made in conjunction with each statement regarding costs and supply. For example, in its 2023 Form 10-K filed on April 3, 2023, ChargePoint explained that factors such as supply chain challenges, heightened logistics costs and component shortages had decreased its gross margins and further said "ChargePoint continues to invest in prioritizing an assurance of supply of its products and new customer acquisition as part of its 'land and expand' model, which in the current environment puts pressure on gross margins and increases operating expenses." Ex. 7 at 45-46. And, elsewhere in the June 6, 2023 earnings call, Jackson reiterated, "we also managed to break free on a number of supply chain issues and move our inventory solidly from raw materials and [] or work in progress to finished goods, meaningfully increasing our inventory level." *See* Ex 9 at 8. Most strikingly, Plaintiffs challenge a statement in ChargePoint's 10-Q for the second quarter of fiscal year 2024 (Stmt. 23). That 10-Q was filed on September 11, 2023 *and it is the same 10-Q in which ChargePoint disclosed the $28 million impairment charge. See* ¶ 166; Ex. 12 at 19, 50. This 10-Q also came five days *after* ChargePoint disclosed the impairment charge in a Form 8-K. ¶¶ 155-56; Ex. 10 at 4.

Accordingly, Plaintiffs have not demonstrated a material omission in connection with any of these challenged statements.

*Third*, the allegations from FE-5 and FE-3 do not demonstrate that any of the inventory valuation challenged statements were false or misleading. FE-5 merely notes that "[b]eginning in

2023" excess supply of the CPE 250 was discussed on bi-weekly calls. ¶ 79. FE-3 (who contends there was "overstock" of the CPE 250 in 2023) stopped working for ChargePoint in early 2022 and is therefore not a reliable source for this issue. No FEs state when in 2023 such oversupply existed or how much, let alone supports that it was concealed in any way. In addition neither FE supports Plaintiffs' contention that ChargePoint was experiencing higher component costs in 2023. To the contrary, as noted above, ChargePoint disclosed efforts to build up inventory in 2023 and discussed costs.

*Finally*, the Court should also reject Plaintiffs' conclusory assertion that ChargePoint violated its own inventory policy by failing to timely write down inventory. Plaintiffs blatantly misquote the policy in paragraph 78 and ignore that the policy states "[I]nventory levels are analyzed periodically" implying instead that there was a specific quarterly obligation to do so. ¶ 78. Plaintiffs allege no facts to demonstrate that inventory levels were required to be evaluated before the challenged statements were made, that they had been analyzed before the challenged statements were made, or that anyone had concluded following such a review that a write down was necessary at any time prior to September 2023.

**B.      Plaintiffs Have Not Pled Facts Supporting a Strong Inference of Scienter for the Inventory Valuation Theory.**

Plaintiffs also fail to plead particular facts supporting a strong inference that Romano and Jackson, knew, or were deliberately reckless in not knowing, that the challenged inventory valuation statements they made were false. *Zucco*, 552 F.3d at 991.

Specifically, the FE allegations do not create a strong inference that Romano or Jackson knew that ChargePoint was "likely to incur [future] impairment charges" when the inventory valuation statements were made in April, June, and September, 2023. Rather, FE-5 professed an understanding that "executives" were "apprised" of "bi-weekly calls [in 2023] where the excess supply of CPE 250-s was discussed" because the Senior Vice President for North America stated that FE-5 had to report the contents of the meeting to 'Paq [Romano] and Michael [Hughes]." ¶ 79. This is plainly insufficient to plead scienter, for several reasons.

*First*, because Plaintiffs do not specify *when* in 2023 these meetings occurred, they fail to

25

plead with particularity what Romano or Jackson knew on April 3, June 1, or September 11, 2023.

*Second*, Plaintiffs do not allege that either FE-5 or the Senior Vice President for North America actually did report on the meeting to Romano, or anyone else. And in any event this vague and confusing assertion of a reporting requirement falls far short of the requirements for pleading scienter of an individual defendant based on the statements of a confidential witness. *See, e.g.*, *LendingClub*, 423 F. Supp. 3d at 814; *Mattel*, 321 F. Supp. 3d at 1154.

*Third*, even if the contents of the meeting were reported to Romano, no particular facts are pled about what, exactly, was reported to Romano about excessive supply. *LendingClub*, 423 F. Supp. 3d at 814 ("[S]cienter cannot be established based on 'general awareness.'"). There is simply no basis on which to infer that Romano was provided with information from which he could have known the challenged statements were false. Again, there is not a single allegation that it was determined by anyone at any time before September 2023 that the Company should take an inventory impairment, let alone that such a view was shared with Romano. There is also no allegation that Jackson was even informed of these meetings, let alone of their content or purported relevance to inventory valuation. *Id.* (finding scienter allegations insufficient where "[t]he CAC does not identify any specific information that was either received or communicated by any Individual Defendant that would contradict any public statement at the time it was made" and stating that "[S]cienter cannot be established . . . by lumping 'management' and 'executives' together.").

