1   Sara B. Brody (SBN 130222)
    sbrody@sidley.com
2   Jaime A. Bartlett (SBN 251825)
    jbartlett@sidley.com
3   Matthew P. Henry (SBN 308878)
    mhenry@sidley.com
4   Chaddy Georges (SBN 335546)
    cgeorges@sidley.com
5   SIDLEY AUSTIN LLP
    555 California Street
6   Suite 2000
    San Francisco, CA 94104
7

8   *Attorneys for Defendants*
    *ChargePoint Holdings, Inc., Pasquale Romano,*
9   *Rex S. Jackson, and Michael Hughes*

10              **UNITED STATES DISTRICT COURT**

11             **NORTHERN DISTRICT OF CALIFORNIA**

12                  **SAN JOSE DIVISION**

13  FAROOQ KHAN, Individually and on Behalf of     Case No. 5:23-cv-06172-NW
    All Others Similarly Situated,
14                                                 **DEFENDANTS CHARGEPOINT**
                                                   **HOLDINGS, INC., PASQUALE ROMANO,**
15                  Plaintiff,                      **REX S. JACKSON, AND MICHAEL**
                                                   **HUGHES'S NOTICE OF MOTION AND**
16          vs.                                    **MOTION TO DISMISS THE SECOND**
                                                   **AMENDED CLASS ACTION COMPLAINT**
17  CHARGEPOINT HOLDINGS, INC., et al.,            **FOR VIOLATIONS OF THE FEDERAL**
                                                   **SECURITIES LAWS; MEMORANDUM OF**
18                  Defendants.                     **POINTS & AUTHORITIES IN SUPPORT**
                                                   **THEREOF**
19
                                                   Assigned to: Hon. Noël Wise
20
                                                   Date:   October 22, 2025
21                                                 Time:   9:00 a.m.
                                                   Place:  Courtroom 3, 5th Floor
22

23

24

25

26

27

28

1

## NOTICE OF MOTION AND MOTION TO DISMISS

2

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3

4    Please take notice that on October 22, 2025, at 9:00 a.m., defendants ChargePoint Holdings,

5    Inc., Pasquale Romano, Rex S. Jackson, and Michael Hughes (collectively, "Defendants") will bring

6    for hearing this Motion to Dismiss the Second Amended Class Action Complaint for Violations of

7    the Federal Securities Laws, before the Honorable Judge Noël Wise, San Jose Courthouse,

8    Courtroom 3, 5th Floor, 280 South First Street, San Jose, CA 95113.

9    As set forth in the attached memorandum, the Court should dismiss this action in its entirety

10   under Rule 12(b)(6) because Lead Plaintiffs Shahram Afshani and Paulina Afshani Schwartz

11   ("Plaintiffs") have failed to state a claim on which relief may plausibly be granted.

12   Plaintiffs assert a claim against all Defendants under Section 10(b) of the Securities

13   Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5(a) and (c) promulgated thereunder, but

14   Plaintiffs fail to plead that claim with the particularity required by Federal Rule of Civil Procedure

15   9(b) and the Private Securities Litigation Reform Act. Specifically, Plaintiffs have (1) failed to plead

16   the existence of a scheme to defraud and (2) failed to establish a strong inference of scienter.

17   Plaintiffs also assert a claim against ChargePoint, Romano, and Jackson under Section 10(b)

18   of the Securities Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5(b) promulgated thereunder.

19   Plaintiffs also fail to plead that claim with the particularity required by Federal Rule of Civil

20   Procedure 9(b) and the Private Securities Litigation Reform Act. Specifically, Plaintiffs have (1)

21   failed to plead with particularity that Defendants made any materially false or misleading statement

22   and (2) failed to establish a strong inference of scienter.

23   Plaintiffs lastly assert a control person claim against Romano, Jackson, and Hughes under

24   Section 20(a) of the Exchange Act, 15 U.S.C. § 78t. This claim fails because Plaintiffs have not

25   established a primary violation under Section 10(b), and because Plaintiffs have failed to plead that

26   Hughes was a control person.

27   This motion is based on the attached memorandum, Defendants' Request for Judicial Notice

28   and Consideration of Documents Incorporated by Reference in Support of Motion to Dismiss, the

     Declaration of Jaime A. Bartlett in Support of Defendants' Motion to Dismiss and all Exhibits

attached thereto, and such argument as may be presented before or after the hearing on this matter.

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION .................................................................................................... 1

FACTS ..................................................................................................................... 3

I.     DEFENDANTS ............................................................................................. 3

II.    RELEVANT ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS ...................... 3

III.   RELEVANT PROCEDURAL HISTORY .............................................................. 4

ARGUMENT ........................................................................................................... 5

I.     THE SAC RESTS ON ALLEGATIONS ATTRIBUTED TO
       ANONYMOUS WITNESSES THAT THE COURT SHOULD DISREGARD. ................... 5

II.    PLAINTIFFS HAVE NOT ALLEGED A DECEPTIVE SCHEME ......................... 7

       A.     Plaintiffs Have Not Pled Facts Demonstrating the Negative
              Circumstances that ChargePoint Allegedly Sought to Conceal .................. 8

              1.     Plaintiffs do not adequately allege undisclosed
                     supply constraints ....................................................................... 8

              2.     Plaintiffs do not allege ChargePoint's negative
                     financial performance. ................................................................. 9

       B.     Plaintiffs Fail to Plead the Operation of an Alleged
              Concealment Scheme ............................................................................... 10

              1.     Plaintiffs' conclusory allegations of undisclosed sales
                     practices do not satisfy the pleading requirements for
                     alleging a revenue recognition scheme. ..................................... 10

              2.     Plaintiffs have not adequately alleged improper
                     inventory practices to support a scheme to defraud ................... 13

       C.     The SAC Does Not Allege Deceptive Conduct by
              the Executive Defendants. ....................................................................... 14

III.   PLAINTIFFS DO NOT ALLEGE A MATERIALLY FALSE
       OR MISLEADING STATEMENT UNDER RULE 10b-5(b). ................................. 16

       A.     Plaintiffs Fail to Plead the Supply Chain Statements
              Were False or Misleading (Stmts. 3, 4, 10, 11, 14, 19, 24). ..................... 16

       B.     Plaintiffs Fail to Plead the Revenue Recognition Statements
              Were False or Misleading (Stmts. 1-3, 5-13, 15-31). ............................... 17

i

C.  Plaintiffs Fail to Plead the Inventory Valuation Statements Were False or Misleading (Stmts. 28, 32-35). ............................................. 18

D.  Plaintiffs Cannot Challenge Puffery, Opinions, or Forward Looking Statements (Stmts. 4, 10, 11, 14, 19, 24, 27, 32-35). ................. 19

   1.  Overcoming Supply Chain Issues (Stmts. 4, 10, 11, 14, 19, 24) ..................................................... 19

   2.  ChargePoint's Prospects and Predicted Revenue (Stmts. 27, 32-35) ........................................... 20

IV.  PLAINTIFFS HAVE NOT PLED A STRONG INFERENCE OF SCIENTER. .................... 21

A.  No Facts Alleged Support the Executive Defendants' Knowledge of a Scheme. ......................................................................... 21

B.  No Facts Alleged Show Romano or Jackson Made the Challenged Statements Intentionally or with Deliberate Recklessness. ........................................... 22

C.  Generic Financial Motivations Do Not Support a Strong Inference of Scienter. ..................................................................... 23

D.  Access to Information, SOX Certifications, the "Core Operations" Doctrine, and Romano and Jackson's Departures Do Not Support a Strong Inference of Scienter. ..................................................... 24

E.  Plaintiffs' Scienter Allegations Are Also Defective Under a Holistic Analysis. ........................................................................ 25

V.  PLAINTIFFS' SECTION 20(a) CONTROL PERSON LIABILITY CLAIM FAILS. ........................................................................ 25

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AGS, Inc. Sec. Litig.*,
  2024 WL 581124 (D. Nev. Feb. 12, 2024) ................................................................15

*Alaska Elec. Pension Fund v. Adecco S.A.*,
  371 F. Supp. 2d 1203 (S.D. Cal. 2005).................................................................7, 12

*In re Autodesk, Inc. Sec. Litig.*,
  132 F. Supp. 2d 833 (N.D. Cal. 2000) .....................................................................24

*Borteanu v. Nikola Corp.*,
  2023 WL 1472852 (D. Ariz. Feb. 2, 2023)......................................................... *passim*

*In re CarLotz, Inc. SEC. Litig.*,
  2024 WL 3924708 (S.D.N.Y. Aug. 23, 2024) .............................................................7

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ...................................................17, 19, 20, 25

*In re Cloudera, Inc. Sec. Litig.*,
  121 F.4th 1180 (9th Cir. 2024) ........................................................................10, 25

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
  934 F. Supp. 2d 1219 (C.D. Cal. 2013) .....................................................................12

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) ..................................................................19, 20, 21

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ..................................................................10, 11

*Inchen Huang v. Higgins*,
  443 F. Supp. 3d 1031 (N.D. Cal. 2020) ...................................................................25

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) ........................................................................................2

*Macomb Cty. Emps. Ret. Sys. v. Align Tech., Inc.*,
  39 F.4th 1092 (9th Cir. 2022) .......................................................................................5

