Lucas E. Gilmore (SBN 250893)
Reed R. Kathrein (SBN 139304)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
lucasg@hbsslaw.com
reed@hbsslaw.com

*Lead Counsel and Counsel for Lead Plaintiffs*
*Shahram Afshani and Paulina Afshani Schwartz*

*(Additional counsel on signature page)*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

FAROOQ KHAN,

Plaintiff,

v.

CHARGEPOINT HOLDINGS, INC., et al.,

Defendants.

Case No. 5:23-cv-06172-NW

**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS

Page

TABLE OF DEFINED TERMS .......... VII

I. INTRODUCTION .......... 1

II. SUMMARY OF THE ALLEGED FRAUD: HOW DEFENDANTS INFLATED CHARGEPOINT'S REVENUE AND CONCEALED THE TRUE SOURCES OF ITS REPORTED GROWTH .......... 7

A. Defendants Reported Quarter-After-Quarter Revenue Growth and Attributed It to Organic Demand for ChargePoint's Products .......... 7

B. In Reality, a Material Portion of ChargePoint's Reported Revenue Derived From Undisclosed Practices That Violated GAAP and ChargePoint's Publicly Stated Revenue Recognition Policy and Were Unsustainable .......... 8

C. Supply Chain Disruptions Were the Catalyst—Not a Separate Fraud—That Drove Defendants to Resort to These Practices .......... 12

D. The Fraud Unraveled When ChargePoint Could No Longer Sustain the Scheme, Resulting in $70 Million in Inventory Impairment Charges and the Termination of Its CEO and CFO .......... 14

III. JURISDICTION AND VENUE .......... 16

IV. PARTIES .......... 17

A. Lead Plaintiffs .......... 17

B. Corporate Defendant .......... 17

C. Executive Defendants .......... 19

V. FORMER CHARGEPOINT EMPLOYEES AND CONFIDENTIAL WITNESS .......... 22

VI. THE REVENUE INFLATION SCHEME: DEFENDANTS EMPLOYED FIVE CATEGORIES OF UNDISCLOSED PRACTICES THAT VIOLATED GAAP AND CHARGEPOINT'S OWN REVENUE RECOGNITION POLICY. .......... 27

A. ChargePoint's Publicly Stated Revenue Recognition Policy and the GAAP Principles It Claimed to Follow .......... 27

B. Unauthorized Shipments: ChargePoint Shipped Products to Customers Who Had Not Approved Delivery, Violating ASC 606, Steps 1, 3, and 5 ..... 28

C. Incomplete, Non-Functioning, and Wrong Products: ChargePoint Shipped Products Customers Could Not Use, Violating ASC 606, Step 5..... 31

D. Channel Stuffing Through Resellers: ChargePoint Offloaded Products Before End Customers Needed Them, Through Coercion and Undocumented Side Deals That Distorted Reported Revenue, Violating ASC 606, Steps 1, 3, and 5 ..... 33

E. Premature Software Token Activations: ChargePoint Activated Subscriptions for "Fictitious" Customers to Inflate Subscription Revenue, Violating ASC 606, Steps 1, 3, and 5 ..... 40

F. The Aggregate Magnitude of These Practices Was Material to ChargePoint's Reported Financial Results ..... 42

VII. HOW SUPPLY CHAIN DISRUPTIONS CATALYZED THE SCHEME—AND WHY THE EXCESS INVENTORY DOES NOT CONTRADICT THE SUPPLY CONSTRAINTS ..... 42

A. ChargePoint Faced Genuine Supply Constraints on Specific Product Lines and Components Beginning in 2020 That Continued Throughout the Class Period..... 43

B. ChargePoint's Outsourcing of Accounts Payable to India Created a Self-Inflicted Supply Crisis That Worsened Every Year of the Class Period ..... 44

C. The Excess Inventory Was Concentrated in One Product—the CPE 250 DC Charger—That ChargePoint Over-Procured in a Failed Attempt to Get Ahead of Supply Constraints ..... 46

D. There Is No Contradiction Between Supply Constraints, Pushing Product Shipments, and Excess Inventory: The Supply Constraints Explain *Why* Defendants Engaged in the Revenue Inflation Scheme and Ultimately Acquired Excess Inventory They Failed to Timely Write-Off..... 49

VIII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD AND THE SPECIFIC FACTS RENDERING EACH STATEMENT FALSE AND MISLEADING WHEN MADE..... 50

A. Q3 FY2022 (Quarter Ended October 31, 2021): Defendants Attributed 79% Revenue Growth to "Strong Q3 Execution" and

Customer Demand While Concealing Improper Revenue Recognition Practices ........ 51

1. The Statements ........ 51

2. The Specific Contemporaneous Facts That Rendered These Statements False and Misleading When Made ........ 53

3. The Information Defendants Omitted to Make Their Statements Not Misleading ........ 55

B. Q4 FY2022 (Quarter Ended January 31, 2022): Defendants Claimed "Another Outstanding Quarter" With 90% Revenue Growth While Revenue Was Partially Derived from Unauthorized Shipments and Channel Stuffing ........ 55

1. The Statements ........ 55

2. The Specific Contemporaneous Facts That Rendered These Statements False and Misleading When Made ........ 56

3. The Information Defendants Omitted to Make Their Statements Not Misleading ........ 57

C. Q1 FY2023 (Quarter Ended April 30, 2022): Defendants Attributed 102% Revenue Growth to Organic Factors While Revenue Was Derived in Part from Premature and Unauthorized Shipments of Incomplete Products ........ 58

1. The Statements ........ 58

2. The Specific Contemporaneous Facts That Rendered These Statements False and Misleading When Made ........ 59

3. The Information Defendants Omitted to Make Their Statements Not Misleading ........ 60

D. Q2 FY2023 (Quarter Ended July 31, 2022): Defendants Touted a "Strong Execution Quarter" with a "Major Milestone" of $100M+Revenue While Employees Were Directed to "Ship All Pending Orders" Regardless of Customer Readiness ........ 60

1. The Statements ........ 60

2. The Specific Contemporaneous Facts That Rendered These Statements False and Misleading When Made ........ 62

3. The Information Defendants Omitted to Make Their Statements Not Misleading ........ 64

E. Q3 FY2023 (Quarter Ended October 31, 2022): Defendants Celebrated "Record" Revenue of $125.3 Million While Continuing to Push $2–5 Million Per Quarter in Unneeded Product to Distributors ..... 64

1. The Statements ..... 64

2. The Specific Contemporaneous Facts That Rendered These Statements False and Misleading When Made ..... 66

3. The Information Defendants Omitted to Make Their Statements Not Misleading ..... 67

F. Q4 FY2023 (Quarter Ended January 31, 2023): Defendants Reported Annual Revenue of $468 Million, a 94% Y/O/Y, While the Revenue Inflation Scheme Continued ..... 68

1. The Statements ..... 68

2. The Specific Contemporaneous Facts That Rendered These Statements False and Misleading When Made ..... 68

3. The Information Defendants Omitted to Make Their Statements Not Misleading ..... 70

G. Defendants' False Statements Associated with the Announcement of ChargePoint's FY 2023 Financial Results ..... 70

1. The Statements ..... 70

2. The Specific Contemporaneous Facts That Rendered These Statements False and Misleading When Made ..... 70

3. The Information Defendants Omitted to Make Their Statements Not Misleading ..... 72

H. Q1 FY2024 (Quarter Ended April 30, 2023): Defendants Stated They Were "Well Past the Worst of It" on Inventory Management Issues While the CPE 250 Overstock Remained Unimpaired ..... 72

1. The Statements ..... 72

2. The Specific Contemporaneous Facts That Rendered These Statements False and Misleading When Made ..... 74

3. What Defendants Omitted ..... 76

IX. THE TRUTH EMERGES: CHARGEPOINT DISCLOSES THE CONSEQUENCES OF ITS CONCEALED PRACTICES ..... 76

A. September 6, 2023: ChargePoint Discloses Revenue Deceleration and $28 Million Inventory Impairment Charge on Its Over-Procured CPE 250 DC Chargers—the Stock Falls 11% ........ 76

B. September–November 2023: Defendants Jackson and Hughes Sell Substantial Shares After Assuring Investors the Worst Was Behind Them ........ 79

C. November 16, 2023: ChargePoint Pre-Announces a Revenue Shortfall, an Additional $42 Million Impairment Charge, and the Immediate Departures of CEO Romano and CFO Jackson—And the Stock Falls 35% ........ 80

D. Post Class Period Events Confirm the Scope of Defendants' Practices ........ 83

X. LOSS CAUSATION: THE CORRECTIVE DISCLOSURES REVEALED THE CONCEALED TRUTH AND CAUSED PLAINTIFFS' LOSSES ........ 85

A. The September 6, 2023 Disclosure Partially Revealed the Consequences of Defendants' Concealed Over-Procurement, Revenue Inflation Practices, and Failure to Timely Impair Obsolete Inventory, Causing an 11% Stock Decline ........ 85

B. The November 16, 2023 Disclosure Revealed a Fuller Extent of ChargePoint's Revenue and Inventory Problems and the Unsustainability of the Practices Defendants Had Concealed, Causing a 35% Stock Decline ........ 87

C. The Timing and Magnitude of the Stock Declines Were Consistent with the Market Absorbing Information About the Specific Risks and Practices Defendants Had Concealed ........ 89

XI. ADDITIONAL ALLEGATIONS OF SCIENTER ........ 91

A. Each Executive Defendant Personally Participated in or Directed the Revenue Inflation Practices ........ 92

1. Romano Personally Approved the Largest Undisclosed Discount Transactions and Oversaw the Sales Practices from the Top Down ........ 92

2. Jackson Personally Discussed Undocumented Side Deals and Rebates in Oral Conversations with Reseller Executives and Signed SOX Certifications Attesting to the Accuracy of Financial Reports He Knew Were Inflated ........ 93

3. Hughes Personally Directed Sales Teams to Ship Products Prematurely, Participated in Rebate Structures with

Resellers, and Gave Sales Awards for Software Token Practices He Knew Were Improper ........ 94

B. Defendants' Stock-Based Compensation Structure Gave Them Motive to Inflate Revenue ........ 96

C. Defendants' Insider Trading During the Class Period Was Unusual and Suspicious in Both Timing and Amount ........ 98

D. The Simultaneous Termination of Both the CEO and CFO Is Circumstantial Evidence That the Board Concluded They Were Responsible for the Concealed Practices ........ 99

E. The Fraud Involved ChargePoint's Core Revenue-Generating Operations, About Which Defendants Repeatedly Held Themselves Out as Knowledgeable ........ 101

XII. THE SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS DOES NOT APPLY ........ 103

XIII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ........ 104

XIV. CLASS ACTION ALLEGATIONS ........ 106

XV. CAUSES OF ACTION ........ 107

COUNT I VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5(B) PROMULGATED THEREUNDER (AGAINST DEFENDANTS CHARGEPOINT, ROMANO, AND JACKSON) ........ 107

COUNT II VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5(A) AND (C) PROMULGATED THEREUNDER (AGAINST ALL DEFENDANTS, INCLUDING HUGHES) ........ 109

COUNT III VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT—CONTROL PERSON LIABILITY (AGAINST DEFENDANTS ROMANO, JACKSON, AND HUGHES) ........ 112

XVI. PRAYER FOR RELIEF ........ 113

XVII. JURY TRIAL DEMANDED ........ 113

## TABLE OF DEFINED TERMS

| Term | Meaning |
|---|---|
| ASC | Accounting Standards Codifications—refers to GAAP rules, which are primarily promulgated by the Financial Accounting Standards Board (“FASB”) |
| ChargePoint | ChargePoint Holdings Inc. (also referred to as “the Company”) |
| Class | All persons or entities who purchased or otherwise acquired ChargePoint securities from December 7, 2021 to November 16, 2023, inclusive (the “Class Period”), and were damaged thereby |
| CW | Confidential witness |
| Defendants | ChargePoint, Romano, Jackson, and Hughes |
| Exchange Act | The Securities Exchange Act of 1934 |
| Executive Defendants | Romano, Jackson, and Hughes |
| EVs | Electric Vehicles |
| FE | Former employee |
| FY | Fiscal Year—for ChargePoint, the period from February 1 to January 31. As an example, FY22 ran from February 1, 2021 to January 31, 2022. |
| GAAP | Generally Accepted Accounting Principles—the standard under which financial statements filed with the SEC are generally prepared and presented. *See* 17 C.F.R. § 210.4-01(a)(1). |
| Hughes | Defendant Michael Hughes, ChargePoint’s Chief Commercial and Revenue Officer until his resignation in January 2024 |
| Jackson | Defendant Rex S. Jackson, ChargePoint’s Chief Financial Officer (“CFO”) until terminated on November 16, 2023 |
| Lead Plaintiffs | Lead Plaintiffs Shahram Afshani and Paulina Afshani Schwartz |
| PSLRA | Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 |
| Romano | Defendant Pasquale Romano, ChargePoint’s President and Chief Executive Officer (“CEO”) until terminated on November 16, 2023 |
| Rule 10b-5 | 17 C.F.R. § 240.10b-5 |
| SEC | The Securities and Exchange Commission |
| YoY | Year-over-year |

# I. INTRODUCTION

1. This is a securities fraud class action brought on behalf of all persons and entities who purchased or otherwise acquired the securities of ChargePoint Holdings, Inc. ("ChargePoint" or the "Company") between **December 7, 2021**, and **November 16, 2023**, inclusive (the "Class Period"), against ChargePoint and three of its senior executives: CEO and President Pasquale Romano ("Romano"), CFO Rex S. Jackson ("Jackson"), and Chief Commercial and Revenue Officer Michael D. Hughes ("Hughes") (together with ChargePoint, "Defendants"). Lead Plaintiffs Shahram Afshani and Paulina Afshani Schwartz allege that Defendants inflated ChargePoint's reported revenue through undisclosed, unsustainable practices that violated Generally Accepted Accounting Principles ("GAAP") and ChargePoint's own revenue recognition policy, while simultaneously misrepresenting the sources of the Company's reported growth as organic customer demand and effective supply chain management.

2. Throughout the Class Period, ChargePoint reported six consecutive quarters of revenue growth, growing from $65 million in Q3 FY2022 to $152.8 million in Q4 FY2023—and Defendants told investors this growth reflected "***strong execution***," "***record***" revenue and growth, and their team's ability to navigate supply chain headwinds. In reality, a material portion of that reported revenue was generated by five categories of improper practices: (1) shipping products to customers who had not authorized delivery, and recognizing revenue before a valid contract existed; (2) shipping incomplete, non-functioning, or wrong products, and recognizing revenue before the customer received a usable product; (3) stuffing distribution channels with unwanted inventory through coercive practices and undocumented side deals, and recognizing revenue on products that sat unsold in reseller warehouses; (4) prematurely activating software subscription tokens for hardware that had not been sold to end customers, inflating subscription revenue; and (5) entering into undocumented oral agreements for rebates, discounts, and special terms that were not reflected in the purchase orders, on which the Company recognized revenue. Each of these practices violated ASC 606, the governing GAAP standard for revenue recognition and the basis for ChargePoint's revenue recognition policy, and each was directed or approved by one or more of the Executive Defendants. *See* Parts VI, XI.

3. The scheme unraveled in two stages. On September 6, 2023, ChargePoint disclosed a $28 million inventory impairment charge on a "particular [direct current] DC product," which Lead Plaintiffs have uncovered was its first-generation CPE 250 DC fast charger. Defendants had over-procured this product and carried it on the Company's books at inflated values rather than writing it down as required by ChargePoint's own inventory valuation policy. ChargePoint's stock fell 11% on the news. Then, on November 16, 2023, ChargePoint stunned the market by pre-announcing a 30% revenue shortfall from prior guidance, an additional $42 million inventory impairment charge (bringing the total to $70 million), and the immediate termination of both CEO Romano and CFO Jackson. The new CEO, Rick Wilmer—who had spent 18 months investigating ChargePoint's supply chain and inventory management—acknowledged that the Company's channel "has moved back to a model where they are carrying lower levels of inventory," confirming that prior revenue levels had been sustained by the undisclosed sales practices described herein. ChargePoint's stock fell 35% on November 17, 2023, to a record low of $2.02 per share—a cumulative decline of approximately 79% from the Class Period high. *See* Parts IX, X.

4. This Third Amended Complaint ("TAC") is filed pursuant to the Court's February 20, 2026 Order granting Defendants' motion to dismiss with leave to amend (Dkt. 149). The Court identified three deficiencies in the Second Amended Complaint's allegations of falsity and deception: (a) that Plaintiffs had "not pled facts showing what was false about Defendants' statements or the impressions those statements created"; (b) that Plaintiffs had "pled facts that are contradictory when viewed together"—specifically, alleging both supply chain constraints and pushing product shipments, which the Court found "inherently implausible"; and (c) that Plaintiffs "primarily rely on facts that occurred outside of the Class Period." The Court further found that the SAC had "insufficiently alleged the deceptive actions taken by Defendants in furtherance of an alleged scheme," and that the SAC did "not adequately allege conduct by the Executive Defendants that furthered the deceptive scheme beyond their alleged misstatements," such that the SAC's allegations did "not support individual liability for the Executive Defendants." The Court also noted in Footnote 5 that Plaintiffs had "not clearly (both substantively and temporally) connected the

alleged fraud and the stock price drop." This Third Amended Complaint addresses each of these deficiencies:

(a) **Falsity.** Part VIII now organizes the false statement allegations quarter by quarter across the Class Period (Q3 FY2022 through Q1 FY2024), and for each quarter identifies: (1) the specific statements Defendants made, (2) the specific contemporaneous facts—drawn from nine former employees and a confidential witness with firsthand Class Period knowledge—that rendered those statements false when made, and (3) the material facts Defendants omitted. Each quarter's false statement allegations are tied to the five categories of practices that violated GAAP and ChargePoint's revenue recognition policy set forth in Part VI, which identifies the specific ASC 606 revenue recognition step each practice violated. *See* Parts VI, VIII.

(b) **The purported "contradiction" between supply constraints pushing product shipments.** Part VII now explains that these facts are not contradictory: supply constraints explain *why* Defendants employed certain improper and unsustainable revenue recognition practices and ultimately acquired excess inventory. External supply constraints (the COVID-19 pandemic, Mexico manufacturing disruptions, and a global chip shortage) risked Defendants' missing ChargePoint's revenue guidance. Defendants had to ship incomplete, non-functioning, or wrong products that they had in stock to make up for any revenue shortfalls. As for the excess inventory, during the COVID-19 pandemic, ChargePoint executives saw an opportunity to capitalize on supply and demand issues and over-ordered the CPE 250 chargers with the hope to have an excess of inventory that no one else would have. These chargers had to be backordered and were behind at least four to six months through 2021 and into 2022, which led to an overstock in 2023. By that time, ChargePoint's other DC fast charger, the Express Plus, was recognized as being a better product and accordingly pushed by salespersons. The market demand for the CPE 250 was further softened by ChargePoint's planned transition from the CPE 250 to its successor, the CPE 280. Because customers were aware that the CPE 250 was being discontinued, demand for the older model plummeted as the market awaited the release of the newer technology.

As a result, ChargePoint got stuck with a lot of CPE 250 inventory. *See* Part VII (and especially Part VII.D, reconciling the two sets of facts).

(c) **Relevance of ChargePoint's Former Vice President, Legal Counsel Rachel Larrenaga's allegations of Defendants' Pre-Class Period Conduct.** In the Third Amended Complaint, Plaintiffs directly address the Court's concerns regarding the relevance of Larrenaga's allegations concerning Defendants' pre-Class Period conduct to Defendants' alleged fraud during the Class Period. Specifically, the Court noted that Larrenaga "left the company in June 2021, six months before the Class Period began," and concluded that "Plaintiffs have not connected the facts surrounding Larrenaga to the alleged material misstatements or deceptive scheme during the Class Period." The TAC provides this necessary connection by demonstrating that Larrenaga's allegations are not used to establish the falsity of statements Defendants made before the Class Period, but offered "to plausibly suggest a long standing course of misconduct extending into the Class Period" that was authorized and concealed by the Executive Defendants. *Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1374 (S.D. Fla. 2015) (citing *Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714, 716-17 (9th Cir. 2010)).

(i) **Similarity in Tactics and Outcome: Quarterly Revenue Engineering Leading to Inventory Glut**: Larrenaga alleges that ChargePoint had an institutionalized habit of "deeply discount[ing] sales to channel partners," including Rexel USA, right before the end of a fiscal quarter to "meet its quarterly revenue expectations." This is the exact same behavior reported by multiple witnesses during the Class Period. Larrenaga alleges these practices led to channel partners "holding excess inventory for long periods of time." This perfectly mirrors the Class Period reality. That Larrenaga—a former top legal officer at the Company who left just six months prior to the Class Period—provided a non-anonymous firsthand account of these undisclosed sales practices makes the FEs'

allegations supporting the material misstatements and deceptive scheme during the Class Period all the more credible.

(ii) **Evidence of the Executive Defendants' Active Concealment and Retaliation**: The TAC connects Larrenaga's allegations of pre-Class Period events to the Executive Defendants' scienter during the Class Period by showing a consistent pattern of suppression. Larrenaga provides a firsthand account of the Executive Defendants not only authorizing deceptive sales practices but actively retaliating against a legal officer who attempted to stop them. Larrenaga's account provides further support for the inference that that undisclosed sales practices during the Class Period were not isolated oversights; they were institutionalized, top-down directives issued by the Executive Defendants, who intentionally shielded these practices from investors by silencing internal whistleblowers.

(d) **Class Period facts.** The TAC relies on evidence from witnesses whose personal knowledge covers specific quarters within the Class Period, not merely pre-Class Period conduct. Part V identifies each former employee's and CW-1's employment dates, reporting chain, practice categories within their knowledge, and the specific Class Period quarters they cover—with a summary table confirming that at least four witnesses span the entire Class Period and every quarter is covered by multiple witnesses. Part VIII cites only witnesses with knowledge of the particular quarter at issue. *See* Parts V, VIII.

(e) **The deceptive scheme.** The Court found that the SAC "insufficiently alleged the deceptive actions taken by Defendants in furtherance of an alleged scheme." The TAC now defines the scheme with specificity: Part VI identifies five categories of undisclosed GAAP and Company policy-violating revenue practices—unauthorized shipments, incomplete/wrong products, channel stuffing with undocumented deals, premature software tokens, and undocumented oral rebates/discounts—each constituting a deceptive act distinct from any statement, and each tied to a specific ASC 606 violation. The TAC no longer relies on Defendants' outsourcing decisions as standalone deceptive acts; instead, the India accounts payable outsourcing is alleged as context for the self-inflicted supply constraints

that motivated the scheme (Part VII.B), and the Mexico manufacturing transition is alleged as an external supply constraint (Part VII.A)—neither as a deceptive act in itself. *See* Parts VI, VII, XV (Count II).

(f) **Individual liability for Executive Defendants.** The Court found that "the SAC does not adequately allege conduct by the Executive Defendants that furthered the deceptive scheme beyond their alleged misstatements" and that the SAC's allegations did "not support individual liability for the Executive Defendants." The TAC now alleges specific deceptive conduct by each Executive Defendant that goes beyond the making of any statement. Part XI.A identifies, for each defendant individually, the deceptive acts they personally committed or directed in furtherance of the scheme—including Jackson's agreement to verify terms of undocumented side deals on quarterly calls with a reseller executive and ultimate approval of them (CW-1), Romano's and/or Hughes's top down direction of premature and unauthorized, incomplete, or incorrect shipments (FE-1, FE-2) and shipment of empty charger frames (FE-3), and Hughes's discussion of rebate structures with respect to certain customers/deals (CW-1) and sales awards for premature software token activations (CW-1). Part IV.C summarizes each defendant's specific conduct in the "Parties" section. Count II cross-references these specific acts as the "deceptive or manipulative acts" required for scheme liability under Rule 10b-5(a) and (c). *See* Parts IV.C, XI.A, XV (Count II).

(g) **Loss causation.** Part X now maps each corrective disclosure to the specific concealed facts it revealed, establishing both substantive and temporal nexus between the fraud and the stock price declines. The September 6, 2023 disclosure (11% decline) revealed the CPE 250 over-procurement and inventory mis-valuation concealed throughout the Class Period. The November 16, 2023 disclosure (35% decline) revealed that revenue had been unsustainably inflated by the practices alleged herein. Each "Cause of Action" in Part XV identifies the specific TAC parts supporting each element, rather than incorporating all preceding allegations by reference. *See* Parts X, XV.

5. Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the ongoing independent investigation of their undersigned counsel, including: (i) ChargePoint's public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports from securities and financial analysts; (iii) press releases, investor presentations, and earnings call transcripts issued or authorized by ChargePoint; (iv) accounts from nine former ChargePoint employees ("FE-1" through "FE-9") with firsthand knowledge of the practices alleged herein during the Class Period; (v) accounts from one confidential witness ("CW-1") who worked for a major ChargePoint reseller and had direct, personal interactions with Defendants Jackson and Hughes regarding the undocumented deals and channel practices at issue; (vi) price and volume data for ChargePoint securities; (vii) consultation with subject matter experts; (viii) court filings in *Larrenaga v. ChargePoint, Inc.*, No. 22-cv-398534 (Cal. Super. Ct.); and (ix) additional materials and data identified herein. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within Defendants' control; Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II. SUMMARY OF THE ALLEGED FRAUD: HOW DEFENDANTS INFLATED CHARGEPOINT'S REVENUE AND CONCEALED THE TRUE SOURCES OF ITS REPORTED GROWTH

### A. Defendants Reported Quarter-After-Quarter Revenue Growth and Attributed It to Organic Demand for ChargePoint's Products

6. Throughout the Class Period (December 7, 2021 to November 16, 2023), Defendants ChargePoint, Romano, and Jackson presented investors with a narrative of extraordinary, organic growth. Beginning with its third quarter of fiscal year 2022, ChargePoint reported six consecutive quarters of revenue growth, with five quarters that met or exceeded guidance, growing from $65 million (Q3 FY22) to $152.8 million (Q4 FY23)—a nearly 135% increase. For the full fiscal year 2023 (ended January 31, 2023), ChargePoint reported a record $468 million in revenue, a 94% year-over-year increase.

7. Defendants attributed this growth to organic demand factors: "growth in charging demand from accelerated EV adoption," "strong execution," "record" revenue and growth, and ChargePoint's investments over "nearly 15 years." *See* Part VIII (identifying each false and misleading statement). CEO Romano publicly assured investors that ChargePoint did not "financially engineer our margin." CFO Jackson told analysts that growth was driven by "super strong" new customer acquisition that was "consistent" and exhibited "really good growth across the board."

8. These statements mattered enormously to the market. On the strength of these representations, analysts at JP Morgan, Fox Advisors, and others published bullish recommendations, and ChargePoint's share price reflected confidence in the organic growth story Defendants promoted. Investors, including Lead Plaintiffs, purchased ChargePoint securities at prices inflated by these representations.

**B. In Reality, a Material Portion of ChargePoint's Reported Revenue Derived From Undisclosed Practices That Violated GAAP and ChargePoint's Publicly Stated Revenue Recognition Policy and Were Unsustainable**

9. As detailed in Part VI below and confirmed by nine former ChargePoint employees and a confidential witness who worked for a major ChargePoint reseller, the growth narrative Defendants sold to investors was materially false and misleading. A significant and material portion of ChargePoint's reported quarterly revenue during the Class Period was not generated by organic customer demand. Instead, it derived from a coordinated set of undisclosed practices and a radical departure from the Company's prior and subsequent model of channel partners and resellers carrying lower inventory levels and placing restocking orders only as needed. These undisclosed practices were designed to recognize revenue prematurely, inflate quarterly financial results, and create the false appearance of meeting guidance—in violation of GAAP and ChargePoint's own publicly stated revenue recognition policy. These practices fell into five categories.