## VII.    PLAINTIFFS HAVE NOT CREATED A COGENT AND COMPELLING INFERENCE OF INTENTIONAL WRONGDOING.

Separate from their deficient assertions of scienter with respect to the statements challenged under their three theories, Plaintiffs invite the Court to infer scienter based on Romano and Jackson's purported motivation to commit fraud as to all challenged statements. ¶¶ 190-201. We discuss these general scienter allegations first and then present the holistic scienter analysis required by *Tellabs*.

### A.    Generic Financial Motivation Does Not Support A Strong Inference of Scienter.

Plaintiffs ask the Court to find scienter adequately pled when they have not made *any* particularized allegations about the knowledge of Romano and Jackson, relying instead on the conclusory statement that "[a]s alleged herein, Defendants acted with scienter since Defendants

knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading." ¶ 190. This scienter conclusion is patently deficient. *Zucco*, 552 F.3d at 991 ("To adequately plead scienter, the complaint must now state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.") (internal quotation marks and citations omitted); *LendingClub*, 423 F. Supp. 3d at 814 (finding scienter allegations insufficient where "[t]he CAC does not identify any specific information that was either received or communicated by any Individual Defendant that would contradict any public statement at the time it was made.").

Nor can Plaintiffs rely on their general allegations of motive and opportunity; under controlling law, such allegations are "not independently sufficient" to establish scienter. *E.g.*, *Intuitive Surgical*, 759 F.3d at 1062. Moreover, even these allegations are deficient.

***Incentive compensation.*** Plaintiffs claim that the Court should infer scienter because Romano and Jackson were entitled to incentive compensation after the company went public in 2021. ¶¶ 192-94. This is contrary to law. "[I]t is common for executive compensation, including stock options and bonuses, to be based partly on the executive's success in achieving key corporate goals . . . [and] we will not conclude that there is fraudulent intent merely because a defendant's compensation was based in part on such successes." *Rigel*, 697 F.3d at 884; *In re Tibco Software, Inc.*, 2006 WL 1469654, at *21 (N.D. Cal. May 25, 2006) ("Plaintiffs *concede* that allegations concerning incentive compensation are insufficient as a matter of law.") (emphasis in original).

***Insider stock sales.*** Plaintiffs next point to stock sales made by Jackson and Romano, ¶¶ 196-201, but these sales weigh *against* an inference of scienter. Plaintiffs themselves admit that all of Romano's sales were made pursuant to a Rule 10b5-1 trading plan. ¶ 196 n.30; Ex. 15. Such sales involve no discretion on the part of an officer or employee, and hence do not support – although they may rebut – an inference of scienter. *Metzler*, 540 F.3d at 1067 n.11 (stock sales made under trading plans weigh against an inference of scienter). Plaintiffs cannot avoid this fact with their conclusory assertion that Romano was in possession of some unspecified material non-public information about ChargePoint on January 13, 2022, when he entered one of the trading plans. ¶ 196 n.30. Plaintiffs do not identify with particularity any information Romano was supposedly aware of at that time (or

27

ever) that would make his decision to establish a trading plan indicative of scienter. Nor do they even plead with particularity any facts supporting any of their theories as of that date.

As for Jackson's sales, 12 of the 13 transactions, constituting 659,269 of the 670,270 shares sold (98%) were made to pay tax liability incurred from other transactions, which is also not indicative of scienter. Ex. 16; *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 611 (E.D. Pa. 2009) (stock sales made to cover tax liability weigh against an inference of scienter) (citing authorities); *Plumley v. Sempra Energy*, 2017 WL 2712297, at *12 (S.D. Cal. June 20, 2017) (stock sales made to pay tax withholding liability do not support an inference of scienter). The only remaining stock sale not specifically identified in the Form 4 as for the purpose of paying a tax withholding liability was made on December 30, 2021. ¶ 199; Ex. 16 at 6. Thus, not only does this sale involve a mere 11,000 shares, it occurred within the first month of the Class Period. As with Romano, Plaintiffs cannot point to a single allegation demonstrating that Jackson was in the possession of material non-public information at the time of this stock sale, or any other. Jackson's stock sales thus also weigh against an inference of scienter.