*Metzler Inv. GMBH v. Corinthian Coll., Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ...................................................................................23

*Middlesex Ret. Sys. v. Quest Software Inc.*,
  527 F. Supp. 2d 1164 (C.D. Cal. 2007) ...................................................................25

iii

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ..........................................................................21, 25

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ........................................................................5, 16, 19

*Patterson v. Jump Trading LLC*,
   2024 WL 49055 (N.D. Cal. Jan. 4, 2024) ...................................................................22

*In re Plantronics, Inc. Sec. Litig.*,
   2021 WL 8572663 (N.D. Cal. Mar. 29, 2021) ....................................................11, 13

*Plumley v. Sempra Energy*,
   2017 WL 2712297 (S.D. Cal. June 20, 2017) ...........................................................23

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) .............................................................................23, 24

*Purple Mountain Tr. v. Wells Fargo & Co.*,
   432 F. Supp. 3d 1095 (N.D. Cal. 2020) ....................................................................25

*In re Radian Sec. Litig.*,
   612 F. Supp. 2d 594 (E.D. Pa. 2009) ........................................................................23

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ...............................................................................16, 23

*Simpson v. AOL Time Warner, Inc.*,
   452 F.3d 1040 (9th Cir. 2006) ...............................................................................8, 14

*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998) ...................................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .................................................................................5, 11, 21, 22

*In re Tibco Software, Inc.*,
   2006 WL 1469654 (N.D. Cal. May 25, 2006) ..........................................................23

*Veal v. LendingClub Corp.*,
   423 F. Supp. 3d 785 (N.D. Cal. 2019) ......................................................................22

*Webb v. Solarcity Corp.*,
   884 F.3d 844 (9th Cir. 2018) .....................................................................................24

*Wozniak v. Align Tech., Inc.*,
   850 F. Supp. 2d 1029 (N.D. Cal. 2012) .........................................................17, 19, 20

*Yaron v. Intersect ENT, Inc.*,
   2020 WL 6750568 (N.D. Cal. June 19, 2020) .................................................17, 22

iv

*Zucco Partners v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ............................................................5, 6, 7, 25

**Statutes & Rules**

15 U.S.C. § 78j(b) (Section 10(b) of the Securities Exchange Act of 1934)....................................1, 7

15 U.S.C. § 78t(a) (Section 20(a) of the Securities Exchange Act of 1934) ..................................1, 25

15 U.S.C. § 78u-5(c)(1)(B) ............................................................................19

17 C.F.R. § 240.10b-5 (Rule 10b-5) ........................................................... *passim*

17 C.F.R. § 240.10b5-1 (Rule 10b5-1) ..........................................................23

Fed. R. Civ. P 9(b) ............................................................................1, 5, 9

1

## <u>INTRODUCTION</u>

2    ChargePoint is a market-leading provider of network solutions for electric vehicles ("EVs"),

3    which it sells to distributors, resellers, and (to a lesser degree) directly to end users. Prior to 2023,

4    ChargePoint experienced substantial growth in demand for its products. It worked to meet this

5    demand in a highly supply-constrained environment and was able to generate increased revenue

6    year-over-year. ChargePoint regularly made disclosures about the supply-constrained environment

7    and its impact. 2023 saw an easing of supply constraints, however, macroeconomic events altered

8    (and slowed) demand for ChargePoint's products, impacting revenue in the later part of the calendar

9    year. ChargePoint disclosed this impact on its Q2 FY 2024 results on September 6, 2023 and, on

10   November 16, 2023, announced leadership changes and its preliminary results for Q3 FY 2024.

11   Following both announcements, ChargePoint's stock price declined and this action was filed.

12    After nearly two years of investigation, Plaintiffs filed their Second Amended Complaint

13   ("SAC") contending that ChargePoint and its former executives—Pasquale Romano, Rex Jackson,

14   and Michael Hughes (together the "Executive Defendants" and with ChargePoint, "Defendants")—

15   had been engaged in a twenty-three month fraudulent scheme, which, along with thirty-five alleged

16   false statements to the market, concealed supply constraints, declining demand and inflated

17   inventory between December 7, 2021 and November 16, 2023 (the "Class Period"). The SAC asserts

18   three causes of action alleging Defendants (1) engaged in a scheme to defraud investors in violation

19   of Section 10(b) and Rule 10b-5(a) and (c), (2) made false or misleading statements to the market in

20   violation of Section 10(b) and Rule 10b-5(b), and (3) the Executive Defendants are also liable as

21   "control persons" under Section 20(a). It takes Plaintiffs 300 paragraphs, 10 anonymous witnesses,

22   and multiple theories to construct their alleged fraud, but the SAC still does not meet the heightened

23   pleading requirements for these claims for the following reasons:

24    *First*, as a threshold matter, claims brought under Section 10(b) are not judged against a

25   notice pleading standard. The Rule 9(b) and the PSLRA's heightened pleading standards require that

26   Plaintiffs allege specific facts to support their claims. They cannot rely on speculation and

27   conclusory allegations. Here, Plaintiffs' claims depend entirely on the allegations of ten anonymous

28   witnesses (five newly added in the SAC). Because Plaintiffs have not adequately demonstrated that

1

1    any of these anonymous witnesses had knowledge of the facts attributed to them, the Court can, and

2    should, disregard all allegations attributed to them.

3    *Second*, Plaintiffs contend that Defendants engaged in a concealment scheme to "create[] the

4    materially misleading impression that ChargePoint was managing COVID-19 supply chain

5    constraints effectively and generating record revenues due to the increased, organic demand for the

6    Company's chargers" as well as conceal the declining value of its inventory. ¶¶ 56, 320. But,

7    Plaintiffs do not plausibly allege that ChargePoint was experiencing undisclosed supply constraints,

8    declining revenue, or decreasing inventory value during the Class Period. Plaintiffs also do not plead

9    facts how a twenty-three month scheme purportedly operated to conceal such circumstances

10   from the market or that the Executive Defendants acted in furtherance of any scheme.

11   *Third*, Plaintiffs advance these same three implausible and unsupported theories of

12   undisclosed supply constraints, declining revenue, and decreasing inventory value to assert that 35

13   challenged statements[1] were materially false or misleading in violation of Rule 10b-5(b). **Supply**

14   **Chain Statements** (*e.g.*, that the team was doing a "tremendous job of keeping things moving

15   through our supply chain") allegedly failed to disclose that internal control deficiencies and business

16   risks were created when the accounts payable function was outsourced to India in 2021. *See, e.g.*, ¶

17   155.[2] **Revenue Recognition Statements** allegedly failed to disclose sales and shipping practices that

18   purportedly allowed the Company to prematurely recognize revenue. *See, e.g.*, ¶ 152. Finally,

19   **Inventory Valuation Statements** made in April, June, and September 2023 allegedly failed to

20   disclose higher component costs and supply overruns or that ChargePoint was likely to incur

21   impairment charges that would adversely impact profitability. *See, e.g.*, ¶ 209. In addition to lacking

22   sufficient facts to plead that these statements were false or misleading, many are inactionable

23   puffery, opinions or protected forward looking statements.[3]

24   *Fourth*, Plaintiffs have not pled facts to support a strong inference that the Executive

25   ---

[1] Attachment A is included for ease in tracking each of Plaintiffs' thirty-five challenged statements
26   by number. References to "Stmt." or "Statement" refer to the numbered statements in Attachment A.
[2] "¶___" citations refer to the SAC, Dkt. 127.
27   [3] Plaintiffs also fail to plead loss causation for the Supply Chain and Revenue Recognition
     Statements because neither of the alleged corrective disclosures convey any "truth" concerning
28   allegedly undisclosed supply chain issues or improper revenue accounting. *See* ¶¶ 222-30, 237-41;
     *Loos v. Immersion Corp.*, 762 F.3d 880, 887-88 (9th Cir. 2014).

1    Defendants acted with intent to defraud or with deliberate recklessness in purported support of a

2    scheme or when making the challenged statements (the scienter element).

3        Because Plaintiffs have already had two chances to amend their complaint (including after

4    full briefing on a motion to dismiss) and almost two years to investigate their claims, it is clear that

5    leave to amend would be futile and the Court should dismiss the SAC with prejudice.

6                                                    **FACTS**

7    **I.    DEFENDANTS**

8        ChargePoint is a market-leading provider of network solutions for electric vehicles, offering

9    both physical charging systems (hardware) and subscription services (software) to commercial, fleet,

10   and residential customers. ¶ 33. In March 2021, ChargePoint became a publicly traded company. ¶

11   35. Pasquale Romano was ChargePoint's President and Chief Executive Officer, Rex Jackson its

12   Chief Financial Officer, and Michael Hughes its Chief Commercial and Revenue Officer during the

13   alleged Class Period.[4] ¶¶ 40-42. Romano and Jackson departed ChargePoint effective November 16,

14   2023. ¶ 240. Hughes resigned from his position in 2024, after the alleged Class Period. ¶ 256.

15   **II.    RELEVANT ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS**

16       ChargePoint reports three lines of revenue: networked charging systems, subscriptions, and

17   other. Ex. 1 at 5.[5] The networked charging systems category reflects hardware sales. *Id.* The

18   subscriptions category reflects cloud services, warranties, and other recurring subscription offerings.