10. ***Unauthorized shipments to recognize revenue in violation of ASC 606.*** ChargePoint routinely shipped products to customers and end users who had not authorized the shipments, particularly toward the end of each quarter. ChargePoint then counted these shipments as recognized revenue, even when the products were later returned at ChargePoint's expense.

According to FE-8, a former sales operations employee who processed orders in ChargePoint's Salesforce system during the Class Period, for at least one customer, ChargePoint released orders involving $1 million of product or more without authorization, over a series of orders within the same quarter in 2023, all of which were later returned. FE-1, a former sales operations specialist who was part of a 24-person sales team, similarly estimated that at least 10% of the orders for which FE-1 was responsible for should not have been released for shipment. These unauthorized shipments violated ASC 606 in several respects, including: Step 1, which requires that "[t]he parties to the contract have approved the contract and are committed to perform their respective obligations" before revenue may be recognized; and Step 5 which prohibits the recognition of revenue until the entity satisfies a performance obligation by transferring control of a promised good to a customer—a condition that cannot be met when products are shipped without authorization. *See* Part VI.B.

11. ***Shipping incomplete, non-functioning, or wrong products to recognize revenue before a performance obligation was satisfied***. ChargePoint shipped products it knew could not be used by the customer, solely to record revenue by quarter-end. According to FE-2, a former sales manager, ChargePoint shipped charger shells without complete components to recognize revenue, knowing they would be returned—a practice FE-2 described as creating "a nightmare of accounting problems, invoicing, and returns." FE-3, a former East Region Account Executive, confirmed that starting in the second half of 2021, ChargePoint shipped empty charger frames to end-user customers without internal components or charging modules installed, rendering them unusable. FE-3 estimated that, based on FE-3's knowledge alone, more than 20 to 30 empty frames, valued at approximately $30,000 each, were shipped nationwide. FE-2 further stated that if a customer ordered a double-port charger and only single-port chargers were in stock, ChargePoint would ship the wrong model to the customer to recognize revenue, knowing the product would be returned. These practices violated ASC 606, Step 5, which requires that revenue be recognized only when a "promised good or service" (that is, an asset) is transferred "to a customer" and "the customer obtains control of [the] asset"— a condition that cannot be met when products arrive in a non-

functioning state that deprives the customer of any ability to direct the use of, or obtain the benefits from, the asset. *See* Part VI.C.

12. ***Channel stuffing through resellers to warehouse products and recognize revenue before end customers needed them.*** ChargePoint used its network of value-added resellers ("VARs") and distributors to offload products that end customers were not yet ready to receive, thereby pulling future-period revenue into the current quarter. According to CW-1, who worked for a reseller that had ChargePoint as a client, from 2021 to 2023, ChargePoint effectively forced resellers to take on more inventory than they needed every quarter. FE-7, a former partner and distributor channel manager, confirmed that ChargePoint aggressively pushed distributors to take on $2 million to $5 million of unneeded product every quarter so that ChargePoint could meet its quarterly targets. According to CW-1, ChargePoint offered generous undocumented rebates to resellers in exchange for taking inventory early. The rebates totaled millions of dollars and were paid to top-level management of CW-1's employer. If CW-1's employer complained, ChargePoint offered further deep discounts and promises of future buyers; if resellers attempted to return unwanted product, ChargePoint threatened to cut off future deliveries or price products to make the reseller's inventory uncompetitive. The scale of this practice was enormous: CW-1 noted that as of early 2025, one major distributor, Rexel, was still holding nearly $100 million of ChargePoint inventory it could not sell, and another, City Electric Supply, was still holding approximately $40 million in inventory it could not sell. *See* Part VI.D.

13. ***Premature activation of software tokens to inflate subscription revenue.*** To further inflate reported revenue, ChargePoint prematurely activated software subscription tokens while the associated hardware was still sitting in reseller warehouses. According to CW-1, ChargePoint assigned software tokens to "fictitious" customers—entities entered into ChargePoint's Salesforce system who had not yet purchased or activated any products—so that the Company could begin recognizing subscription revenue. Because ChargePoint's stated policy was to recognize subscription revenue on a straight-line basis starting at the time those subscriptions are activated, this practice inflated service revenue by recording it months before any customer actually used the service. The dollar amounts were material: CW-1 said Level 2 charger subscriptions cost

approximately $2,400 each, and DC fast charger subscriptions ran up to $25,000 per unit. *See* Part VI.E.

14. ***Undocumented side deals and rebates that distorted reported financial results.*** To facilitate the channel stuffing described above, Defendants negotiated and authorized undocumented rebates, side deals, and oral deal terms with resellers that were not reflected in purchase orders or ChargePoint's financial records. According to CW-1, Jackson had regular meetings with the CFO of CW-1's employer at least once per quarter, and CW-1 was personally on five to ten calls between 2021 and 2023 where Jackson and CW-1's CFO discussed these undocumented rebate deals. CW-1 said Jackson would verify and most of the time approve the terms that ChargePoint's sales team had promised. CW-1 agreed that these undocumented deals meant that ChargePoint closed its books each quarter with no documentation that its financial statements would not be accurate. FE-6, a sales operations employee responsible for Salesforce due diligence, confirmed that Jackson, as CFO, had to sign off on (or otherwise approve in writing) any additional discounts or deals beyond what was being offered as a promotion. *See* Part VI.D.

15. The practices described in ¶¶ 12-14 violated GAAP and ChargePoint's revenue recognition policy. The undocumented nature of these arrangements call into question whether a valid "contract" existed for purposes of ASC 606, Step 1, and whether a transaction price was determined pursuant to ASC 606, Step 3. This is because the actual terms of the transactions—including price concessions and rebates—were not reflected in the purchase orders or ChargePoint's financial records. The practices also violate Step 5, because where products that are sitting unsold in a channel partner's warehouse due to ChargePoint's coercion, or where software is prematurely activated before there is any actual customer, the risks and rewards of ownership often have not truly shifted.

16. The magnitude of the revenue inflation scheme was material to ChargePoint's reported financial results. FE-1 estimated that at least 10% of orders processed by FE-1 alone in a given quarter, as part of a 24-person sales team, should not have been released. FE-2 stated that millions of dollars of product were returned every quarter by customers due to improper shipments of incorrect products or products missing parts. FE-7 confirmed that ChargePoint pushed $2 to $5

million of unneeded product to distributors every quarter. FE-8 described $1 million or more in unauthorized shipments to a single customer in one quarter in 2023, all of which were returned. CW-1 described tens of millions of dollars in unsaleable inventory parked with resellers. These amounts were not trivial against ChargePoint's quarterly revenues, which ranged from $65 million to $152.8 million during the Class Period. *See* Part VI.F.

**C. Supply Chain Disruptions Were the Catalyst—Not a Separate Fraud—That Drove Defendants to Resort to These Practices**

17. These revenue inflation practices did not arise in a vacuum. They were driven by a set of genuine supply chain disruptions that made it impossible for ChargePoint to meet its aggressive revenue guidance through legitimate sales alone. Understanding this causal chain is essential to understanding the fraud.

18. Beginning before the Class Period and continuing throughout it, ChargePoint faced real supply constraints affecting specific product lines and components. According to FE-2, the COVID-19 pandemic caused plant closures for a supplier in Italy and manufacturing delays in Mexico, resulting in a deficit of certain charging stations. Per FE-1, a chip shortage in late 2021 and early 2022 compounded these delays and created a backlog of charger orders. FE-3 similarly stated that a backlog of orders for the CPE 250 charger started in 2021 and rolled into 2022, finally getting caught up in late October 2022 when FE-3 left ChargePoint.

19. In addition, ChargePoint's own decision to outsource its accounts payable functions to India—made by CFO Jackson—created a separate, self-inflicted supply crisis. According to FE-4, who formerly worked in the purchasing/procurement department, within two weeks of establishing the outsourcing in or about June 2020, problems arose with accounts payable not paying suppliers' inventory and non-inventory bills on time. The number of unpaid invoices grew from 600 in 2020 to 800 in 2021, to 1,600 in 2022, and to 2,400 in 2023. Suppliers placed credit holds on ChargePoint, including DigiKey (three to four times in one year), Arrow Electronics, and others. ChargePoint's Amazon E-commerce account was shut down three times in 2022 for non-payment. *See* Part VII.A–B.

20. These supply constraints meant ChargePoint could not obtain new products and components to fulfill customer orders properly and on time through legitimate business operations. This created a widening gap between the revenue guidance Defendants had given to investors and the revenue ChargePoint could actually generate through normal sales channels. Rather than disclose this gap—which would have revealed the severity of the supply problems and ChargePoint's inability to deliver the growth story it had promised—Defendants chose to fill the gap by aggressively pushing the unwanted products and components ChargePoint had on hand through the five categories of improper practices described in subsection B above.

21. Critically, the supply chain constraints eventually led to the excess CPE 250 DC fast chargers. According to FE-5, who was responsible for sales to major national fleet sales customers, ChargePoint executives saw an opportunity during the pandemic to capitalize on supply and demand dynamics and over-ordered the CPE 250, hoping to stockpile inventory that competitors could not match. While FE-3 stated that the chargers had to be backordered and were behind at least four to six months through 2021 and got pushed into 2022, there was an eventual overstock by 2023. At the same time, per FE-5, ChargePoint had a superior product—the Express Plus—which offered greater power output, a more versatile architecture, and better scalability. Salespersons pushed the Express Plus over the CPE 250. The market demand for the CPE 250 was further softened by ChargePoint's planned transition from the CPE 250 to its successor, the CPE 280. Because customers were aware that the CPE 250 was being discontinued, demand for the older model plummeted as the market awaited the release of the newer technology. By early 2023, ChargePoint knew it was sitting on tens of millions of dollars of CPE 250 inventory for which there was insufficient demand. Rather than write down these chargers "[a]t the point of loss recognition" as its own inventory policy and GAAP required, ChargePoint carried this overvalued inventory on its books while simultaneously trying to offload it through the fire-sale discounts and channel stuffing described herein. *See* Part VII.C.

22. There is no contradiction between these facts. ChargePoint faced supply chain constraints for new parts and products coming in. To fill the revenue hole the supply issues created Defendants pushed the products and components they had on hand by shipping incomplete,

incorrect, the wrong products, or unwanted products to customers, resellers, and distributors. Those same supply chain constraints led ChargePoint to over-order CPE 250s in a misguided attempt to stockpile inventory that its competitors could not match. Once the CPE 250 backlogs were clear, ChargePoint was left with excess inventory as its superior product, Express Press, and anticipated release of the CPE 280 model softened demand for the CPE 250. What unified these practices was a single objective: maintaining the appearance that ChargePoint was delivering on its growth narrative so that Defendants could continue to tell investors that revenue was driven by organic demand. *See* Part VII.D.

### D. The Fraud Unraveled When ChargePoint Could No Longer Sustain the Scheme, Resulting in $70 Million in Inventory Impairment Charges and the Termination of Its CEO and CFO

23. As with all such practices, ChargePoint's revenue inflation scheme was unsustainable. It could conceal poor underlying revenues and mask declining product demand for only so long. The truth emerged in two stages.

24. ***September 6, 2023: Partial Corrective Disclosure.*** After the market closed on September 6, 2023, ChargePoint reported its second quarter fiscal year 2024 financial results. The Company disclosed a $28 million inventory impairment charge "taken to address legacy supply chain-related costs and supply overruns on a particular DC product." That "particular DC product" was the CPE 250 that multiple former employees identified as the product ChargePoint had over-procured and could not sell. ChargePoint reported a GAAP gross margin of only 1%—down from 17% in the prior year's same quarter—driven in significant part by the impairment charge it had delayed for months. On this news, the Company's share price fell $0.77, or 11%, from a close of $7.06 per share on September 6, 2023, to $6.29 per share on September 7, 2023, on unusually heavy trading volume. The stock continued to decline the following day, closing at $5.72 on September 8, 2023. *See* Part IX.A.

25. Yet even in disclosing the $28 million impairment, Defendants continued to mislead investors. CFO Jackson assured analysts that "[w]ith the inventory issue behind us and aggressive programs for improving our cost structure," they "would expect to resume continued improvement in gross margin next year." Jackson stated that the margin headwinds "should go away going

forward." Within days of these assurances, Defendants Jackson and Hughes began selling substantial amounts of their personally held shares. Jackson sold 556,255 shares on September 8, 2023—two days after the earnings call—and an additional 16,799 shares on September 21, 2023. Hughes sold 58,000 shares on September 14, 2023. *See* Part IX.B.

26. ***November 16, 2023: Full Corrective Disclosure.*** On November 16, 2023, after the market closed, ChargePoint pre-announced selected third quarter fiscal year 2024 results. The disclosures were devastating. Revenue was expected to be only $108 to $113 million—a 30% shortfall from the prior guidance of $150 to $165 million and a 25–28% decline from the prior quarter. The Company disclosed a second inventory impairment charge of $42 million—on top of the $28 million from the prior quarter—bringing total impairment charges to $70 million. GAAP gross margin was expected to be negative 21% to 23%. ChargePoint's new CEO, Rick Wilmer, disclosed that he had conducted an "18-month" review of ChargePoint's "supply chain, manufacturing partnerships and inventory management approach," resulting in the decision to take the additional impairment charges. And, in the most telling disclosure, the Company announced the immediate departures of CEO Romano and CFO Jackson, offering no detailed reasons for the abrupt leadership change. On this news, the Company's share price fell $1.11, or 35%, from a close of $3.13 per share on November 16, 2023, to a record low of $2.02 per share on November 17, 2023, on unusually heavy trading volume. *See* Part IX.C.

27. In total, from its Class Period high of $9.78 on June 7, 2023, to its post-disclosure low of $2.02 on November 17, 2023, ChargePoint's stock price declined by approximately 79%, wiping out hundreds of millions of dollars in market capitalization. The corrective disclosures revealed the financial consequences of the practices Defendants had concealed: the revenue Defendants had attributed to organic demand was not sustainable; the inventory Defendants had assured investors was under control was in fact massively impaired; and the growth story that had supported ChargePoint's stock price was built, in material part, on improper practices that could not be maintained. *See* Part X (Loss Causation).




28. Post-Class Period developments further confirmed the scope of the fraud. On December 6, 2023, ChargePoint's new CEO Wilmer confirmed the Company "had some execution challenges that I began to fix as COO and will finish addressing as CEO," and confirmed that "our channel has moved back to a model where they are carrying lower levels of inventory and placing smaller restocking orders as needed." In the two subsequent quarters after the Class Period, ChargePoint reported revenue of $115.8 million in 4Q FY2024 (-24.2% year-over-year), and $107.04 million in 1Q FY2025 (-17.5% year-over-year), further corroborating the FEs' account of Defendants' unsustainable revenue recognition practices. And as of early 2025, the consequences of ChargePoint's channel stuffing remained visible: according to CW-1, Rexel was still holding nearly $100 million of ChargePoint inventory it could not sell, and City Electric Supply was still holding approximately $40 million in inventory it could not sell. *See* Part IX.D.

## III. JURISDICTION AND VENUE

29. Lead Plaintiffs bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

30. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

31. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in Campbell, California, within this District.

32. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## IV. PARTIES

### A. Lead Plaintiffs

33. Lead Plaintiffs Shahram Afshani and Paulina Afshani Schwartz, as set forth in their previously filed certifications (ECF No. 27-1), incorporated by reference herein, purchased ChargePoint securities during the Class Period and suffered damages as a result of the federal securities law violations alleged herein, including Defendants' false or misleading statements and/or material omissions and the fraudulent schemes, acts, or conduct alleged herein.

### B. Corporate Defendant

34. Defendant ChargePoint is a publicly traded company incorporated under the laws of Delaware with its principal executive offices located in Campbell, California.

35. ChargePoint went public on March 1, 2021, following a merger with Switchback Energy Acquisition Corporation, a Special Purpose Acquisition Company ("SPAC"). ChargePoint's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "CHPT." As of December 1, 2023, ChargePoint had approximately 418 million shares of stock available for trading, owned by at least hundreds or thousands of investors.

36. ChargePoint provides networked solutions and software subscription solutions for

charging electric vehicles ("EVs"). In terms of the scope and direction of its business plan, ChargePoint described it as follows: "ChargePoint is currently a market leader in North America in the commercial Level 2 AC chargers. ChargePoint also offers Level 1 power chargers for use at home or multifamily settings, and high-power Level 3 DC Fast chargers for urban fast charging, corridor, or long-trip charging and fleet applications. ChargePoint intends to expand its market share over time in its product categories, leveraging the network effects of its products and Cloud Services software."[1]

37. During the Class Period, ChargePoint offered the following Level 2 AC charging stations[2]:




[1] *See* ChargePoint Amended Prospectus dated March 9, 2021, at 53.

[2] *See* ChargePoint, "Smart Charging Stations" (Feb. 20, 2022), available at https://web.archive.org/web/20220220022427/https://www.chargepoint.com/products/commercial.

38. ChargePoint offered the following Level 3 DC Fast Chargers during the Class Period[3]:




39. At the start of the Class Period, ChargePoint reported that approximately 75% of its revenue came from sales of its charging stations, with 20% derived from its software-based subscription services.[4] By the end of the Class Period, ChargePoint's sales of charging stations constituted 67% of its revenue, with 28% earned from subscription services.[5]

40. ChargePoint reports its financial results on a fiscal year basis, with the fiscal year ending on the last day of January (*e.g.*, fiscal year 2022 ran from February 1, 2021, to January 31, 2022).

**C. Executive Defendants**

41. Defendant Pasquale Romano served as ChargePoint's President and Chief Executive Officer ("CEO") throughout the Class Period, until his immediate termination on November 16, 2023. During the Class Period, Romano made materially false and misleading

[3] *Id.*

[4] *See* ChargePoint 10-Q for 3Q FY2022.

[5] *See* ChargePoint 10-Q for 3Q FY2024.

statements about ChargePoint's revenue and gross margin growth and financial condition in the Company's public filings and earnings calls, and signed Sarbanes-Oxley certifications attesting to the accuracy of financial reports he knew or was severely reckless in not knowing were materially misleading. Romano was also present when other Defendants made statements or omissions on these subjects without correcting them. *See* Part VIII.

42. Beyond his role in making these statements, Romano personally participated in and directed the deceptive practices at the heart of the scheme. According to FE-3, the improper sales practice of shipping out empty charger frames was directed from the top down. Similarly, FE-2 said the directive to engage in premature shipping of products or shipping of incorrect or incomplete products came from FE-2's supervisor's supervisors, which would have been Hughes and/or Romano. Romano sold 1,175,802 shares (20% of his holdings) for approximately $14 million during the Class Period. *See* Parts VI.B-C, XI.A.1, XI.C.

43. Romano directly participated in the management and day-to-day operations of the Company and, because of his position of control and authority, his ability to exercise power and influence over ChargePoint's conduct, and his access to material inside information, was a controlling person within the meaning of Section 20(a) of the Exchange Act.

44. Defendant Rex S. Jackson served as ChargePoint's Chief Financial Officer ("CFO") from May 2018 through his immediate termination on November 16, 2023. During the Class Period, Jackson made materially false and misleading statements about ChargePoint's revenue and gross margin growth and financial condition in the Company's public filings and earnings calls, and signed Sarbanes-Oxley certifications attesting to the accuracy and completeness of financial reports he knew or was severely reckless in not knowing were materially misleading. Jackson was also present when other Defendants made statements or omissions on these subjects without correcting them. *See* Part VIII.

45. Beyond his role in making these statements, Jackson personally participated in the financial practices at the heart of the fraud. According to CW-1, Jackson personally attended regular meetings with CW-1's CFO at least once per quarter. CW-1 was on 5 to 10 calls between 2021 and 2023 in which Jackson acknowledged certain terms in undocumented side deals, including rebates,

that he needed to verify and most of the time approved. According to FE-6, Jackson had to sign off on (or otherwise approve in writing) any additional discounts or deals beyond what was being offered as a promotion. Jackson sold 670,269 shares (over 23% of his holdings) for approximately $4.6 million during the Class Period, including 556,255 shares two days after publicly assuring investors the Company's inventory problem was "behind us." *See* Parts VI.D, XI.A.2, XI.C.

46. Jackson directly participated in the management and day-to-day operations of the Company and, because of his position of control and authority, his ability to exercise power and influence over ChargePoint's conduct, and his access to material inside information, was a controlling person within the meaning of Section 20(a) of the Exchange Act.

47. Defendant Michael Hughes served as ChargePoint's Chief Commercial and Revenue Officer from September 2018 through February 29, 2024. As Chief Commercial and Revenue Officer, Hughes managed all revenue-generating activities for ChargePoint and was responsible for ensuring that the Company's revenue goals were met. Hughes is not alleged to have made the challenged public statements in Part VIII; his liability arises under Rule 10b-5(a) and (c) for his direct, personal participation in the deceptive scheme.

48. During the Class Period, Hughes personally directed and participated in each category of improper practice that inflated ChargePoint's revenue. According to FE-1, Hughes approved the directive to ship all pending orders prematurely to customers who had not authorized delivery. FE-2 similarly stated that their supervisor's supervisors (*i.e.*, Hughes and/or Romano) issued the orders to FE-2's supervisor to make premature shipments or ship incomplete or wrong products to customers to recognize revenue early. Per FE-3, the decision to ship empty charger frames without internal components was made from the top down by Hughes and the VP of Revenue Operations. CW-1 said Hughes personally sat down with CW-1's boss to talk about rebate structures for certain customers/deals. CW-1 further stated Hughes gave out sales awards to employees who sold software tokens for charging stations that had not been activated yet. Hughes sold over 600,000 shares (over 41% of his holdings) for approximately $6.8 million during the Class Period. *See* Parts VI.B–E, XI.A.3, XI.C.

49. Hughes directly participated in the management and day-to-day operations of the Company and, because of his position of control and authority, his ability to exercise power and influence over ChargePoint's conduct, and his access to material inside information, was a controlling person within the meaning of Section 20(a) of the Exchange Act.

50. Defendants Romano, Jackson, and Hughes (collectively the "Executive Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors (*i.e.*, the market). The Executive Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material, non-public information available to them, the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and/or misleading. The Executive Defendants are liable for the false statements and/or fraudulent schemes, conduct, or acts pleaded herein.

## V. FORMER CHARGEPOINT EMPLOYEES AND CONFIDENTIAL WITNESS

51. The allegations in this Complaint are supported by the accounts of nine former ChargePoint employees ("FE-1" through "FE-9") and one confidential witness ("CW-1"), each of whom has direct, firsthand knowledge of the practices described herein during the Class Period. Collectively, these witnesses cover every quarter of the Class Period and provide testimony relevant to each of the five categories of improper practices identified in Part VI. Their employment tenure, positions, reporting relationships, and Class Period knowledge are summarized below and in the table that follows.

52. **FE-1** was a Sales Operations Specialist who worked for ChargePoint from 2019 until March 2023. FE-1 was responsible for processing sales orders from shipping (Salesforce software) and sending them to shipping (which utilized NetSuite software). FE-1 worked alongside 23 other Sales Operations Specialists, 17 of whom were located in India. FE-1 reported to the Sales

Operation Manager, who in turn reported to the VP of Revenue Operations, who reported to Michael Hughes, Chief Commercial and Revenue Officer. Hughes reported to CEO Pasquale Romano. FE-1 has direct knowledge of the unauthorized and premature shipment practices (Part VI.B) and inventory and supply constraints (Part VII.A). FE-1's knowledge covers Q3 FY2022 through part of Q1 FY2024.

53. **FE-2** was a Sales Manager from 2019 until March 2023. FE-2 was responsible for entering and processing sales orders, addressing shipping issues, and preparing the end of month sales reports for North America and Canada. FE-2 oversaw a team of 24 sales operations specialists that reported directly to FE-2. FE-2 reported to the VP of Revenue Operations, who in turn reported to Defendant Michael Hughes, Chief Commercial and Revenue Officer. Hughes reported to CEO Defendant Pasquale Romano. FE-2 was responsible for preparing a monthly sales report on an Excel spreadsheet that documented sales and tracked orders that were shipped. The report was used to determine monthly and quarterly revenue. The report was submitted up the chain of command through FE-2's supervisor and discussed in meetings held by FE-2's supervisor and Defendant Hughes. FE-2 has direct knowledge of unauthorized shipments (Part VI.B), incomplete/wrong product shipments (Part VI.C), the severe supply chain constraints from COVID-19 (Part VII.A), and the Mexico outsourcing problems (Part VII.A). FE-2's knowledge covers Q3 FY2022 through part of Q1 FY2024. FE-2 also reported that they learned from colleagues that the improper shipping practices ceased around April 2024 when rumors of the lawsuit and articles began circulating.

54. **FE-3** was an East Region Account Executive for several years prior to the Class Period, and up through late October 2022 during the Class Period. FE-3 reported to the Vice President of Channel Sales, who reported to Defendant Michael Hughes, who reported to Defendant Romano. FE-3 has direct knowledge of the shipment of empty charger frames (Part VI.C), supply constraints and CPE 250 over-procurement (Parts VII.A, VII.C), and the India outsourcing problems (Part VII.B). FE-3's knowledge covers Q3 FY2022 through Q3 FY2023.

55. **FE-4** worked in ChargePoint's purchasing/procurement department several years prior to the Class Period, up until September 2023. FE-4 was responsible for non-inventory-related invoices and purchases worldwide, which included NPI (New Product Introduction), testing

equipment, and any other materials not required for product lines. FE-4 was previously involved with handling product inventory invoices. FE-4 reported to the Director of NPI Materials and Strategic Sourcing, who reported to the Senior Vice President of Operations and Support, who reported to Defendant Romano. FE-4 is the principal witness on the India accounts payable outsourcing crisis (Part VII.B), including the progression of unpaid invoices from 600 (2020) to 2,400 (2023) and the resulting supplier credit holds. FE-4's knowledge covers Q3 FY2022 through part of Q3 FY2024.

56. **FE-5** was employed by ChargePoint from late spring 2022 until early 2024. FE-5 was responsible for sales to major national fleet sales customers. FE-5 reported to the then-Director of Fleet Sales, who in turn reported to the Senior Vice President - North America. FE-5 has direct knowledge of the CPE 250 over-procurement strategy and its consequences (Part VII.C), including the push to sell the Express Plus fast charger, the anticipated transition to the CPE 280 model and softening market demand that rendered CPE 250 inventory obsolete, and the semi-weekly sales calls beginning in January or February of 2023 where excess CPE 250 supply was discussed. FE-5 understood that Romano and Hughes were apprised of the call contents. FE-5's knowledge covers Q2 FY2023 through Q3 FY2024.

57. **FE-6** worked in ChargePoint's Sales Operations segment throughout the Class Period, handling Stages 1 through 6 in ChargePoint's Salesforce platform, including spot-checking and due diligence to make sure orders had proper documentation and approvals. FE-6 worked with managers or directors of ChargePoint resellers, including Rexel. FE-6 has direct knowledge of the channel stuffing, including Jackson's sign-off authority on any additional discounts or deals beyond what was being offered as a promotion (*e.g.*, a buy-one-get-one free promotion offered to resellers) and the $10 million CPE 250 fire-sale promotion requiring CEO approval. (Part VI.D). FE-6's knowledge covers the entire Class Period: Q3 FY2022 through Q3 FY2024.