**B.    Plaintiffs' Scienter Allegations Are Also Defective Under a Holistic Analysis.**

Plaintiffs' scienter allegations are no stronger taken together than considered separately. Plaintiffs cite no facts suggesting that any person within ChargePoint disagreed with the Company's financial reporting at the time of the challenged statements, much less that Romano or Jackson believed the financial statements were false or misleading. The same is true of Plaintiffs' challenge to statements about supply constraints, revenue drivers, and inventory. On the issue of motivation, Plaintiffs allege facts about incentive compensation that could be made against virtually any public company. The stock sales identified by Plaintiffs in no way suggest that Romano or Jackson believed that ChargePoint's stock price was inflated. Plaintiffs' burden is to allege facts supporting an inference of intentional wrongdoing that is strong, cogent and at least as compelling as the competing inference that Romano and Jackson made the challenged statements with a good-faith belief that they were accurate and not misleading. Plaintiffs have not carried that burden.

Finally, for the reasons above that Plaintiffs fail to plead scienter as to the executives, they also fail as to ChargePoint, because Romano and Jackson are the only executives that Plaintiffs

28

claim are responsible for the misleading statements. ¶¶ 24-26; *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prod. Liab. Litig.*, 2017 WL 6041723, at *8 (N.D. Cal. Dec. 6, 2017) ("[L]iability for fraud cannot be imputed to a corporation without evidence that an agent of the corporation who participated in making the challenged statements did so with scienter.").

## VIII.    PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION.

The AC cites two alleged corrective disclosures: On September 6, 2023, ChargePoint disclosed "worse-than-expected financial results" and a $28 million impairment, ¶ 155-69, and on November 16, 2023, it announced preliminary Q3 2023 financial results, including that the company did not expect to meet its revenue guidance, and the replacement of Romano and Jackson. ¶ 170-74. In addition to their shortfalls in pleading falsity and scienter, Plaintiffs fail to meet their burden to plead loss causation as to the statements challenged under their Supply Chain and Revenue Recognition Theories.

To adequately plead loss causation, a plaintiff must allege that a company's stock price "fell significantly after the truth became known." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The relevant "truth" must relate to the allegedly false statement or deceptive conduct: Securities plaintiffs must "show a causal connection between the fraud and the loss . . . by tracing the loss back to the very facts about which the defendant lied." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (internal quotation marks and citations omitted). Moreover, the mere disclosure of negative financial results is insufficient to plead loss causation in the absence of specific allegations connecting those financial results to the alleged misstatements. *Loos v. Immersion Corp.*, 762 F.3d 880, 887-88 (9th Cir. 2014) (rejecting plaintiff's allegation of a causal link between a disappointing earnings disclosure and alleged revenue accounting fraud stating, "our precedent requires a securities fraud plaintiff to allege that the market learned of and reacted to th[e] fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally").

On their face, neither of the alleged corrective disclosures convey information concerning alleged undisclosed supply issues caused by outsourcing to India or concerning any purported improper revenue accounting. And, Plaintiffs' own allegations about analyst commentary following

29

the disclosures evidence that the market was reacting to ChargePoint's negative financial results, and not allegedly undisclosed supply chain issues or an improper revenue recognition scheme. ¶¶ 164, 175-77. On this basis alone, Plaintiffs fail to plead loss causation with respect to the statements challenged under their Supply Chain and Revenue Recognition Theories.

Plaintiffs also fail to plead loss causation for Statement 23. As discussed above, that statement is challenged under the Inventory Valuation Theory, yet it was made after ChargePoint had already disclosed a $28 million impairment charge on September 6, 2023.

**IX. PLAINTIFFS' SECTION 20(a) CONTROL PERSON LIABILITY CLAIM FAILS.**

Because Plaintiffs have not adequately pled a claim under Section 10(b) for the reasons discussed above, they have also failed to establish control person liability against Romano or Jackson under Section 20(a). *See City of Dearborn Heights*, 856 F.3d at 623 ("[W]ithout a primary violation of federal securities law, Plaintiff cannot establish control person liability.") (internal quotation omitted). Accordingly, Plaintiffs' Section 20(a) claim should be dismissed. *See Zucco*, 552. F.3d at 990 ("Section 20(a) claims may be dismissed summarily, however, if a plaintiff fails to adequately plead a primary violation of section 10(b).") (citations omitted).

Date:  September 17, 2024

Respectfully submitted,

By:*/s/ Jaime A. Bartlett*
    Jaime A. Bartlett
    Sidley Austin LLP
    555 California Street, Suite 2000
    San Francisco, CA 94104
    Telephone: (415) 772-1279
    JBartlett@sidley.com

*Attorneys for Defendants*
*ChargePoint Holdings, Inc., Pasquale Romano,*
*and Rex S. Jackson*

30