19   *Id.* Revenue is recognized at the point of shipment. Ex. 7 at 47. Through Q2 FY 2024, ChargePoint

20   reported growth in hardware and in overall revenue year-over-year. *See generally* Exs. 1-10.

21   ChargePoint achieved revenue growth, despite operating in a highly supply-constrained

22   environment, which it regularly discussed with the market. For example:

23           We are very pleased with this performance **despite a number of supply chain challenges
24           and demand in the quarter we could not meet has given us a good start on Q4**. . . . We
             estimate elevated logistical costs and **supply chain constraints cost us approximately 2%
25           of additional networked charging system margin**.

26   Ex. 1 at 5-6 (emphasis added). *See also* Ex. 2 at 4, 6; Ex. 3 at 2-3; Ex. 4 at 4-5; Ex. 5 at 3. In

27   _____

28   [4] Capitalized terms not defined herein shall have the meaning ascribed to them in the SAC.
     [5] "Ex. _" citations refer to the exhibits to the concurrently-filed Declaration of Jaime A. Bartlett.

addition, ChargePoint consistently noted in the Risk Factors and Management Discussion and Analysis sections of its SEC filings that supply chain constraints were not only a theoretical risk, but in fact, a risk that had already materialized to adversely affect its business. *See, e.g.*, Ex. 7 at 14, 46.

Following Q1 FY 2024, supply constraints were lessening, but ChargePoint cautioned that the business impact would persist, including that supply obtained in the constrained environment was "now sitting in inventory." *See* Ex. 9 at 17. And at the same time that the Company saw an easing of supply constraints, macroeconomic events altered (and slowed) demand, the impact of which ChargePoint disclosed: ***September 6, 2023 announcement.*** ChargePoint disclosed that it was taking a $28.0 million inventory impairment charge to address legacy "supply chain-related costs and supply overruns on its first-generation DC charging product." Ex. 11 at 7. Revenue for the quarter was within guidance. *Id.* at 4. ChargePoint's share price fell $0.77, from a closing price of $7.06 on September 6 to a closing price of $6.29 the following day. ¶ 232. ***November 16, 2023 announcements.*** ChargePoint announced that CEO Romano and CFO Jackson were departing. Ex. 13 at 2. Also that day, ChargePoint released preliminary financial results for Q3 FY 2024, including a lower expected revenue range of $108 to $113 million as compared to the $150 to $165 million previously forecast, and a non-cash impairment charge of $42 million. *Id.* at 17. New CEO, Rick Wilmer, explained, "Overall macroeconomic conditions, along with fleet and commercial vehicle delivery delays impacted anticipated deployments with government, auto dealership and workplace customers." *Id.* ChargePoint's share price fell $1.11, from a closing price of $3.13 on November 16 to a closing price of $2.02 the following day. ¶ 245.

In connection with its Q3 FY 2024 earnings call on December 6, 2023, Wilmer reaffirmed the factors affecting demand (and thus revenue) to be (1) "the arrival of many commercial fleet vehicles has been delayed, or in other cases, these vehicles have been slow to ramp up production"; (2) "a slowdown in commercial demand combined with supply chain normalization"; and (3) "hesitation related to the automotive labor disputes in the United States." Ex. 14 at 5; *see also* ¶ 180.

## III.    RELEVANT PROCEDURAL HISTORY

The first complaint was filed on November 29, 2023, thirteen days after the second alleged corrective disclosure. Dkt. 1. Lead Plaintiffs filed the FAC on July 19, 2024. On September 17,

4

1   2024, Defendants moved to dismiss the FAC. Dkt. 106. That motion was fully briefed as of

2   December 20, 2024, Dkt. 114, and was set to be heard on July 16, 2025. Dkt. 120. On July 7, 2025,

3   Plaintiffs sought Court approval to vacate the hearing and instead file their SAC. Dkt. 122. Plaintiffs

4   filed their SAC on July 22, 2025, challenging 35 statements and asserting a scheme claim. Dkt. 127.

5   <u>**ARGUMENT**</u>

6   **I.    THE SAC RESTS ON ALLEGATIONS ATTRIBUTED TO ANONYMOUS**

7   **WITNESSES THAT THE COURT SHOULD DISREGARD.**

8       A claim for securities fraud is subject to the "[e]xacting pleading requirements" of both Rule

9   9(b) and the PSLRA. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). These

10  pleading requirements "present no small hurdle," *Macomb Cty. Emps. Ret. Sys. v. Align Tech., Inc.*,

11  39 F.4th 1092, 1096 (9th Cir. 2022) (citation omitted), and plaintiffs must plead ***each*** element ***with***

12  ***particularity***. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

13  Particularity requires specific facts. And, because Plaintiffs rely on anonymous witness allegations,

14  they must plead a "basis for determining that the witnesses in question have personal knowledge of

15  the events they report." *Zucco Partners v. Digimarc Corp*., 552 F.3d 981, 995 (9th Cir. 2009).

16  Courts will only consider information attributed to anonymous witnesses where the witness is

17  "described with sufficient particularity to support the probability that a person in the position

18  occupied by the source would possess the information alleged." *Id.* (citation omitted). Plaintiffs have

19  failed to adequately describe any of their ten anonymous witnesses sufficiently to conclude that such

20  witnesses possess information to support their allegations.

21      **FE-1** was a Sales Operations Specialist responsible for processing sales orders from

22  ChargePoint's Salesforce CRM software platform to shipping. ¶ 44. This "Specialist" role was three

23  levels below Hughes and Plaintiffs do not allege that FE-1 had any direct contact with any of the

24  Executive Defendants or any customers or had any insight, role or responsibility for ChargePoint's

25  accounting practices. *See* ¶¶ 59, 64, 74, 89-90. **FE-2** was a Sales Manager responsible for entering

26  and processing sales orders, addressing shipping issues, and preparing end of the month sales

27  reports. ¶ 45. FE-2 sat two levels below Hughes and left ChargePoint in March 2023, and therefore

28  has no plausible claim to personal knowledge of anything at ChargePoint during the last eight

5

1  months of the Class Period. *Id.* **FE-3** was an East Region Account Executive two levels below

2  Hughes who left ChargePoint halfway through the Class Period (¶ 46[6]), and whose job

3  responsibilities are not even described. *See* ¶¶ 60, 74, 96, 137-38; *Zucco*, 552 F.3d at 996 (job titles

4  and responsibilities must be described with "ample detail").

5       **FE-4** worked in the purchasing/procurement department three levels below Romano, and

6  relied on "scuttlebutt" for their allegations. ¶¶ 47, 97. **FE-5** was responsible for sales to major

7  national fleet customers but Plaintiffs do not even allege that they had a direct reporting chain to any

8  of the Executive Defendants. ¶ 48. **FE-6** worked with the managers or directors of resellers as part of

9  ChargePoint's Sales Operations segment and did spot checking and due diligence in ChargePoint's

10  Salesforce platform. ¶ 49. FE-6 explicitly *denies* that the Executive Defendants attended relevant

11  meetings *See* ¶ 136. **FE-7** managed partnerships with distributors and was three levels below

12  Hughes. ¶ 50. FE 7 only alleges indirect contact with Hughes when Hughes would sometimes "get

13  on calls and urge the sales team to do whatever they could to close deals." ¶ 113.

14       **FE-8** was in Sales Operations, responsible for processing orders entered into the Salesforce

15  system and for answering customer questions. ¶¶ 51, 54. FE-8 acknowledges the distinction between

16  ChargePoint's *customers* for accounting purposes—often resellers or distributors—and the ultimate

17  *end-users* of ChargePoint's products (*see* ¶ 91), but does not specify whether it was the

18  resellers/distributors or the end-users who allegedly were not ready to receive the shipments of

19  product at issue in their allegations. In addition, FE-8 admits that, if ChargePoint received

20  complaints about products shipped prematurely, it would pay for the product to be returned, a

21  corrective action that undermines the allegations of a scheme to defraud. *Id.*

22       **FE-9** was an Operations Manager managing third-parties who installed or repaired charging

23  stations. ¶ 52. No basis is alleged for FE-9's "information and belief" that ChargePoint asked

24  contactors to hold inventory in exchange for future installment work so as to prematurely recognize

25  revenue. ¶ 121. And FE-9 admits this is alleged information they learned about years after the fact.

26  ¶¶ 119-20.

27  ───────────────

28  [6] In the FAC, Plaintiffs alleged that FE-3 left ChargePoint in *early* 2022. Dkt. 99 ¶ 30. In the SAC, without any explanation, Plaintiffs have changed FE-3's alleged departure to *late* 2022. ¶¶ 46, 54.

1    **CW-1** is alleged to have had an unspecific position at an unnamed reseller. ¶ 53. The

2    disclosures on CW-1 are patently inadequate. *See, e.g., Alaska Elec. Pension Fund v. Adecco S.A.*,

3    371 F. Supp. 2d 1203, 1211 (S.D. Cal. 2005) (describing a CW as merely "one former executive"

4    without details of title and responsibilities is insufficient). Moreover, CW-1 alleges no particularized

5    facts supporting their stated "assumption[s]" about internal ChargePoint procedures, such as whether

6    Jackson orally approved rebates (¶ 106), how ChargePoint documented and accounted for those

7    rebates (¶ 109), or ChargePoint's recognition of revenue for software activations (¶¶ 128-33).