58. **FE-7** filled several roles at ChargePoint from 2021 to 2024, including as a manager for ChargePoint's partner and distributor channels. In this role, FE-7 was responsible for managing partnerships with distributors in their assigned geographic region. FE-7 worked under ChargePoint's Senior Director of Distribution, who reported to the Vice President of Channel Sales,

who in turn reported to Defendant Hughes. FE-7 has direct knowledge of the channel stuffing practices, including Hughes's role in urging the sales team to close deals (Part VI.D). FE-7's knowledge covers the entire Class Period: Q3 FY2022 through Q3 FY2024.

59. **FE-8** worked in Sales Operations from mid-2022 to mid-2024. FE-8 was responsible for processing orders entered into the Salesforce system by the sales reps and answering customer questions. FE-8 has direct knowledge of unauthorized shipments to customers who had not authorized delivery, including estimating that for at least one customer, ChargePoint released $1 million or more of product without authorization in a single quarter in 2023, which was later returned (Part VI.B). FE-8 also confirmed that hold-for-release orders—orders for products that the customers were not ready to receive—were identifiable in Salesforce because they had "HFR" in their titles. FE-8's knowledge covers Q3 FY2023 through Q3 FY2024.

60. **FE-9** was an Operations Manager at ChargePoint throughout the Class Period. In this role, FE-9's responsibilities included managing third-party contractors who installed or repaired ChargePoint charging stations. FE-9 has direct knowledge that ChargePoint had contractors hold millions of dollars of inventory that customers were not ready to receive by promising these contractors the installation work when the time came (Part VI.D). FE-9's knowledge covers the entire Class Period: Q3 FY2022 through Q3 FY2024.

61. **CW-1** is a former employee of a reseller, and ChargePoint was one of their clients. CW-1 worked with ChargePoint from before the Class Period through late 2023. CW-1 has direct knowledge of ChargePoint using VARs and distributors to offload products that end customers were not ready to receive, Jackson's and Hughes' knowledge of undocumented side deals and rebates, and the premature activation of software tokens to inflate subscription revenue. *See* Part VI.D-E.

62. For ease of reference, the following table summarizes each witness's position, employment period, reporting chain, and the specific quarters of the Class Period for which each witness has direct knowledge:

| FE/CW | Position | Employment | Reporting Chain | Class Period Quarters |
|---|---|---|---|---|
| FE-1 | Sales Operations Specialist | 2019–Mar. 2023 | Sales Ops Mgr → VP Rev Ops → Hughes → Romano | Q3 FY22–part of Q1 FY24 |
| FE-2 | Sales Manager | 2019–Mar. 2023 | VP Rev Ops → Hughes → Romano | Q3 FY22–part of Q1 FY24 |
| FE-3 | East Region Account Executive | Pre-CP–late Oct. 2022 | VP Channel Sales → Hughes → Romano | Q3 FY22–Q3 FY23 |
| FE-4 | Purchasing / Procurement | Pre-CP–Sept. 2023 | Dir. NPI Materials → SVP Ops → Romano | Q3 FY22–part of Q3 FY24 |
| FE-5 | National Fleet Sales | Late spring 2022–early 2024 | Dir. Fleet Sales → SVP North America | Q2 FY23–Q3 FY24 |
| FE-6 | Sales Operations (due diligence) | Throughout CP | Sales Operations segment | Q3 FY22–Q3 FY24 (entire CP) |
| FE-7 | Partner/Distributor Channel Manager | 2021–2024 | Sr. Dir. Distribution → VP Channel Sales → Hughes | Q3 FY22–Q3 FY24 (entire CP) |
| FE-8 | Sales Operations | Mid-2022–mid-2024 | Sales Operations | Q3 FY23–Q3 FY24 |
| FE-9 | Operations Manager | Throughout CP | Operations | Q3 FY22–Q3 FY24 (entire CP) |
| CW-1 | Employee of ChargePoint reseller | Pre-CP–late 2023 | Direct interaction w/ Jackson & Hughes | Q3 FY22–Q2 FY24 (entire CP) |

63. As the table demonstrates, at least four witnesses (FE-6, FE-7, FE-9, and CW-1) have direct knowledge spanning the entire Class Period from Q3 FY2022 through Q3 FY2024. FE-1, FE-2, FE-4, FE-5, and FE-8, collectively, cover every quarter in which Lead Plaintiffs allege Defendants made false and misleading statements (Q3 FY2022 through Q1 FY2024). And FE-3 provides critical information regarding how the improper shipments were in place right at the start of the Class Period in Q3 FY 2022. In sum, every quarter of the Class Period is covered by multiple witnesses. Together, the witnesses provide firsthand evidence of all five categories of improper practices identified in Part VI, the supply chain and inventory conditions described in Part VII, and the involvement of each Executive Defendant as described in Part XI.A.

## VI. THE REVENUE INFLATION SCHEME: DEFENDANTS EMPLOYED FIVE CATEGORIES OF UNDISCLOSED PRACTICES THAT VIOLATED GAAP AND CHARGEPOINT'S OWN REVENUE RECOGNITION POLICY.

### A. ChargePoint's Publicly Stated Revenue Recognition Policy and the GAAP Principles It Claimed to Follow

64. Throughout the Class Period, ChargePoint claimed to recognize revenue in accordance with GAAP, specifically ASC Topic 606 ("Revenue from Contracts with Customers").[6] ChargePoint adopted ASC 606 on February 1, 2019, and in its public filings described a five-step revenue recognition model: (a) identification of the contract, or contracts with a customer; (b) identification of the performance obligations in the contract; (c) determination of the transaction price; (d) allocation of the transaction price to the performance obligations in the contract; and (e) recognition of revenue when, or as, the Company satisfies a performance obligation.[7] This policy was restated in every Annual Report (10-K) filed during the Class Period and remained materially unchanged.

65. For hardware products, including Level 2 AC charging stations and Level 3 DC fast charging stations, ChargePoint's stated policy was to recognize revenue upon shipment to distributor resellers or direct customers. For subscription revenues—Cloud services and extended maintenance service plans—ChargePoint recognized revenue on a "straight-line basis" starting at the time those subscriptions were activated.[8]

66. Proper application of ASC 606 required that each step be satisfied before revenue could be recognized. Step 1 ("identification of a contract") required, among other things, that "[t]he parties to the contract have approved the contract … and are committed to perform their respective

---

[6] The accounting profession and the SEC recognize GAAP as the uniform rules, conventions, and procedures necessary to define and reflect accepted accounting practices. GAAP rules are primarily promulgated by the Financial Accounting Standards Board ("FASB") and have been codified since 2009 in its Accounting Standards Codifications. These rules, referred to as ASCs, represent the source of authoritative GAAP for nongovernmental entities such as ChargePoint. *See* ASC 106, Generally Accepted Accounting Principles, section 10-05-1.

[7] *See* Form S-1 Registration Statement dated March 1, 2021.

[8] *See* Form 10-K Annual Report for fiscal year ended January 31, 2023, at 47 ("Subscriptions revenue consists of services related to Cloud, as well as extended maintenance service plans under Assure…. Subscriptions revenue is generally recognized over time on a straight-line basis as ChargePoint has an ongoing obligation to deliver such services to the customer.").

obligations" and that "[t]he contract has commercial substance." ASC 606-10-25-1. Step 5 ("satisfies a performance obligation") required that the "promised good or service (that is, an asset)" be transferred "to a customer" and that "[a]n asset is transferred when (or as) the customer obtains control of that asset." ASC 606-10-25-23. A customer does not "obtain control" of an asset it did not authorize receiving, cannot use for its intended purpose, or for which the seller retains the significant risks and rewards of ownership.

67. As detailed below, throughout the Class Period, ChargePoint routinely violated GAAP revenue recognition principles, specifically ASC 606, and its own revenue recognition policy by booking revenue on transactions where one or more of the five steps had not been satisfied. Based on statements from nine former ChargePoint employees and a confidential witness who worked for a major ChargePoint reseller, ChargePoint reported revenues that derived, in material part, from five categories of undisclosed, unsustainable practices designed to inflate reported revenue and create the false appearance of meeting quarterly guidance.

**B. Unauthorized Shipments: ChargePoint Shipped Products to Customers Who Had Not Approved Delivery, Violating ASC 606, Steps 1, 3, and 5**

68. Throughout the Class Period, ChargePoint routinely shipped products to customers and end users who had not authorized delivery, then counted these shipments as recognized revenue. This practice violated ASC 606, Step 1, which requires that "[t]he parties to the contract have approved the contract and are committed to perform their respective obligations" before a valid contract exists. Where a customer has not authorized delivery—and particularly where the customer subsequently returns the product and ChargePoint bears the return cost—there is no valid contract, no commercial substance, and no basis for revenue recognition. This practice also violates Step 3, which "requires determination of the transaction price" because where the customer has a functional right of return, this creates variable consideration that was ignored. Furthermore, this practice violates ASC 606, Step 5, as a customer does not "obtain control" of an asset it did not authorize receiving.

69. ***The directive to ship all pending orders (FE-1).*** FE-1, a Sales Operations Specialist employed at ChargePoint from 2019 until March 2023, described a systematic directive to ship

products regardless of customer readiness. Between summer and fall of 2022 (which would have been late July/early August), ChargePoint's Vice President of Revenue Operations directed the sales operations team, including FE-1, to ship all pending orders. FE-1 said the VP of Revenue Operations was being told by their superiors to ship all pending orders. According to FE-1, under this "heavy handed push," all orders in the Salesforce "queues" were to be released to NetSuite (the warehouse management system) to be shipped. FE-1 recalled that normally in any given week, FE-1 processed 20 to 45 orders totaling $200,000 to $500,000 that would be shipped, but the end-of-quarter directive doubled or tripled the normal amount. FE-1 estimated that roughly $1 million to $5 million of product was released for shipment from FE-1's queue alone, and that at least 10% of the orders in FE-1's Salesforce database should not have been released because the customers were not prepared to receive them. FE-1 confirmed that this directive had to be approved at the executive level, which would have been Michael Hughes or above, and that the finance department also had to be aware and approve so that revenue could be recognized for these shipments.

70. FE-1 further explained the logistics. Products were stored in four warehouses (three in the U.S. and one in Mexico). Customers that became aware of premature shipments sometimes requested pullbacks. According to FE-1, a few orders could be pulled back before shipping, but the majority—approximately 80% in FE-1's area of responsibility—had to be reversed through ChargePoint's logistics department and involved the shipping company reversing the shipment. By FE-1's estimation, 20% of prematurely shipped orders were delivered to customers. FE-1 saw the invoices and reconciliation for these shipments in Salesforce and confirmed that ChargePoint recognized revenue for them.

71. ***Customers complained about unauthorized shipments every quarter (FE-8)***. FE-8, a Sales Operations employee who processed orders in ChargePoint's Salesforce system from mid-2022 to mid-2024, similarly stated that products were routinely sent to customers or end users who said they did not authorize the shipments, especially toward the end of each quarter. FE-8 stated that, after the end of a quarter, FE-8 would receive phone calls from customers who complained they did not authorize certain orders. When a customer complained, FE-8 had to fill out a form called a "Jira" ticket, and ChargePoint would pay for the product to be returned. FE-8

stated that complaints about unauthorized orders occurred frequently, perhaps every quarter, beginning in late 2022.

72. According to FE-8, because orders were shipped, this allowed ChargePoint to count the shipment as revenue, even if it was later returned to ChargePoint at ChargePoint's expense. FE-8 estimated that, for at least one customer in a single quarter in 2023, early releases of orders involved $1 million of product or more over a series of orders, which were later returned.

73. FE-8 also reported the existence of "Hold for Release" orders—orders for products that customers were not ready to receive. FE-8 said that hold-for-release orders allowed ChargePoint to claim the orders as revenue even though the client had not paid for or received the product or even received it, and these orders were known as "booked but not billed" orders. According to FE-8, hold-for-release orders were identifiable in Salesforce because they had "HFR" in their titles and notes all over stating hold for release or customer not ready for it. FE-8 knew ChargePoint was counting Hold for Release orders as revenue because FE-8 reviewed booked and billed figures at sales operations meetings. FE-8 added that, toward the end of their time at ChargePoint, the Company was getting to the point that FE-8 was going to say, "I am not releasing [hold orders] anymore until I have something from the customer … because there was just so many."

74. ***Products were shipped to vacant lots and construction sites (FE-2)***. FE-2, a Sales Manager from 2019 to March 2023, described how ChargePoint's sales operations team started shipping out orders that were on hold by the customer or partial orders to counterbalance missing sales and revenues caused by supply chain challenges. According to FE-2, ChargePoint reconfigured its Salesforce software to allow on hold or partial orders to be shipped instead of whole charger units, creating a host of logistical problems, including millions of dollars of returned product every quarter. FE-2 stated that some on-hold products were shipped to vacant lots and construction sites that were not completed, which is precisely why the customer had requested a hold on shipping. FE-2 confirmed that ChargePoint shipped them anyway to recognize revenue. The chargers were dropped off at vacant lots with no security and sites still under construction, resulting in products being weather damaged, vandalized, or stolen, leading to huge write-offs.

75. According to FE-2, the order to ship products came from FE-2's supervisor, who told FE-2 that they were hesitant to issue this directive, but were following orders from their supervisors (which would have been Defendants Hughes and/or Romano). FE-2 said that the premature product shipping was always directed at the end of quarters and FE-2 specifically remembered it occurring in July 2022, October 2022, January 2023, and continuing through March 2023 when FE-2 resigned. FE-2 was later advised by colleagues still employed at ChargePoint that the practices continued through April 2024, ceasing only when rumors of the lawsuit and articles began circulating and employees were told to stop shipping partial and on hold orders.

## C. Incomplete, Non-Functioning, and Wrong Products: ChargePoint Shipped Products Customers Could Not Use, Violating ASC 606, Step 5

76. In a related but distinct practice, ChargePoint shipped products it knew could not be used by the customer—empty charger frames without internal components, products with missing parts, or entirely wrong product models—solely to record revenue by quarter-end. This practice violated ASC 606, Step 5, which requires that revenue be recognized only when "the customer obtains control of [the] asset." A customer does not obtain "control" of an asset that cannot be used for its intended purpose or benefit from the product. A non-functioning charger frame shipped without the components necessary to charge a vehicle is not a completed asset over which the customer has meaningful control.

77. ***Empty charger frames shipped starting in H2 2021 (FE-3).*** FE-3, a former East Region Account Executive who worked at ChargePoint before the start of the Class Period through late October 2022, stated that starting in the second half of 2021, ChargePoint shipped empty charger frames to end-user customers without the internal components or charging modules installed, rendering the units unusable. Per FE-3, this practice was a direct attempt to minimize the financial repercussions of the backorder situation. FE-3 estimated that more than 20 to 30 empty frames were shipped nationwide. Each frame was valued at approximately $30,000, and each required two power modules valued at approximately $10,000 each. The decision to prematurely ship empty frames was made by Defendant Hughes and ChargePoint's Vice President of Revenue Operations, and FE-3 confirmed the decision was made from the top down so that revenue could

be recognized. FE-3 attended weekly sales meetings in the second half of 2021, led by the then Southeast Regional Director, Sales, where these issues were discussed. All of the information, including a report tracking the empty frames, should be available in Salesforce and was sent to ChargePoint's Vice President of Revenue Operations.

78. FE-3 said customers were not informed in advance that they would receive empty, non-functioning equipment. Per FE-3, when customers discovered the problem, the sales team, at the direction of the Regional Vice President of Sales or Vice President of Sales, advised customers to install the empty station on the ground so as to easily add the internal components later as soon as they were received. FE-3 added that sales personnel also advised customers to hold off paying invoices until all components arrived. Such a placation effectively acknowledged that the shipment of an empty frame did not constitute delivery of a complete, usable product. Despite this, ChargePoint recognized revenue upon shipment of the empty frames.

79. ***Wrong products shipped to recognize revenue (FE-2).*** According to FE-2, ChargePoint also shipped wrong product models to customers. For example, FE-2 said if a customer ordered a double-port charger and only single-port chargers were available, ChargePoint would ship the single-port charger, knowing the product would be returned. FE-2 noted that products with missing or incomplete parts were also shipped out, including charger "shells" without complete components, which only angered customers. Per FE-2, ChargePoint knew customers would ship back these incorrect or incomplete orders but used the opportunity to recognize revenue. As FE-2 stated: "This created a nightmare of accounting problems, invoicing, and returns, and made us look like idiots to the customers." FE-2 remembered that some of the products shipped included CT4000, 4010, 4025, and 4027 units, and stated that millions of dollars of product were returned every quarter by customers, in part, due to these sales practices. This shipping directive came from FE-2's supervisor, who was following orders from their supervisors (Hughes and/or Romano). FE-2 personally observed ChargePoint employees engage in this practice during the last three quarters of FE-2's tenure (July 2022, October 2022, and January 2023). After FE-2 left, FE-2 learned from FE-2's former colleagues who were still employed there that ChargePoint continued such sales practices through April 2024.

80. ***Corroboration from procurement (FE-4).*** FE-4, who worked in ChargePoint's purchasing/procurement department from before the Class Period through September 2023, corroborated these accounts. FE-4 heard "scuttlebutt" about wrong products being shipped to wrong customers or the wrong products being shipped to the right customers and some "bogus" orders being shipped out. FE-4 recalled consistently seeing one or two pallets of returned finished good material products sitting in the shipping department at the end of each month and every quarter since ChargePoint went public in 2021—an amount much more than usual. According to FE-4, products were from various customers, but FE-4 specifically recalled seeing return labels from Rexel Energy. When FE-4 asked about the high volume of returns during a meeting, management refused to answer FE-4's questions.

81. FE-4 added that Return Material Authorizations (RMAs) were required to be authorized by the sales department, and that orders that were shipped and/or returned were documented on a Materials Authorization Report, which noted when products were sent and why they were returned. FE-4 stated that the report was sent to Patricia Fagundas, Director Supply Chain.

### D. Channel Stuffing Through Resellers: ChargePoint Offloaded Products Before End Customers Needed Them, Through Coercion and Undocumented Side Deals That Distorted Reported Revenue, Violating ASC 606, Steps 1, 3, and 5

82. Throughout the Class Period, ChargePoint engaged in a systematic practice of pushing unwanted product to value-added resellers ("VARs") and distributors at the end of each quarter, pulling future-period revenue into the current quarter. This practice was facilitated by undocumented rebates, oral side deals, and threats to resellers who attempted to return unwanted product. The undocumented nature of these arrangements raised fundamental questions about whether a valid "contract" existed for purposes of ASC 606, Step 1, and whether a transaction price was determined pursuant to ASC 606, Step 3, because the actual terms of the transactions—including price concessions, rebates, and return rights—were not reflected in the purchase orders or ChargePoint's financial records. Furthermore, the practice violates Step 5, because where products that are sitting unsold in a channel partner's warehouse due to ChargePoint's coercion, or

software is activated without there being a "customer" that actually purchased or activated the software, the risks and rewards of ownership often have not truly shifted.

83. ***Forcing resellers to accept unwanted inventory (CW-1).*** CW-1 worked for a reseller that had ChargePoint as a client, and interacted with ChargePoint from before the Class Period through late 2023. CW-1 provided the most detailed account of the channel stuffing practices. According to CW-1, from 2021 to 2023, ChargePoint effectively forced resellers to take on more inventory than they needed every quarter, but in CW-1's experience, most forcefully in January and July of every year. Resellers like CW-1's employer agreed for two reasons:

84. First, ChargePoint offered generous rebates totaling millions of dollars to top-level management of CW-1's employer. According to CW-1, if their employer complained about the level of excess inventory, ChargePoint offered further deep discounts and the promises of a pipeline of buyers to purchase the inventory so that the reseller would continue to stock the product.

85. Second, resellers, including CW-1's employer, effectively had no choice based on ChargePoint's market power at the time. If resellers tried to return unwanted product, ChargePoint threatened the resellers and told them that ChargePoint would no longer sell to them if they insisted on returning the unwanted products, or ChargePoint would tell them that it will lower their discounts. Resellers did not want to take the chance that ChargePoint would follow through on this threat because ChargePoint was offering the most incentives in the country. ChargePoint did this over and over again to resellers.

86. ***Undocumented rebates and oral deal terms (CW-1).*** CW-1 stated that the rebates ChargePoint offered to CW-1's employer were not documented in purchase orders most of the time. According to CW-1, sometimes the payment terms were not in writing, and sometimes the shipment terms were not in writing. CW-1 agreed that not documenting terms in purchase orders was a form of accounting fraud. CW-1 said approvals and side deals would often be documented in emails and text messages, but many deals were not documented at all and were simply verbal. CW-1 stated that resellers are still waiting for rebate payments that ChargePoint owed and that have been owed for years.

87. ***Jackson personally participated in the undocumented deals (CW-1, FE-6).*** CW-1 stated that Jackson had to have known about this practice of offering undocumented rebates. Jackson had regular meetings with the CFO of CW-1's employer at least once per quarter. CW-1 was personally on five to ten calls between 2021 and 2023 where Jackson and CW-1's CFO discussed undocumented deals. CW-1's CFO would tell Jackson that ChargePoint's sales personnel—Brian McKinnon (former Electrical Distribution Channels Sales Manager), Adam Cook (former VP of Partnerships), and Davin Jader (Regional Vice President of North American Channel Sales)—promised him certain terms in these undocumented side deals. Jackson would say he had to verify this, and most of the time Jackson would approve the terms agreed to by ChargePoint. FE-6, a sales operations employee responsible for Salesforce due diligence, corroborated this: Jackson, as CFO, had to sign off on (or otherwise approve in writing) any additional discounts or deals beyond what was being offered as a promotion at the time via email or Chatter—the Salesforce messaging system used by ChargePoint during the Class Period.

88. ***Hughes directly participated in rebate structures (CW-1)***. CW-1 reported that Defendant Hughes directly participated in ChargePoint's rebate structures and partner programs. On one occasion, CW-1 recounted how Hughes sat down with CW-1's boss to talk about rebate structures, including with respect to certain customers/deals.

89. ***Hughes directly urged the sales team to close deals and have distributors take on more product than they needed, including deals involving $2-5 million each quarter (FE-7)***. FE-7, a channel manager for distributors from 2021 to 2024, confirmed that, throughout the Class Period, ChargePoint aggressively pushed distributors to take on more product than needed so that ChargePoint could meet its quarterly targets. FE-7 added that sometimes Defendant Hughes would get on calls and urge the sales team to do whatever they could to close deals. FE-7 recalled that the push involved $2 to $5 million every quarter.

90. FE-7 described a specific example involving Hyundai in late 2022/early 2023: ChargePoint approached a California reseller with an opportunity to provide Level 3 charging stations to Hyundai dealerships. ChargePoint told the reseller Hyundai was going to need many stations installed within a year and asked the reseller to take inventory. The reseller thus purchased

a "big buy" of stations from ChargePoint, excess stock that would retail for a few hundred thousand dollars. When Hyundai rolled back on the program because the ChargePoint stations could not be installed by a certain date, the reseller was stuck holding all the excess inventory, instead of ChargePoint. ChargePoint generally did not permit returns.

91. FE-7 also recounted that there were a lot of verbal handshake deals between ChargePoint and resellers throughout their tenure, creating confusion when ChargePoint's accounting tried to collect and resellers cited verbal terms. FE-7 said the cited verbal terms were agreed to by a specific electrical distribution channels sales manager at ChargePoint who reported to Defendant Hughes. The manager would then confirm he agreed to the specified terms, FE-7 added.

92. FE-8 confirmed that at quarter-end throughout their tenure, ChargePoint approached distributors and offered them significant incentives to order products for ChargePoint to meet its revenue targets.

93. ***Last-week-of-quarter "stink bombs" (FE-6).*** FE-6 stated that there were always end-of-quarter pushes to get distributors to take on as much product as possible so ChargePoint could meet its numbers. FE-6 said the amounts varied but FE-6 anticipated at least three to five "stink bombs"—large deals without the proper written documentation—being pushed through that last week of the quarter. FE-6 said these would be very large deals, upwards of $1 million each. FE-6 stated that many deals had documents attached but they would be for the wrong deal, or were expired contracts or the wrong contracts, or were not signed or signed incorrectly, with "crazy markings" on the documents. FE-6 said these deals also did not have the proper approvals and did not go through the stages in Salesforce. For example, FE-6 stated Key Deal Identifiers ("KDIs") that describe the deal or promotion that is being offered were supposed to be attached to the opportunity for the deal in Salesforce, which helps the order taker ensure that ChargePoint is in compliance, but many of these last-minute deals did not have them.

94. FE-6 stated there were specific leaders who were notorious for "stink bombs" and that there was a lot of skirting of processes and slamming things through at the very end of the quarter. FE-6 said the behavior continued even after deals were flagged for not having the required

written documentation. But FE-6 said a lot of managers told sales reps to "[j]ust do the deal" and would push it through and bypass all the systems to make the numbers.

95. ***The $10 million, 50% discount CPE 250 fire sale (FE-6).*** FE-6 provided a particularly significant example of a promotion that needed approval. In the third quarter of fiscal 2024 (summer 2023), Jackson and other C-suite executives approved a "summer promotion" in which three resellers purchased 400 to 500 CPE 250 chargers at a 50% discount, totaling $10 million. According to FE-6, the promotion was so exceptional that everyone up to the CEO had to approve it. FE-6 explained that the promotion took months of planning to execute, with discussions likely starting in as early as Q4 2022, because value-added resellers generally did not have the same amount of storage space as the large distributors. FE-6 stated the chargers were shipped to the resellers with the promise that dealerships would buy them in large quantities (*e.g.*, 20 units to this dealership, 75 to another), with all shipments to be completed by the end of the third quarter (October 2023). FE-6 said the only documentation for the deal was a really big spreadsheet that listed which units were going to be sold to which dealership. In reality, per FE-6, the dealerships were not even close to being ready to accept the charging stations because several of them were new dealerships that were still under construction. According to FE-6, about 75 percent of the dealerships were under construction, so they really were not ready to be sold. FE-6 said if the resellers had known that, they would not have agreed to hold those units in their storage facilities.

96. ***Contractors warehoused millions in inventory (FE-9).*** FE-9, a former Operations Manager throughout the Class Period, reported that during the Class Period, ChargePoint had contractors hold millions of dollars of inventory that customers were not ready to receive by promising these contractors the installation work when the time came. FE-9 stated this practice was in contrast with normal workflows, where a company does not ship out products until the customer is ready to install. Based on FE-9's experiences, FE-9 believes the practice went back to 2021. Upon information and belief, FE-9 affirmed that ChargePoint pushed these orders out the door to contractors' warehouses, several quarters before customers were actually ready to receive them, to bolster the Company's reported quarterly sales and revenue targets.

97. According to FE-9, FE-9 learned of these warehousing arrangements after the fact, sometime in 2023, when contractors complained to FE-9 that they were still holding inventory and were still waiting for the work they were promised.

98. For example, in mid-2023, FE-9 learned that one contractor had accumulated between $3 to $5 million in warehoused ChargePoint products over 14 to 16 months. FE-9 learned that the contractor had been sent products with no reference point for an actual sale or a customer.