8    None of the anonymous witnesses are alleged to have held a position within ChargePoint's

9    accounting or finance team, to have knowledge of, or participated in, the preparation of its financial

10    statements, to know the Company's revenue recognition and accounting practices, or to have had

11    any direct communications with the Executive Defendants, let alone communications reflecting any

12    scheme to defraud. Thus, while seemingly voluminous, the anonymous witnesses' allegations lack

13    the details and other indicia of reliability necessary for the Court to rely on any of the attributed

14    "facts." *See Zucco*, 552 F.3d at 996 (finding allegations of six different anonymous witnesses

15    insufficient because "[s]ome . . . were simply not positioned to know the information alleged, many

16    report only unreliable hearsay, and others allege conclusory assertions of scienter").

17    **II.    PLAINTIFFS HAVE NOT ALLEGED A DECEPTIVE SCHEME.**

18    Section 10(b) and Rule 10b-5(a) and (c) make it unlawful "to employ any device, scheme, or

19    artifice to defraud" or "to engage in any act, practice, or course of business which operates or would

20    operate as a fraud or deceit upon any person." In order to plead this type of claim, Plaintiffs must

21    plausibly allege, with particularity, the "nature, purpose, and effect" of the alleged scheme. *Borteanu*

22    *v. Nikola Corp.*, 2023 WL 1472852, at *23 (D. Ariz. Feb. 2, 2023). That requires, at a minimum,

23    facts (1) demonstrating the conditions that Defendants allegedly sought to conceal, and (2) sufficient

24    to show the manner in which the purported scheme operated. *See, e.g.*, *In re CarLotz, Inc. SEC.*

25    *Litig.*, 2024 WL 3924708, at *6 (S.D.N.Y. Aug. 23, 2024) (failure to plausibly allege either the

26    concealed true facts or that defendants' conduct would create a false impression about those facts).

27    Furthermore, Rule 10b-5(a) and (c) also requires Plaintiffs to identify specific facts showing that

28    *each Defendant* committed a deceptive or manipulative act in furtherance of the alleged scheme.

7

*Borteanu*, 2023 WL 1472852, at \*22; *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1047 (9th Cir. 2006) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)), *vacated on other grounds*, *sub nom Avis Budget Grp., Inc. v. Cal. State Teachers' Ret. Sys.*, 552 U.S. 1162 (2008)).

Here, Plaintiffs treat their scheme claim as a catch-all for their disparate (and unsupported) allegations of undisclosed supply disruptions, revenue inflation and inventory overvaluation. But the SAC fundamentally fails to plead a coherent and plausible explanation of what negative circumstances Defendants sought to conceal or how they tried to do so.

### A. Plaintiffs Have Not Pled Facts Demonstrating the Negative Circumstances that ChargePoint Allegedly Sought to Conceal.

#### 1. *Plaintiffs do not adequately allege undisclosed supply constraints.*

Plaintiffs claim that, as part of its concealment scheme, ChargePoint failed to disclose (1) that supply chain disruptions were causing ChargePoint to decline business from key customers (¶ 67) and (2) the existence of internal control deficiencies and business risks due to outsourcing of its accounts payable function to India (¶ 75). No facts are pled to support these conclusory assertions.

*First*, ChargePoint disclosed that supply constraints were occurring and negatively impacting business. *See, e.g.*, Ex. 1 at 6 ("[S]upply chain constraints cost us approximately 2% of additional networked charging system margin."). *See also* Ex. 2 at 4; Ex. 3 at 2-3; Ex. 4 at 4. ChargePoint also disclosed the existence of many of the ***causes*** of these constraints. *See, e.g.*, Ex. 7 at 17 ("Disruptions in the manufacturing, delivery and overall supply chain of vehicle manufacturers and suppliers, ***such as prolonged port congestion and intermittent supplier shutdowns and delays***, each of which has been exacerbated by the COVID-19 pandemic, have resulted in additional costs and, to a lesser extent, component shortages.") (emphasis added). And, ChargePoint repeatedly disclosed that supply constraints were causing the Company to be unable to meet demand. *See, e.g.*, Ex. 1 at 5 ("[D]emand in the quarter ***we could not meet*** has given us a good start on Q4.") (emphasis added). *See also* Ex. 2 at 6; Ex. 3 at 2-3; Ex. 4 at 5; Ex. 5 at 3.

*Second*, Plaintiffs do not allege a material impact on ChargePoint's financial health of any undisclosed supply disruptions. Plaintiffs first point to declining business from Amazon (¶ 67), but, according to Plaintiffs' own allegations, that happened "[o]ne year prior to the COVID-19

8

1  pandemic," (¶ 58) which would have been **two and a half years before the start of the Class Period**.

2  Plaintiffs also claim that Walmart "issued fines to ChargePoint for contract violations based on its

3  failure to supply chargers." ¶ 67. But FE-2 alleges only that Walmart "*threatened* to issue contract

4  fines." ¶ 63 (emphasis added). An alleged threat of fines in an unspecified amount is insufficient to

5  establish that it happened or a material impact on ChargePoint's financial health. As to the single

6  allegedly cancelled contract with Mercedes-Benz (¶ 62), Plaintiffs don't identify when this contract

7  was lost, the value of the contract, or whether the loss of the contract was disclosed, making it

8  impossible for Plaintiffs to show a material impact. *See Borteanu*, 2023 WL 1472852, at *23 ("[A]

9  plaintiff must specify . . . what effect the scheme had on the securities at issue.") (citations omitted).

10      *Third*, an alleged failure to disclose the internal control deficiencies and business risks from

11  its outsourcing of the accounts payable function (¶ 75) is also insufficient to establish a scheme.

12  Plaintiffs do not identify *any* impact on ChargePoint's financial performance caused by this

13  outsourcing. ¶¶ 70, 73, 74. Plaintiffs' conclusory claim that "[a]s a result of the strained relations

14  with key suppliers, ChargePoint incurred higher supply costs or were shut off from key suppliers,

15  leading to higher costs of sales, or they missed sales altogether" (¶ 75) is without supporting facts,

16  does not quantify the "higher costs of sales" incurred nor identify a single missed sale.

17      *Fourth*, Plaintiffs' theory that the allegedly undisclosed supply constraints were concealed by

18  pulling in future sales and improperly recognized revenue is implausible. *See, e.g.*, ¶ 57. As

19  discussed below, Plaintiffs have not pled a scheme based on sales and inventory practices.

20  Moreover, the allegations cannot be reconciled: It cannot be that ChargePoint did not have enough

21  product to meet demand and had to turn down sales (*e.g.*, ¶¶ 58, 61-63) and, at the same time, **forced**

22  **resellers to take on excess inventory despite lack of demand**. *See, e.g.*, ¶ 102.

23          **2.**      **Plaintiffs do not allege ChargePoint's negative financial performance.**

24      Plaintiffs also fail to allege specific facts showing that ChargePoint experienced negative

25  financial performance on account of any alleged supply disruptions or lack of demand. Instead,

26  Plaintiffs rely on generic claims that some unspecified financial metrics disclosed by ChargePoint

27  were "inflat[ed]." *See, e.g.*, ¶ 166. These claims lack the specificity required by Rule 9(b) and the

28  PSLRA. And, to the extent Plaintiffs claim that the alleged scheme "inflated" ChargePoint's *revenue*

1    numbers, as discussed below, Plaintiffs never quantify the allegedly concealed gap in revenue as is

2    required by the pleading standard. And, as also discussed below, Plaintiffs have not sufficiently pled

3    that ChargePoint's excess inventory declined in value at some point earlier in the Class Period than

4    disclosed. Thus, the SACs' vague, conclusory assertions such as that the "scale" of the fraud was

5    "significant" (¶ 15) are insufficient to sustain a claim of fraud.

6         Plaintiffs also claim that because ChargePoint's revenue decreased after the Class Period,

7    that means that some portion of revenues during the Class Period were "borrowed" from future

8    quarters. ¶ 257. Plaintiffs never, however, explain what percentage of the revenue decrease in 3Q FY

9    2024 was attributable to any alleged scheme and what percentage was attributable to other factors,

10   such as those disclosed by the Company at the time of its earnings call for such quarter. Importantly,

11   Plaintiffs have pled no facts to refute the Company's explanation for this decline in revenue (Ex. 14

12   at 5; *see also* ¶ 248). A mere decline in revenue without more is inadequate to plead fraud. *In re

13   Cloudera, Inc. Sec. Litig.*, 121 F.4th 1180, 1189 (9th Cir. 2024) ("'[L]ater, sobering revelations' do

14   not by themselves 'make the earlier, cheerier statement a falsehood.'") (citation omitted).

15        **B.    Plaintiffs Fail to Plead the Operation of an Alleged Concealment Scheme.**

16        Plaintiffs also do not allege how the hypothetical scheme operated to conceal the alleged

17   impact of supply disruptions, slowing demand, or inventory inflation. *Borteanu*, 2023 WL 1472852,

18   at *23. Specifically, Plaintiffs do not allege the requisite specific facts to (1) show inflated revenue,

19   (2) plead widespread undisclosed sales practices, or (3) plausibly allege that ChargePoint overvalued

20   its inventory to conceal negative financial information.