99. ***The Larrenaga whistleblower corroboration.*** The practice of unloading unneeded inventory to resellers is further corroborated by Rachel Larrenaga, ChargePoint's former corporate counsel. As alleged in the state court proceeding *Larrenaga v. ChargePoint*, No. 22-cv-398534 (Cal. Super. Ct., Santa Clara Cnty.), Larrenaga began working at ChargePoint as Legal Counsel in 2016 and in 2020 was promoted to Vice President. *See* Second Amended Complaint ¶ 9, *Larrenaga v. ChargePoint*, No. 22-cv-398534 (Cal. Super Ct., Santa Clara Cnty., Mar. 26, 2024). As Vice President, Legal Counsel, Larrenaga "guided the legal department's attorneys through the handling of 90% of the revenue generating contracts at the Company, 100% of the product legal work, and 100% of the litigation as well as taking on other responsibilities that touched on financing, compliance, product management, and other roles." *Id.* ¶ 10.

100. Larrenaga alleged she was terminated in retaliation "for reporting potential legal issues or compliance concerns," including one "that is now part of an investigation by the Securities [and] Exchange Commission," just months before the Class Period. *Id.* ¶ 1. She further alleged that "[a]t multiple points during [her] employment … ChargePoint sales staff—as the end of a fiscal quarter was approaching—would deeply discount sales to channel partners in order for channel partners to take such sales, and allow ChargePoint to meet its quarterly revenue expectations. For example, sales staff would sometimes sell products to a channel partner at an unusually large discount right before the end of the fiscal quarter. In other instances, sales staff sold an unusually large amount of products right before the fiscal quarter ended, even though there was not enough customer demand to justify such large channel sales." *Id.* ¶ 37.

101. According to Larrenaga, these practices "tended to lead to a channel partner's holding excess inventory for long periods of time. This would sometimes result in partners'

attempting to return product as well." *Id.* She added that, "[b]y selling more products to channel partners than justified by customer demand, channel partners were left with excess inventory that languished for months." *Id.* ¶ 38.

102. Larrenaga reported that when she "learned about one particularly suspicious transaction involving channel seller Rexel USA," she raised concerns that "it was not clear if the end customer would actually end up buying the products being sold to Rexel." *Id.* ¶ 39. Larrenaga alleged that "[a]fter ChargePoint's auditor asked about the transaction, several ChargePoint officers pressured Ms. Larrenaga to write a memorandum justifying the transaction." *Id.* Larrenaga was terminated on June 4, 2021—just a few months before the Class Period. *Id.* ¶ 41.

103. Subsequent discovery disputes in the *Larrenaga* case implicate Defendants Jackson's and Hughes' past involvement in similar channel stuffing sales practices with the same large resellers as alleged here during the Class Period. In a motion to compel, Ms. Larrenaga sought production of documents concerning meetings and communications between Defendants Jackson and Hughes about a third-party distribution deal involving Long Beach Community College and Rexel Energy from 2019 to 2021. *See* Decl. of Anthong J. Tartaglio ISO Pl.'s Mot. to Compel at 114–119, *Larrenaga v. ChargePoint*, No. 22 cv 398534 (Cal. Super. Ct., Santa Clara Cnty., Apr. 4, 2024) (identifying specific requests for production). Ms. Larrenaga also requested documents reflecting communications from PricewaterhouseCoopers regarding the same Long Beach–Rexel deal. *Id.* The case settled one month after Ms. Larrenaga filed her motion to compel.

104. ChargePoint terminated Ms. Larrenaga as in-house counsel, allegedly in retaliation for her reporting legal and compliance concerns about the company's sales practices. According to Ms. Larrenaga, Defendant Jackson admitted at his deposition that he was involved in the decision to terminate Ms. Larrenaga's employment. MPA ISO Pl.'s Mot. to Compel at 4, *Larrenaga v. ChargePoint*, No. 22 cv 398534 (Cal. Super. Ct., Santa Clara Cnty., Apr. 4, 2024). Ms. Larrenaga's concerns, which were consistent with accounts from other FEs and CW-1 in this Complaint, strongly corroborate the misconduct alleged here. Such Pre-Class-period evidence of improper conduct by a defendant, including Ms. Larrenaga's account, reinforces the inference that the same wrongful practices persisted during the Class Period itself.

105. ***The channel remains stuffed years later (CW-1).*** The scale and durability of the undisclosed channel stuffing practice is confirmed by post-Class Period evidence. CW-1 learned in February 2025, from sources both within and external to ChargePoint, that one major reseller, Rexel, was still holding approximately $100 million of ChargePoint inventory it could not sell, and that another reseller, City Electric Supply, was still holding approximately $40 million of ChargePoint inventory that it could not sell. CW-1 further stated that at the time CW-1 spoke with counsel, ChargePoint is still paying off oral deals it made years ago and resellers are still waiting for rebate payments that ChargePoint owes that have been owed for years.

**E. Premature Software Token Activations: ChargePoint Activated Subscriptions for "Fictitious" Customers to Inflate Subscription Revenue, Violating ASC 606, Steps 1, 3, and 5**

106. In addition to the hardware revenue practices described above, ChargePoint inflated its subscription revenue by prematurely activating software tokens. ChargePoint's stated policy was to recognize subscription revenue on a "straight-line basis" beginning at the time subscriptions were activated. By activating tokens before any customer had actually purchased or used the associated products, ChargePoint pulled forward subscription revenue it was not entitled to recognize under ASC 606, Steps 1, 3, and 5.

107. ***Tokens assigned to "fictitious" customers (CW-1)***. CW-1 stated that ChargePoint required resellers to purchase the hardware, software, and services all at the same time. To recognize revenue early, at the end of the quarter ChargePoint assigned software tokens to "fictitious" customers—in the sense that they were not yet customers who had purchased or activated ChargePoint's products (although they were in the Salesforce system). CW-1 stated that ChargePoint's employees then entered these fictitious customers' information into the system that were not yet customers so that the Company could begin recognizing subscription revenue. According to CW-1, when chargers were eventually sold to or activated by other customers, the software tokens would be expired or in someone else's name, leading to upset customers. This practice began in or about January 2020 and continued with other resellers up through 2023.

108. According to CW-1, after the customer discovered the wrong token was installed, the customer would contact ChargePoint, which would then refer the matter to the distributor,

before the distributor would have to demand that ChargePoint reissue the pre-activated software token. CW-1 added that, often, the electrical distributor or electrical contractor would have to send out a technician again to finish the installation, sometimes costing the customers more money to get the station activated. CW-1 reported the process of assigning the correct token to the correct customer took several months.

109. CW-1 stated this practice continued with other resellers up through 2023, based on conversations with other reseller employees at conferences and industry events. According to CW-1, even now they get emails to activate charging stations, even though they no longer work for their reseller employer.

110. ***Material dollar amounts.*** CW-1 stated that ChargePoint made a material amount of service revenue from this practice. Services for Level 2 chargers cost approximately $2,400 for five years, paid up front with a 15% discount. For DC fast chargers, service revenue was all the way up to $25,000 per charger, and ChargePoint asked customers to pre-pay for those services.

111. Given the volume of chargers moved through the channel stuffing described in Section D, the aggregate subscription revenue recognized through premature token activations was material.

112. ***Executive knowledge (CW-1).*** CW-1 stated that Hughes knew about the premature token activation practice because Hughes gave out sales awards to employees who sold software tokens for charging stations that had not been activated yet. As a result of the award process, CW-1 believes Hughes was aware or recklessly disregarded that ChargePoint was putting software services in a company's name that did not actually do the deal.

113. CW-1 believed that Jackson was also aware through his sales operations team, because Jackson would have seen the delay in software activation; if software sales are high but activation is low, that would indicate that the software sales are not going to the current, active customers.

### F. The Aggregate Magnitude of These Practices Was Material to ChargePoint's Reported Financial Results

114. The five categories of practices described in subsections B through E above were not isolated or *de minimis*. They operated in combination, across multiple product lines and distribution channels, throughout every quarter of the Class Period. The aggregate magnitude was material when measured against ChargePoint's quarterly revenues, which ranged from $65 million to $152.8 million during the Class Period.

115. FE-1 was one member of a 24-person sales operation team, and FE-1 estimated that at least 10% of orders under FE-1's control between summer and fall of 2022 should not have been released for shipment. FE-2 stated that millions of dollars of product were returned every quarter by customers as a result of unauthorized or improper shipments. FE-7 recalled that ChargePoint pushed $2 million to $5 million of unneeded product to distributors every quarter. FE-8 described $1 million of product or more in unauthorized shipments to a single customer in one quarter of 2023, all of which were returned. FE-9 described a single contractor holding $3 to $5 million in warehoused ChargePoint products accumulated over 14 to 16 months, with no reference point to an actual sale or customer. CW-1 described tens of millions of dollars in unsaleable inventory warehoused with resellers—including, as of February 2025, approximately $100 million at Rexel and $40 million at City Electric Supply. FE-6 described a single fire-sale promotion totaling $10 million at a 50% discount, requiring CEO approval because it was exceptional.

116. These amounts were not trivial against quarterly revenues of $65 million to $152.8 million. To the contrary, they demonstrate that a material portion of ChargePoint's reported revenue during the Class Period derived from practices that violated GAAP and ChargePoint's own revenue recognition policy, and would not have been recognized as revenue had ChargePoint followed its stated policy. The practices described herein directly inflated the revenue figures.

## VII. HOW SUPPLY CHAIN DISRUPTIONS CATALYZED THE SCHEME—AND WHY THE EXCESS INVENTORY DOES NOT CONTRADICT THE SUPPLY CONSTRAINTS

117. This Section explains the relationship between ChargePoint's supply chain problems and the revenue inflation scheme described in Part VI. Understanding this relationship is

essential because Defendants publicly attributed their revenue growth in part to their purported ability to manage supply chain headwinds (*see* Part VIII), when in reality, to deal with the supply chain headwinds, Defendants employed *undisclosed* sales practices that violated GAAP and ChargePoint's own revenue recognition policy to mask the resulting revenue gap. This Section also explains why ChargePoint's supply constraints and its pushing of product shipments are not contradictory facts: the supply chain constraints motivated the improper revenue recognition practices and were the catalyst for ChargePoint over-ordering CPE 250 chargers that ultimately resulted in an excess supply once backlogs were cleared.

**A. ChargePoint Faced Genuine Supply Constraints on Specific Product Lines and Components Beginning in 2020 That Continued Throughout the Class Period**

118. ChargePoint's supply chain constraints were real. According to FE-2, a former Sales Manager, beginning in February 2020, the COVID-19 pandemic caused plant closures in Italy, where parts for certain fast chargers were manufactured by an Italian corporation called ABB. ABB was unable to ship stations from 2020 through 2023. Other products manufactured in Mexico (CT4000) were also delayed.

119. FE-3, a former East Region Account Executive, described a severe backlog of orders due to the COVID-19 supply chain issues that started in 2021 and rolled into 2022, finally getting caught up in late October when FE-3 departed. According to FE-3, suppliers were essentially trying to extort customers (ChargePoint and others) by offering to prioritize their orders to the front of the line if they paid more. ChargePoint was unwilling to pay more, resulting in a severe backlog of orders for the CPE 250 chargers.

120. FE-1, a former Sales Operations Specialist, similarly described how a backorder of charger orders occurred around early 2022, with a chip shortage being one of the key issues causing it in late 2021 and early 2022. The DC fast chargers also had issues where they were missing handles, which occurred in mid-2022. FE-1 stated that inventory and supply constraints persisted until they resigned in March 2023, especially for pre-orders to sites that were still under construction, but older ones were starting to be cleared out.

121. ChargePoint also compounded its supply problems by outsourcing manufacturing from the United States to Mexico in late 2019 and early 2020. According to FE-2, this outsourcing included the Level 2 AC chargers (CT4000), Level 3 DC chargers (CPE 250), and home charging units (CPH50s). FE-2 advised executives that outsourcing to Mexico was a bad idea and would create additional supply chain delays, adding three additional weeks, because ChargePoint would have to deal with cross-border issues such as trucking from Guadalajara and customs delays. FE-2's advice was not heeded. FE-2 stated that customs delays sometimes added four to six additional weeks of delay and that ChargePoint had difficulty fulfilling orders of charging stations manufactured in Mexico in all of 2021, 2022, and the first part of 2023.

122. The combined effect of these external and self-inflicted supply constraints was that ChargePoint could not fill customer orders properly and on time through legitimate business operations. As demand for EV charging infrastructure grew, the gap between the revenue guidance Defendants had given to investors and the revenue ChargePoint could actually generate through normal sales channels widened. Rather than disclose this gap, Defendants chose to bridge it through the five categories of improper practices described in Part VI.

123. Furthermore, as discussed in Section C below, the supply constraints, and ChargePoint's desire to have an inventory unmatched by any competitor, were also the catalyst for ChargePoint accumulating an excess amount of CPE 250s. These motivations are central to understanding why supply constraints, efforts to push product, and the creation of the excess inventory coexisted simultaneously.

**B. ChargePoint's Outsourcing of Accounts Payable to India Created a Self-Inflicted Supply Crisis That Worsened Every Year of the Class Period**

124. Separate from the external supply disruptions, ChargePoint's own decision to outsource its IT and accounts payable functions to India—a decision made by CFO Jackson's finance organization—created a progressively worsening supply crisis that was entirely self-inflicted. This evidence is significant. The self-inflicted supply constraints further motivated the improper revenue practices described in Part VI: the wider the gap between guidance and

deliverable revenue, the greater the pressure to bridge it through unauthorized shipments, incomplete product shipments, and channel stuffing.

125. ***The outsourcing decision and immediate fallout (FE-4).*** According to FE-4, who worked in ChargePoint's purchasing/procurement department from before the Class Period through September 2023, the outsourcing of IT and accounts payable to India (a decision made by ChargePoint executives, including Jackson) occurred in or about June 2020. FE-4 described it as the moment "all hell broke loose." Employees were not notified in advance; FE-4 learned of it literally overnight when FE-4 came to work and discovered they had lost access to the system. FE-4 said within two weeks of the outsourcing, problems arose with accounts payable not paying inventory and non-inventory bills on time. FE-4 added the supplier portal system that FE-4 had previously maintained was not properly maintained. When FE-4 complained about these problems within two weeks of the transition, FE-4 received a verbal warning. The second time FE-4 complained, FE-4 received a written warning. As FE-4 described the outsourced operation: "[T]hey were out of control and had no idea what they were doing." ChargePoint was not paying on time and not getting the parts they needed.

126. ***Unpaid invoices grew every year of the Class Period (FE-4).*** FE-4 provided a year-by-year accounting of the deterioration. The number of unpaid supplier invoices grew from approximately 600 in 2020, to 800 in 2021, to 1,600 in 2022, to 2,400 in 2023—a fourfold increase over three years, with the problem growing 50% to 100% every year. FE-4 stated that numerous suppliers did not want to continue conducting business with ChargePoint and that at least half of them started requiring payment in advance. The disorganization was systemic: after the outsourcing, invoices were duplicated and triplicated, payment accounts became jumbled, and payments were sent to wrong accounts, resulting in unpaid invoices. As FE-4 explained: "It's not like they didn't have the money to pay the bills, it was just that the accounts payable was so disorganized that bills did not get paid."

127. ***Specific suppliers placed credit holds (FE-4).*** The consequences were concrete and documented. According to FE-4, numerous suppliers placed credit holds on ChargePoint. DigiKey placed credit holds on ChargePoint at least three to four times in one year. Per FE-4, other

companies where ChargePoint lost credit terms or had credit holds placed included Arrow Electronics, SunPe, Edsas, Intertek, Powerhouse, Comemso Electronics GmbH, Vectrails, S.A de C.V., Reelcraft (Changzhou) Co., Ltd., McMaster-Car, and Farnell. ChargePoint's Amazon e-commerce account was shut down three times in 2022 for non-payment.

128. These were not abstract risks; they were realized supplier disruptions occurring during the Class Period that directly impaired ChargePoint's ability to procure the parts it needed to fill customer orders. In response, Defendants turned to the improper practices detailed in Part VI to bridge any gap between guidance and actual revenue it could generate.

129. ***Corroboration (FE-3).*** FE-3 confirmed that several departments were outsourced to India in or around June 2020, including accounts payable, receivables, and sales operations. FE-3 stated that the outsourcing led to delays in the sales process, requiring at least three-days processing time, which became a big concern when trying to get deals out at the end of the quarters.

130. Throughout the Class Period, FE-4 raised the accounts payable issue in regular weekly team meetings (virtually by Zoom) led by management and attended by all the buyers worldwide and contract managers. FE-4 repeatedly told management that the supply issue was more of an accounting department issue and a lack of establishing relationships with the suppliers. Despite these warnings, the problem with unpaid invoices was never remedied. It worsened every year.

### C. The Excess Inventory Was Concentrated in One Product—the CPE 250 DC Charger—That ChargePoint Over-Procured in a Failed Attempt to Get Ahead of Supply Constraints

131. The following section explains how ChargePoint accumulated a massive surplus of one specific product—its first-generation CPE 250 DC fast charger—and why it does not contradict the supply constraints.

132. ***ChargePoint over-ordered CPE 250s during the pandemic (FE-5, FE-3).*** FE-5, a sales employee responsible for major national fleet customers from late spring 2022 through early 2024, explained the origin of the CPE 250 surplus. According to FE-5, during the COVID-19 pandemic, ChargePoint executives saw an opportunity to capitalize on supply and demand issues and over-ordered the CPE 250 chargers, hoping to have an excess of inventory that no one else

would have. The strategy was to stockpile product while competitors faced the same supply constraints, positioning ChargePoint to fill orders that competitors could not.

133. But according to FE-3, the CPE 250 chargers had to be backordered and were behind at least four to six months through 2021 and got pushed into 2022, which led to an overstock in 2023. FE-3 said Senior ChargePoint leaders explained the backlog to the employees by saying that the suppliers were essentially trying to extort the Company by offering quicker delivery times if they paid more than their contracted prices, which they were unwilling to do.

134. ***The Express Plus and anticipated CPE 280 model killed CPE 250 demand (FE-5).*** ChargePoint compounded the over-procurement problem by having a superior product in its DC charging lineup—the Express Plus—which offered greater power output, a more versatile architecture, better scalability, and broader customer appeal. According to FE-5, salespersons in turn pushed the Express Plus over the CPE 250. According to FE-5, the market demand for the CPE 250 was further softened by ChargePoint's planned transition from the CPE 250 to its successor, the CPE 280. Because customers were aware that the CPE 250 was being discontinued, demand for the older model declined as the market awaited the release of the newer technology. FE-5 said the market demand softened, "inventory sat, and they got stuck with a lot of extra inventory." Beginning in January or February 2023, FE-5 participated in semi-weekly sales team calls where the excess supply of CPE 250s was discussed. Although executive defendants did not attend these calls directly, FE-5's understanding was that they were apprised of the discussions because the Senior Vice President for North America stated that they had to report the contents of the meeting to "Paq [Romano] and Michael [Hughes]."

135. ***The Hyundai and dealership assumptions that never materialized (FE-3).*** According to FE-3, part of the overstock was driven by assumptions about announced programs by Hyundai and Mercedes to install one-to-two charging stations at dealerships nationwide. For FE-3 alone, there were at least 60 dealerships in their sales area of responsibility. ChargePoint executives, including ChargePoint's former SVP of Operations and Support, assumed these type of programs would expand to city governments, utility companies, retailers, condominium complexes, et cetera. According to FE-3, it did not spread like they assumed and, as a result, they overbought and

undersold product. By 2023, customers were buying CPE 250s at clearance prices, and ChargePoint was offering it to Rexel at cost, a much lower margin than the other customers. FE-3 had separated from ChargePoint by 2023, but knew this information as FE-3 continued to work within the industry and had conversations with ChargePoint employees and their resellers.

136. ***The "first generation DC charging product" that suffered the $28 million impairment charge was the CPE 250.*** FE-3 and FE-5 both confirmed that the produced referenced in the September 6 announcement was the CPE 250.

137. ***ChargePoint failed to timely write down the CPE 250 inventory.*** ChargePoint's own publicly stated inventory policy—in ChargePoint's March 2021 Amended Prospectus—required that "[i]nventories are stated at the lower of cost or net realizable value" and that inventory levels be "written down to their net realizable value if they have become obsolete, have a cost basis in excess of expected net realizable value or are in excess of expected demand." The policy further specified that "[a]t the point of the loss recognition, a new, lower cost basis for those inventories is established[.]" Despite knowing by early 2023 that the CPE 250 inventory was obsolete and in excess of demand, ChargePoint did not begin writing down the inventory until September 2023—when it took a $28 million impairment charge described by the Company as addressing "legacy supply chain-related costs and supply overruns on a particular DC product." *See* Part IX.A. Two months later, ChargePoint took an additional $42 million impairment on the same product line, bringing total impairment charges to $70 million. *See* Part IX.C.

138. ***The $10 million, 50% discount fire sale confirms the timeline (FE-6).*** The evidence demonstrates that ChargePoint knew the CPE 250 inventory was overvalued well before September 2023. FE-6 confirmed that in the third quarter of fiscal 2024 (summer 2023), Jackson and other C-suite executives approved a "summer promotion" in which three resellers purchased 400 to 500 CPE 250 chargers at a 50% discount, totaling $10 million. According to FE-6, the promotion was so exceptional that everyone up to the CEO had to approve it and it took months of planning to execute, with negotiations likely starting as early as in Q4 of 2022. *See* Part VI.D. That ChargePoint was selling CPE 250s at 50% discounts months before taking its first impairment charge demonstrates that the "point of loss recognition" occurred no later than late 2022/early 2023,

when executives began planning the fire sale—not September 2023, when ChargePoint finally disclosed the write-down.

139. ***The delayed impairment had direct financial consequences.*** By carrying overvalued CPE 250 inventory on its books, ChargePoint overstated its reported inventory value and its gross margins throughout the first half of fiscal year 2024 (February through July 2023). When the impairments were finally taken, the effect was concentrated in two quarters rather than spread across the periods when the loss actually occurred, distorting the timing and magnitude of the financial impact.

### D. There Is No Contradiction Between Supply Constraints, Pushing Product Shipments, and Excess Inventory: The Supply Constraints Explain *Why* Defendants Engaged in the Revenue Inflation Scheme and Ultimately Acquired Excess Inventory They Failed to Timely Write-Off

140. ChargePoint's supply constraints simultaneously drove the premature and unauthorized shipment practices and shipment of incomplete or incorrect products and the accumulation of excess CPE 250 devices. These facts are not contradictory, but complementary, and explain Defendants' motivations during the Class Period.

141. ***First***, these constraints prevented ChargePoint from filling legitimate customer orders on time and created a revenue gap between Defendants' public guidance and what ChargePoint could actually deliver. As such, Defendants turned to improper revenue inflation practices. When ChargePoint could not build complete products in time, it shipped empty frames, wrong models, and products customers had not authorized—anything to recognize revenue by quarter-end (Part VI.B-C). In turn, ChargePoint offloaded product to resellers through undocumented deals and deep discounts, recognizing revenue on products that would sit unsold in distributor warehouses for years (Part VI.D). Tokens were prematurely activated for software in hardware that had been warehoused with resellers, inflating subscription revenue even though no end customer had actually paid for or activated the software (Part VI.E).

142. ***Second***, the accumulation of the excess inventory of CPE 250 chargers came about because of the supply constraints. Specifically, ChargePoint made a specific over-procurement decision during the pandemic that was supposed give ChargePoint an inventory advantage no other

competitor would have and position ChargePoint to fill orders others could not. By the time backlog orders were filled, there was an overstock of CPE 250 chargers in 2023. These chargers soon became obsolete in the face of ChargePoint's superior DC charger offering, the Express Plus, as well as the anticipated release of the next generation CPE 280.

143. What unified all of these practices was a single objective: maintaining the appearance that ChargePoint was delivering on the organic growth narrative Defendants had sold to investors. Each quarter, Defendants told analysts that revenue growth was driven by "strong execution," "strong demand," and effective supply chain management. *See* Part VIII. In reality, a material portion of that revenue was generated by practices that violated GAAP, would not have been recognized as revenue had ChargePoint followed its own stated policy, and were unsustainable—as the eventual $70 million in impairment charges, the 30% revenue shortfall, and the termination of both the CEO and CFO confirmed. *See* Part IX.

## VIII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD AND THE SPECIFIC FACTS RENDERING EACH STATEMENT FALSE AND MISLEADING WHEN MADE

144. Lead Plaintiffs allege that, without limitation, the statements highlighted in bold and italics within this Section were materially false, misleading, and omitted material information that should have been disclosed. Any other non-bolded and non-italicized language included in block quotes are meant to provide context for the alleged false and misleading statements and omissions.

145. Throughout the Class Period, Defendants made numerous statements concerning ChargePoint's financial results and attributing revenue growth to organic demand, strong execution, and effective supply chain management. Closer to the end of the Class Period, Defendants also made statements concerning ChargePoint's inventory levels. As set forth below, on a quarter-by-quarter basis, these statements were materially false and misleading when made because they concealed that a material portion of ChargePoint's reported revenue derived from the improper practices detailed in Part VI, and by at least April 3, 2023, ChargePoint's reported inventory figure was materially overvalued (Part VII.C). For each quarter, this Section identifies: (1) the specific false and misleading statements; (2) the specific contemporaneous facts, known to

Defendants, that rendered each statement false when made; and (3) the material information Defendants omitted.

**A. Q3 FY2022 (Quarter Ended October 31, 2021): Defendants Attributed 79% Revenue Growth to "Strong Q3 Execution" and Customer Demand While Concealing Improper Revenue Recognition Practices**

**1. The Statements**

146. The Class Period begins on December 7, 2021. On that day, ChargePoint issued a press release filed with the SEC on Form 8-K, which announced its financial results for the third quarter of the fiscal year 2022 ended October 31, 2021. The press release stated, in relevant part:

> ***ChargePoint has delivered another strong quarter***, as we have continued to scale our commercial, fleet and residential verticals across two continents," said Pasquale Romano, President and CEO of ChargePoint. "***The investments we have made over many years have enabled us to capture charging demand from customers preparing for an electric future. This quarter we added more customers at an accelerated rate,*** while also successfully closing two acquisitions.

147. ChargePoint further reported third quarter revenue of $65 million, an increase of 79% from $36.4 million in the prior year's same quarter. It also reported a quarterly gross margin of 25%, "up from 20% in the prior year's same quarter primarily as a result of product cost improvements and the impact of acquisitions."

148. In a December 7, 2021 earnings call hosted by Defendants Romano and Jackson, Defendant Romano promoted and highlighted ChargePoint's reported financial quarterly performance, attributing the "strong financial performance" to organic factors such ChargePoint's "strong Q3 execution," favorable EV market conditions, and customer demand for ChargePoint's products:

> I'll provide a business update, including details of our ***strong Q3 execution*** against plan before turning it over to Rex for financials. As I stated previously, ***our success is tied to the arrival of electric vehicles, and this quarter we saw continued momentum in EV sales in both the passenger and fleet categories.*** According to BloombergNEF, as many as 2.9 million electric vehicles are expected to be sold across North America and Europe this year, an increase of approximately 67% from 2020. And accordingly, ***we are seeing strong demand from auto dealers for charging infrastructure, an indicator that they are prepping for high volume EV sales***.

> Our strong financial performance throughout this year is the result of investments in a product and go-to-market strategy we have made over many years to be able to capture associated demand across commercial, fleet and residential verticals in both North America and Europe. Historically, our revenue has only been limited by a sufficient breadth of and quantity of vehicle options available to consumers and fleets. And this further reinforces that ChargePoint is the equivalent of an index for the electrification of mobility.
>
> Our Q3 revenue of $65 million was at the high end of the guidance range we provided on September 1. This positions us to raise our expectations for the fourth quarter and full year, despite what continues to be a dynamic supply chain environment.