21        **1.    *Plaintiffs' conclusory allegations of undisclosed sales practices do not
                  satisfy the pleading requirements for alleging a revenue recognition scheme.***

22

23        Plaintiffs allege that the scheme concealed negative information by inflating revenue through

24   certain undisclosed sales practices. ¶ 57. But, "[w]hen pleading irregularities in revenue recognition,

25   plaintiffs should allege (1) such basic details as the approximate amount by which revenues and

26   earnings were overstated; (2) the products involved in the contingent transaction; (3) the dates of any

27   of the transactions; or (4) the identities of any of the customers or [company] employees involved in

28   the transactions." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1016-17 (9th Cir. 2005), *abrogated in part*

1   *on other grounds as recognized by Glazer Capital Mgmt, L.P. v. Forescout Techs., Inc.*, 63 F.4th

2   747, 766 (9th Cir. 2023) (cleaned up). Plaintiffs "must allege enough information so that a court can

3   discern whether the alleged GAAP violations were minor or technical in nature, or whether they

4   constituted widespread and significant inflation of revenue." *Id.* Here, Plaintiffs imply that

5   ChargePoint's practices were channel stuffing. *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293,

6   1298 (9th Cir. 1998) (defining channel stuffing); *see, e.g.* ¶¶ 99-133. Such allegations "are only

7   probative of falsity if plaintiffs can (1) demonstrate defendants engaged in channel stuffing in order

8   to artificially inflate sales, and (2) make a showing of specific transactions, specific shipments,

9   specific customers, specifics times, or specific dollar amounts". *In re Plantronics, Inc. Sec. Litig.*,

10  2021 WL 8572663, at *6 (N.D. Cal. Mar. 29, 2021) (citation omitted); *Tellabs*, 551 U.S. at 325.

11          Plaintiffs' addition of four new FEs and a new CW in the SAC do not rectify their

12  fundamental failure to plead widespread and significant sales practices to inflate revenue, which was

13  called out by Defendants as a central deficiency in the FAC. *See* Dkt. 106 at 17-18. As noted above,

14  all of the anonymous witnesses are unreliable and can be disregarded. And, even if the Court were to

15  consider their allegations, they do not allege the basic facts called for in *Daou*. As explained directly

16  below, none of these witnesses allege specific facts to demonstrate how any scheme operated to

17  impact revenue across the 23-month Class Period.

18          FE-1, 2 and 3 allege instances of early product shipments or shipments of empty frames or

19  incorrect products, but even considered together, the allegations do not demonstrate a coordinated

20  effort across the Class Period to use shipping practices to increase revenue. ¶¶ 89-96. In fact, FE-3

21  acknowledges customers were consulted after the shipping of 20-30 empty chargers frames; which

22  due to the modular nature of ChargePoint's products, may be shipped in advance of other necessary

23  components (¶ 96), undermining Plaintiffs' contentions that for twenty-three months ChargePoint

24  was in the practice of sending clients products they didn't order or were not prepared to accept.

25          FE-1, 2, 4 and 8's allegations about returned product also do not evidence a scheme as they

26  do not quantify the magnitude of such returns, tie those returns to specific purportedly improper

27  sales or even give a clear time period for the returns, let alone speak to the Company's accounting of

28  any such returns. ¶ 88, 91-94, 98. And, Plaintiffs' characterization of FE-1's estimate of the scope of

11

1   the sales practices at issue is misleading. FE-1 only claimed that 10% of allegedly prematurely

2   shipped orders should not have been shipped, **in a single quarter** and not during the entire Class

3   Period, and does not know how most if not all of those products were accounted for. ¶ 89. So, in the

4   end, FE-1 only alleges one instance in which Salesforce reflected revenue for $8,000 to $100,000[7] in

5   prematurely shipped product, for a Company that reported $108 million in revenue during the

6   quarter in which this allegedly occurred. As noted above, FE-1 was not in the accounting group and

7   would not know whether the revenue they observed in the Salesforce database was actually included

8   in the Company's publicly reported revenue. ¶ 44.

9   　　　FE-5, 6, and 7 purportedly attest to ChargePoint's engagement with resellers, but do not

10  allege sufficient details of the time frame, terms or volume of product that resellers accepted because

11  of pressure or deals offered to them. ¶¶ 101, 110-16. And, again none of these FEs tie their general

12  assertions of legitimate business practices to specific and improper revenue inflation. As explained

13  above, no basis of knowledge is provided for FE-9's assertions about the reason ChargePoint

14  allegedly asked contractors to hold inventory, which they admit they learned about after the fact. ¶¶

15  117-21.

16  　　　Finally, CW-1's allegations are based on assumptions about ChargePoint's internal processes

17  for documenting deals and recognizing subscription revenue. *See, e.g.*, ¶¶ 106, 127-33. Such

18  assumptions from an unnamed former employee of an unnamed reseller are insufficient to establish

19  conduct within ChargePoint that could support a scheme. *See Alaska Elec. Pension Fund*, 371 F.

20  Supp. 2d at 1211 (rejecting allegations of "one former executive" for failure to plead details of title

21  and responsibilities).

22  　　　Nor do Plaintiffs' new allegations concerning former ChargePoint legal counsel Rachel

23  Larrenaga establish a scheme. *See* ¶¶ 122-26. First, "[a]s a general rule, paragraphs in a complaint

24  that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or

25  otherwise not resolved are, as a matter of law, immaterial." *In re Countrywide Fin. Corp. Mortg.-*

---

[7] FE-1 alternatively claims that the amount of product shipped was (a) between $1 and $5 million or
(b) double or triple the normal weekly shipment of $200K to $500K (i.e., between $400K and $1.5
million). ¶ 89. Allegedly ten percent of that ($40K to $500K), should not have been shipped, and
20% of that shipped amount was purportedly recognized as revenue ($8K to $100K). ¶¶ 89-90.

1    *Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1226 (C.D. Cal. 2013) (citation omitted). Second,

2    Larrenaga claims she was terminated over six months before the start of the Class Period, making

3    her claims irrelevant. ¶ 126.

4    　　　Even together, it is impossible to discern from these disparate allegations whether the alleged

5    sales activities were widespread and significant, whether they caused any inflation of revenue, much

6    less significant inflation, or when any purported scheme began. *Plantronics*, 2021 WL 8572663, at

7    *11-12. In this regard, the SAC is distinguishable from cases such as *Plantronics* where those

8    plaintiffs adequately pled channel stuffing that resulted in a channel inventory backlog predicated on

9    allegations with substantially more non-conclusory detail about: when the practice was adopted and

10   why, how the sales practice worked, how much more inventory distributors held as a result of the

11   practice,[8] awareness of the individual defendants that inventory buildup had "reached concerning

12   levels," and the individual defendants' knowledge of an internal audit project showing the practice

13   was widespread at the company and widely considered to be a threat to company financial health. *Id.*

14   The duty to disclose a sales practice only arose when there was a specifically alleged inventory

15   accumulation that "significantly" affected revenue and defendants' statements implied that positive

16   revenue was the result of other sources. *Id.* No such allegations are present in the SAC.

17   　　　　　**2.**　　**Plaintiffs have not adequately alleged improper inventory practices to support a scheme to defraud.**

18

19   　　　Plaintiffs also appear to contend that ChargePoint "delay[ed] writing down unsalable

20   inventory" as part of the alleged scheme. *See* ¶ 320. No alleged facts show a delayed inventory

21   write-down and, thus, this theory also does not support Plaintiffs' conclusory assertion of a scheme.

22   　　　*First*, FE-5 claims that "[b]eginning in 2023" excess supply of the CPE 250 was discussed on

23   sales calls. ¶ 136. But FE-5 does not state *when* in 2023 these discussions began, which is crucial,

24   since ChargePoint *did* disclose inventory impairments "in 2023," namely in September and

25   November. Although Plaintiffs try to spin FE-5's allegations to mean excess supply was discussed in

26   "early 2023," (*see* ¶¶ 17, 135), that is not what "beginning in 2023" means. And this is not an issue

27   _____

28   [8] CW-1 alleges amounts of inventory still held by resellers, but does not tie any of this amount to alleged improper sales practices. *See* ¶ 109.

1  of poor word choice—ChargePoint pointed out this issue in its first motion to dismiss, (Dkt. 106 at

2  24-25; *see also* Dkt. 114 at 13) yet Plaintiffs did not change this phrasing in the SAC, tacitly

3  acknowledging that they either *know* FE-5 would *not* say that these discussions began in early 2023,

4  or, at the very least, they are afraid to ask. Furthermore, even if Plaintiffs had alleged that excess

5  supply was discussed in early 2023, that would not show a scheme to delay writing down inventory.

6  Discussing excess inventory is a far cry from knowing the value of that inventory has decreased to

7  the point that an inventory impairment is necessary.

8      *Second*, FE-3 contends there was "overstock" of inventory in 2023 that led ChargePoint to

9  sell at much lower prices than normal, but again does not specify *when* in 2023 this occurred. ¶ 137.

10  Moreover, FE-3 *did not work for ChargePoint in 2023* underscoring their unreliability. ¶¶ 46, 137.

11  And, as with FE-5, FE-3's allegations as a whole do not suggest a scheme.

12      *Third*, FE-6 describes a promotion "in 2023" where product was offered to resellers at a 50%

13  discount. ¶ 139. Elsewhere in the SAC, Plaintiffs allege that this promotion was in the third quarter

14  of calendar year 2023, i.e. between July and September. ¶ 110. Such a promotion, occurring

15  concurrent with or immediately preceding ChargePoint's first inventory impairment disclosure in

16  September 2023, does not establish a scheme to delay writing down inventory. And, FE-6's

17  speculation that "discussions" about this promotion "likely started as early as in Q4 of 2022" does

18  not establish a scheme either, as merely discussing offering a promotion on certain inventory does

19  not mean that the inventory is already devalued and must be written down.