149. Analysts asked Defendants Romano and Jackson what "the actual drivers of the revenue increase from last quarter" were and "[w]hat's kind of shaken out better than planned in the last quarter?" Defendant Jackson responded, "***New customer acquisition was super strong in the quarter and then the distribution of what they buy, again, consistent. So, it's just really good growth across the board***."

150. The analyst then asked Defendant Romano and Jackson whether given supply chain issues, there was a potential for the Company to prioritize the sale of products in stock to its customers, including ChargePoint's higher margin segments. Defendant Romano refuted this notion, assuring investors that ChargePoint's sales practice takes the long view with the customer, selling them the product they want today, and that the Company does not "financially engineer our margin":

> We tend not to. ***We don't financially engineer our margin***. And the reason is, our customer today is a customer for a very long time because of the re-buy nature of this. So, shaping is dangerous. We try to take all the business we can service, and obviously, inventory levels and lead times may impact our ability to win a deal in the future, who knows, but so far so good and not having an impact on things. But remember, a customer's initial buy is usually a fraction of their ongoing buys and you have a lot of time over the life of that customer to mature and evolve the product they need to buy today. So if they buy a product today that's under, say, supply chain pressure, well, you want that customer anyway, because most of the products they're going to buy is going to be well past when all of this clears.

151. **Analysts responded positively to the news.** On December 8, 2021, JP Morgan Research reported on ChargePoint's "solid results and guide with revenues exceeding expectations despite supply constraints …. ChargePoint is navigating supply chain issues well, in our view, with

a 2 percentage point impact to gross margin in F3Q (down from 3 PP in F2Q). While we see continued supply chain issues well-into FY23, ChargePoint should see an upward bias to gross margin as demand from Work customers improves and through the higher margin software businesses the team acquired." It further stated that "ChargePoint is a clear leader in the North American commercial Level 2 market with increasing emerging growth opportunities in DCFC in North America and in L2/DCFC in Europe. We anticipate ChargePoint driving significant growth over the next 5-10 years, with revenues outpacing the growth range of EVs in the US and Europe driven by new opportunities in commercial and fleet operations."[9]

**2. The Specific Contemporaneous Facts That Rendered These Statements False and Misleading When Made**

152. At the time Romano and Jackson made these statements, Defendants knew, or were deliberately reckless in not knowing, that a material portion of the $65 million in reported revenue and "strong financial performance" was not attributable to its investments, increased charging demand, adding new customers, "strong Q3 execution," favorable EV market conditions, or avoidance of "financial[] engineer[ing]," but instead derived from the undisclosed practices set forth in Part VI.

153. The following facts, drawn from the testimony of former employees and a confidential witness with personal knowledge of contemporaneous events, rendered Defendants' statements false and misleading:

154. **Shipping empty, unusable products to recognize revenue (FE-3).** FE-3, a former East Region Account Executive, stated that starting in the second half of 2021—encompassing the very quarter at issue—ChargePoint began shipping empty charger frames to end-user customers without the internal components or charging modules installed, rendering the chargers completely unusable. FE-3 estimated that more than 20 to 30 empty frames, each valued at approximately $30,000, were shipped nationwide. The decision to ship empty frames was made from the top down by Defendant Hughes and ChargePoint's Vice President of Revenue Operations so that revenue

[9] "ChargePoint: Solid Results and Guide with Revenues Exceeding Expectations Despite Supply Constraints," JPMorgan Research (Dec. 8, 2021).

could be recognized. FE-3 attended weekly sales meetings in the second half of 2021 where these issues were discussed. This practice violated ASC 606, Step 5, because ChargePoint did not transfer "control" of a functioning asset to the customer. *See* Part VI.C.

155. **Channel stuffing through resellers and distributors to pull forward revenue (CW-1, FE-7).** The channel stuffing was underway as of Q3 FY2022. CW-1, who worked for a reseller that had ChargePoint as a client, stated that from 2021 through 2023, ChargePoint effectively forced resellers to take on more inventory than needed every quarter, most forcefully in January and July of every year. CW-1 stated that ChargePoint offered undocumented rebates totaling millions of dollars to CW-1's employer's management to secure agreement, and that if resellers, including CW-1's employer, attempted to return unwanted product, ChargePoint threatened to cut off future sales or reduce their discount. According to CW-1, Jackson had to have known about this practice, as he had regular meetings with the CFO of CW-1's employer at least once per quarter. CW-1 was personally on five to ten calls between 2021 and 2023 where Jackson and CW-1's CFO discussed these undocumented deals. *See* Part VI.D.

156. Similarly, FE-7, a channel manager for distributors from 2021 to 2024, confirmed that by the start of the Class Period, ChargePoint was already pushing distributors to take on $2 million to $5 million in unneeded product every quarter to meet quarterly targets. FE-7 added that sometimes Defendant Hughes would get on calls and urge the sales team to do whatever they could to close deals. *See* Part VI.D.

157. Such practices violated ASC 606, Steps 1, 3, and 5. *See* Part VI.D.

158. **Premature software token activations creating false revenue (CW-1)**. CW-1 further recounted that, at the end of the quarter, ChargePoint assigned software tokens to "fictitious" customers—entities entered into ChargePoint's system who had not yet purchased or activated any products—so that the Company could begin recognizing subscription revenue. This practice began in or about January 2020 and continued up through 2023, thus covering Q3 2022. When chargers were eventually sold to or activated by other customers, the software tokens had often expired or were in someone else's name, leading to customer complaints. Hughes gave out sales awards to employees who sold tokens for charging stations that had not been activated. CW-1 believed that

Jackson was also aware through his sales operations team. This practice further violated ASC 606, Steps 1, 3, and 5. *See* Part VI.E.

**3. The Information Defendants Omitted to Make Their Statements Not Misleading**

159. Defendants were required to disclose the following omitted, material facts to make the above alleged statements not misleading: (a) that ChargePoint was shipping empty charger frames to recognize revenue on products customers could not use; (b) that ChargePoint was forcing resellers to accept unwarranted product with undocumented side deals and threatening those who tried to return it; and (c) that ChargePoint was activating software tokens for fictitious customers.

**B. Q4 FY2022 (Quarter Ended January 31, 2022): Defendants Claimed "Another Outstanding Quarter" With 90% Revenue Growth While Revenue Was Partially Derived from Unauthorized Shipments and Channel Stuffing**

**1. The Statements**

160. On March 2, 2022, ChargePoint issued a press release filed with the SEC on Form 8-K, which announced its financial results for the fourth quarter and full fiscal year 2022, ended January 31, 2022. The press release stated, in relevant part:

> ***ChargePoint delivered another outstanding quarter, exceeding the high end of both our quarterly and annual revenue guidance and advancing our technology leadership in our commercial, fleet and residential verticals across North America and Europe***," said Pasquale Romano, President and CEO of ChargePoint. "***We had numerous successes in our first year as a publicly traded company, including a 65 percent year over year increase in annual revenue, two strategic acquisitions, expansion of our activated port count by over 60 percent, and growing our team of world class talent.***

161. In the press release, ChargePoint reported fourth quarter revenue of $80.7 million, an increase of 90% from $42.4 million in the prior year's same quarter. It further reported "fourth quarter GAAP gross margin was 22%, up from 21% in the prior year's same quarter primarily due to the impact of acquisitions."

162. In a March 2, 2022 earnings call with analysts hosted by Defendants Romano and Jackson, Romano stated that "***[t]he investments we made over nearly 15 years set us up to capture the demand we are seeing today*** across commercial fleet and residential verticals in both North America and Europe. And these results further cement ChargePoint as the equivalent of an index

for the electrification mobility. ***Our strong performance and record revenue throughout the year was fueled by growth in charging demand from accelerated EV adoption***."

163. CFO Rex Jackson further stated that "Q4 revenue was $81 million, up 90% year-on-year, above our previously announced guidance range of $73 million to $78 million, and up 24% sequentially. ***We're particularly pleased with this performance given continuing supply chain challenges***. ***We've managed [this] well relative to our guidance commitments***."

164. Analysis applauded to this report and these statements. JP Morgan Research immediately raised its price target for ChargePoint from $20.00 to $22.00 per share, explaining:

> **Strong Revenue Growth & Investments to Support "Land and Expand"; Margin Headwinds to Abate – Remain [Overweight]**
>
> ChargePoint reported better than expected 4Q revenue on strong execution in the quarter amid persistent supply dislocations and exited the quarter with record levels of backlog. … ChargePoint has been managing the constrained environment well, in our view….[10]

165. Investors also responded favorably, as the price of ChargePoint stock immediately rose $0.97 per share, or 6.5%, from a close price of $14.07 per share on March 2, 2022, to $15.01 at close of market on March 3, 2022.

**2. The Specific Contemporaneous Facts That Rendered These Statements False and Misleading When Made**

166. At the time Romano and Jackson made these statements, Defendants knew, or were deliberately reckless in not knowing, that a material portion of the $80.7 million in reported revenue and its "outstanding quarter" was not attributable to "growth in charging demand" but instead derived from the undisclosed practices set forth in Part VI.

167. Furthermore, Jackson's claim to be "particularly pleased" with performance given "continuing supply chain challenges" and that ChargePoint had managed the supply chain challenges well omitted that ChargePoint was managing the lost business due to its supply constraints by engaging in improper sales and revenue recognition practices that were not disclosed.

---

[10] "ChargePoint : Strong Revenue Growth & Investments to Support "Land and Expand"; Margin Headwinds to Abate - Remain OW," JPMorgan Research (Mar. 3, 2022).

168. The following facts, drawn from the testimony of former employees and a confidential witness with personal knowledge of contemporaneous events, rendered Defendants' statements false and misleading:

169. **Shipping incomplete continued (FE-3).** FE-3 stated that the practice of shipping empty frames that began in H2 2021 continued into 2022, as the backlog of charger orders did not abate until late October 2022. *See* Parts VI.C and VII.A.

170. **Channel stuffing was most forceful in January (CW-1 and FE-7).** CW-1 stated that ChargePoint's pressure on resellers to accept unwanted inventory was most forceful in January and July of every year. Q4 FY2022 ended January 31, 2022, placing it squarely within this peak period. CW-1 stated that the undocumented rebates occurred between 2021 and 2023, which encompasses this quarter, and that Jackson had regular meetings with CW-1's employer's CFO at least once per quarter where these arrangements were discussed. CW-1 also was personally on five to ten calls between 2021 and 2023 where Jackson and CW-1's employer's CFO discussed these undocumented deals. *See* Part VI.D. FE-7 recalled that the push for distributors to accept $2–5 million in unwanted product happened every quarter, and sometimes Hughes would get on calls and urge the sales team to do whatever they could to close deals. *See* Part VI.D.

171. **Premature software token activations creating false revenue (CW-1)**. CW-1 stated that the practice of prematurely activating software tokens to begin recognizing subscription revenue that began in January 2020 continued up through 2023, thereby including this quarter. *See* Part VI.E.

### 3. The Information Defendants Omitted to Make Their Statements Not Misleading

172. Defendants were required to disclose the following omitted, material facts to make the above alleged statements not misleading: (a) the quarterly revenue figures reflected, in material part, improperly recognized revenue from incomplete shipments; (b) the channel stuffing was intensified at the end of this quarter; (c) undocumented side deals with resellers were being discussed by Jackson through oral conversations and approved outside normal documentation processes; and (d) software tokens were being prematurely activated for fictitious customers.

### C. Q1 FY2023 (Quarter Ended April 30, 2022): Defendants Attributed 102% Revenue Growth to Organic Factors While Revenue Was Derived in Part from Premature and Unauthorized Shipments of Incomplete Products

#### 1. The Statements

173. On May 31, 2022, ChargePoint issued a press release filed on Form 8-K which announced its financial results for the first quarter of fiscal year 2023, ended April 30, 2022. The press release stated, in relevant part:

> ***Positive first quarter results, despite expected significant headwinds due to global supply constraints, are a testament to the strength of our business***," said Pasquale Romano, president and CEO of ChargePoint.

174. ChargePoint reported first quarter revenue of $81.6 million, an increase of 102% from $40.5 million in the prior year's same quarter. It also reported 1Q GAAP gross margin of 15%, which was "down from 23% in the prior year's same quarter as newer, currently lower margin, products performed strongly relative to more mature, higher margin offerings, and due to supply chain disruptions, which affected both cost and supply availability."

175. In a May 31, 2022 earnings call, Romano emphasized the Company's year-over-year quarterly growth the Company's "remarkable" ability to overcome supply chain headwinds, exclaiming that "[o]ur operations team did a great job assuring supply this quarter to deliver our top line":

> ***We are happy to report that our first quarter revenue of $82 million exceeded the high end of the quarterly guidance provided on the last call***. ***Consistent with recent quarters, we performed well from a demand perspective across all verticals***, ***we achieved record growth in Europe with 67% sequential quarterly revenue growth, a great indicator that our strategy to establish ourselves as a leader in that geography is working.***
>
> ***Our year-over-year quarterly growth was 102%, and we grew sequentially from Q4 to Q1, beating the seasonal revenue decline we typically see between Q4 and Q1. Even more remarkable is we overcame supply chain headwinds to achieve that level of growth***. We remain steadfast in prioritizing assurance of supply amidst the challenging macro-environment. ***The increased inventory level on our balance sheet reflects our critical raw materials acquisition program. We are not accumulating finished product, having shipped what we could build during the quarter***.

176. On the earnings call, an analyst asked Defendants Jackson and Romano "what drove the revenue beat in the first quarter." Defendant Jackson responded by identifying all organic factors: "[F]leet was strong. Europe was strong. Home was strong, which is part of residential, obviously."

> From a numerical perspective, obviously, we did a little bit better than we expected. From a mix perspective, it's shifted even a little bit more in the direction it's [been] for the last two or three quarters, which is strongly in the direction of some of the [quarter] and fast-charging things that we're doing. Obviously, ***fleet was strong. Europe was strong. Home was strong***, which is part of residential, obviously. But some of the commercial was impacted by, first, supply, couldn't get it out the door, and also people aren't back to work yet. It wasn't meaningfully different than what we expected, it was just a slight product mix shift in a direction that you've seen over the last two quarters.

177. Analysts were receptive to the public statements. According to a June 1, 2022 report from Fox Advisors, ChargePoint's "Growth story [is] more than intact."

**2. The Specific Contemporaneous Facts That Rendered These Statements False and Misleading When Made**

178. At the time Romano and Jackson made these statements, Defendants knew, or were deliberately reckless in not knowing, that a material portion of the $81.6 million in reported revenue was not due to ChargePoint's "remarkable" ability to overcome "supply chain headwinds to achieve that level of growth" or organic factors like the "fleet," "Europe," and "home" being "strong," but instead derived from the undisclosed practices set forth in Part VI.

179. Romano's statement that ChargePoint was "not accumulating finished product, having shipped what we could build during the quarter" was also misleading because ChargePoint was shipping products it had not finished building—empty charger frames lacking internal components—precisely to avoid the appearance of inventory accumulation while recognizing revenue.

180. The following facts, drawn from the testimony of former employees and a confidential witness with personal knowledge of contemporaneous events, rendered Defendants' statements false and misleading:

181. **Unauthorized and premature shipments were accelerating (FE-3).** FE-3 stated the empty frame shipments continued through Q1 FY2023 (ended April 30, 2022), as the backlog of chargers did not abate until FE-3 left in late October 2022. *See* Parts VI.C and VII.A.

182. **Channel stuffing and software token practices continued (CW-1, FE-7).** CW-1 stated that the quarterly channel stuffing and software token activation practices described above continued through 2023, encompassing this period. Per CW-1, Jackson had to have known about this practice because Jackson had regular meetings with CW-1's employer's CFO at least once per quarter. CW-1 also was personally on five to ten calls between 2021 and 2023 where Jackson and CW-1's employer's CFO discussed these undocumented deals. FE-7 recalled that the push for distributors to accept $2–5 million in unwanted product happened every quarter, and sometimes Hughes would get on calls and urge the sales team to do whatever they could to close deals. *See* Parts VI.D–E.

#### 3. The Information Defendants Omitted to Make Their Statements Not Misleading

183. Defendants were required to disclose the following omitted, material facts to make the above alleged statements not misleading: (a) ChargePoint was shipping incomplete, non-functioning products specifically to recognize revenue it could not otherwise generate; (b) ChargePoint was "not accumulating finished product" in part because it was shipping unfinished product; (c) channel partners were being pressured to accept unneeded inventory with undocumented rebates; and (d) software tokens were being activated for fictitious customers.

### D. Q2 FY2023 (Quarter Ended July 31, 2022): Defendants Touted a "Strong Execution Quarter" with a "Major Milestone" of $100M+Revenue While Employees Were Directed to "Ship All Pending Orders" Regardless of Customer Readiness

#### 1. The Statements

184. On August 30, 2022, ChargePoint issued a press release filed with the SEC on Form 8-K, which announced its financial results for the second quarter of fiscal year 2023, ended July 31, 2022. The press release stated, in relevant part:

> ***ChargePoint delivered another strong quarter, with continued growth across all verticals and geographies***," said Pasquale Romano, President and CEO of ChargePoint. "***We continue to execute on our strategy, as demand continues to grow for our***

> ***portfolio of industry-leading charging solutions for every vertical and in both North America and Europe***.

185. ChargePoint reported second quarter revenue of $108.3 million, up 93% from $56.1 million in the prior year's same quarter. It further reported that "second quarter GAAP gross margin was 17%, down from 19% in the prior year's same quarter primarily due to supply chain disruptions, which affected both cost and supply availability as well as increasing new product introduction and transition costs."

186. Later, on August 30, 2022, Defendants Romano and Jackson hosted an earnings call with analysts. On the call, Defendant Romano emphasized the Company's revenues meeting the high end of their previous guidance and attributed the success to the Company's "strong execution" and EV market demand:

> ***I am pleased to report another strong execution quarter as we posted Q2 revenue of $108 million, above the high end of the guidance provided on our Q1 call. Notably, Q2 is our first $100 million quarter, another major milestone in the company's 15-year history.*** According to BloombergNEF, combustion vehicle sales peaked in 2017, and as we have said before, improvement in historic attach rates, ***our growth, closely tracks the arrival rate of vehicles***.
>
> As consumers embrace the transition to EVs at an accelerating rate, the future of this business is incredibly strong. ***Year-over-year revenue growth of 93% and sequential revenue growth of 33% continue to demonstrate the company's strength across verticals and geographies. We have improved gross margin from Q1 and realized the operating leverage as forecasted.***

187. Romano also emphasized how the Company was able to produce these results while effectively managing supply constraints, stating that "[r]esidential demand remains remarkably strong. Billings for residential were up over 125% from the second quarter of last year and a sequential increase of 11% versus the first quarter, ***the growth would have been significantly higher, if not for supply chain constraints.***"

188. In response, on August 31, 2022, Morningstar Equity Research raised its target price and reported as follows:

> We're raising our fair value estimate for no-moat ChargePoint to $14.50 per share from $13 following the company's second-quarter results. The drivers of the fair value estimate increase are higher long-term profitability and increased long-term revenue growth

> following recent policy tailwinds. At current prices, we view the shares as fairly valued.
>
> ChargePoint reported revenue of $108 million, above the high end of its guidance range. Non-GAAP gross margins of 19% represented sequential improvement from the 17% generated in the first quarter. For the full year, ChargePoint reiterated non-GAAP gross margin guidance of 22%-26%, with management pointing to the lower half.[11]

189. On this news, ChargePoint's stock surged, rising $1.78 per share, from a close price of $14.49 per share on August 30, 2022, to $16.27 per share at the close of market on August 31, 2022.

**2. The Specific Contemporaneous Facts That Rendered These Statements False and Misleading When Made**

190. At the time Romano and Jackson made these statements, Defendants knew, or were deliberately reckless in not knowing, that a material portion of the $108.6 million in reported revenue and report of a "strong quarter [] with continued growth" was not due to ChargePoint's "strong execution," "demand contin[uing] to grow," or "the company's strength across verticals and geographies." Rather, the revenue ChargePoint did report was inflated by improper practices described in Part VI.

191. In addition, Romano's claim that growth "would have been significantly higher if not for supply chain constraints" was misleading, as it falsely suggests that ChargePoint was achieving the reported revenue in the face of supply constraints through legitimate sales practices when in fact the revenue ChargePoint did report was inflated by improper undisclosed sales practices.

192. The following facts, drawn from the testimony of former employees and a confidential witness with personal knowledge of contemporaneous events, rendered Defendants' statements false and misleading:

193. **ChargePoint executives directed mass release of all queued orders (FE-1).** This quarter marks a critical inflection point. According to FE-1, a Sales Operations Specialist, between

[11] "Raising ChargePoint Fair Value Estimate to $14.50 on Improved Outlook; Shares Fairly Valued," Morningstar Equity Research (Aug. 31, 2022).

summer and fall of 2022 (which would have been late July/early August—the end of Q2 FY2023), ChargePoint's Vice President of Revenue Operations directed the sales operations team to ship all pending orders. Under this "heavy handed push," all orders in the Salesforce "queues" were released to NetSuite (the warehouse management system) to be shipped, regardless of customer readiness. FE-1 recalled that normally in any given week, FE-1 processed 20 to 45 orders totaling $200,000 to $500,000, but the end-of-quarter directive doubled or tripled the normal amount. FE-1 estimated that roughly $1 million to $5 million of product was released for shipment from FE-1's queue alone, and that at least 10% of these orders should not have been released for shipment as the customers were not prepared to receive them. FE-1 confirmed this directive had to be approved at the executive level, which would have been Michael Hughes or above, and that the finance department also had to be aware and approve so that revenue could be recognized for these shipments. This practice violated ASC 606, Steps 1, 3, and 5. *See* Part VI.B.

194. **Premature and unauthorized shipments and shipments of incomplete and wrong products resulted in millions in returns every quarter (FE-2)**. FE-2, a former Sales Manager employed through March 2023, stated that ChargePoint continued shipping charger shells without complete components, wrong product models, and products to customers who had not authorized delivery. Some of these on-hold and partial orders were shipped to vacant lots and construction sites, resulting in products being weather damaged, vandalized, or stolen, leading to huge write-offs. FE-2 stated that this "created a nightmare of accounting problems, invoicing, and returns" and that millions of dollars of product were returned every quarter. According to FE-2, the order to ship products came from FE-2's supervisor, who told FE-2 they were hesitant to issue this directive, but were following orders from their supervisors (which would have been Defendant Hughes and/or Romano). FE-2 specifically remembered these practices happening in the quarter ending in July 2022. These practices violated ASC 606, Steps 1, 3, and 5. *See* Part VI.B–C.

195. **Channel stuffing in peak July period (CW-1, FE-7).** CW-1 stated that July was one of the two months when ChargePoint's pressure on resellers to take on unneeded inventory, which occurred from 2021 to 2023, was most forceful. Q2 FY2023 ended July 31, 2022. Jackson also had regular meetings with CW-1's employer's CFO at least once per quarter where these

arrangements were discussed. CW-1 also was personally on five to ten calls between 2021 and 2023 where Jackson and CW-1's employer's CFO discussed these undocumented deals. FE-7 recalled that the push for distributors to accept $2–5 million in unwanted product happened every quarter, and sometimes Hughes would get on calls and urge the sales team to do whatever they could to close deals. *See* Part VI.D.

196. **Premature software token activations creating false revenue (CW-1)**. CW-1 stated that the practice of prematurely activating software tokens to begin recognizing subscription revenue that began in January 2020 continued up through 2023, including this period. *See* Part VI.E

### 3. The Information Defendants Omitted to Make Their Statements Not Misleading

197. Defendants were required to disclose the following omitted, material facts to make the above alleged statements not misleading: (a) management had issued a specific directive to ship all pending orders regardless of customer readiness in order to meet revenue targets; (b) this directive doubled or tripled the normal volume of FE-1's end-of-quarter shipments, who was one of 24 members of a sales specialist team and at least 10% of FE-1's orders should not have been released; (c) millions of dollars of product were being returned every quarter as a direct result of these improper shipping practices; (d) channel partners were being pressured to accept unneeded product in what CW-1 identified as a peak pressure month; and (e) software tokens were being activated for fictitious customers.

## E. Q3 FY2023 (Quarter Ended October 31, 2022): Defendants Celebrated "Record" Revenue of $125.3 Million While Continuing to Push $2–5 Million Per Quarter in Unneeded Product to Distributors

### 1. The Statements

198. On December 1, 2022, ChargePoint issued a press release, which announced its financial results for the third quarter of fiscal year 2023, ended October 31, 2022. The press release stated, in relevant part:

> ***ChargePoint delivered another quarter of growth exceeding 90% year-over-year, as we continue to scale the business to meet strong demand for our solutions across North America and Europe,"*** said Pasquale Romano, President and CEO of ChargePoint.

199. ChargePoint reported third quarter revenue of $125.3 million, up 93% from $65.0 million in the prior year's same quarter.

200. In a December 1, 2022 earnings call with analysts, Romano emphasized the Company's 93% year-over-year revenue growth and the fact that its revenue growth "continues to be correlated with the availability of electronic vehicles":

> ***We had another record quarter, with strong growth yielding $125 million in revenue, at the low-end of our guidance range, up 93% year-over-year and 16% sequentially.***
>
> ***
>
> As we have commented previously, ***we have invested ahead of the market for many years, and our revenue growth has been and continues to be correlated with the availability of electric vehicles***.

201. During the call, Defendant Romano highlighted that the Company has seen a steady increase in the number of bookings exceeding $1 million within a quarter, which Romano claimed was a reinforcing trend supporting ChargePoint's land-and-expand strategy:

> ***A useful growth indicator in this area is the number of bookings in a quarter that exceed $1 million.*** Last year, we averaged one booking over $1 million per quarter. ***This year, we have seen steady increases in the number of bookings exceeding $1 million within a quarter, which is a reinforcing trend supporting our land-and-expand strategy. In the third quarter alone, we had 11 bookings to end customers of over $1 million.***

202. During the call, CFO Rex Jackson further stated that "we have supply chain constraints, ***but our growth rate is fairly astounding***, ***so, I think we're banging through this pretty well***."

203. In response, on December 2, 2022, Oppenheimer & Co. reported as follows:

> Given CHPT delivering on the low end of its range as component availability limited revenue, we are encouraged by several elements of CHPT's results. … CHPT indicated important signs of growth in key commercial vehicle markets, notably last-mile delivery and transit. As we rationalize our PT to $26 (from $40) driven by a lower multiple to reflect current equity risk premiums, we note our estimates are essentially unchanged as we see the company executing well against a compelling opportunity set.[12]

---

[12] "CHPT: Solid Performance; Adjusting PT in Line with Current Risk Premiums," Oppenheimer & Co. (Dec. 2, 2022).

### 2. The Specific Contemporaneous Facts That Rendered These Statements False and Misleading When Made

204. At the time Romano and Jackson made these statements, Defendants knew, or were deliberately reckless in not knowing, that a material portion of the $125.3 million in reported revenue was not attributable to ChargePoint's "scal[ing] the business to meet strong demand," a "correlat[ion] with the availability of electric vehicles," or a "reinforc[ement]" of its "land-and-expand strategy." Rather, the revenue ChargePoint did report was inflated by the improper practices described in Part VI.