20      **C.    The SAC Does Not Allege Deceptive Conduct by the Executive Defendants.**

21      For a claim under Rule 10b-5(a) and (c), Plaintiffs must also plead with particularity that

22  each Executive Defendant engaged in manipulative or deceptive conduct in furtherance of the

23  alleged scheme. *See Simpson*, 452 F.3d at 1048 ("It is not enough that a *transaction* in which a

24  defendant was involved had a deceptive purpose and effect; the defendant's *own conduct*

25  contributing to the transaction or overall scheme must have had a deceptive purpose and effect.")

26  (emphasis in original). They do not do so here.

27      **Romano.** There is not a single specific act attributed to Romano that Plaintiffs contend

28  contributed to the scheme. Because Plaintiffs have not adequately pled fraud as to any challenged

statement (*see* § III, *infra*) Plaintiffs cannot rely on Romano's statements to the market to plead conduct in furtherance of a scheme. *In re AGS, Inc. Sec. Litig.*, 2024 WL 581124, at *5 (D. Nev. Feb. 12, 2024), *aff'd sub nom. Okla. Police Pension & Ret. Sys. v. PlayAGS, Inc.*, 2025 WL 927296 (9th Cir. Mar. 27, 2025) ("[I]f a plaintiff's scheme liability claim is based on the same alleged set of facts as its misrepresentation claim, and the court finds that those facts do not sufficiently allege fraud (with the requisite scienter) to sustain the misrepresentation claim, the scheme liability claim necessarily fails.").

**Jackson.** Plaintiffs claim that Jackson participated in the scheme by approving the offering of undocumented rebates to resellers. *See* ¶¶ 106, 108, 110, 274. But these accusations are based on assumptions about what Jackson would have known or must have approved, not specific allegations from a credible source that he knew or actually did so. *See id.*

Moreover, Plaintiffs have not alleged that these purported approvals were "deceptive" because they have not pled that the approvals led to revenue inflation or that Jackson knew the accounting would not be proper (which has also not been pled). *See* §II.B.1, *supra*; § IV, *infra*. In fact, CW-1 admits that, at ChargePoint, products could not be "push[ed] . . . through to production" without "financial approval to do so." ¶ 106. And, as with Romano, Jackson's statements to the market cannot evidence conduct in furtherance of a scheme.

**Hughes.** For the same reasons, CW-1's claim that Hughes met with CW-1's boss to discuss rebate structures, FE-3's claim that Hughes made the decision to ship out frames in advance of other components, and FE-7's claim that Hughes encouraged the sales team to close deals do not show deceptive conduct because Plaintiffs do not sufficiently allege that these actions were for illegitimate reasons, or were tied to improper revenue inflation or improper accounting. *See* ¶¶ 96, 103, 113.

Plaintiffs' additional vague assertions that directives in furtherance of the scheme came "from the top down" or from "management," "executives," "superiors," or "supervisors" (*see, e.g.*, ¶¶ 87, 89, 95, 96), are insufficient to establish that "*each defendant* committed their own deceptive act in furtherance of the scheme." *Borteanu*, 2023 WL 1472852, at *21-*26 (dismissing scheme liability claims because, among other reasons, the plaintiff failed to identify "*who* among the Individual Defendants" engaged in the allegedly deceptive conduct) (emphasis in original).

III. **PLAINTIFFS DO NOT ALLEGE A MATERIALLY FALSE OR MISLEADING STATEMENT UNDER RULE 10b-5(b).**

To plead a misstatement claim under Rule 10b-5(b), Plaintiffs must identify statements that are "capable of objective verification," *Apollo*, 774 F.3d at 606, and demonstrably "false or misleading at the time they were made." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Despite their volume, these allegations fail to plead a single actionable misstatement made by Romano or Jackson (no statements by Hughes are challenged).

A. **Plaintiffs Fail to Plead the Supply Chain Statements Were False or Misleading (Stmts. 3, 4, 10, 11, 14, 19, 24).**

*Every single one* of the Supply Chain Statements explicitly disclosed the existence and negative impact of supply constraints, as well as many of the sources of these constraints. *See* Stmt. 3, ¶ 147 ("[D]espite what continues to be a *dynamic supply chain environment*."); Stmt. 4, ¶ 65 ("[I]f you can imagine how hard that is in a *supply chain constrained environment*."); Stmt. 10, ¶ 161 ("[G]iven continuing *supply chain challenges*."); Stmt. 11, ¶ 167 ("[D]espite *expected significant headwinds due to global supply constraints*."); Stmt. 14, ¶ 169 ("[W]e overcame *supply chain headwinds* to achieve that level of growth."); Stmt. 19, ¶ 181 ("The growth would have been significantly higher if not for *supply chain constraints*."); Stmt. 24, ¶ 192 ("[W]e have *supply chain constraints*.") (emphasis added to all).

To try to overcome these explicit acknowledgements of supply chain issues, Plaintiffs attack cherry-picked positive phrases about ChargePoint's results despite the supply chain issues, and argue that these positive assessments were misleading because they failed to disclose: (1) supply constraints caused by outsourcing the accounts payable function to India and (2) the existence of the alleged scheme to conceal ChargePoint's negative financial circumstances. *See, e.g.*, ¶¶ 155, 166. But there is no contradiction between alleged supply constraints caused by outsourcing and Romano and Jackson's statements that they believed ChargePoint had handled those challenges well.

All of the challenged statements focused on the positive revenue numbers and/or growth that ChargePoint had achieved **despite** supply chain headwinds. *See* ¶¶ 65, 147, 161, 167, 169, 181, 192. Plaintiffs have also not pled any undisclosed revenue impact caused by outsourcing the accounts

1   payable function to India to demonstrate that the failure to identify those issues was a material

2   omission. Nor have they established or quantified any alleged revenue recognition scheme. Thus,

3   Plaintiffs have not pled that Romano and Jackson's assessments that they were "particularly

4   pleased" with ChargePoint's revenue and growth numbers in spite of the disclosed existence of

5   supply constraints were materially misleading. Plaintiffs may disagree with these assessments with

6   the benefit of hindsight, but that does not make them fraudulent. *See Wozniak v. Align Tech., Inc.*,

7   850 F. Supp. 2d 1029, 1038 (N.D. Cal. 2012); *City of Dearborn Heights Act 345 Police & Fire Ret.*

8   *Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017).

9         **B.    Plaintiffs Fail to Plead the Revenue Recognition Statements Were False or**

10             **Misleading (Stmts. 1-3, 5-13, 15-31).**

11       The attacks on ChargePoint's reported revenue numbers (Stmts. 2, 8, 10, 12, 17, 21, 26, 28,

12  29, 31) fail because Plaintiffs do not allege that the reported amounts were false. *Yaron v. Intersect*

13  *ENT, Inc.*, 2020 WL 6750568, at *7 (N.D. Cal. June 19, 2020) (dismissing claim challenging

14  financial results and earnings guidance based on alleged artificial revenue inflation through channel

15  stuffing because allegations did not support that the reported revenue was false or misleading).

16       Plaintiffs also challenge comments made by Romano and Jackson in earnings press releases

17  and earnings calls concerning ChargePoint's growth and overall performance. *See, e.g.*, ¶ 145 (Stmt.

18  1) (**"*The investments we have made over many years have enabled us to capture charging demand*

19  *from customers preparing for an electric future. This quarter we added more customers at an*

20  *accelerated rate,* while also successfully closing two acquisitions.")** (emphasis in original).

21  However, Plaintiffs do not contend that these descriptions of ChargePoint's business were

22  themselves false—for example there is no dispute that the Company successfully closed two

23  acquisitions or added customers at an accelerated rate in the third quarter of fiscal year 2022. Rather,

24  Plaintiffs argue that each challenged statement was false or misleading because "at least part of

25  [ChargePoint's] purported growth" was "the result of the undisclosed and unsustainable sales,

26  shipping, and invoicing practices described herein." *Id.* But there is a disconnect between the

27  challenged statements and Plaintiffs' criticism. And, because Plaintiffs have not pled a revenue

28  recognition scheme (§ II.B.1, *supra*), they have also failed to plead falsity for these statements.

17

### C.    Plaintiffs Fail to Plead the Inventory Valuation Statements Were False or Misleading (Stmts. 28, 32-35).

Plaintiffs assert that five statements in 2023 failed to disclose that ChargePoint was experiencing higher component costs and supply overruns for its first generation DC charging products or that, as a result, ChargePoint was likely to incur impairment charges that would adversely impact profitability. ¶¶ 209, 217, 220. But, Plaintiffs allege no facts to demonstrate falsity of the five asserted statements.

*First,* Statements 33 and 35 speak about the very topics that Plaintiffs contend were omitted. Statement 33 refers to supply sitting in inventory and the need to work through existing inventory that had higher prices. ¶ 213 ("***As you can imagine, there are some prior deals that we had to cut to get supply that's now sitting in inventory.***" (emphasis in SAC)). And Statement 35 discusses (1) disruptions in manufacturing, delivery and overall supply chain; (2) component shortages; and (3) heightened logistics costs. ¶ 219.