205. Moreover, Jackson's assurance that ChargePoint was "banging through" the supply chain constraints "pretty well" was materially misleading because it omitted that a material portion of the revenue growth Jackson emphasized as "fairly astounding" was generated not by legitimate sales execution but by the five categories of improper practices identified in Part VI. Further, while Jackson disclosed a supply constraint challenge, he failed to disclose the fraudulent means by which Defendants concealed the supply constraint challenge's impact on financial results.

206. Romano's citation of 11 bookings exceeding $1 million as a "reinforcing trend" was misleading because large end-of-quarter deals upwards of $1 million were routinely "stink bombs"—deals pushed through without proper written documentation. Romano's presentation of these bookings as organic demand masked the reality that a material portion of these deals were the product of the channel stuffing scheme.

207. The following facts, drawn from the testimony of former employees and a confidential witness with personal knowledge of contemporaneous events, rendered Defendants' statements false and misleading:

208. **The ship-all-pending-orders directive, as well as shipments of incomplete or incorrect products, continued through fall 2022 (FE-1, FE-2).** FE-1's testimony that the directive to release all queued orders came between summer and fall of 2022 and would encompass orders shipped in Q3 FY2023 (ending October 31, 2022). FE-2 specifically remembered that the shipment practices, including unauthorized shipments and shipments of incomplete and incorrect products, continued through the quarter ending October 2022. *See* Part VI.B-C.

209. **Channel stuffing and software token practices continued (CW-1, FE-7).** CW-1 stated that the quarterly channel stuffing and software token activation practices described above continued through 2023, encompassing this period. Jackson also had regular meetings with CW-1's employer's CFO at least once per quarter where these arrangements were discussed. CW-1 also was personally on five to ten calls between 2021 and 2023 where Jackson and CW-1's employer's CFO discussed these undocumented deals. FE-7 recalled that the push for distributors to accept $2–5 million in unwanted product happened every quarter, and sometimes Hughes would get on calls and urge the sales team to do whatever they could to close deals. FE-7 further described a specific example involving Level 3 charging station stock offloaded to a California reseller in late 2022/early 2023 for a Hyundai program that ultimately fell through, leaving the reseller stuck holding all the excess inventory. *See* Parts VI.D–E.

210. **$1 million-plus bookings were not evidence of organic demand (FE-6).** FE-6, who worked in the Sales Operations segment throughout the Class Period, anticipated at least three to five "stink bombs" in the final week of each quarter—deals upwards of $1 million each pushed through without proper documentation, whether it was the wrong deal, expired contracts or the wrong contracts, or documents that were not signed or signed incorrectly. *See* Part VI.D.

**3. The Information Defendants Omitted to Make Their Statements Not Misleading**

211. Defendants were required to disclose the following omitted, material facts to make the above alleged statements not misleading: (a) the directive to release all queued orders regardless of customer readiness was still in effect during this quarter; (b) unauthorized shipments and shipments of incomplete and incorrect products continued this quarter; (c) $2–5 million per quarter in unneeded product was being pushed to distributors; (d) channel partners were being pressured to accept unneeded products and warehouse them with undocumented rebates; (e) software tokens were being activated for fictitious customers; (f) large quarter-end bookings cited as evidence of organic demand were, in at least some instances, improperly documented "stink bomb" deals; and (g) ChargePoint was offloading excess Level 3 charger inventory to resellers based on promises of future programs that had not materialized.

### F. Q4 FY2023 (Quarter Ended January 31, 2023): Defendants Reported Annual Revenue of $468 Million, a 94% Y/O/Y, While the Revenue Inflation Scheme Continued

#### 1. The Statements

212. On March 2, 2023, ChargePoint issued a press release filed with the SEC on Form 8-K, which announced its financial results for the fourth quarter and full fiscal year 2023 ended January 31, 2023. The press release stated, in relevant part:

> ***ChargePoint delivered its largest sequential revenue growth to date and another record quarter, although below our guidance range as supply challenges for our DC solutions and quarter end shipment challenges at this growth rate persisted***," said Pasquale Romano, President and CEO of ChargePoint. "***We continued to extend our technology and market leadership position across North America and Europe this year while driving 94% year-over-year growth and delivering improving gross margin and better operating expense leverage as we progress toward profitability.***

213. ChargePoint reported fourth quarter revenue was $152.8 million, up 93% from $79.3 million in the prior year's same quarter. For the full year, revenue was $468.1 million, an increase of 94% from $241.0 million in the prior year. In addition, "fourth quarter GAAP gross margin improved sequentially to 22%, but was flat to the prior year's same quarter." Full year GAAP gross margin was 18%, down from 22% in the prior year.

214. In response, on March 3, 2023, Needham & Co. reported as follows:

> We reinstate coverage of CHPT with a Buy rating and a $14 target. We view CHPT's market leadership position in EV charging and improving margins as compelling when considering the likely backdrop of high industry growth as US EV penetration grows.[13]

#### 2. The Specific Contemporaneous Facts That Rendered These Statements False and Misleading When Made

215. At the time Romano and Jackson made these statements, Defendants knew, or were deliberately reckless in not knowing, that a material portion of the $152.8 million in reported 4Q FY2023 revenue and $486.1 million in FY 2023 revenue, which amounted to the "largest sequential revenue growth to date and another record quarter," was not due to ChargePoint's strategic

---

[13] "Fully Charged, Reinstate Coverage With a Buy, $14 Target," Needham & Co. (Mar. 3, 2023).

execution and growing organic demand, but was rather derived from the undisclosed practices set forth in Part VI.

216. In addition, the "quarter end shipment challenges" Romano referenced would have had a greater negative impact on reported revenue but for ChargePoint's practice of rushing premature, unauthorized, and incomplete shipments out the door. *See* Part VI.

217. The following facts, drawn from the testimony of former employees and a confidential witness with personal knowledge of contemporaneous events, rendered Defendants' statements false and misleading:

218. **The improper shipment and revenue recognition practices continued (FE-2, FE-8).** FE-2 specifically remembered that the shipment practices, including unauthorized shipments and shipments of incomplete and incorrect products, occurred in Q4 FY2023, ending January 31, 2023. FE-8, a sales operation employee, stated that complaints about unauthorized orders occurred frequently, including in late 2022, which falls within Q4 FY2023. *See* Part VI.B.

219. FE-8 also reported the existence of "Hold for Release" orders—orders for products that customers were not ready to receive—that allowed ChargePoint to claim the orders as revenue even though the client had not paid for or received the product. FE-8 said these orders were also known as "booked but not billed" orders. Such orders were readily identifiable in Salesforce. FE-8 knew that ChargePoint was claiming the Hold for Release orders as revenue because FE-8 would go over booked and billed figures at sales operations meetings. *See* Part VI.B.

220. **Channel stuffing in peak January period and continued premature software activation (CW-1 and FE-7).** From 2021 to 2023, January was one of the two peak months for channel stuffing pressure, per CW-1, and the undocumented rebates and side deals continued. CW-1 was personally on five to ten calls between 2021 and 2023 where Jackson and CW-1's employer's CFO discussed these undocumented deals. Jackson also had regular meetings with CW-1's employer's CFO at least once per quarter. FE-7 similarly recalled that the push for distributors to accept $2–5 million in unwanted product happened every quarter, and sometimes Hughes would get on calls and urge the sales team to do whatever they could to close deals. CW-1 also stated the

software token activation practices described above continued up through 2023, which includes this quarter. *See* Part VI.D-E.

**3. The Information Defendants Omitted to Make Their Statements Not Misleading**

221. Defendants were required to disclose the following omitted, material facts to make the above alleged statements not misleading: (a) unauthorized shipments and shipments of incomplete and incorrect products continued this quarter; (b) the existence of "Hold for Release" orders by which ChargePoint would claim the orders as revenue even though the client had not paid for or received the product; (c) $2–5 million per quarter in unneeded product was being pushed to distributors; (d) channel partners were being pressured to accept unneeded inventory with undocumented rebates; and (e) software tokens were being activated for fictitious customers.

**G. Defendants' False Statements Associated with the Announcement of ChargePoint's FY 2023 Financial Results**

**1. The Statements**

222. On April 3, 2023, ChargePoint released its annual 10-K for Fiscal Year 2023. In its submission, ChargePoint repeated total FY2023 financial results.

223. In addition, the 10-K for Fiscal Year 2023 reported ChargePoint's inventory as valued at $39.4 million:

> The change in operating assets and liabilities was mainly driven by increases in accounts receivable of $94.6 million, ***inventory of $39.4 million***, prepaid expenses and other assets of $38.0 million and operating lease liabilities of $5.0 million, offset by increases in deferred revenue of $51.8 million, accounts payable of $31.5 million and accrued and other liabilities of $29.4 million.

**2. The Specific Contemporaneous Facts That Rendered These Statements False and Misleading When Made**

224. ChargePoint's repeated total FY 2023 financial results were false and contained the same omissions as stated in Part VIII.F.

225. The reported $39 million in inventory was also materially misleading given the CPE 250 overstock, and the lack of any write-down of the obsolete CPE 250 charger. By the time Defendants announced this figure, executive leadership was discussing a 50% discount for the CPE 250 chargers, a promotion that was so exceptional that it would need the approval of Romano, the

CEO. Defendants therefore failed to disclose to investors: (1) the Company was experiencing higher component costs and supply overruns for first generation DC charging products; (2) that, as a result, the Company was likely to incur impairment charges; and (3) that, as a result of the foregoing, the Company's profitability would be adversely impacted. *See* Part VII.C.

226. The following facts, drawn from the testimony of former employees and a confidential witness with personal knowledge of contemporaneous events, rendered Defendants' statements false and misleading:

227. **The improper shipment and revenue recognition practices continued (FE-2, FE-8).** FE-2 specifically remembered that the shipment practices, including unauthorized shipments and shipments of incomplete and incorrect products, occurred in Q4 FY2023, encompassing the end of FY2023. FE-8 stated that complaints about unauthorized orders occurred frequently, including in late 2022, which falls within the end of FY2023. FE-8 also knew that ChargePoint was claiming the Hold for Release orders as revenue because FE-8 would go over booked and billed figures at sales operations meetings. *See* Part VI.B.

228. **Channel stuffing in peak January period and continued premature software activation (CW-1 and FE-7).** From 2021 to 2023, January (*i.e.*, the end of FY2023) was one of the two peak months for channel stuffing pressure, per CW-1, and the undocumented rebates and side deals continued. CW-1 was personally on five to ten calls between 2021 and 2023 where Jackson and CW-1's employer's CFO discussed these undocumented deals. Jackson also had regular meetings with CW-1's employer's CFO at least once per quarter. FE-7 similarly recalled that the push for distributors to accept $2–5 million in unwanted product happened every quarter, and sometimes Hughes would get on calls and urge the sales team to do whatever they could to close deals. CW-1 also stated that the software token activation practices described above continued up through 2023, which includes the end of FY2023. *See* Part VI.D-E.

229. **CPE 250 overstock was a known problem; fire-sale planning underway (FE-5, FE-6).** By the end of FY2023, ChargePoint knew it was sitting on a massive surplus of CPE 250 DC chargers. According to FE-6, the 50% discount promotion on CPE 250s—ultimately totaling $10 million—took months of planning to execute, with discussions likely starting as early as in Q4

of 2022. FE-5, an employee responsible for major national fleet customers, stated that beginning in January or February 2023, semi-weekly sales team calls were held discussing the excess supply of CPE 250s, and FE-5's understanding was that Defendants Romano and Hughes were apprised of these discussions. Despite this knowledge, ChargePoint did not write down the CPE 250 inventory as required by its own inventory policy. *See* Part VII.C.

#### 3. The Information Defendants Omitted to Make Their Statements Not Misleading

230. Defendants were required to disclose the following omitted, material facts to make the above alleged statements not misleading: (a) unauthorized shipments and shipments of incomplete and incorrect products continued at the end of FY2023; (b) the existence of "Hold for Release" orders by which ChargePoint would claim the orders as revenue even though the client had not paid for or received the product; (c) $2–5 million per quarter in unneeded product was being pushed to distributors; (d) channel partners were being pressured to accept unneeded inventory with undocumented rebates; (e) software tokens were being activated for fictitious customers; and (f) ChargePoint knew it had tens of millions of dollars of obsolete CPE 250 inventory requiring write-down under its own inventory policy, which would materially impact profitability.

### H. Q1 FY2024 (Quarter Ended April 30, 2023): Defendants Stated They Were "Well Past the Worst of It" on Inventory Management Issues While the CPE 250 Overstock Remained Unimpaired

#### 1. The Statements

231. On June 1, 2023, ChargePoint issued a press release filed on Form 8-K with the SEC, which announced its financial results for the first quarter of fiscal year 2024, ended April 30, 2023. ChargePoint reported first quarter revenue of $130.0 million, up 59% from $81.6 million in the prior year's same quarter. First quarter GAAP gross margin was 23%, up from 15% in the prior year's same quarter. The press release stated, in relevant part:

> ***ChargePoint delivered strong results in the first quarter, growing at nearly 60% year-over-year***. ***We focused on delivering our broad portfolio of charging solutions across North America and Europe, while continuing to improve gross margins, and managing operating expenses***," said Pasquale Romano, President and CEO of ChargePoint. "***The positive first quarter results are a testament to***

> ***the strength and diversity of our business***. As the only charging network to operate across all verticals in North America and Europe, we believe we remain well positioned to take advantage of the inevitable long-term growth opportunity ahead.

232. On June 1, 2023, Defendants Romano and Jackson hosted an earnings call with analysts. During the call, Defendant Romano emphasized ChargePoint's "strong first quarter" that included $130 million revenue at the high end of ChargePoint's previous guidance range in face of a challenging macroeconomic environment:

> ***We delivered a strong first quarter. Revenue was at the high end of our guidance range at $130 million, and non-GAAP gross margin sequentially improved 2 points to 25%. To put these results into perspective, we achieved a 59% year-over-year growth rate in the first quarter and had the second largest quarter in ChargePoint's history.*** We did that while the EV installed base in North America and Europe are still in single-digits and the EV market is only at the beginning of a decades-long growth cycle. We also achieved this growth in the midst of a challenging macroeconomic environment. ***Diversification across verticals and geographies continues to contribute resilience to our business***. ***So, while we saw less growth in North American commercial and residential than we would have liked due to what we believe is a delay in discretionary purchases, we continue to see overall growth and margin improvement.***

233. On the earnings call, an analyst asked Defendants about the impact of supply chain issues on ChargePoint's first quarter results and how it may affect ChargePoint's shipment targets for the balance of the year. In response, Defendant Jackson explained that the Company had made significant progress over the last year in addressing these issues and is well past the worst of the impact on inventory:

> ***I think I actually said in prior calls, geez, I'd love to build some inventory, right? Because we've had to leave business on the table in prior quarters and backlog got out of whack, everything else. So we're back to a nice rhythm now I think from a build perspective[.] [A]s you can imagine, there are some prior deals that we had to cut to get supply that's now sitting in inventory***.
>
> So, you won't see 100% of the supply chain impact disappear overnight. We [] obviously have to work that through [] inventory and sell that through. But I would say from an operational perspective, logistics are pretty much back to normal, which is a real-time [thing, you either pay it] or you don't. And then the supply chain thing also back to a really good place. ***So, once we work through any existing inventory that had those higher prices previously [we'll] be hitting our stride. [] [B]ut I think it's fair to say that we are well past the worst of it***.

234. On June 1, 2023, Finbold reported the overall positive coverage ChargePoint had received thus far from securities analysts, stating that "ChargePoint is well-positioned to tackle the ever-growing demand for EV charging stations…. Meanwhile, 23 analysts offered their views on CHPT in the past three months, giving it a consensus rating of 'buy.' This is based on 17 financial experts seeing the stock as a 'strong buy,' 5 believing it is a 'hold,' while only 1 rated it as a 'strong sell.'"[14]

**2. The Specific Contemporaneous Facts That Rendered These Statements False and Misleading When Made**

235. At the time Romano and Jackson made these statements, Defendants knew, or were deliberately reckless in not knowing, that a material portion of the $130.0 million in reported Q1 FY2024 revenue and the "strong" results and first quarter were not attributable to the "strength and diversity of [ChargePoint's] business," but was rather derived from the undisclosed practices set forth in Part VI.

236. Jackson's "well past the worst of it" statement regarding inventory management was demonstrably false, given the CPE 250 overstock, and the lack of any write-down of the obsolete CPE 250 charger. By the time Jackson made this statement, executive leadership was discussing a 50% discount for the CPE 250 chargers, a promotion that was so exceptional that it would need the approval of Romano, the CEO. The existence of this promotion demonstrates that at the time of Jackson's statement, Defendants knew the CPE 250 inventory problem was far from over, and failed to disclose to investors: (1) the Company was experiencing higher component costs and supply overruns for first generation DC charging products; (2) that, as a result, the Company was likely to incur impairment charges; and (3) that, as a result of the foregoing, the Company's profitability would be adversely impacted. *See* Part VII.C.

237. The following facts, drawn from the testimony of former employees and a confidential witness with personal knowledge of contemporaneous events, rendered Defendants' statements false and misleading:

---

[14] "3 battery stocks to keep on your watchlist in June, 2023," *Finbold* (June 1, 2023), available as of July 19, 2024 at https://finbold.com/3-battery-stocks-to-keep-on-your-watchlist-in-june-2023/.

238. **Improper revenue practices continued through Q1 FY2024 (FE-2, FE-8, CW-1, FE-7 FE-9)**. FE-2 specifically remembered the improper premature shipment practices and shipment of incomplete and incorrect products were ongoing through their departure in March 2023, a period that covers the majority of Q1 FY2024. FE-8 similarly stated that complaints regarding unauthorized shipments occurred frequently, perhaps every quarter. FE-8 estimated, that for at least one customer in a single quarter in 2023, early release of orders involved $1 million of product or more over a series of orders, which were later returned.

239. FE-8 also knew that ChargePoint was claiming the Hold for Release orders as revenue because FE-8 would go over booked and billed figures at sales operations meetings.

240. CW-1 stated that channel stuffing and premature software activation continued through 2023, which would include this quarter. CW-1 was personally on five to ten calls between 2021 and 2023 where Jackson and CW-1's employer's CFO discussed these undocumented deals. Jackson also had regular meetings with CW-1's employer's CFO at least once per quarter. FE-7 similarly recalled that the push for distributors to accept $2–5 million in unwanted product happened every quarter, and sometimes Hughes would get on calls and urge the sales team to do whatever they could to close deals. Finally, FE-9 reported that ChargePoint had contractors hold millions of dollars of inventory that customers were not ready to receive by promising the contractors the installation work when the time came. Upon information and belief, FE-9 affirmed that ChargePoint pushed these orders before customers were actually ready to receive them to bolster the Company's reported revenue targets. FE-9 stated that they learned in mid-2023 that a contractor had accumulated between $3 to $5 million in warehoused ChargePoint products over the preceding 14-16 months. FE-9 learned that the contractor had been sent products with no reference point for an actual sale or customer. *See* Parts VI.B–E.

241. **Inventory problems were prevalent (FE-3, FE-5, FE-6).** Beginning in January or February 2023, FE-5 participated in semi-weekly sales team calls where discussions regarding the CPE 250 overstock were held. FE-5 understood the contents of these meetings were reported to Romano and Hughes. FE-6 similarly explained that the $10 million fire-sale discount promotion was in advanced planning stages, having likely been started in Q4 2022. According to FE-6, the

promotion was so exceptional that everyone up to the CEO had to approve it. Finally, FE-3 said the CPE 250s were sold at clearance prices in 2023, yet the CPE 250 inventory had still not been written down. *See* Part VII.C.

**3. What Defendants Omitted**

242. Defendants were required to disclose the following omitted, material facts to make the above alleged statements not misleading: (a) unauthorized shipments and shipments of incomplete and incorrect products continued in Q1 FY2024; (b) the existence of "Hold for Release" orders by which ChargePoint would claim the orders as revenue even though the client had not paid for or received the product; (c) $2–5 million per quarter in unneeded product was being pushed to distributors; (d) channel partners were being pressured to accept unneeded inventory with undocumented rebates; (e) software tokens were being activated for fictitious customers; (f) contractors held millions of dollars in inventory with no reference point for an actual sale or customer; and (g) ChargePoint knew it had tens of millions of dollars of obsolete CPE 250 inventory requiring write-down under its own inventory policy, which would materially impact profitability.

## IX. THE TRUTH EMERGES: CHARGEPOINT DISCLOSES THE CONSEQUENCES OF ITS CONCEALED PRACTICES

243. The truth about ChargePoint's financial condition emerged through two corrective disclosure events—on September 6, 2023, and November 16, 2023—followed by insider stock sales between the two events that underscored Defendants' awareness that the initial disclosure was incomplete. Post-Class Period developments further confirmed the scope of the concealed practices.

### A. September 6, 2023: ChargePoint Discloses Revenue Deceleration and $28 Million Inventory Impairment Charge on Its Over-Procured CPE 250 DC Chargers—the Stock Falls 11%

244. On September 6, 2023, after the market closed, ChargePoint issued a press release filed with the SEC on Form 8-K announcing its financial results for the second quarter of fiscal year 2024 (quarter ended July 31, 2023). ChargePoint reported quarterly revenue of only $150.5 million. While the Company characterized this as a 39% year-over-year increase, the reported

revenue was below the analyst consensus estimate of $153.2 million, barely within the Company's prior guidance range of $148 to $158 million, and reflected a continued and marked deceleration in the revenue growth rate that Defendants had sustained for six consecutive quarters during the Class Period.

245. The Company also disclosed a $28 million inventory impairment charge taken "to address legacy supply chain-related costs and supply overruns on a particular [direct current] DC product." As detailed in Part VII.C, the "particular DC product" was the CPE 250 first-generation DC fast charger that ChargePoint had over-procured as a result of the pandemic. The Company reported a GAAP gross margin of only 1%—down from 17% in the prior year's same quarter and significantly below analyst consensus of 24.9%. CFO Jackson explained on the accompanying earnings call that the quarter included the $28 million impairment (a 19 percentage-point margin impact) plus an additional $6 million, or 3 percentage point, headwind from selling the first-generation DC product at the pre-impairment cost structure.

246. ChargePoint also announced a restructuring plan to cut operating expenses by $30 million annually, in part through a 10% workforce reduction. The Company's forward guidance foreshadowed further deceleration: Q3 FY2024 revenue was guided to $150–$165 million, well below the consensus estimate of $180.9 million. The Company guided non-GAAP gross margin of 22–25% for Q3 FY2024.

247. Despite the severity of these disclosures, Defendants continued to downplay the inventory problem on the September 6 earnings call. Jackson assured investors:

> ***With the inventory issue behind us*** and aggressive programs for improving our cost structure on supply and manufacturing, we would expect to resume continued improvement in gross margin next year.

248. When an analyst asked whether margin headwinds would persist, Jackson stated: "[T]hose should go away going forward. It was an in-quarter item." These assurances proved false within ten weeks.

249. The Company subsequently filed its quarterly report on Form 10-Q for the period ended July 31, 2023, on September 11, 2023. The 10-Q provided additional detail on the

impairment, disclosing that the $28 million charge consisted of (a) a $15 million charge to write down the carrying value of certain inventory on hand and (b) a $13 million charge for losses on non-cancelable purchase commitments for inventory to be received after July 31, 2023, "to reduce the carrying value of certain DC fast charging products to their estimated net realizable value."

250. ***Analyst reactions confirmed the disclosures drove the decline.*** ChargePoint's widening losses, inventory impairment woes, and decelerating revenue growth caught the attention of securities analysts. In noting that the "headline figures were disappointing" and the $28 million inventory impairment, Wolfe Research lowered its price target from $12 to $8 per share, stating, "[W]e think investors are increasingly questioning CHPT's fundamental value proposition. While there remains a sizable need for greater (and more reliable) charging infrastructure, ChargePoint's revenues are continuing to decelerate. FQ3 guidance implies a 24% y/y increase, and FQ4 is expected to rise by just ~18%."[15] Similarly, Fox Advisors downgraded ChargePoint, explaining, "We lower our rating on ChargePoint (CHPT; $7.06) from Outperform to Equal-Weight after FQ2 (July) results disappointed even if we exclude an unexpected inventory write-down. CHPT also provided weaker than expected top and bottom-line targets for the rest of F2024E (Jan), implying a severe growth deceleration despite still rapidly expanding electric vehicle markets."[16] Pickering Energy echoed this sentiment, stating "It's hard to find much to be positive about in CHPT's F2Q24 results, which included a material EBITDA miss, disappointing revenue guidance, and a much worse-than-expected cash burn … Revenue growth is decelerating rapidly – Revenue guidance was worse than expected and points to a sharp deceleration in growth."[17]

251. ***Market Reaction.*** On this news, the Company's share price fell $0.77, or 11%, from a close price of $7.06 per share on September 6, 2023, to close price of $6.29 per share on September 7, 2023, on unusually heavy trading volume. Losses on ChargePoint shares extended

---

[15] "CHPT Still Facing Challenges; EV Battery Costs Now Declining Quickly," Wolfe Research (Sep. 7, 2023).

[16] "CHPT: Reduce Rating to Equal-Weight," Fox Advisors (Sep. 7, 2023).

[17] "Fiscal 2Q24 Follow-Up - Cash Flow Challenges Continue and Top Line Growth is Decelerating," Pickering Energy Partners (Sep. 7, 2023).

the next trading day as the market continued to digest the Company's disclosures, falling to a close price of $5.72 per share on September 8, 2023.




**B. September–November 2023: Defendants Jackson and Hughes Sell Substantial Shares After Assuring Investors the Worst Was Behind Them**

252. Within days of Jackson's assurances that the "inventory issue" was "behind us" and that margin headwinds would "go away going forward," Defendants Jackson and Hughes sold substantial amounts of their personally held ChargePoint shares.

253. On September 8, 2023—two days after the earnings call—Jackson sold 556,255 shares at an average price of approximately $5.84 per share. On September 21, 2023, Jackson sold an additional 16,799 shares at an average price of approximately $5.03 per share. In total, Jackson sold 573,054 shares in September 2023 alone, for total proceeds of approximately $3.3 million.

254. On September 14, 2023, Hughes sold 58,000 shares at an average price of approximately $6.00 per share. These sales were made at prices that Defendants knew were inflated by the false assurances Jackson had given on the September 6 earnings call—assurances that, as the November 16 disclosure would confirm, were materially false when made.

255. The timing of these sales was suspicious. Jackson sold the vast majority of his shares just two days after publicly assuring analysts that the worst was behind ChargePoint. Both Jackson and Hughes sold before the November 16 disclosure of the additional $42 million impairment and 30% revenue shortfall, which sent the stock to its record low. During the Class Period as a whole, Romano sold 1,175,802 shares (20% of his holdings) for over $14 million, Jackson sold 670,269 shares (over 23% of his holdings) for approximately $4.6 million, and Hughes sold over 600,00 shares (over 41% of his holdings) for approximately $6.8 million. These sales were inconsistent with these Defendants' light prior trading histories before the Class Period. *See* Part XI.C.

256. Almost immediately after these insider sales, on October 11, 2023, ChargePoint announced it had secured $232 million in capital through a dilutive share sale (issuing approximately 50 million additional shares), of which $57 million had already been raised through an at-the-market ("ATM") private offering during Q3 FY2024 and $175 million came from new institutional investor commitments. The Company also disclosed, on October 11, 2023, that it had modified the terms of its existing $300 million in convertible notes, extending the maturity to 2028 but increasing the interest rate from 3.5% to 7% per year. That ChargePoint needed to raise capital on these increasingly unfavorable terms—immediately after insiders had dumped their own shares—underscored the deterioration in ChargePoint's financial condition.