*Second*, Plaintiffs do not contend ChargePoint's statements about its operating assets and liabilities (Stmt. 28) or its statements concerning revenue (Stmts. 32 & 34) were inaccurate.

*Third*, Plaintiffs ignore the additional disclosures regarding costs and supply made in conjunction with each challenged statement. For example, ChargePoint explained that (1) factors such as supply chain challenges, heightened logistics costs and component shortages had decreased its gross margins and (2) its prioritization of assuring supply and new customer acquisition "puts pressure on gross margins and increases operating expenses." Ex. 7 at 45-46. And, in the June 6, 2023 earnings call, Jackson reiterated, "we also managed to break free on a number of supply chain issues and move our inventory solidly from raw materials and [] or work in progress to finished goods, meaningfully increasing our inventory level." *See* Ex 9 at 8. Plaintiffs also challenge Inventory Statements made in September 2023 concurrent with ChargePoint's disclosure of a $28 million impairment charge, meaning that, when these Statements were made, the market was already aware of ChargePoint's need to take inventory impairments. *See* Stmts. 34 & 35; Exs. 10, 12; ¶¶ 222-23, 233. But Plaintiffs obscure this important timeline by incorrectly claiming that these Statements were made on August 6, 2023. *Compare id.*, *with* ¶¶ 218-19.

18

*Fourth*, as discussed above (§ II.B.2, *supra*), the FE allegations do not demonstrate *when* in 2023 excess inventory became so devalued it needed to be written down which is a requirement needed to show ChargePoint even had a prior obligation to make any such disclosure.

### D. Plaintiffs Cannot Challenge Puffery, Opinions, or Forward Looking Statements (Stmts. 4, 10, 11, 14, 19, 24, 27, 32-35).

Eleven of the challenged statements are inactionable puffery, opinions, and/or forward-looking statements about how the Company had handled supply chain issues and ChargePoint's prospects. "[M]ildly optimistic, subjective assessment[s]" are non-actionable; they express opinions, not facts and are not "capable of objective verification," and therefore no reasonable investor would rely on them. *Apollo*, 774 F.3d at 606. Plaintiffs can only challenge opinion statements in three narrow circumstances (none of which are present here): (1) when the opinion was "objectively incorrect," and the speaker did not "honestly hold the stated belief"; (2) when a statement of fact within an opinion is untrue; and (3) where "omitted material facts" about the speaker's "inquiry into or knowledge concerning" the stated opinion "conflict with what a reasonable investor would take from the statement itself." *See City of Dearborn Heights*, 856 F.3d at 615-16  (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015)). Finally, forward-looking statements are not actionable if *either* they are "identified as forward-looking statements and accompanied by meaningful cautionary language" *or* the plaintiff fails to prove that they were made with "*actual* knowledge that they were materially false or misleading." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (emphasis in original); 15 U.S.C. § 78u-5(c)(1)(B).

#### 1. *Overcoming Supply Chain Issues (Stmts. 4, 10, 11, 14, 19, 24)*

Six of the seven Supply Chain Statements are non-actionable corporate puffing, as evidenced by the vague, positive opinion language used throughout these statements such as "incredibly proud," "tremendous job," "particularly pleased," "remarkable," and "astounding." *See* ¶¶ 148, 161, 167, 169, 181, 192; *Wozniak*, 850 F. Supp. at 1036 ("we are very pleased" is non-actionable puffery). They also express opinions about ChargePoint's business and no facts are pled showing these opinions were objectively incorrect. Furthermore, Plaintiffs do not plead that Romano and Jackson did not believe the statements they made about overcoming supply chain issues. *See* § IV.B,

19

1   *infra.* Instead, Plaintiffs assert Romano and Jackson should have had less optimistic opinions. *See,*

2   *e.g.*, ¶ 166 ("ChargePoint *should not have been* 'particularly pleased.'") (emphasis added). Plaintiffs'

3   disagreement with the executives' optimism and corporate puffing is insufficient to state a claim. *See*

4   *Wozniak*, 850 F. Supp. 2d at 1038; *City of Dearborn Heights*, 856 F.3d at 615-16.

5              **2.      *ChargePoint's Prospects and Predicted Revenue (Stmts. 27, 32-35)***

6          Plaintiffs also challenge four statements that they describe as "positive statements about the

7   Company's business, operations, and prospects," (Stmts. 32-35; ¶¶ 217, 220) and one revenue

8   prediction (Stmt. 27, ¶ 201). Plaintiffs do not specify which parts of the four block-quoted "positive

9   statements" they are challenging (which is itself a pleading failure), but two of the cited statements

10  are once again replete with non-actionable corporate puffing and opinion, such as "[w]e delivered a

11  strong quarter," "[d]iversification across verticals and geographies continues to contribute resilience

12  to our business," "we continue to see overall growth and margin improvement," "we're back to a

13  nice rhythm now," and "I think it's fair to say that we are well past the worst of it." Stmts. 32, 33; ¶¶

14  212-13 (emphasis omitted). The other two statements do not appear to be positive statements at all,

15  so it is unclear on what basis Plaintiffs challenge them, but, in any event, these statements do not rise

16  to the level of being "capable of objective verification." *See* Stmts. 34, 35; ¶¶ 218-19.

17         In addition, the statements concerning the Company's "prospects" (*see* ¶¶ 217, 220) are

18  forward-looking and non-actionable. ChargePoint's 10-Qs identified statements about the

19  Company's prospects as forward-looking, and all four statements come from a 10-Q, press release,

20  or earnings call and all were accompanied by meaningful cautionary language. Ex. 12 at p. 3

21  ("[F]orward-looking statements could include . . . statements regarding . . . ChargePoint's . . .

22  prospects."); *see also* Ex. 9 at p. 3; Ex. 10 at p. 3. Likewise, Statement 27 challenges a *prediction* of

23  expected revenue for a future quarter, which is a classic forward-looking statement made with

24  meaningful cautionary language. ¶ 201; Ex. 6 at 2; *Cutera*, 610 F.3d at 1112.

25         Plaintiffs have also failed to plead that the speakers had "actual knowledge" that their

26  forward-looking positive statements about ChargePoint's prospects or predicted revenue were false

27  or misleading, or even that they were aware of the alleged inventory valuation and revenue

28  recognition issues that Plaintiffs claim made those statements misleading. *See* ¶¶ 205, 217, 220;

1  *Cutera*, 610 F.3d at 1111; *see also* § IV.B, *infra*.

2  **IV.    PLAINTIFFS HAVE NOT PLED A STRONG INFERENCE OF SCIENTER.**

3        Each of Plaintiffs' claims require sufficiently pled scienter as to each Defendant. *See, e.g.*,

4  *Borteanu*, 2023 WL 1472852, at *3, *22, *29. To do so, Plaintiffs must allege that each Defendant

5  acted either intentionally or with deliberate recklessness, with the recklessness standard "much

6  closer to one of intent." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014).

7  Scienter requires particularized facts that "give rise to a 'strong'—*i.e.*, a powerful or cogent—

8  inference." *Tellabs*, 551 U.S.  at 323. Scienter is a separate element and a court should deny a

9  motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at

10 least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

11 Courts evaluate scienter allegations both individually and holistically. *NVIDIA*, 768 F.3d at 1056.

12       There are no facts alleged that show Jackson, Romano or Hughes had knowledge of any

13 alleged scheme or that Jackson or Romano made any challenged statement with the requisite intent

14 to defraud. The Court also cannot infer scienter based on (1) the Executive Defendants' purported

15 general motivation to commit fraud (¶¶ 259-73), (2) the Executive Defendants' access to

16 information, SOX certifications, and the "core operations" doctrine (¶¶ 274-78, 284-87); or (3)

17 Romano and Jackson's simultaneous departures (¶¶ 279-83). We discuss each of these pleading

18 deficiencies individually first and then present the holistic scienter analysis required by *Tellabs*.

19       **A.    No Facts Alleged Support the Executive Defendants' Knowledge of a Scheme.**

20       Not one of the anonymous witnesses reported to the Executive Defendants—they were, in

21 fact, separated by multiple organizational layers within the Company. *See* ¶¶ 44-53. Because of this

22 lack of meaningful interaction, none of these witnesses can plausibly (or have even tried to) allege

23 the Executive Defendants directed or were aware of any scheme at ChargePoint. Instead, the

24 Plaintiffs conclude that the Executive Defendants "must" have known about an overarching scheme

25 because of their receipt of general sales and shipping reports and participation in discrete calls or

26 decisions. But the reports, calls, and decisions actually described in the SAC do not even suggest,

27 much less demonstrate, a scheme. *See, e.g.*, ¶¶ 274-76. Thus, it's pure speculation by Plaintiffs that

28 the Executive Defendants had any information that would have shown the existence of a scheme.