### C. November 16, 2023: ChargePoint Pre-Announces a Revenue Shortfall, an Additional $42 Million Impairment Charge, and the Immediate Departures of CEO Romano and CFO Jackson—And the Stock Falls 35%

257. On November 16, 2023, after the market closed, ChargePoint surprised the market by releasing selected preliminary unaudited financial results for the third quarter of fiscal year 2024 (quarter ended October 31, 2023). The disclosures were devastating across every dimension:

258. ***Revenue shortfall.*** ChargePoint now expected to generate Q3 FY2024 revenue of only $108 to $113 million—a 30% shortfall from the prior guidance of $150 to $165 million that Jackson had provided just ten weeks earlier, a 25–28% decline from the prior quarter, and a 10–15% decline year-over-year. This was ChargePoint's first negative year-over-year revenue growth quarter during or after the Class Period. The Company attributed the shortfall to "macroeconomic conditions" and "fleet and commercial vehicle delivery delays." New CEO Rick Wilmer stated:

"Our core markets of North America and Europe both came under pressure late in the third quarter, with revenue falling far short of expectations."

259. ***Second inventory impairment.*** The Company disclosed an *additional $42 million non-cash inventory impairment charge*—on top of the $28 million from the prior quarter—bringing *total impairment charges to $70 million.* ChargePoint stated that this impairment was "related to product transitions" and reflected a decision to "better align inventory with current demand." New CEO Wilmer disclosed that the decision to impair was the product of an analysis he had conducted "***[o]ver the past 18 months in his prior role as Chief Operating Officer***"—a "thorough analysis of ChargePoint's supply chain, manufacturing partnerships and inventory management approach." ***This 18-month review spanned the majority of the Class Period.***

260. ***Negative gross margins.*** ChargePoint expected GAAP gross margin of negative 21% to 23% and non-GAAP gross margin of negative 17% to 19%. Even excluding the $42 million impairment, adjusted gross margin had deteriorated further. This represented a more than 40-point swing from the 22–25% non-GAAP gross margin Jackson had guided on September 6, 2023—just ten weeks earlier. *See* Part IX.A.

261. ***CEO and CFO terminated.*** Coinciding with these financial disclosures, ChargePoint announced the immediate departures of CEO Romano and CFO Jackson. The Company offered no detailed reasons for the abrupt leadership changes. Rick Wilmer, who had served as COO since July 2022, was named CEO and President. Mansi Khetani, Senior Vice President of Financial Planning and Analysis, was appointed interim CFO. The simultaneous removal of both the CEO and CFO responsible for the statements challenged herein—at the same moment the full extent of ChargePoint's financial deterioration was disclosed—was *powerful circumstantial evidence that the Board concluded Romano and Jackson bore responsibility for the concealed problems*.

262. ***Analyst reactions were severe.*** Pickering Energy Partners wrote, "Hard to Sugarcoat It – This is a Very Bad Update[:] CHPT's Q3 pre-announcement checked virtually every possible box for a spectacularly bad update including Q3 revenue ~30% below guidance, its first negative Y/Y growth quarter, the abrupt departure of both the CEO and CFO, and what looks to be another

~$100MM negative cash burn…. The hard reality is that with this update CHPT has morphed from a high-growth, money-losing enterprise to a negative-growth, money-losing enterprise, a combination that has limited investment appeal until it shows sustained signs of reversing."[18]

263. Similarly, Fox Advisors connected the leadership resignations with the poor financial results, stating it "assume[d]" the CEO and CFO departures were "directly related to the significant disappointments of FQ3 as well as some prior, albeit less dramatic misses in prior quarters" and we "assume this latest inventory charge is a 'clear the decks' move by new CEO Wilmer."[19]

264. Several other firms downgraded their rating of ChargePoint and slashed their target price. Needham cut its price target on ChargePoint's stock to $4 from $8.[20] Oppenheimer cut its rating on ChargePoint to perform from outperform and removed its $13 price target for the stock saying, "We are stepping to the sidelines … given the management transition, choppy demand, and potential for further organizational changes."[21] Roth Capital went even further, downgrading shares of ChargePoint to Neutral from Buy and cut the target price to $2 per share from $11 per share, representing an 81% decline.[22]

265. ***Market Reaction.*** On this news, the Company's share price fell $1.11, or 35%, from a close price of $3.13 per share on November 16, 2023, to close at a record low of $2.02 per share on November 17, 2023, on unusually heavy trading volume. The November 17 decline alone cost investors approximately $400 million in shareholder value.

---

[18] "Q3 Update Very Negative On Multiple Levels," Pickering Energy (Nov. 17, 2023).

[19] "CHPT: Big Miss Leads to CEO & CFO Changes," Fox Advisors (Nov. 17, 2023).

[20] "All Charged Up But Nowhere To Go, Reiterate Buy, Lower Target to $4," Needham & Co. (Nov. 17, 2023).

[21] "CHPT: Downgrading to Perform," Oppenheimer & Co. (Nov. 17, 2023).

[22] "CHPT: Downgrading to Neutral; F3Q24 Pre-Release Shows Material Deterioration," Roth Capital Partners (Nov. 17, 2023).




**D. Post Class Period Events Confirm the Scope of Defendants' Practices**

266. Post-Class Period events further confirmed the scope and consequences of the concealed practices.

267. ***New CEO confirmed the channel had been overstocked.*** On December 6, 2023, ChargePoint reported its full Q3 FY2024 results. Revenue was $110.3 million (down 27% quarter-on-quarter and down 12% year-over-year), approximately in line with the November 16 pre-announcement. On the accompanying earnings call, new CEO Wilmer provided further detail on the inventory impairment, stating that the Q3 charge "addresses executional issues related to multiple product transitions and better aligns inventory with current demand. This was a deliberate action that cleans the slate for the business moving forward. We did not execute these new product transitions well, and we have learned from our mistakes."

268. Critically, Wilmer acknowledged that the distribution channel had been overstocked: "[I]n simple terms, our channel has *moved back to a model* where they are carrying

lower levels of inventory and placing smaller restocking orders as needed." This statement confirmed what CW-1, FE-7, FE-6, and FE-9 had described: ChargePoint had made an undisclosed change to its business practices by systematically pushing large, unwanted product into reseller, distributor, and contractor channels and have them carry large levels of inventory, inflating reported revenue. When the channel reverted to normal purchasing patterns, revenue collapsed. *See* Part VI.D.

269. Wilmer also provided additional color concerning management's knowledge:

> As I have said at the beginning of the call, we have had some execution challenges that I began to fix as COO and will finish addressing as CEO. We believe the noncash impairments taken this quarter are conservative and comprehensive and that we are now in an excellent position to monetize our current inventory.

270. ***Subsequent quarters confirmed revenue was unsustainable without the concealed practices.*** ChargePoint's financial results continued to deteriorate in subsequent quarters. In Q4 FY2024, the Company reported revenue of only $115.8 million—a 24.2% year-over-year decline. In Q1 FY2025 (reported April 2024), revenue was $107.04 million—a 17% year-over-year decline. Three consecutive quarters of revenue decline confirmed the former employees' account: Defendants' practices had "borrowed" revenue from future periods, making it inevitable that subsequent quarters would suffer shortfalls once the practices ceased. *See* Part VI.F.

271. ***Announcement of Hughes' resignation in January 2024.*** On January 10, 2024, ChargePoint announced the resignation of Defendant Hughes as the Chief Commercial and Revenue Officer, effective February 29, 2024. Hughes directed the sales team to ship all pending orders, premature and unauthorized orders, and orders involving incomplete or incorrect products (FE-1, FE-2), participated in rebate structures with resellers (CW-1), and rewarded employees for selling software tokens on inactivated stations (CW-1). *See* Parts VI.B-C, VI.D, VI.E. Hughes's departure came as the last of the three Executive Defendants to leave the Company.

272. ***As of 2025, the channel remains stuffed.*** The enduring consequences of Defendants' channel stuffing are confirmed by evidence obtained in 2025. According to CW-1, who in February 2025 learned from sources both within and external to ChargePoint, one major reseller, Rexel, was still holding approximately $100 million of ChargePoint inventory it could not

sell, and another reseller, City Electric Supply, was still holding approximately $40 million of ChargePoint inventory it could not sell. CW-1 stated that ChargePoint is still paying off oral deals it made years ago and that resellers are still waiting for rebate payments that ChargePoint owes that have been owed for years. *See* Part VI.D. That $140 million of ChargePoint inventory remained stranded with two distributors more than a year after the Class Period ended confirms the extraordinary scale of the channel stuffing practices described herein.

## X. LOSS CAUSATION: THE CORRECTIVE DISCLOSURES REVEALED THE CONCEALED TRUTH AND CAUSED PLAINTIFFS' LOSSES

273. Lead Plaintiffs' losses were caused by the disclosure of the very facts Defendants concealed. As set forth below, the fraud alleged herein was revealed to the market through two corrective disclosure events—on September 6, 2023, and November 16, 2023—each of which disclosed information about the specific risks and practices that Defendants had misrepresented or omitted during the Class Period, and each of which caused a statistically significant decline in the price of ChargePoint securities on unusually heavy trading volume. The stock price declines were not caused by unrelated market forces, industry trends, or general macroeconomic conditions. They were caused by the market learning, for the first time, specific facts about ChargePoint's financial condition that Defendants had concealed. *See, e.g., Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018); *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120-21 (9th Cir. 2013).

### A. The September 6, 2023 Disclosure Partially Revealed the Consequences of Defendants' Concealed Over-Procurement, Revenue Inflation Practices, and Failure to Timely Impair Obsolete Inventory, Causing an 11% Stock Decline

274. ***What was disclosed.*** On September 6, 2023, after the market closed, ChargePoint reported its second quarter fiscal year 2024 financial results. The Company disclosed: (a) a $28 million inventory impairment charge "taken to address legacy supply chain-related costs and supply overruns on a particular DC product"; (b) a GAAP gross margin of only 1%—down from 17% in the prior year's same quarter—driven in significant part by the impairment charge; (c) an additional $6 million in margin headwind from selling the first-generation DC product at the pre-impairment

cost structure; and (d) forward guidance of $150–$165 million for Q3 FY2024, well below the consensus estimate of $180.9 million. *See* Part IX.A.

275. ***What this disclosure revealed about the concealed fraud.*** The September 6 disclosure partially revealed the financial consequences of two categories of concealed facts:

276. *First*, the $28 million impairment charge on the "first generation DC charging product"—identified by FE-5 and FE-3 as the CPE 250 DC fast charger—revealed that ChargePoint had been carrying tens of millions of dollars of obsolete inventory on its books at inflated values. As detailed in Part VII.C, ChargePoint had tried to over-procure the CPE 250 as a result of the pandemic in a failed attempt to stockpile inventory and capture opportunities from its competitors. By the time the backorders were cleared, ChargePoint's problem was compounded by demand for its alternative DC charger, the Express Plus, and the anticipated release of the CPE 280 model, which softened demand for the CPE 250. Defendants knew by early 2023 at the latest that the CPE 250 inventory was overvalued—as demonstrated by the $10 million, 50% discount fire-sale promotion that FE-6 explained was likely being planned as early as Q4 of 2022 (*i.e.*, Q4 FY2023) and required CEO approval because it was so far outside the ordinary course. *See* Parts VI.D, VII.C. Despite this knowledge, Defendants had delayed the required write-down for at least two to three quarters, during which time ChargePoint's reported inventory values and gross margins were overstated.

277. *Second*, the dramatically reduced forward guidance—$150–$165 million versus consensus of $180.9 million—revealed that the revenue trajectory Defendants had sustained throughout the Class Period of six consecutive quarters of revenue growth (with five quarters meeting or exceeding guidance) was not sustainable. This was the first public indication that the growth story Defendants had sold to investors was eroding. As detailed in Parts VI and VIII, the revenue Defendants had attributed to "strong execution" and "strong demand" was derived in material part from the improper revenue recognition practices described herein—unauthorized shipments, shipments of incomplete products or the wrong products, channel stuffing, premature activation of software tokens, and undocumented side deals—all of which were unsustainable by their nature.

278. ***Market impact.*** On this news, ChargePoint's share price fell $0.77, or 11%, from a closing price of $7.06 per share on September 6, 2023, to $6.29 per share on September 7, 2023, on unusually heavy trading volume. Losses extended the following trading day as the market continued to absorb the disclosures, with the stock falling to $5.72 on September 8, 2023. *See* Part IX.A. Analyst reactions confirmed that the stock decline was caused by the specific facts disclosed, not unrelated factors. Wolfe Research lowered its price target from $12 to $8, stating that "investors are increasingly questioning CHPT's fundamental value proposition" and noting that "revenues are continuing to decelerate." Fox Advisors downgraded ChargePoint, explaining that the results "disappointed even if we exclude an unexpected inventory write-down." Pickering Energy stated: "It's hard to find much to be positive about in CHPT's F2Q24 results," and "[r]evenue guidance was worse than expected and points to a sharp deceleration in growth."

279. ***The disclosure was partial.*** The September 6 disclosure was a partial corrective disclosure. Defendants took only a $28 million write-down when the full impairment would prove to be $70 million. Jackson assured investors that "with the inventory issue behind us" margins would resume improving—an assurance that proved false within ten weeks. And the disclosure did not reveal the underlying revenue inflation practices that had sustained six quarters of growth. The full corrective disclosure came on November 16, 2023.

**B. The November 16, 2023 Disclosure Revealed a Fuller Extent of ChargePoint's Revenue and Inventory Problems and the Unsustainability of the Practices Defendants Had Concealed, Causing a 35% Stock Decline**

280. ***What was disclosed.*** On November 16, 2023, after the market closed, ChargePoint pre-announced selected preliminary results for the third quarter of fiscal year 2024. The Company disclosed: (a) expected revenue of only $108–$113 million—a 30% shortfall from prior guidance of $150–$165 million, a 25–28% decline from the prior quarter, and a 10–15% decline year-over-year (ChargePoint's first negative year-over-year growth quarter); (b) an additional $42 million inventory impairment charge—on top of the $28 million from the prior quarter—bringing total impairment charges to $70 million; (c) expected GAAP gross margin of negative 21% to 23% and non-GAAP gross margin of negative 17% to 19%; and (d) the immediate termination of both CEO

Romano and CFO Jackson, with no detailed explanation for the abrupt leadership changes. *See* Part IX.C.

281. ***What this disclosure revealed about the concealed fraud.*** The November 16 disclosure revealed a much fuller extent of the problems Defendants had concealed throughout the Class Period:

282. *First*, the 30% revenue shortfall revealed that ChargePoint's reported revenue trajectory had been unsustainable. For six consecutive quarters in the Class Period, Defendants reported revenue growth, with five quarters that met or exceeded guidance, while attributing revenue growth to organic demand. *See* Parts II.A, VIII. The sudden and massive shortfall—from $150.5 million in Q2 FY2024 to an expected $108–$113 million in Q3 FY2024—demonstrated that the revenue levels Defendants had sustained could not be maintained without the improper undisclosed practices described in Part VI.

283. *Second*, the additional $42 million impairment charge—bringing the total to $70 million—revealed that Jackson's September 6 assurance that the "inventory issue" was "behind us" was false. The inventory problem was nearly three times larger than the $28 million Defendants had acknowledged ten weeks earlier. Wilmer further disclosed that the decision to impair was the product of an "18-month" review of ChargePoint's "supply chain, manufacturing partnerships and inventory management approach"—a review that spanned most of the Class Period. *See* Parts VII.C, IX.C.

284. *Third*, the simultaneous termination of both Romano and Jackson—the two executives who had made the materially false and misleading statements identified in Part VIII and who had personally participated in the practices identified in Part VI—was powerful circumstantial evidence that the Board had concluded they were responsible for the problems now being disclosed. Fox Advisors explicitly connected the leadership departures to the financial disappointments, noting that the CEO and CFO departures were "directly related to the significant disappointments of FQ3 as well as some prior, albeit less dramatic misses in prior quarters." *See* Part IX.C.

285. *Fourth*, the negative gross margins—GAAP gross margin of negative 21% to 23%—revealed the true state of ChargePoint's cost structure when stripped of the improper

practices and delayed impairments that had inflated margins during the Class Period. This represented a more than 40-point swing from the 22–25% non-GAAP gross margin Jackson had guided just ten weeks earlier, and a stark reversal from the positive margins Defendants had consistently reported. *See* Part IX.A.

286. ***Market impact***. On this news, ChargePoint's share price fell $1.11, or 35%, from a closing price of $3.13 per share on November 16, 2023, to a record low of $2.02 per share on November 17, 2023, on unusually heavy trading volume. *See* Part IX.C. Analyst reactions again confirmed that the stock decline was driven by the specific facts disclosed. Pickering Energy stated that the update "checked virtually every possible box for a spectacularly bad update" and that "with this update CHPT has morphed from a high-growth, money-losing enterprise to a negative-growth, money-losing enterprise." Needham cut its price target from $8 to $4. Oppenheimer downgraded ChargePoint and removed its $13 price target. Roth Capital downgraded shares and cut the price target to $2 from $11—an 81% decline.

**C. The Timing and Magnitude of the Stock Declines Were Consistent with the Market Absorbing Information About the Specific Risks and Practices Defendants Had Concealed**

287. The loss causation nexus between Defendants' fraud and Lead Plaintiffs' losses is confirmed by the timing, magnitude, and specificity of the stock price declines:

288. ***Temporal nexus.*** Both stock declines occurred immediately upon the disclosure of previously concealed information. The September 7 decline followed the after-market September 6 announcement. The November 17 decline followed the after-market November 16 pre-announcement. There was no lag, no intervening event, and no confounding disclosure between the announcement and the price decline in either instance. The market reacted to the specific information disclosed, on the trading day immediately following disclosure, on unusually heavy volume.

289. ***Substantive nexus.*** Each corrective disclosure can be traced directly to the "very facts about which the defendant[s] lied." *Mineworkers' Pension Scheme*, 881 F.3d at 753. The September 6 disclosure of the $28 million CPE 250 impairment was the direct financial consequence of the unsustainable revenue inflation practices described in Part VI, the over-

procurement described in Part VII.C, and the delayed impairment Defendants had concealed while assuring investors they were "well past the worst of it." *See* Part VIII.H. The November 16 disclosure of the revenue shortfall and additional $42 million impairment revealed a fuller extent of the unsustainable revenue inflation practices described in Part VI and the concealment of inventory obsolescence described in Part VII.C. The corrective disclosures did not reveal unrelated bad news; they revealed the specific financial consequences of the specific practices Defendants had concealed.

290. While the corrective disclosures revealed only the *consequences* of the alleged fraud—inventory impairments and a revenue shortfall—rather than the specific revenue recognition violations themselves, a corrective disclosure need not take the form of a confession or a restatement. It is enough that the disclosure reveals information about "the very facts about which the defendant lied," or simply the financial consequences of those facts. *Mineworkers' Pension Scheme*, 881 F.3d at 753. A $28 million impairment on inventory that Defendants had assured investors was properly valued, followed two months later by an additional $42 million impairment, a 30% revenue shortfall from guidance, and the simultaneous termination of the CEO and CFO, are not generic bad news—they are the direct, foreseeable, and inevitable financial consequences of inflating revenue through improper sales and revenue recognition practices and over-procuring CPE 250 inventory and then carrying it at inflated values well-beyond the point it should have been written-down. Second, the November 16, 2023 disclosure went beyond mere consequences: the 30% revenue shortfall itself revealed that the revenue levels Defendants had projected—and that the market had relied upon—were unsustainable, which is precisely what would be expected if a material portion of prior revenue derived from the improper practices alleged herein. *See, e.g.*, *Nuveen Mun. High Income Opportunity Fund*, 730 F.3d at 1120-21; *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).

291. ***Progressive disclosure.*** The two-event corrective disclosure pattern is consistent with what courts have recognized as a "leaking out" of concealed information. *See, e.g.*, *In re Broadcom Corp. Sec. Litig.*, 2005 WL 8152913, at *4 (C.D. Cal. Sept. 12, 2005); *In re Tesla, Inc. Sec. Litig.*, 2022 WL 7374936, at *7-14 (N.D. Cal. Oct. 13, 2022). The September 6 disclosure

partially revealed the inventory problem but understated its magnitude and did not disclose the revenue inflation practices. The November 16 disclosure provided a more complete picture: the revenue practices were unsustainable, the inventory problem was far larger than acknowledged, and the executives responsible were terminated. The cumulative stock decline—from the Class Period high of $9.78 on June 7, 2023, to the post-disclosure low of $2.02 on November 17, 2023—totaled approximately 79%.

292. ***Analyst commentary confirms the nexus.*** Securities analysts covering ChargePoint consistently identified the disclosed information—not extraneous market forces—as the driver of the stock declines. After September 6, analysts cited the "unexpected inventory write-down" and "sharp deceleration in growth." After November 16, analysts identified a "spectacularly bad update" driven by the revenue miss, inventory impairment, and CEO/CFO departures. None attributed the declines to general market conditions, industry trends, or macroeconomic factors.

293. In total, from its Class Period high of $9.78 on June 7, 2023, to its post-disclosure low of $2.02 on November 17, 2023, ChargePoint's stock price declined by approximately 79%, wiping out hundreds of millions of dollars in market capitalization. The November 17 decline alone cost investors approximately $400 million. These losses were caused by the disclosure of the previously concealed facts alleged herein, and Lead Plaintiffs and members of the Class are entitled to recover the damages they suffered as a result.

## XI. ADDITIONAL ALLEGATIONS OF SCIENTER

294. In addition to the facts alleged throughout this Complaint—including the specific false and misleading statements in Part VIII, the practices described in Part VI, the concealed supply chain and inventory problems in Part VII, and the corrective disclosures in Part IX—the following facts further demonstrate that Defendants acted with the required scienter, *i.e.*, that they knew or were severely reckless in not knowing that their statements were materially false and misleading. Taken together, these facts give rise to a strong inference of scienter—one that is at least as compelling as any opposing inference of nonfraudulent intent. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

### A. Each Executive Defendant Personally Participated in or Directed the Revenue Inflation Practices

295. The scienter of each Executive Defendant is established not merely by their positions or their role in making the challenged statements, but by their *direct, personal participation* in the specific deceptive practices described in Part VI. This evidence satisfies both the scienter requirement for statement liability under Rule 10b-5(b) and the requirement for scheme liability under Rule 10b-5(a) and (c) that each defendant committed a "deceptive or manipulative act" in furtherance of the alleged scheme—conduct that goes "beyond their alleged misstatements." *See York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*, 738 F. Supp. 3d 1182, 1206 (N.D. Cal. 2024).

#### 1. Romano Personally Approved the Largest Undisclosed Discount Transactions and Oversaw the Sales Practices from the Top Down

296. Defendant Romano, as CEO and President throughout the Class Period, personally approved the most significant undisclosed discount transactions and oversaw the sales organization that executed the improper practices:

297. ***CEO approval of the $10 million CPE 250 fire sale and knowledge of Excess CPE 250 Inventory.*** FE-6 stated that in the third quarter of fiscal 2024 (summer 2023), everyone up to the CEO approved a "summer promotion" in which three resellers purchased 400 to 500 CPE 250 chargers at a 50% discount, totaling $10 million. This meant Romano personally approved a transaction that sold product at half price to clear obsolete inventory, while the Company continued to carry that inventory at full value on its books. The fire sale took months of planning to execute, with discussions likely starting as early as in Q4 of 2022. FE-5 further stated that supply chain issues, including the excess CPE 250 inventory, was discussed in semi-weekly calls beginning in January or February 2023. FE-5 understood that Romano was apprised of the discussions, because the Senior Vice President for North America stated they had to report the contents of the meeting to "Paq [Romano] and Michael [Hughes]." Romano therefore had knowledge of the CPE 250 overstock problem well before the September 2023 impairment. *See* Part VI.D and Part VII.C.

298. ***Top-down direction of sales practices.*** FE-2 stated that orders to ship out on-hold orders, products with missing or incomplete parts, or the wrong product altogether, came from FE-

2's supervisor, who was following orders from their supervisors. This would have been Hughes and/or Romano. FE-3 also said the decision to ship out empty frames was made from the top down so that revenue could be recognized. *See* Part VI.B-C. Romano thus knew the practices being used to mask the supply chain constraints.

299. Furthermore, Romano's top-down oversight of the sales organization that executed the premature and incomplete product shipments described in Parts VI.B-C constituted additional deceptive conduct beyond his role in making the statements challenged in Part VIII.

300. ***SOX certifications with knowledge of improper practices.*** Romano signed Sarbanes-Oxley certifications for every quarterly and annual report filed during the Class Period, personally attesting that the financial statements fairly presented in all material respects the financial condition of ChargePoint. He further certified that he had designed and evaluated effective internal controls over financial reporting and had disclosed any fraud or significant deficiencies in internal controls to the Company's auditors and audit committee. These certifications were either knowingly false or signed with severe recklessness in light of the widespread improper practices described in Part VI.

#### 2. Jackson Personally Discussed Undocumented Side Deals and Rebates in Oral Conversations with Reseller Executives and Signed SOX Certifications Attesting to the Accuracy of Financial Reports He Knew Were Inflated

301. Defendant Jackson, as CFO throughout the Class Period, had the most direct personal involvement in the financial practices at the heart of the fraud:

302. ***Personal participation in undocumented side deals (CW-1).*** CW-1 described Jackson's direct, personal involvement in the undocumented rebate deals that enabled the channel stuffing scheme. Jackson attended regular meetings with CW-1's CFO at least once per quarter. CW-1 was on 5 to 10 calls between 2021 and 2023 in which Jackson and CW-1's CFO discussed undocumented deals. On those calls, CW-1's CFO would cite promises made by ChargePoint sales personnel (McKinnon, Cook, and Jader), and Jackson would verify the promises and most of the time approve the terms. These were oral acknowledgements of rebates that were not documented in purchase orders most of the time—deals where sometimes payment terms not in writing, sometimes shipment terms not in writing. *See* Part VI.D.

303. Jackson's personal participation in undocumented side deals was itself a deceptive act in furtherance of the scheme and shows his role was not limited to making false statements. Rather, he personally structured the transactions that generated the false revenue figures he then reported to investors.

304. ***Sign-off authority on all non-standard deals (FE-6).*** FE-6 confirmed that Jackson, as CFO, had to sign off on (or otherwise approve in writing) any additional discounts or deals beyond what was being offered as a promotion (*e.g.*, a buy-one-get-one free offer going above and beyond a promotion). This also included the $10 million summer promotion, which required approval from everyone up to the CEO. *See* Part VI.D.

305. ***Knowledge of premature activation of software tokens.*** CW-1 believed Jackson was aware of the premature activation of software tokens through his sales operations team because Jackson would have seen the delay in software activation; if software sales are high but activation is low, that would indicate that the software sales are not going to the current, active customers. *See* Part VI.E.

306. ***SOX certifications with knowledge of GAAP violations.*** Jackson signed Sarbanes-Oxley certifications for every quarterly and annual report during the Class Period, attesting to the accuracy of the financial statements and the effectiveness of internal controls. As the officer directly responsible for ChargePoint's financial reporting, Jackson knew that revenue was being recognized on unauthorized shipments (Part VI.B), shipments of incomplete or incorrect products (Part VI.C), inventory subject to undocumented side deals (Part VI.D), and premature activation of software tokens (Part VI.E.)—all of which violated ASC 606 and ChargePoint's own revenue recognition policy (Part VI.A). His certifications were either knowingly false or signed with severe recklessness.