21

**B.    No Facts Alleged Show Romano or Jackson Made the Challenged Statements Intentionally or with Deliberate Recklessness.**

*Supply Chain Statements. (Stmts. 3, 4, 10, 11, 14, 19, 24).* The SAC does not allege *any* facts about Romano and Jackson's knowledge of supply constraints caused by outsourcing the accounts payable department to India. ¶¶ 69-75. Rather, anonymous witnesses several levels removed from Romano (one who left a year before the end of the Class Period, ¶ 46) claim awareness of these issues and vaguely assert that the negative effect of outsourcing was reported to "management." *See, e.g.*, ¶¶ 69, 71. This is insufficient to plead Romano or Jackson's scienter. *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 814 (N.D. Cal. 2019) ("None of the CWs had any direct (or indirect) contact with any of the Individual Defendants and therefore cannot provide reliable insight into the Defendants' state of mind.").

*Revenue Recognition Statements. (Stmts. 1-3, 5-13, 15-31).* The SAC also does not allege a strong inference that Romano or Jackson knew facts contrary to their statements about the drivers and growth of ChargePoint's revenue because they improperly rely on vague, conclusory assertions that "ChargePoint executives" ordered or were aware of some of the sales practices alleged in the SAC. *See, e.g.*, ¶¶ 87, 95, 96, 97, 103, 131, 133. *See also LendingClub*, 423 F. Supp. 3d at 814; *Yaron*, 2020 WL 6750568, at \*9. And, because the sales practices alleged may be done for legitimate reasons, mere knowledge of those practices is insufficient to infer intent to deceive. *See Tellabs*, 551 U.S. at 325; *cf. Patterson v. Jump Trading LLC*, 2024 WL 49055, at \*17 (N.D. Cal. Jan. 4, 2024).

*Inventory Valuation Statements. (Stmts. 28, 32-35).* Plaintiffs' allegations are likewise insufficient to create a strong inference that Romano or Jackson knew that ChargePoint was "likely to incur [future] impairment charges." ¶¶ 209, 217, 220. Once again, Plaintiffs rely on vague allegations, namely FE-5's allegation that "executives" were "apprised" of "semi-weekly sales teams calls [in 2023] where the excess supply of CPE 250s was discussed." ¶ 136. But FE-5 alleges only that someone was supposed to report on these calls to Romano, not that anyone actually *did* report on the calls, or what, exactly they reported. *Id.* And FE-5 says nothing about any alleged knowledge by Jackson. *See LendingClub*, 423 F. Supp. 3d at 814. Plaintiffs also rely on FE-6's claim that a promotion offered to resellers "received approval from everyone up to the CEO," including Jackson,

22

1  and "discussions" about the promotion "likely start[ed] as early as in Q4 of 2022." ¶¶ 110, 139

2  (emphasis omitted). But FE-6 does not identify when Romano or Jackson allegedly approved the

3  promotion, or when they were first made aware of these "discussions" much less that they believed a

4  write down was required.

5       **C.    Generic Financial Motivations Do Not Support a Strong Inference of Scienter.**

6            Under controlling law, general allegations of motive and opportunity are "not independently

7  sufficient" to establish scienter. *E.g.*, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d

8  1051, 1062 (9th Cir. 2014). Moreover, even taken together with the other scienter allegations, these

9  motive and opportunity allegations are deficient.

10           ***Incentive compensation.*** The law does not support Plaintiffs' assertion of scienter based on

11  the Executive Defendants compensation structure. ¶¶ 259-63. "[I]t is common for executive

12  compensation, including stock options and bonuses, to be based partly on the executive's success in

13  achieving key corporate goals. . . [and] we will not conclude that there is fraudulent intent merely

14  because a defendant's compensation was based in part on such successes." *Rigel*, 697 F.3d at 884; *In*

15  *re Tibco Software, Inc.*, 2006 WL 1469654, at *21 (N.D. Cal. May 25, 2006).

16           ***Insider stock sales.*** Although Plaintiffs point to stock sales by the Executive Defendants (¶¶

17  264-73), these sales weigh *against* an inference of scienter. All of the Executive Defendants' stock

18  sales, save one sale by Jackson reflecting 2% of the total volume of shares he sold during the Class

19  Period, were sold either pursuant to a Rule 10b5-1 trading plan or were nondiscretionary sales to

20  cover tax withholding liability, which were mandated by ChargePoint's "sell to cover" program

21  under its equity incentive plans. ¶¶ 265 n.30, 268, 271, Exs. 15-17. Such sales involve no discretion

22  on the part of an executive, and hence do not support—although they may rebut—an inference of

23  scienter. *Metzler Inv. GMBH v. Corinthian Coll., Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008); *In*

24  *re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 611 (E.D. Pa. 2009); *Plumley v. Sempra Energy*, 2017

25  WL 2712297, at *12 (S.D. Cal. June 20, 2017) (same).

26

27

28

**D. Access to Information, SOX Certifications, the "Core Operations" Doctrine, and Romano and Jackson's Departures Do Not Support a Strong Inference of Scienter.**

*First*, Plaintiffs cannot show scienter by claiming that the Executive Defendants had access to "the requisite knowledge [of falsity] by virtue of" their positions, "because that would eliminate the necessity for specially pleading scienter, as any corporate officer could be said to possess the requisite knowledge by virtue of his or her position." *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000). Plaintiffs have failed to identify any specific information that the Executive Defendants had access to *that demonstrates falsity*. *See* ¶¶ 274-76.

*Second*, Romano and Jackson's SOX certifications do not support scienter because Plaintiffs have, at most, pled a handful of disparate sales practices that former employees disliked. *See* § II.B.1, *supra*. This is nowhere near the "widespread improper revenue recognition practices and inventory mismanagement" that Plaintiffs' claim would make Romano and Jackson's SOX certifications either knowingly false or made with reckless disregard for the truth. ¶ 278.

*Third*, Plaintiffs have not pled core operations. Under that doctrine, a court may "infer that facts critical to a business's core operations or an important transaction are known to a company's key officers." *Webb v. Solarcity Corp.*, 884 F.3d 844, 854 (9th Cir. 2018) (internal quotation marks and citations omitted). Pleading core operations "is not easy," and requires "either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring, . . . or witness accounts demonstrating that executives had actual involvement in creating false reports." *Intuitive Surgical*, 759 F.3d at 1062 . The SAC has no specific admissions by the Executive Defendants of "detailed involvement in the minutia" of ChargePoint's shipping, logistics, operations and sales, which form the basis for most of the challenged statements nor do any of the FE or CW accounts demonstrate that the Executive Defendants were directly involved in wrongdoing akin to creating false reports.

Lastly, Plaintiffs urge this Court to infer scienter from Romano and Jackson's departures from ChargePoint. But none of the analysts or commentators even implied that Romano or Jackson left because of any *intentional wrongdoing*. *See, e.g.*, ¶ 283 ("Two major leadership changes at once are a sign that change is needed to turn a business around and that the board has lost confidence in

24

1   management's *ability to execute*.") (emphasis added).

2       **E.**    **Plaintiffs' Scienter Allegations Are Also Defective Under a Holistic Analysis.**

3       Plaintiffs' scienter allegations are no stronger taken together than considered separately. In

4   that way, this case is analogous to *NVIDIA*, where the Court rejected seven different scienter

5   arguments raised by Plaintiffs, including reliance on other lawsuits filed against the company,

6   executive departures, the collective scienter doctrine, and the core operations doctrine, before

7   concluding that "[e]valuating the allegations together, we find that they do not create a strong

8   inference of scienter collectively." 768 F.3d at 1063.

9   **V.    PLAINTIFFS' SECTION 20(a) CONTROL PERSON LIABILITY CLAIM FAILS.**

10      Having not pled an actionable 10(b) claim, Plaintiffs' Section 20(a) control person liability

11  claim fails. *See City of Dearborn Heights*, 856 F.3d at 623. Furthermore, Plaintiffs do not plead any

12  facts showing that Hughes "exercised actual power or control over the primary violator" for any of

13  the challenged statements, let alone as to oral statements made by the CEO and CFO he reported to.

14  *Id.* (citation omitted); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1194 (C.D.

15  Cal. 2007). Conclusory allegations about an executive's role and responsibilities, such as those made

16  in SAC paragraph 327 are insufficient to establish a Section 20(a) claim. *See Purple Mountain Tr. v.*

17  *Wells Fargo & Co.*, 432 F. Supp. 3d 1095, 1106 (N.D. Cal. 2020).

18                                  **<u>CONCLUSION</u>**

19      Plaintiffs' failure, even after months of additional investigation, to adequately plead the

20  elements of their claims shows that further amendment would be futile. *See Zucco*, 552 F.3d at 1007

21  (affirming dismissal with prejudice because plaintiffs' failure to correct deficiencies from their FAC

22  is "a strong indication that the plaintiffs have no additional facts to plead.") (citation omitted);

23  *Cloudera*, 121 F.4th at 1189-91 (same); *Inchen Huang v. Higgins*, 443 F. Supp. 3d 1031, 1059 (N.D.

24  Cal. 2020) (similar). For these reasons, Defendants respectfully request the Court dismiss the SAC

25  with prejudice.

26

27

28

Date:  September 17, 2025

Respectfully submitted,

By: */s/ Jaime A. Bartlett*
    Jaime A. Bartlett
    Sidley Austin LLP
    555 California Street, Suite 2000
    San Francisco, CA 94104
    Telephone: (415) 772-1279
    JBartlett@sidley.com

*Attorneys for Defendants*

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT—CASE NO. 5:23-CV-06172-NW