**3. Hughes Personally Directed Sales Teams to Ship Products Prematurely, Participated in Rebate Structures with Resellers, and Gave Sales Awards for Software Token Practices He Knew Were Improper**

307. Defendant Hughes, as Chief Commercial and Revenue Officer throughout the Class Period, was the executive most directly responsible for the sales operations that executed the improper practices. While Hughes is not alleged to have made any of the challenged statements in

Part VIII, his liability arises under Rule 10b-5(a) and (c) for scheme liability based on his personal deceptive conduct. Each of the following acts was a deceptive or manipulative act in furtherance of the scheme to inflate ChargePoint's reported revenue, and each went well beyond the making of any statement:

308. ***Directed unauthorized and premature shipments (FE-1, FE-2).*** FE-1 stated that the directive to ship all pending orders between summer and fall of 2022 (late July/early August) came from the VP of Revenue Operations and had to be approved at executive level, which would have been Hughes or above. FE-2 stated that orders to ship on-hold or partial orders came from FE-2's supervisor, who was following orders from their supervisors. This would have been Defendants Hughes and/or Romano. FE-7 stated that sometimes Hughes would get on calls and urge the sales team to do whatever they could to close deals with distributors and have them take on more product than needed. *See* Part VI.B-D.

309. ***Directed shipping of empty frames (FE-3, FE-2).*** FE-3 stated that the decision to ship empty charger frames without internal components—recognizing revenue on non-functioning products—was made from the top down by Hughes and the VP of Revenue Operations so revenue could be recognized. FE-2 similarly stated that the order to ship incomplete or incorrect products came from FE-2's supervisor's supervisors, which would have been Hughes and/or Romano. *See* Part VI.C.

310. ***Participated in rebate structures with resellers (CW-1).*** CW-1 stated that Hughes sat down with CW-1's boss to talk about rebate structures, including with respect to certain customers/deals. This was a direct, personal act of structuring undisclosed side deals with a channel partner. *See* Part VI.D.

311. ***Gave sales awards for improper software token practices (CW-1).*** CW-1 stated that Hughes gave out sales awards to employees who sold software tokens for charging stations that had not been activated yet. This is powerful evidence of scienter: Hughes did not merely tolerate the premature token activation practice described in Part VI.E—he affirmatively rewarded it. By giving awards for selling tokens on inactivated stations, Hughes incentivized the very improper conduct that inflated ChargePoint's subscription revenue.

**B. Defendants' Stock-Based Compensation Structure Gave Them Motive to Inflate Revenue**

312. After ChargePoint went public through its SPAC merger, the Company dramatically shifted its executive compensation structure from primarily cash to primarily equity. This shift gave the Executive Defendants a direct financial motive to inflate the Company's stock price by inflating reported revenue:

313. **Romano.** Before the Class Period, Romano received $859,167 in total compensation for FY2021, all in cash. After going public, Romano's compensation exploded to $58,679,085 for FY2022, approximately 75% of which consisted of stock option awards ($43,823,305 in options and $14,355,780 in other compensation). For FY2023, Romano received $16,755,533, approximately 93% of which consisted of stock awards ($15,748,311).

314. **Jackson.** For FY2022, Jackson received $13,188,729 in total compensation, approximately 72% of which consisted of stock awards ($9,555,000 in stock awards plus $3,181,229 in other compensation). For FY2023, Jackson received $8,541,031, approximately 92% of which derived from stock awards ($7,874,156).






315. **Hughes.** For FY2021 (prior to the Class Period), Hughes received over $660,000, with 59% reflecting discretionary bonuses and sales commissions. For FY2022, Hughes's compensation jumped to over $7.5 million, consisting of more than $4 million (54%) in stock awards and nearly $2.7 million reflecting the value of common stock issued on vested options. Hughes also earned $383,250 in sales commissions—the maximum permitted. For FY2023, Hughes received $8,536,714, over 92% in stock awards. Hughes's compensation was uniquely tied to revenue performance: as Chief Commercial and Revenue Officer, he earned commissions on the very sales his team generated through the improper practices described in Part VI.

316. The shift from cash to equity compensation gave each Executive Defendant a personal financial stake in maintaining an artificially inflated stock price. Revenue growth was the central metric by which ChargePoint was valued and by which the Defendants' equity-based compensation appreciated. The improper practices described in Part VI directly served this motive by generating the appearance of organic revenue growth that sustained ChargePoint's stock price during the Class Period.

### C. Defendants' Insider Trading During the Class Period Was Unusual and Suspicious in Both Timing and Amount

317. During the Class Period, while ChargePoint's stock price was artificially inflated by the concealed practices, each Executive Defendant sold substantial portions of their personally held shares:

318. **Romano** sold 1,175,802 shares during the Class Period for total proceeds of approximately $14,396,670, representing approximately 20% of his personally held ChargePoint stock. Romano's sales were made through a series of transactions from April 2022 through August 2023, with a marked acceleration in 2023 when he sold in multiple small tranches across May, June, July, and August. Before the Class Period, Romano had made only one sales transaction in Company stock—a sale of 315,000 shares on July 19, 2021, for approximately $7.4 million. His Class Period sales thus represented a dramatic increase in both frequency and aggregate volume over his prior trading history.[23]

319. **Jackson** sold 670,269 shares during the Class Period for total proceeds of approximately $4,620,830, representing over 23% of his personally held ChargePoint shares. Jackson's sales included the massive sale of 556,255 shares on September 8, 2023—just two days after he had publicly assured investors that ChargePoint's "inventory issue" was "behind us" and that margin headwinds would "go away going forward." *See* Part IX.B. Before the Class Period, Jackson made only two sales totaling approximately $938,558. His September 8 sale alone exceeded his entire pre-Class Period trading history by a factor of nearly four. The timing—selling immediately after providing false assurances, and before the November 16 disclosure that the inventory problem was nearly three times larger than disclosed—is powerful circumstantial evidence of scienter.

320. **Hughes** sold over 600,000 shares during the Class Period for total proceeds of approximately $6.8 million, representing over 41% of the 1.48 million shares he personally

[23] Some of Romano's sales were effected pursuant to a Rule 10b5-1 plan adopted on an unspecified date; others pursuant to a plan adopted January 13, 2022, during the Class Period when Romano possessed material non-public information. The 10b5-1 plan defense will be addressed in opposition to any summary judgment motion; at the pleading stage, the plan's adoption date and circumstances are subject to discovery.

obtained or held during the Class Period. Before the Class Period, Hughes had made only three sales, two of which were mandatory sales to cover tax withholding obligations on vesting RSUs, and the third was a one-time sale in ChargePoint's secondary offering. After the Class Period, Hughes made only one sale (December 21, 2023, for $33,830—again to cover tax withholding obligations). The contrast between Hughes's aggressive Class Period selling—including a 58,000-share sale at $6.00 on September 14, 2023, just days after the first corrective disclosure—and his minimal pre- and post-Class Period activity is striking.

321. Taken together, the three Executive Defendants sold shares representing a material percentage of their holdings (20–41%), at prices artificially inflated by the concealed practices, in patterns that deviated markedly from their pre- and post-Class Period trading histories. The timing of Jackson's and Hughes's September 2023 sales—immediately after providing false assurances about the inventory problem and before the November 16 disclosure of its true magnitude—is particularly probative of scienter.

### D. The Simultaneous Termination of Both the CEO and CFO Is Circumstantial Evidence That the Board Concluded They Were Responsible for the Concealed Practices

322. On November 16, 2023, ChargePoint announced the immediate departures of both CEO Romano and CFO Jackson, effective the same day the Company pre-announced the devastating Q3 FY2024 preliminary results described in Part IX.C. The Board offered no detailed reasons for the abrupt leadership changes, had no permanent replacement ready for Jackson, and elevated COO Wilmer—who had spent 18 months investigating the supply chain and inventory management problems during Romano's and Jackson's tenure.

323. The simultaneous removal of both the CEO and CFO is powerful circumstantial evidence of scienter. Here, multiple features make this evidence particularly compelling: (a) both occurred on the same day as the corrective disclosure; (b) there was no permanent CFO replacement, indicating the decision was abrupt; (c) the new CEO's first act was to take a $42 million impairment charge that the prior management had failed to take; and (d) Wilmer described the impairment weeks later as addressing "executional issues" from the prior regime.

324. Analysts and commentators directly connected Romano's and Jackson's abrupt exits to the impairment charges and other underlying concerns at ChargePoint, including::

- EVinFocus (November 17, 2023): "And the firm *suggests that Romano and Jackson's exits may be in relation to the impairment charge. In his previous role, Wilmer was leading a probe into the company's supply chain, manufacturing processes and inventory management*." [24]

- Pickering Energy (November 17, 2023): "Effectively immediately, CEO Pat Romano has been replaced with COO Rick Wilmer, and CFO Rex Jackson has been replaced on an interim basis by Mansi Khetani, who is CHPT's current SVP of Financial Planning and Analysis. *The abrupt leadership change shortly after the substantial capital raise in October is disconcerting, to say the least*."

- The Motley Fool (November 20, 2023): "*Those sudden leadership changes, along with the fact that its insiders sold more than 10 times as many shares as they bought over the past 12 months, don't inspire much confidence in a quick turnaround*." [25]

- The Motley Fool (December 8, 2023): "On Nov. 16, ChargePoint published two unexpected press releases. The first said that its COO, Rick Wilmer, would replace 12-year CEO Pasquale Romano as the new CEO. And CFO Rex Jackson would be replaced by interim CFO Mansi Khetani, the senior vice president of financial planning and analysis. *Two major leadership changes at once are a sign that change is needed to turn a business around and that the board has lost confidence in management's ability to execute*." [26]

---

[24] Ciaran Donnelly, "Chargepoint execs exit as earnings take $42mn hit," EVinFocus (Nov. 17, 2023), available at https://www.evinfocus.com/chargepoint-execs-exit-as-earnings-take-42mn-hit/.

[25] Leo Sun, "3 Red Flags for ChargePoint Holdings' Future," The Motley Fool (Nov. 20, 2023), available at https://www.fool.com/investing/2023/11/20/3-red-flags-for-chargepoint-holdings-future/.

[26] Daniel Foelber, "Is the Worst Finally Over for ChargePoint Stock?," The Motley Fool (Dec. 8, 2023), available at https://www.fool.com/investing/2023/12/08/is-the-worst-finally-over-for-chargepoint-stock/.

### E. The Fraud Involved ChargePoint's Core Revenue-Generating Operations, About Which Defendants Repeatedly Held Themselves Out as Knowledgeable

325. The alleged fraud did not involve some peripheral aspect of ChargePoint's business. It involved the Company's *core* operations: how it recognized revenue on the sale of its primary products—charging stations and subscriptions—and how it managed the inventory and supply chain that produced those products. Revenue from networked charging systems and subscriptions was ChargePoint's principal revenue stream, constituting the vast majority of reported revenue in every quarter of the Class Period. The practices described in Part VI—unauthorized shipments, shipments of incomplete or incorrect products, pushing unneeded product to resellers and distributors, premature software activations, and undocumented side deals—went to the heart of how that core revenue was generated and recognized.

326. Defendants repeatedly held themselves out as personally knowledgeable about these core operations. On every quarterly earnings call during the Class Period, Romano and Jackson provided detailed commentary on revenue growth, supply chain conditions, inventory levels, gross margins, and customer demand. They voluntarily offered granular detail, suggesting they were deeply engaged with and informed about the very operational areas where the fraud was occurring. *See* Part VIII (identifying these statements by quarter).

327. Defendants also had access to the real-time data systems that would have revealed the improper practices. According to FE-3, all information—including a report tracking the empty frames—should be available in Salesforce and was sent to the VP of Revenue Operations. According to FE-8, hold-for-release orders were identifiable in Salesforce because they had "HFR" in their titles and notes all over stating hold for release or customer not ready for it. FE-2 prepared a monthly sales report that documented sales and tracked orders that were shipped, which was used to determine monthly and quarterly revenue. The report was prepared on an Excel spreadsheet that was submitted up the chain of command through FE-2's supervisor and was discussed in meetings held by FE-2's supervisor and Hughes.

328. Where, as here, the alleged fraud involves a company's core operations and the individual defendants repeatedly held themselves out as knowledgeable about those operations, the

inference that they knew of the improper practices is strong. *See South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008). The Executive Defendants were not distant overseers of a large conglomerate; they were hands-on operators of a company whose entire business was selling charging stations and subscriptions—the very products at the center of the fraud.

329. Considered collectively, as *Tellabs* requires, these facts give rise to a strong inference of scienter that is at least as compelling as any opposing inference of innocent conduct. The Executive Defendants did not merely fail to detect problems below them in the organization; they personally participated in the very practices at the heart of the fraud—Romano by approving a $10 million fire-sale promotion that was so far outside the ordinary course it required CEO sign-off (Part XI.A.1), Jackson by personally acknowledging undocumented side rebate deals in oral conversations with a reseller executive and agreeing to verify and ultimately approve them (Part XI.A.2), and Hughes by directing sales teams to ship products prematurely and giving awards for the premature activation of software tokens (Part XI.A.3). They were motivated to inflate revenue because their compensation was tied to it—with revenue-linked PSUs, stock options, and bonuses constituting the majority of their total compensation (Part XI.B). They acted on their knowledge by selling substantial shares during windows between their public assurances and the corrective disclosures—Jackson and Hughes together selling shares worth $3.39 million during the September-November 2023 window alone (Part XI.C). The Board's response—simultaneously terminating both the CEO and CFO on the same day as the worst corrective disclosure in the Company's history—is inconsistent with mere business misjudgment and strongly suggests the Board concluded that Romano and Jackson bore personal responsibility for the concealed practices (Part XI.D). And the fraud involved the core of ChargePoint's business—how it sold, shipped, and recognized revenue on the only products it made—not some peripheral division or subsidiary unknown to senior management (Part XI.E). No plausible opposing inference can account for all of these facts simultaneously. An innocent executive does not personally agree to verify and ultimately approve oral side deals, sell shares before a disclosure, and get fired on the day the truth comes out. The inference of scienter is cogent and compelling.

## XII. THE SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS DOES NOT APPLY

330. The statutory safe harbor for forward-looking statements under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-5, and the judicially created bespeaks caution doctrine do not apply to any of the materially false and misleading statements alleged in this Complaint.

331. ***The challenged statements were not forward-looking***. The vast majority of the statements identified in Part VIII were statements of then-present or historical fact: reported revenue figures, reported gross margins, and characterizations of existing customer demand. None of these statements was forward-looking. The safe harbor does not protect statements "included in a financial statement prepared in accordance with generally accepted accounting principles." 15 U.S.C. § 78u-5(b)(2)(A). The improper revenue recognition practices described in Part VI rendered ChargePoint's reported financial results materially misleading, as Defendants never disclosed that a material portion of reported revenue was derived from unauthorized shipments, incomplete product deliveries, channel stuffing, premature software token activations, and undocumented side deals that violated ChargePoint's revenue recognition policy. As such, the financial statements incorporating those results are not protected.

332. ***Any forward-looking statements lacked meaningful cautionary language***. To the extent any of the challenged statements could be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying the specific risks that actually materialized. ChargePoint's generic risk disclosures did not warn investors that a material portion of reported revenue was derived from unauthorized shipments, incomplete product deliveries, channel stuffing, premature software token activations, and undocumented side deals that violated GAAP. *See* Part VI. Nor did they disclose that ChargePoint was carrying tens of millions of dollars of obsolete CPE 250 inventory at inflated values. *See* Part VII.C. Cautionary language that omits the specific risks that are known to the speaker and that actually come to pass is not "meaningful" within the meaning of the safe harbor.

333. ***Defendants had actual knowledge of falsity.*** Even if the safe harbor could otherwise apply, it does not protect forward-looking statements made with “actual knowledge” that the statement was “false or misleading.” 15 U.S.C. § 78u-5(c)(1)(B). As alleged in Part XI, each Executive Defendant personally participated in or directed the practices that rendered ChargePoint’s financial reports false: Romano personally approved the $10 million fire-sale promotion; Jackson personally approved undocumented side deals on quarterly calls with a reseller executive; Hughes personally directed sales teams to ship products prematurely and gave awards for the premature software token practices. *See* Part XI.A. Defendants’ actual knowledge of the practices that contradicted their public statements—including any forward-looking statements—precludes application of the safe harbor.

## XIII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

334. The market for ChargePoint’s securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, ChargePoint’s securities traded at artificially inflated prices during the Class Period. On June 7, 2023, the Company’s share price closed at a Class Period high of $9.78 per share. Lead Plaintiffs and other members of the Class purchased or otherwise acquired the Company’s securities relying upon the integrity of the market price of ChargePoint’s securities and market information relating to ChargePoint and have been damaged thereby.

335. During the Class Period, the artificial inflation of ChargePoint’s shares was caused by the material misrepresentations and/or omissions particularized in Part VIII. These misstatements and omissions created an unrealistically positive assessment of ChargePoint’s business, revenue trajectory, financial condition, and prospects, causing the price of ChargePoint’s securities to be artificially inflated at all relevant times. When the truth was disclosed through the corrective disclosures described in Part IX, the artificial inflation was removed and the price of ChargePoint’s securities declined, as described in Part X. Defendants’ materially false and misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the

Class purchasing ChargePoint securities at artificially inflated prices, and each of them has been damaged as a result.

336. At all relevant times, the market for ChargePoint's securities was an efficient market for the following reasons, among others:

a. ChargePoint shares met the requirements for listing and ChargePoint was listed and actively traded on the NYSE, a highly efficient and automated market;

b. As a regulated issuer, ChargePoint filed periodic public reports with the SEC, including annual reports on Form 10-K, quarterly reports on Form 10-Q, and current reports on Form 8-K;

c. ChargePoint regularly communicated with the investing public through established market communication mechanisms, including regular dissemination of press releases on major newswire services, quarterly earnings calls open to analysts and investors, and investor presentations; and

d. ChargePoint was followed by securities analysts employed by major brokerage firms—including Wolfe Research, Needham, Oppenheimer, Roth Capital, Fox Advisors, and Pickering Energy Partners—who published research reports about the Company that were distributed to their clients and entered the public marketplace.

337. As a result of the foregoing, the market for ChargePoint's securities promptly digested current information regarding ChargePoint from all publicly available sources and reflected such information in ChargePoint's share price. Under these circumstances, all purchasers of ChargePoint's securities during the Class Period suffered similar injury through their purchase of ChargePoint's securities at artificially inflated prices and a presumption of reliance applies.

338. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded in significant part on Defendants' material omissions. As alleged in Part VIII, Defendants failed to disclose that a material portion of ChargePoint's reported revenue was generated by practices violating ChargePoint's revenue policy and that the revenue

growth Defendants attributed to organic demand was unsustainable (Part VI), that the Company was carrying tens of millions of dollars of obsolete inventory at inflated values (Part VII.C). Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth in Part VIII, that requirement is satisfied here.

## XIV. CLASS ACTION ALLEGATIONS

339. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities that purchased or otherwise acquired ChargePoint securities between December 7, 2021 and November 16, 2023, inclusive, and who were damaged thereby ("Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

340. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ChargePoint's shares actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of ChargePoint shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by ChargePoint or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

341. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

342. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

343. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether the federal securities laws were violated by Defendants' acts as alleged herein; (b) whether statements made by Defendants to the investing public during the Class Period omitted or misrepresented material facts about the business, operations, revenue recognition practices, and financial condition of ChargePoint; (c) whether Defendants acted with scienter in making materially false and misleading statements and in engaging in the fraudulent scheme alleged herein; (d) whether the prices of ChargePoint securities were artificially inflated during the Class Period; and (e) to what extent the members of the Class have sustained damages and the proper measure of damages.

344. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XV. CAUSES OF ACTION

### COUNT I

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder (Against Defendants ChargePoint, Romano, and Jackson)**

345. This cause of action is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5. This claim is asserted on behalf of all members of the Class against Defendants ChargePoint, Romano, and Jackson.

346. ***Material misstatements and omissions.*** During the Class Period, Defendants ChargePoint, Romano, and Jackson made untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading, in connection with the purchase or sale of securities, as particularized in Part VIII. These statements included, but were not limited to, materially false and misleading representations about ChargePoint's revenue, revenue growth rates, gross margins, inventory valuation, and the sustainability of the Company's financial performance, made in filings with the SEC and earnings calls during each quarter of the Class Period from Q3 FY2022 through Q1 FY2024. *See* Part VIII.A–H.

347. ***Falsity.*** Each of the statements identified in Part VIII was materially false and misleading when made because: (a) a material portion of ChargePoint's reported revenue was generated by practices that violated GAAP (ASC 606) and the Company's own revenue recognition policy, including unauthorized shipments, shipment of incomplete or non-functioning products, channel stuffing through undocumented deals, premature software token activations, and undocumented oral agreements for rebates and discounts (Part VI.B–E); (b) ChargePoint was carrying tens of millions of dollars of obsolete CPE 250 inventory at inflated values rather than writing it down as required by ChargePoint's inventory policy (Part VII.C); and (c) the revenue growth that Defendants attributed to organic customer demand was materially dependent on the improper practices and was therefore unsustainable.

348. ***Scienter.*** Defendants acted with scienter—that is, with knowledge or severe recklessness—as established by: the personal participation of Romano and Jackson in the deceptive practices (Part XI.A.1–2); the stock-based compensation structure that gave Defendants motive to inflate revenue (Part XI.B); the insider trading during the Class Period that was unusual and suspicious in both timing and amount (Part XI.C); the simultaneous termination of both Romano and Jackson coinciding with the full corrective disclosure (Part XI.D); and the fact that the fraud involved ChargePoint's core revenue-generating operations about which Defendants repeatedly held themselves out as knowledgeable (Part XI.E). Taken together, these allegations give rise to a strong inference of scienter at least as compelling as any opposing inference.

349. ***Reliance.*** Lead Plaintiffs and the Class are entitled to a presumption of reliance under the fraud-on-the-market doctrine and the *Affiliated Ute* omissions presumption, as set forth in Part XIII.

350. ***Loss causation.*** The corrective disclosures on September 6, 2023, and November 16, 2023, revealed the very facts that Defendants had concealed, causing statistically significant declines in ChargePoint's stock price of 11% and 35%, respectively, as set forth in Part X.

351. ***Damages.*** Lead Plaintiffs and the Class suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ChargePoint securities. Had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct, they would not have purchased ChargePoint securities at the prices they paid, or at all.

352. By virtue of the foregoing, Defendants ChargePoint, Romano, and Jackson violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

**COUNT II**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder (Against all Defendants, Including Hughes)**

353. This Count is brought pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. § 240.10b-5(a) and (c). Accordingly, Lead Plaintiffs need not allege in this Count, nor prove in this case, that each of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law. This claim is asserted on behalf of all members of the Class against Defendants ChargePoint, Romano, Jackson, and Hughes.

354. ***The deceptive scheme.*** During the Class Period, Defendants engaged in deceptive and manipulative acts in furtherance of a scheme to defraud investors by artificially inflating ChargePoint's reported revenue and concealing the true sources of the Company's reported growth. The scheme involved five categories of specific deceptive practices, each of which constituted a "deceptive or manipulative act" distinct from, and in addition to, the false and misleading statements challenged in Count I:

(a) Shipping products to customers who had not authorized delivery, including to construction sites, vacant lots, and locations that were not ready to receive them, and recognizing revenue before the fulfillment of ASC 606 Steps 1, 3, and 5 (Part VI.B);

(b) Shipping incomplete, non-functioning, or wrong products—including empty charger frames without internal components—and recognizing revenue before the customer received a product that satisfied ChargePoint's performance obligation under ASC 606 Step 5 (Part VI.C);

(c) Stuffing distribution channels with unneeded inventory through coercive practices and undocumented side deals—including oral agreements for rebates, discounts, buy-one-get-one arrangements, and return rights that were not reflected in purchase orders—and recognizing revenue on products that sat unsold in reseller warehouses, in violation of ASC 606 Steps 1, 3, and 5 (Part VI.D);

(d) Prematurely activating software subscription tokens for hardware that had not been installed, sold to end customers, or even shipped from warehouses, inflating subscription revenue in violation of ASC 606 Step 5 (Part VI.E); and

(e) Entering into undocumented oral agreements for rebates, discounts, and special terms that created unrecorded obligations not reflected in ChargePoint's financial statements, in violation of ASC 606, Steps 1 and 3 (Part VI.D).

355. ***Each Executive Defendant's specific deceptive conduct.*** Each Executive Defendant personally committed deceptive acts in furtherance of the scheme that went beyond the making of any statement:

(a) **Romano** oversaw the top-down direction of the improper sales practices (FE-2 and FE-3), and signed SOX certifications attesting to the accuracy of financial reports he knew were misleading. *See* Part XI.A.1.

(b) **Jackson** personally agreed to verify undocumented side deals in oral conversations with reseller executives on at least 5 to 10 calls between 2021 and 2023 (CW-1), exercised sign-off authority over any additional discounts or deals beyond what was being offered as

a promotion and all non-standard deal terms (FE-6), and signed SOX certifications. *See* Part XI.A.2.

(c) **Hughes** personally directed sales teams to ship products prematurely and without authorization (FE-1, FE-2), directed the shipment of empty charger frames (FE-3), personally negotiated rebate structures with a reseller (CW-1), and gave sales awards for premature software token activations (CW-1). *See* Part XI.A.3.

356. ***Connection to purchase or sale of securities.*** The deceptive practices described above were undertaken in connection with the purchase or sale of ChargePoint securities. The practices artificially inflated ChargePoint's reported revenue and other financial metrics that were disseminated to the market through the SEC filings and earnings calls identified in Part VIII, directly causing ChargePoint's securities to trade at artificially inflated prices during the Class Period.

357. Lead Plaintiffs and the Class reasonably relied upon the integrity of the market in which ChargePoint securities traded. During the Class Period, Lead Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct. Had they known of the scheme, they would not have purchased ChargePoint securities at the artificially inflated prices they paid, or at all.

358. As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchases of ChargePoint securities during the Class Period.

359. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Lead Plaintiffs and the Class for damages suffered in connection with their purchases of ChargePoint securities during the Class Period.

## COUNT III

### Violation of Section 20(a) of the Exchange Act—Control Person Liability (Against Defendants Romano, Jackson, and Hughes)

360. This Count is asserted on behalf of Lead Plaintiffs and all members of the Class against Defendants Romano, Jackson, and Hughes (collectively, the "Executive Defendants") for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

361. The Executive Defendants acted as controlling persons of ChargePoint within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company—CEO, CFO, and Chief Commercial and Revenue Officer, respectively—their direct participation in and awareness of the Company's operations, and their intimate knowledge of the Company's actual financial performance and practices, the Executive Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the materially false and misleading statements alleged herein. *See* Part IV.C.

362. Each Executive Defendant was provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. The Executive Defendants also had direct and supervisory involvement in the day-to-day operations of the Company and therefore had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. *See* Part XI.A.1–3 (detailing each Executive Defendant's specific involvement).

363. As set forth above, ChargePoint and the Executive Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XVI. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## XVII. JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

DATED: March 6, 2026

Respectfully submitted,

By: *<u>/s/ Lucas E. Gilmore</u>*

Lucas E. Gilmore (SBN 250893)
Reed R. Kathrein (SBN 139304)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
lucasg@hbsslaw.com
reed@hbsslaw.com

Raffi Melanson (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Sq, 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
raffim@hbsslaw.com

*Lead Counsel and Counsel for Lead Plaintiffs Shahram Afshani and Paulina Afshani Schwartz*