Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: reed@hbsslaw.com
Email: lucasg@hbsslaw.com

*Lead Counsel and Counsel for Lead Plaintiffs*
*Shahram Afshani and Paulina Afshani Schwartz*

*[Additional counsel on signature page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FAROOQ KHAN, Individually on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CHARGEPOINT HOLDINGS, INC., et al., <br><br> Defendants. | Case No. 5:23-cv-06172-NW <br><br> CLASS ACTION <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS CHARGEPOINT HOLDINGS, INC., PASQUALE ROMANO, REX S. JACKSON, AND MICHAEL HUGHES'S MOTION TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> Assigned to: Hon. Noël Wise <br><br> Date: June 17, 2026 <br> Time: 9:00 a.m. <br> Place: Courtroom 3, 5th Floor |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT                    Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

**TABLE OF CONTENTS**

**Page**

TABLE OF DEFINED TERMS ........................................................................................................ vi

I.      INTRODUCTION ......................................................................................................... 1

II.     OVERVIEW OF THE FRAUD ..................................................................................... 3

        A.      A material portion of ChargePoint's reported revenue derived from
                undisclosed, unsustainable practices. .............................................................. 3

        B.      ChargePoint concealed a massive inventory overvaluation. ............................ 5

        C.      The truth emerges in two stages. ..................................................................... 5

III.    THE TAC RESOLVES THE COURT'S PRIOR CONCERNS
        REGARDING SUPPLY CONSTRAINTS AND PRE-CLASS PERIOD
        FACTS ......................................................................................................................... 7

        A.      Supply constraints and excess inventory are not contradictory. ...................... 7

        B.      Pre-Class Period conduct is connected to the Class Period. ............................ 8

IV.     THE TAC STATES A CLAIM FOR SCHEME LIABILITY UNDER
        RULE 10B-5(A) AND (C)............................................................................................ 9

        A.      The TAC alleges a widespread revenue recognition scheme.............................. 9

        B.      The aggregate magnitude was material................................................................ 11

        C.      Each Executive Defendant committed deceptive acts. ...................................... 13

        D.      The FEs and CW-1 are credible witnesses......................................................... 14

V.      THE TAC STATES A CLAIM UNDER RULE 10B-5(B). ......................................... 16

        A.      Revenue-driver statements were false and misleading. ...................................... 16

        B.      Inventory statements were false and misleading.................................................. 18

        C.      The challenged statements are not puffery, opinion, or protected
                forward-looking statements.................................................................................. 19

VI.     DEFENDANTS ACTED WITH SCIENTER................................................................ 20

VII.    THE TAC ADEQUATELY ALLEGES LOSS CAUSATION ...................................... 23

VIII.   THE TAC ADEQUATELY ALLEGES CONTROL PERSON LIABILITY ................. 25

IX.     CONCLUSION ............................................................................................................. 25

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT - i                    Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adaptive Broadband Sec. Litig.*,
   2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ............................................................................ 11

*Alaska Elec. Pension Fund v. Adecco S.A.*,
   371 F.Supp. 2d. 1203 (S.D. Cal. 2005) ................................................................................. 15

*In re Alphabet, Inc. Secs. Litig.*,
   1 F.4th 687 (9th Cir. 2021) .................................................................................................... 11

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ................................................................................................. 15

*In re: Bofi Holding, Inc. Sec. Litig.*,
   2016 WL 5390533 (S.D. Cal. Sept. 27, 2016) ........................................................................ 8

*Borteanu v. Nikola Corp.*,
   2023 WL 1472852 (D. Ariz. Feb. 2, 2023) ............................................................................ 14

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
   964 F. Supp. 2d 1128 (N.D. Cal. 2013) ................................................................................. 25

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ............................................................................................ 19, 22

*City of Providence v. Aeropostale, Inc.*,
   2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ....................................................................... 21

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ............................................................................................... 12

*In re Doximity, Inc. Secs. Litig.*,
   2025 WL 1449598 (N.D. Cal. May 13, 2025) (Wise, J.) ....................................................... 20

*Eminence Cap., LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ............................................................................................... 25

*Evanston Police Pension Fund v. McKesson Corp.*,
   411 F. Supp. 3d 580 (N.D. Cal. 2019) ................................................................................... 25

*Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ................................................................................................. 22

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
   97 F.4th 1171 (9th Cir. 2024) ................................................................................................ 23

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT - ii          Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

*In re Gilead Sci. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) .............................................................................. 8

*Gimpel v. The Hain Celestial Grp., Inc.*,
    156 F.4th 121 (2d Cir. 2025) .............................................................................. 17

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) ................................................................................ 8

*Hurst v. Emphase Energy, Inc.*,
    2021 WL 3633837 (N.D. Cal. Aug. 17, 2021) ..................................................... 10

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................................. 16

*Kampe v. Volta Inc.*,
    2024 WL 308262 (N.D. Cal. Jan. 26, 2024) ....................................................... 16

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ................................................................................ 3

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ............................................................................ 24

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) .............................................................................. 24

*Lorenzo v. Sec. & Exch. Comm'n*,
    139 S.Ct. 1094 (2019) .......................................................................................... 9

*In re Mattel, Inc. Sec. Litig.*,
    2021 WL 1259405 (C.D. Cal. Jan. 26, 2021) ..................................................... 14

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) .............................................................. 16

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ......................................................................... 23, 25

*Mulderrig v. Amyris, Inc.*,
    492 F. Supp. 3d 999 (N.D. Cal. 2020) ................................................................ 20

*Murphy v. Precision Castparts Corp.*,
    2017 WL 3084274 (D. Or. June 27, 2017) .......................................................... 17

*Nathanson v. Polycom, Inc.*,
    87 F. Supp. 3d 966 (N.D. Cal. 2015) .................................................................. 25

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ............................................................................ 23

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT - iii              Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

*In re Plantronics, Inc. Sec. Litig.*,
2022 WL 3653333 (N.D. Cal. Aug. 16, 2022)........................................................... 17, 18, 22

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017).................................................................................. 10, 19

*In re Questcor Sec. Litig.*,
2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) .......................................................... 21

*Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*,
111 F. Supp. 3d 1336 (S.D. Fla. 2015) .................................................................. 8

*Roberti v. OSI Sys., Inc.*,
2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)........................................................ 22

*Roberts v. Zuora, Inc.*,
2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ........................................................ 15

*In re Seagate Tech. Holdings PLC Sec. Litig.*,
2025 WL 1744505 (N.D. Cal. May 12, 2025) ........................................................ 14

*Sharenow v. Impac Mortg. Holdings, Inc.*,
385 F. App'x 714 (9th Cir. 2010) .......................................................................... 8

*Stary v. Teladoc Health, Inc.*,
2026 WL 878939 (S.D.N.Y. Mar. 31, 2026) .......................................................... 22

*State Teachers Ret. Sys. of Ohio v. ZoomInfo Techs., Inc.*,
2025 WL 3013683 (W.D. Wash. Oct. 28, 2025) ................................................. 12, 13, 16, 19

*Steamfitters Local 449 Pension & Ret. Sec. Funds v. Extreme Networks, Inc.*,
2026 WL 817221 (N.D. Cal. Mar. 23, 2026).................................................................*passim*

*In re Stem, Inc. Sec. Litig.*,
2025 WL 3675114 (N.D. Cal. Dec. 17, 2025) ...................................................... 10

*In re SVB Fin. Grp. Secs. Litig.*,
2025 WL 1676800 (N.D. Cal. June 13, 2025) (Wise, J)........................................ 15

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ............................................................................................. 13, 20, 22

*In re The Trade Desk, Inc. Sec. Litig.*,
2026 WL 790911 (N.D. Cal. Mar. 17, 2026)....................................................... 16, 19, 20, 21

*Thomas v. Magnachip Semiconductor Corp.*,
167 F. Supp. 3d 1029 (N.D. Cal. 2016) .............................................................. 22

*United Ass'n Nat'l Pension Fund v. Carvana Corp.*,
759 F.Supp.3d 926 (D. Ariz. 2024)..................................................................... 9

011214-11/3502847 V7

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) .............................................................................. 20, 21

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996)...................................................................................................... 16

*Weston v. DocuSign*,
    669 F. Supp. 3d 849 (N.D. Cal. 2023) .................................................................................. 15

*York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*,
    738 F. Supp. 3d 1182 (N.D. Cal. 2024) ............................................................................... 13

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)................................................................................................... 16

**Statutes**

15 U.S.C. § 78t(a) ....................................................................................................................... 25

15 U.S.C. § 78u-5(c)(B)(i) .......................................................................................................... 19

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT - v          Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

**TABLE OF DEFINED TERMS**

| Term | Meaning |
| --- | --- |
| ¶ (in text) | Refers to paragraph in the Third Amended Class Action Complaint for Violations of the Federal Securities Laws ("TAC") (ECF No. 150). |
| ChargePoint | ChargePoint Holdings Inc. (also referred to as "the Company") |
| Class | All persons or entities who purchased or otherwise acquired ChargePoint securities from December 7, 2021 to November 16, 2023, inclusive (the "Class Period"), and were damaged thereby. |
| CW | Confidential witness |
| Defendants | Corporate Defendant ChargePoint and Executive Defendants Romano, Jackson and Hughes. |
| Executive Defendants | Romano, Jackson, and Hughes |
| EVs | Electric vehicles |
| FE | Former employee |
| FY | Fiscal Year—for ChargePoint, the period from February 1 to January 31. As an example, FY22 ran from February 1, 2021 to January 31, 2022. |
| GAAP | Generally Accepted Accounting Principles—the standard under which financial statements filed with the SEC are generally prepared and presented. *See* 17 C.F.R. § 210.4-01(a)(1). |
| Hughes | Defendant Michael Hughes, ChargePoint's Chief Commercial and Revenue Officer, who reported to ChargePoint's CEO, Defendant Romano. ¶¶47-49, 52. |
| Jackson | Defendant Rex S. Jackson—ChargePoint's Chief Financial Officer ("CFO") from 2018 to November 2023. ¶¶44-46. |
| Plaintiffs | Lead Plaintiffs Shahram Afshani and Paulina Afshani Schwartz. ¶33. |
| PSLRA | Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 |
| Romano | Defendant Pasquale Romano—ChargePoint's President and Chief Executive Officer ("CEO") from 2018 to November 2023. ¶¶41-43. |
| Rule 10b-5 | 17 C.F.R. § 240.10b-5 |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT - vi          Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

## I.  INTRODUCTION

Defendants' Motion ("MTD") asks this Court to take an unprecedented step. Defendants seek to dismiss a securities fraud complaint where eight former employees, a former General Counsel/Vice President, and a former employee for a ChargePoint reseller each describe, with firsthand knowledge, the same categories of improper sales practices collectively covering every quarter of the twenty-three-month Class Period. No court in this Circuit has dismissed a complaint at the pleading stage where that many independent, corroborating witnesses with that breadth of temporal coverage described the same systemic, top-down scheme to manufacture revenue.

Defendants offer no justification for this Court to be the first.  Instead, they ask the Court to accept their account that ChargePoint's collapse stemmed from legitimate revenue practices and ignore the detailed accounts of eleven individuals who bear witness to the deceptive sales practices. That is not a proper pleading challenge. It is a request that the Court weigh evidence, resolve factual disputes, and credit Defendants' counter narrative — precisely what the PSLRA forbids at this stage.

Contrary to Defendants' spin, the TAC is not a case of "fraud by hindsight." It is a case of fraud by design, documented in real-time by witnesses across the Company's hierarchy and broader distribution ecosystem. Through these witnesses, the TAC provides the precise details the Court previously sought, describing with particularity the five specific categories of deceptive revenue practices—unauthorized deliveries, shipping incomplete or incorrect products, coercive channel stuffing, fictitious software activations, and undocumented side deals—used to bridge the gap between flat organic demand and the Company's aggressive revenue guidance. The subsequent $70 million inventory impairment, 30% revenue shortfall, negative gross margins, and simultaneous termination of the CEO and CFO are not the ***basis*** for the fraud allegations. Rather, as the TAC alleges, these events were the ***inevitable consequences*** of the unsustainable practices detailed by the witnesses.

Defendants contend that the TAC contains no new facts. MTD at 1. But that misses the point. This Court did not dismiss the Second Amended Complaint ("SAC") because Plaintiffs lacked factual merit. It dismissed because Plaintiffs had not organized and connected those facts

011214-11/3502847 V7

with sufficient particularity and had not explained what was false, had not reconciled the supply constraint theory, and had not tied pre-Class Period conduct to the Class Period. The TAC does each of these things, and addresses the remaining deficiencies identified by the Court's Order:

*Falsity.* The TAC now organizes the false statement allegations quarter by quarter, identifying: (1) the specific false and misleading statements; (2) the specific contemporaneous facts—drawn from nine former employees and a confidential witness with firsthand Class Period knowledge—that rendered those statements false when made; and (3) the material information Defendants omitted. ¶¶144-242. The statements were false and misleading when made because Defendants attributed revenue growth to organic demand when a material portion was manufactured through the five categories of improper practices. ¶145.

*The contradiction.* The Court found the simultaneous allegation of supply constraints and excess inventory implausible. Part VII of the TAC resolves this: ChargePoint simultaneously faced supply constraints on certain components and products (preventing it from filling legitimate orders) while accumulating excess inventory of one specific legacy product—the CPE 250—because it had over-ordered CPE 250s during the pandemic and the charger later became unsalable due to product transitions. ¶¶117-39. These are not contradictory; they are two consequences of the same set of supply chain disruptions. ¶¶140-43.

*Pre-Class Period conduct.* The TAC connects the pre-Class Period accounts of former VP and corporate counsel Rachel Larrenaga to the Class Period by showing a longstanding course of misconduct—quarterly revenue engineering through deep discounts, channel loading, and retaliation against those who objected—that continued throughout the Class Period as confirmed by multiple Class Period witnesses describing the identical practices. ¶¶99-104.

*Individual liability.* The TAC identifies specific deceptive acts committed by each Executive Defendant beyond making false statements: Romano approved the $10 million fire sale and directed the premature shipment practices (¶¶297-300); Jackson participated in undocumented side deals on calls with resellers and had sign-off authority over all non-standard discounts (¶¶302-06); and Hughes directed the unauthorized and premature shipments, participated in rebate structures, and rewarded employees who sold software tokens for inactivated stations (¶¶308-11).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT – 2          Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

***Loss causation***. The TAC maps each corrective disclosure to the specific concealed facts it revealed, connecting the September partial disclosure and the more fulsome November disclosure to the practices Defendants failed to disclose. ¶¶273-93.

Defendants' Motion largely reprises arguments the Court has already seen. Its repeated mantra—that the TAC is merely a reshuffled version of the SAC—ignores the structural and substantive changes detailed above. Defendants' Motion should be denied.

## II.   OVERVIEW OF THE FRAUD

### A.   A material portion of ChargePoint's reported revenue derived from undisclosed, unsustainable practices.

During the Class Period, Defendants engaged in five categories of deceptive practices that violated GAAP—specifically ASC 606—and ChargePoint's own publicly stated revenue recognition policy, to inflate the Company's reported revenue. ¶¶64-113.[1] As detailed below, the Executive Defendants personally directed and approved these practices. ¶¶ 297-311.

**1.   Unauthorized shipments.** ChargePoint routinely shipped products to customers who had not authorized delivery. ¶¶69-70. FE-1 described a directive between summer/fall 2022 to ship all pending orders regardless of customer readiness, and personally observed invoices and reconciliation in Salesforce confirming ChargePoint recognized revenue on those shipments. *Id.* FE-2 described shipping orders to vacant lots and construction sites at the end of quarters in July 2022, October 2022, January 2023, and continuing through March 2023. ¶¶74-75. FE-8 reported customers complained about unauthorized shipments every quarter beginning in late 2022, which ChargePoint could count as revenue even if shipments were later returned at ChargePoint's expense. ¶¶71-72. FE-8 also reported the existence of "Hold for Release" orders which were for products that customers had not even paid for and were not ready to receive. ¶73. FE-8 knew ChargePoint counted "Hold for Release" orders as revenue based on FE-8's review of booked and billed figures at sales operations meetings. *Id.*

FE-1 stated the directive to ship pending orders had to be approved at the executive level—

---

[1] Plaintiffs do not oppose Defendants' request for judicial notice (ECF No. 154) based on their understanding that the Court will not "assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." Order at 6 n.4 (citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018)).

011214-11/3502847 V7

Hughes or higher. ¶69. FE-2 confirmed the orders came from FE-2's supervisor, who said they were following orders from their supervisors: Hughes and/or Romano. ¶75.

**2.     Incomplete and wrong products.** According to FE-3, starting in the second half of 2021, ChargePoint shipped empty charger frames without internal components or charging modules. ¶77. FE-3 stated Hughes and the VP of Revenue Operations made this decision to minimize financial repercussions of the backorder situation and recognize revenue. *Id.* FE-2 described shipping wrong product models and products with missing parts, including CT4000 units, knowing customers would return them but using the opportunity to recognize revenue. ¶79. This shipping directive came from FE-2's supervisor's supervisors (Hughes and/or Romano) and FE-2 personally observed this practice in July 2022, October 2022, and January 2023. *Id.*

**3.     Channel stuffing.** CW-1, a senior employee at a ChargePoint reseller, described how from 2021 to 2023, ChargePoint forced resellers to take on more inventory than they needed, offering undocumented rebates and threatening those who tried to return product. ¶¶83-86. FE-6 described end-of-quarter "stink bomb" deals totaling $1 million each, 3-5 per quarter, that lacked proper documentation. ¶93. FE-6 also described a $10 million, 50% discount fire sale of CPE 250 chargers in summer 2023 requiring approval from everyone up to the CEO. ¶95. FE-7 stated Hughes would urge the sales team to close deals and have distributors take on more product to meet quarterly targets. ¶89. FE-9 described contractors holding millions of dollars of inventory that customers were not ready to receive, a practice FE-9 believes started in 2021. ¶¶96-98.

**4.     Premature software tokens.** CW-1 stated ChargePoint prematurely activated software tokens, assigning them to "fictitious" customers who had not yet purchased or activated the associated products, beginning in January 2020 and continuing through 2023. ¶107. ChargePoint's stated policy was to recognize subscription revenue on a "straight-line basis" beginning at the time subscriptions were activated. ¶106. By activating tokens before any customer had actually purchased or used the associated products, ChargePoint pulled forward subscription revenue it was not entitled to recognize under ASC 606, Steps 1, 3, and 5. *Id.* Nevertheless, Hughes gave sales awards to employees who sold tokens for inactivated stations. ¶112.

**5**.     **Undocumented side agreements.** CW-1 stated the rebate terms offered to resellers

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT – 4                    Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

were not documented in purchase orders and were verbal. ¶86. CW-1 described 5 to 10 calls with Jackson where Jackson and CW-1's CFO discussed these undocumented deals. ¶87. FE-6 confirmed Jackson had sign-off authority on any additional discounts beyond standard promotions. *Id.* CW-1 reported that Hughes directly participated in ChargePoint's rebate structures and partner programs, and on one occasion, Hughes sat down with CW-1's boss to talk about rebate structures. ¶88.

Defendants never disclosed these unsustainable practices to investors. Instead, they attributed the resulting revenue to organic demand, emphasizing ChargePoint's "investments . . . over many years" (¶146), "growth in charging demand from accelerated EV adoption" (¶162), and "the strength and diversity of our business" (¶231). Analysts and investors relied on these representations. ¶¶151, 165, 177, 188, 203, 214, 234.

### B.    ChargePoint concealed a massive inventory overvaluation.

According to FE-5, during the pandemic, ChargePoint over-ordered CPE 250 DC fast chargers hoping to stockpile inventory competitors could not match. ¶132. While FE-3 stated that the chargers had to be backordered and were behind at least 4-6 months through 2021 and got pushed into 2022, there was an eventual overstock by 2023. ¶133. But per FE-5, as ChargePoint's superior Express Plus became the preferred product and the planned CPE 280 successor further softened demand, the CPE 250 became unsalable and excess inventory accrued. ¶¶134, 142. By January or February 2023, the CPE 250 inventory glut was discussed on semi-weekly sales calls whose contents were reported to Romano and Hughes. ¶134.

Rather than write down the inventory at the point of loss recognition as its own policy and GAAP required (¶137), ChargePoint carried this overvalued inventory on its books at full value while trying to offload it through the fire-sale discounts described above. The $10 million, 50% discount fire sale—with discussions that FE-6 stated likely started as early as Q4 2022 and required CEO approval—signals that the inventory's net realizable value had fallen below cost well before the September 2023 write-down. ¶¶138-39.

### C.    The truth emerges in two stages.

On September 6, 2023, ChargePoint disclosed decelerating revenue, a substantially

011214-11/3502847 V7

declining gross margin (down from 17% to 1% year-over-year), and a $28 million inventory impairment. ¶¶244-45. The stock fell 11%. ¶251. Yet Jackson assured analysts that the "inventory issue" was "behind us," and that margin headwinds "should go away going forward." ¶¶247-48.

Two months later, on November 16, 2023, ChargePoint disclosed a revenue shortfall approximately 30% below already reduced guidance, an additional $42 million impairment (totaling $70 million), negative 21% to 23% gross margins, and the immediate departures of CEO Romano and CFO Jackson. ¶¶257-61. The stock price fell 35%. ¶265.

On December 6, 2023, the new CEO, Rick Wilmer, confirmed the channel had been overstocked and tied both impairments to the same root causes: "the extreme supply chain shortages brought on by the COVID pandemic and the surge in demand we experienced from 2022 through the first half of 2023, leaving us with surplus inventory." *See* SAC ¶248. Wilmer further explained that the $42 million impairment addressed "executional issues related to multiple product transitions." ¶267. Wilmer admitted these had long been known by management, stating the Company "had some execution challenges that I began to fix as COO and will finish addressing as CEO." ¶269. Wilmer also admitted that ChargePoint had concealed a change in its channel inventory practices model, stating "our channel has moved back to a model where they are carrying lower levels of inventory and placing smaller restocking orders as needed." ¶268. Wilmer's reference to returning "back to a model" confirmed what FE-1, FE-7, FE-6, and FE-9 had described: ChargePoint made an undisclosed change to its business practices by pushing large, unwanted product into reseller, distributor, and contractor channels to inflate revenues. *Id.*

Revenue collapsed in subsequent quarters, declining 24% and 17% year-over-year respectively, further confirming the witnesses' accounts that prior revenue levels were unsustainable without the concealed practices. ¶270.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT – 6                    Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

## III. THE TAC RESOLVES THE COURT'S PRIOR CONCERNS REGARDING SUPPLY CONSTRAINTS AND PRE-CLASS PERIOD FACTS

### A. Supply constraints and excess inventory are not contradictory.

The Court found a tension between Plaintiffs' allegations of supply constraints and allegations that ChargePoint was pushing excess product. Order at 9. The TAC resolves this through a product-line distinction not previously before the Court.

ChargePoint is a company with numerous products. ¶¶37-39. Supply constraints affected specific components that ChargePoint needed to build and ship current-generation chargers. ¶¶118-23. The CPE 250 over-procurement was a separate phenomenon—the excess did not arise from having too much product generally, but from a strategic decision to over-order one specific product during the pandemic that backfired when demand shifted. ¶¶131-34.

The five categories of revenue inflation practices responded to both conditions. When ChargePoint could not obtain the right parts to complete orders, it shipped what it had—empty frames without charging modules (FE-3, ¶77), wrong product models (FE-2, ¶79), and partial orders to vacant lots and unfinished construction sites (FE-2, ¶74). When it had excess CPE 250 inventory with evaporating demand, it offered fire-sale discounts and forced resellers to absorb unwanted stock. ¶¶83-98. Throughout, ChargePoint prematurely activated software tokens to inflate subscription revenue. ¶¶106-13. What unified all of these practices was a single objective: maintaining the appearance that ChargePoint was delivering on its growth narrative. ¶143.

Defendants claim the CPE 250 could not have been at the center of the scheme before late 2022 because it was itself backordered until then. MTD at 6. But the TAC does not allege the CPE 250 was the only product improperly shipped or stuffed into channels during FY 2022 and 2023. FE-2 explicitly identifies the CT4000 units. ¶79. FE-3 describes empty charger frames shipped starting in H2 2021 in direct response to the backorder situation. ¶77. The scheme evolved over the Class Period—early on, it relied on unauthorized shipments, shipments of incomplete and incorrect parts, and fake subscription activations. As CPE 250 excess emerged in late 2022 and into 2023, channel stuffing of that specific product became an additional tool along with the other practices. A real-world fraud does not operate through a single, static mechanism across 23 months, and

011214-11/3502847 V7

demanding one is demanding the "impossible." *See Steamfitters Local 449 Pension & Ret. Sec. Funds v. Extreme Networks, Inc.*, 2026 WL 817221, at \*8 (N.D. Cal. Mar. 23, 2026) (*citing Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 769 (9th Cir. 2023)) (rejecting defendants' attempt to "transform the PSLRA's formidable pleading requirement into an impossible one").

Defendants' preference for a simpler narrative is not grounds for dismissal. The question at this stage is not whether the Court finds the narrative likely, but whether it is plausible. *In re Gilead Sci. Sec. Litig.,* 536 F.3d 1049, 1057 (9th Cir. 2008) (noting any "skepticism" should be reserved for "later stages of the proceedings").

### B. Pre-Class Period conduct is connected to the Class Period.

Defendants argue that former VP and corporate counsel Larrenaga's pre-Class Period experiences are irrelevant. MTD at 9, 22. They are wrong. Ms. Larrenaga described the exact same behavior reported by multiple witnesses during the Class Period: deep discounting of sales to channel partners at the end of a fiscal quarter to meet revenue expectations, resulting in channel partners holding excess inventory for long periods. ¶¶100-01. Ms. Larrenaga raised concerns about a suspicious transaction involving the same reseller—Rexel—that CW-1 identified as holding $100 million in unsalable inventory years later. ¶¶102, 105. When Ms. Larrenaga objected, ChargePoint pressured her to write a memorandum justifying the transaction and ultimately terminated her just months before the Class Period began. ¶¶102, 104. Ms. Larrenaga's allegations are thus relevant because they "are similar to the events that occurred during the Class Period, which plausibly suggest a long standing course of misconduct extending into the Class Period." *See Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1374 (S.D. Fla. 2015) (citing *Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714, 716-17 (9th Cir. 2010)); *see also In re: Bofi Holding, Inc. Sec. Litig.,* 2016 WL 5390533, at \*10, n.5 *(*S.D. Cal. Sept. 27, 2016*)* (finding account from a former employee who left company prior to class period relevant because "Plaintiffs allege that defendants engaged in a pattern of misrepresenting and misleading investors over a number of years").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT – 8                    Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

## IV.   THE TAC STATES A CLAIM FOR SCHEME LIABILITY UNDER RULE 10B-5(a) AND (c)

To establish "scheme liability" under Rule 10b-5(a) and (c), Plaintiffs must plead a deceptive or manipulative act in furtherance of the alleged scheme; scienter; a connection with the purchase or sale of a security; reliance; economic loss; and loss causation. Order at 5-6. Rules 10b-5(a) and (c), by their broad terms, "capture a wide variety of conduct," schemes, and acts. *See Lorenzo v. Sec. & Exch. Comm'n*, 139 S.Ct. 1094, 1101 (2019). Given that "the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the nature, purpose and effect of the fraudulent conduct and the roles of defendants are sufficient for alleging participation." *See United Ass'n Nat'l Pension Fund v. Carvana Corp.*, 759 F.Supp.3d 926, 967 (D. Ariz. 2024).

### A.   The TAC alleges a widespread revenue recognition scheme.

The TAC identifies the nature of the scheme: five categories of undisclosed, GAAP-violating revenue practices, each tied to a specific ASC 606 violation. ¶¶64-116. It identifies the purpose: to artificially inflate ChargePoint's reported revenue and conceal that growth was not organic. ¶¶143, 354. And it identifies the effect: investors were deceived into paying artificially inflated prices for ChargePoint securities. ¶¶335-37, 356. Far from being "isolated incidents" (MTD at 5), nine former employees and a confidential witness at a ChargePoint reseller collectively describe practices that operated repeatedly across the full Class Period—with at least four witnesses (FE-6, FE-7, FE-9, and CW-1) having knowledge spanning the entire period, and every quarter covered by multiple witnesses. ¶¶62-63. *See Extreme Networks,* 2026 WL 817221, at *4-5, 8-9, 15 (upholding scheme liability claim based on allegations from four former employees describing revenue inflation practices).

Defendants' attempt to recast the alleged practices as permissible accounting judgments mischaracterizes the allegations. MTD at 6-7. Shipping non-functioning products to recognize revenue (¶¶76-77), recognizing revenue on orders where the client has not paid for or received the product (¶¶68, 73), and shipping orders to vacant lots (¶¶68, 74) are deliberate circumventions of ASC 606, not judgment calls.[2] At this stage, the Court must take the TAC's allegations as "true"

---

[2] Defendants mistakenly equate a customer's pending order with an enforceable contract. MTD at 8, n.5. Under ASC 606, a contract requires a present, mutual obligation to ship and pay. ¶¶64-

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT – 9                    Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

and "construe them in the light most favorable" to Plaintiffs, not resolve what ASC 606 might allow in the abstract. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017). [3]

Defendants assert Plaintiffs now "rely[]" on "channel stuffing" in the TAC. MTD at 8-10. Not so. Plaintiffs' theory in the TAC is consistent with the Second Amended Complaint: Defendants pushed substantial quantities of unwanted product into reseller channels based on undocumented rebates and promises of future business and threatened those who resisted with uncompetitive pricing to inflate reported revenue and create the false impression that ChargePoint's growth was driven by organic demand and "strong execution." ¶¶83-98, 354-56. Such practices are precisely the kind courts have recognized can support Defendants' scheme liability because they present revenue as the product of sustainable demand. *See, e.g., Extreme Networks*, 2026 WL 817221, at *4-5, 8-9, 15. In making this claim, Plaintiffs need not allege the "channel stuffing" details Defendants require (MTD at 8). *See id.* at *8-9, 15 (rejecting defendants' argument that former employee had to provide information about "when the deal was closed, what incentives were offered, what the final price was, and whether the transaction artificially inflated Extreme's earnings"). But in any case, the TAC does include specific details about numerous transactions, including the products involved, the dates, the dollar amounts, and the identities of the customers and employees involved in the transactions. *E.g.,* ¶79 (identifying CT4000, 4010, 4025, and 4027 units being shipped without complete components, resulting in return of "millions of dollars of product" ); ¶105 (by February 2025, Rexel held $100 million in unsalable inventory); ¶93 (3-5 large deals without proper written documentation totaling upward of $1 million each being pushed at end of quarter); ¶89 (ChargePoint aggressively pushed between $2M to $5M in product each quarter to meet targets).

---

68, 76. By overriding customer holds and shipping incomplete or unauthorized products, Defendants did not comply with orders—they hijacked them to create the illusion of revenue where no legal right to payment yet existed. *Id.*

[3] Defendants' reliance on *Hurst v. Emphase Energy, Inc.*, 2021 WL 3633837, at *4 (N.D. Cal. Aug. 17, 2021) and *In re Stem, Inc. Sec. Litig.*, 2025 WL 3675114, at *13 (N.D. Cal. Dec. 17, 2025) is misplaced, as plaintiffs in those cases set out no facts for why the revenue recognition was improper or why "it was not 'probable' [the company] would 'collect substantially all' of the revenue" from a certain deal (*Stem*, 2025 WL 3675114, at *13). The TAC has no such defects. *E.g.,* ¶¶64-68, 76, 82, 106.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT – 10                    Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

Defendants' spin on FE-7's account regarding the Hyundai channel dump as an unforeseeable rollback is meritless. MTD at 9. By affirmatively representing that massive Hyundai demand was imminent, Defendants induced a reseller to execute a big buy of Level 3 stations that exceeded any current organic need. ¶¶89-90. This allowed ChargePoint to book revenue today for inventory that would have otherwise sat in its own warehouse for months. *Id*. By making the sales final with a no-returns policy, Defendants effectively cannibalized future quarters to hit current targets, shifting the risk of the eventual rollback entirely onto the reseller. *Id*.

Defendants' focus on the "straight-line" method of recognition is a red herring that fails to address the core of the fraud (MTD at 10): the falsification of the service period's start date. ¶¶106-07. Likewise, Defendants' claim that they disclosed ChargePoint began recognition after a "fixed time after the associated hardware shipments to accommodate installations" reinforces the fraud. There is no "subscription service" to provide, and no installation to accommodate, for a charger that is sitting idle in a crate in a third-party warehouse. *Id*. By prematurely activating tokens for fictitious subscribers, ChargePoint was able to pull subscription revenue into the current quarter that should not have existed on the books at all. *Id.* None of this was disclosed to investors. *See In re Alphabet, Inc. Secs. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021) (resolving materiality of disclosure is generally appropriate "only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ").

And the fact that ASC 606 may allow oral contracts (MTD at 9-10) does not salvage undocumented side deals that materially changed the actual terms of transactions and undermined the reliability of ChargePoint's financial reporting. ¶¶82, 86; *see also In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *15 (N.D. Cal. Apr. 2, 2002) (recognizing securities fraud claims may be predicated on undocumented side agreements because such arrangements are often excluded from the very ledger reports that auditors and investors rely upon).

## B.    The aggregate magnitude was material.

Defendants attempt to minimize the scheme by isolating each witness's individual dollar figure and arguing it is immaterial. MTD at 11. This approach ignores the aggregate picture the TAC presents.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT – 11          Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

The FEs each spoke from their own vantage point within a large organization. They spoke of widespread practices affecting other ChargePoint employees, customers, resellers, and distributors. As such, the TAC presents multiple, overlapping indicators of material revenue inflation. FE-1 was one member of a 24-person sales operations team, and FE-1 alone identified up to $500,000 in prematurely shipped product in a single quarter. ¶¶69, 115. If even a fraction of the remaining 23 team members was involved in comparable activity, the practice would generate millions of dollars in prematurely recognized revenue per quarter. FE-6 described 3 to 5 large end-of-quarter deals without proper documentation totaling upward of $1 million each—$3 to $5 million per quarter. ¶93. FE-7 stated ChargePoint aggressively pushed distributors to take on $2 to $5 million in unneeded product each quarter. ¶89. FE-8 estimated that, for at least one customer in a single quarter in 2023, early releases of orders involved $1 million of product or more over a series of orders, which were later returned. ¶72. FE-9 described one contractor alone holding $3 to $5 million in warehoused product accumulated over 14 to 16 months. ¶¶97-98. FE-6 described the $10 million fire sale in a single quarter. ¶95. And CW-1—who spoke of the experience of just one ChargePoint reseller—reported that as of early 2025, Rexel still held $100 million and City Electric Supply held $40 million in unsalable inventory. ¶105.

These amounts were not trivial. Against quarterly revenues that ranged from $65 million to $152.8 million, millions of dollars in prematurely recognized revenue per quarter, generated through multiple overlapping practices across a 24-person team operating under executive directive, is not minor or technical in nature (¶116). *See In re Daou Sys., Inc.,* 411 F.3d 1006, 1020 (9th Cir. 2005). And the $140 million in unsold inventory sitting in just two resellers' warehouses years later is powerful corroborating evidence that ChargePoint's channel was massively overstuffed with product for which there was no genuine end-user demand. ¶272. Plaintiffs at the pleading stage are not required to reconstruct ChargePoint's internal ledgers. *See State Teachers Ret. Sys. of Ohio v. ZoomInfo Techs., Inc.,* 2025 WL 3013683, at *17 (W.D. Wash. Oct. 28, 2025) ("At this stage, Plaintiffs need not [] engage in a rigorous analysis – likely requiring ZoomInfo's internal documents – to estimate a hypothetical 'true' RPO."). The TAC includes specific details about the products involved, the dates, the dollar amounts, and the identities of the customers and

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT – 12          Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

employees involved. ¶¶68-113. That is what *Daou* requires.

**C.    Each Executive Defendant committed deceptive acts.**

The Court's Order found the SAC did not adequately allege conduct by the Executive Defendants beyond their alleged misstatements. Order at 10. The TAC cures this deficiency.

***Romano.*** Romano approved the $10 million CPE 250 fire sale to inflate sales—a transaction so extraordinary it required CEO approval. ¶297. FE-2 stated orders to ship on-hold and partial products came from FE-2's supervisor, who was following orders from their supervisors, Hughes and/or Romano. ¶298. FE-3 stated the decision to ship empty frames was a "top down" decision. *Id.* Romano signed Sarbanes-Oxley certifications for every quarterly and annual report during the Class Period. ¶300. Such conduct supports scheme liability. *See, e.g., York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.,* 738 F. Supp. 3d 1182, 1207 (N.D. Cal. 2024) (sustaining scheme liability where executive approved steep discounts to inflate sales).

***Jackson.*** CW-1 described being on 5 to 10 calls between 2021 and 2023 where Jackson and CW-1's CFO discussed undocumented deals. ¶302. Jackson's personal participation in undocumented side deals was itself a deceptive act because it created a gap between the documented terms and the actual economics. ¶¶86, 303. FE-6 confirmed Jackson had sign-off authority on all non-standard discounts. ¶304. Like Romano, Jackso also signed Sarbanes-Oxley certifications. ¶306. Jackson's conduct was certainly deceptive. *See, e.g., Extreme Networks,* 2026 WL 817221, at *5, 13, 15 (crediting allegation of verbal-only agreements in upholding scheme liability).

***Hughes.*** FE-1 stated the push to ship unauthorized orders had to be approved at the executive level—Hughes or higher. ¶308. FE-3 stated Hughes made the top-down decision to ship empty charger frames to recognize revenue. ¶309. CW-1 said Hughes personally discussed rebate structures with CW-1's employer, and incentivized employees to participate in the scheme by giving sales awards to employees who sold software tokens for inactivated stations. ¶¶310-11. Plaintiffs have sufficiently pleaded Hughes' deceptive conduct. *See ZoomInfo,* 2025 WL 3013683, at *18-19 (finding scheme liability where defendant directed undisclosed sales tactics); *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 325-26 (2007) (noting "writing orders for products customers had not requested" was "illegitimate").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT – 13                    Case No. 5:23-cv-06172-NW

Further, by making false and misleading statements, Romano and Jackson contributed to the deceptive scheme. *See In re Seagate Tech. Holdings PLC Sec. Litig.*, 2025 WL 1744505, at *10 (N.D. Cal. May 12, 2025) (sustaining scheme liability where plaintiffs alleged defendants made false statements).

Defendants argue these accounts are speculative because FE-2's supervisor said the orders came from their supervisors, which "would have been" Hughes and/or Romano. MTD at 17-18. But this is not the collective, undifferentiated allegation rejected in *Borteanu v. Nikola Corp.,* 2023 WL 1472852, at *23 (D. Ariz. Feb. 2, 2023). Here, FE-3 directly identifies Hughes as the decision-maker for empty frame shipments (¶309), FE-6 directly identifies Jackson as having the sign-off authority (¶304), and FE-6 directly identifies Romano as the approver of the $10 million fire sale (¶297). The chain-of-command inference from FE-2 supplements—rather than substitutes for—these direct attributions.

Defendants further assert that the TAC does not link Hughes or Jackson to "any deceptive accounting practice" or "improper revenue recognition." MTD at 18-19. But Plaintiffs have alleged that Jackson and Hughes directed and participated in practices that violated ASC 606. ¶¶68, 76, 82, 106, 301-11; *see also Extreme Networks*, 2026 WL 817221, at *4-5, 8-9, 15 (upholding scheme claim and rejecting argument that a former employee's allegations must have information about "whether the transaction artificially inflated Extreme's earnings").

To some extent, Defendants' arguments boil down to a dispute over the legitimacy of the sales practices or Defendants' belief of sufficient demand. MTD at 8-9, 17-19. Given the depth of the practices outlined by the FEs, CW-1 and Larrenaga, that some "contrary evidence 'undercuts' [Defendants'] theories only highlight Plaintiffs' entitlement to discovery." *See In re Mattel, Inc. Sec. Litig.,* 2021 WL 1259405, at *8 (C.D. Cal. Jan. 26, 2021) (refusing to credit defendants' theory in the face of complaint that "provides more than 'mere' allegations with respect to [its] fact-intensive theories").

**D.      The FEs and CW-1 are credible witnesses.**

Defendants argue that because the FEs worked in sales or procurement, rather than accounting, the Court cannot credit their accounts. MTD at 7. That misstates the standard. As this

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT – 14                    Case No. 5:23-cv-06172-NW

Court has held, "all that is required is sufficient detail to establish that a witness has personal knowledge about the facts that they reported." *See In re SVB Fin. Grp. Secs. Litig.*, 2025 WL 1676800, at *13 n.8 (N.D. Cal. June 13, 2025) (Wise, J). A witness need not physically sit in a department (*e.g.*, finance) to have credible knowledge about that area, *see Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008), nor directly report to the Executive Defendants, *Weston v. DocuSign*, 669 F. Supp. 3d 849, 883-85 (N.D. Cal. 2023), to have their accounts be deemed reliable.

Here, the TAC shows that the witnesses have "personal knowledge about the facts that they reported." By way of example, FE-1 and FE-8 worked in sales operations, and FE-1 saw orders in Salesforce and confirmed ChargePoint recognized revenue on prematurely shipped orders while FE-8 processed shipments and knew "Hold for Release" orders were counted as revenue based on participation in sales operations meetings. ¶¶69–73. FE-2, a sales manager, received explicit instructions to ship orders on hold and incomplete products to hit revenue targets. ¶¶74-75, 79. FE-6, a sales operations employee, participated in and tracked end-of-quarter "stink bomb" deals that bypassed standard approvals and documentation. ¶¶93-94. CW-1 was a senior employee at a reseller who personally joined calls with Jackson and CW-1's CFO to discuss oral rebates and side deals. ¶87. Defendants' authority against CW-1, *Alaska Elec. Pension Fund v. Adecco S.A.*, 371 F.Supp. 2d. 1203, 1211 (S.D. Cal. 2005) is inapposite, as the complaint there had only one reference to a witness—"one former executive"—and had no other "description of the confidential witnesses."

Defendants incorrectly argue that FE-3's reports are "unreliable" merely because FE-3 was no longer a ChargePoint employee in 2023. MTD at 12. But there is no rule that witnesses need to have worked at the company during the entire Class Period. *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020). And this argument ignores the Complaint's specific allegations that FE-3 remained active within the industry and derived this information from direct conversations with ChargePoint employees and their resellers. ¶135.

Defendants criticize FE-8 for failing to name the complaining customers and recite their precise complaints after receiving unauthorized shipments. MTD at 11. But this level of specificity

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT – 15                    Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

is not required, and FE-8 explains that ChargePoint's internal records (*e.g.*, its "Jira" ticket system) contain these details. ¶71; *see ZoomInfo*, 2025 WL 3013683, at \*17.

Defendants also cannot undermine FE-9's reliability. FE-9 describes the practice of having contractors hold inventory and its approximate magnitude. ¶¶96-98. That FE-9 learned certain details after the fact does not negate FE-9's personal knowledge of the contractor relationships and the pattern of warehousing inventory. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1256, 1275 (N.D. Cal. 2000) (crediting testimony that CW learned of revenues being booked that "contained unsatisfied contingencies" in months after close of quarter). At the pleading stage, FE-9's account, corroborated by CW-1 and FE-7 describing parallel practices through different channels, is sufficient.

The TAC's witnesses have direct, first-hand knowledge of the practices described that is more than enough to credit their accounts at this stage. *See, e.g., In re The Trade Desk, Inc. Sec. Litig.*, 2026 WL 790911, at \*11-13 (N.D. Cal. Mar. 17, 2026) (finding strong support for scienter from allegations from FEs who did not report to, have a personal conversation with, or attend an individual meeting with an individual defendant).[4]

## V. THE TAC STATES A CLAIM UNDER RULE 10B-5(b)

Rule 10b-5(b) concerns fraudulent statements and omissions. A claim should be dismissed "only if reasonable minds could not disagree" that the identified statements "were not misleading." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1021–22 (S.D. Cal. 2005) (citing *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)). Defendants make no such showing.

### A. Revenue-driver statements were false and misleading.

Defendants repeatedly told the market that ChargePoint's revenue growth was driven by organic factors: "growth in charging demand from accelerated EV adoption" (¶162), "fleet [being] strong" (¶176), "strong execution" (¶186), and "the strength and diversity of our business" (¶231). These were not abstract observations—they were specific explanations, tied to specific reported

---

[4] Defendants' reliance on *Kampe v. Volta Inc.,* 2024 WL 308262, at \*13 (N.D. Cal. Jan. 26, 2024) is misplaced—*Kampe* involved a single sales witness with no corroboration concerning the facts he alleged. In *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998-1000 (9th Cir. 2009), no witness had personal knowledge of "the particulars of the alleged transgressions."

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT – 16                    Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

revenue figures, for why the Company was delivering the growth it reported. ¶¶161, 174, 185, 231; *see also Gimpel v. The Hain Celestial Grp., Inc.*, 156 F.4th 121, 141 (2d Cir. 2025) (statements actionable where defendant omitted it "achieved its financial results" by "granting distributors credits [and] incentives").

These statements were materially false and misleading because a material portion of the reported revenue did not derive from organic demand. It derived from the five categories of improper practices described in Part II. Unlike the SAC, the TAC no longer challenges what Defendants' deemed the "supply chain statements" (*e.g.*, that the team was doing a "tremendous job keeping things moving through our supply chain" (SAC ¶148)). As such, falsity does not depend on quantifying the supply constraints themselves, or the revenue "gap" caused by those constraints. MTD at 4-5. The supply constraints go to motive, not the measure of falsity. ¶141. Whether supply constraints caused a $10 million or $50 million revenue gap is irrelevant to whether telling the market that growth was organic was false when that growth was driven by channel stuffing, unauthorized shipments, and fire sales. Courts in this Circuit routinely uphold misstatement allegations based on the same theory developed in the TAC. *See Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *8-9 (D. Or. June 27, 2017) (sustaining fraud theory that "the practice of 'aggressively pursuing quarterly results' by pulling in sales … [was] misleading to the extent it creates the impression of a sustainable demand for [company] products"); *Extreme Networks*, 2026 WL 817221, at *8-9.

The TAC provides comparable details as *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, *8 (N.D. Cal. Aug. 16, 2022), which found defendants misled investors by "tout[ing] positive revenue results" that they attributed to "sustainable organic demand" rather than "undisclosed sales practice and resulting unsustainable build-up of channel inventory." In the TAC, the practices are identified by category, attributed to specific witnesses, tied to specific time periods, and linked to specific Executive Defendants. ¶¶68-116. While the TAC does not allege an internal audit (because Plaintiffs do not have access to ChargePoint's internal records), the nine-witness corroboration serves the same function of establishing that the practices were widespread and not isolated. *Id.*; *see also Plantronics*, 2022 WL 3653333, at *11-12.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT – 17                    Case No. 5:23-cv-06172-NW

**B.      Inventory statements were false and misleading.**

On April 3, 2023, ChargePoint released its 10-K reporting inventory of $39.4 million. ¶¶222-23. On June 1, 2023, Jackson told analysts that ChargePoint was "well past the worst of" any effect of lingering supply chain issues on inventory. ¶233. These statements were materially false because they hid a critical fact: the Company had a massive inventory surplus of CPE 250s that was materially overvalued. ¶¶131-39.

Defendants argue this is "fraud by hindsight" and that Plaintiffs fail to show that inventory should have been written down before September 2023.[5] MTD at 12-14. Not so. By January or February 2023, ChargePoint knew it was sitting on tens of millions of dollars of CPE 250 inventory for which there was insufficient demand. ¶¶134-38. FE-5 attended semi-weekly calls where excess CPE 250 supply was discussed, and stated that Romano and Hughes were apprised. ¶134. FE-3 stated there was an overstock by 2023 and that ChargePoint was selling CPE 250s to Rexel at cost. ¶¶133, 135. FE-6 stated the $10 million, 50% discount promotion took months of planning, with discussions likely starting as early as Q4 2022 given that value added resellers had to make space for the products, and required CEO approval. ¶¶95, 138.

Defendants' focus on the lack of a communicated determination to write down inventory is a red herring. MTD at 13. Under GAAP, an impairment is triggered by the objective fact of obsolescence, not the subjective admission of management. Likewise, the TAC does not allege that a promotion itself triggers an impairment (*id*.); it alleges that documented product obsolescence does. Under ChargePoint's own stated policy, a write-down was required "at the point of the loss recognition" (¶137)—and the confluence of evaporating demand, semi-weekly calls about the problem, and planning for a 50% discount fire sale establishes that the point of loss recognition was reached well before September 2023. Holding that inventory on the books at cost while planning its replacement was not a business strategy—it was a material overvaluation of a dead asset. Defendants' requirement that Plaintiffs present a full "net realizable value" model or pinpoint the

---

[5] While Defendants also argue that "ordinary business conduct" cannot be the basis for scheme liability, Plaintiffs do not rely on their fraudulent failure to timely impair inventory as part of their scheme liability claim. *See* Count II (¶¶353-59).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT – 18               Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

exact day the accounting line should have moved is not required by PSLRA or any authority. *See ZoomInfo*, 2025 WL 3013683, at \*17; *Extreme Networks,* 2026 WL 817221, at \*8. Any challenges to the precise timing of decisions about the summer promotion and when net realizable value cross cost are also not viable grounds for dismissal. *Quality Sys.,* 865 F.3d at 1140.

### C.    The challenged statements are not puffery, opinion, or protected forward-looking statements.

Defendants argue many statements are inactionable puffery, opinion, or forward-looking statements. MTD at 15-17. Isolated expressions of satisfaction, standing alone, might not be actionable. But the challenged statements do not stand alone. When Jackson said he was "particularly pleased" about ChargePoint's performance (¶163) or when Romano called the Company's growth "remarkable" (¶175), they did so in direct reference to specific reported revenue figures. *See also* ¶¶200, 202 (Jackson calling the specific 93% year-over-year increase as "fairly astounding"). These are mixed statements of fact and opinion, actionable where Defendants omitted concrete, known facts that undercut the basis for their optimism. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,* 856 F.3d 605, 615-16 (9th Cir. 2017); *Trade Desk,* 2026 WL 790911, at \*11. Plaintiffs do not contend that every challenged expression of satisfaction is independently actionable. But these expressions were part of a broader narrative of organic growth that was materially misleading because it concealed the unsustainable practices driving reported revenue. *See Extreme Networks,* 2026 WL 817221, at \*5, 8-9.

As to the PSLRA safe harbor (MTD at 16-17), Defendants' statements about current revenue, current growth rates, and current inventory values are not forward-looking. ¶331. Even to the extent the statements were forward looking, the cautionary language was boilerplate and did not warn of the specific known risk that ChargePoint was overvaluing inventory and generating revenue through improper practices. *Extreme Networks*, 2026 WL 817221, at \*11. And in any event, Defendants had actual knowledge of falsity. *See* 15 U.S.C. § 78u-5(c)(B)(i). They knew of the improper practices and the fact they had overordered supplies and overvalued inventory. *See* Part VI. As such, any "forward-looking statements *premised on* those false statements about present facts also were made with knowledge of their falsity" and are not protected. *See also Mulderrig v.*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT – 19                    Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

*Amyris, Inc.*, 492 F. Supp. 3d 999, 1018-21 (N.D. Cal. 2020).

## VI.    DEFENDANTS ACTED WITH SCIENTER

Defendants attempt to pick apart each scienter allegation individually. MTD at 19-23. But, the proper inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs,* 551 U.S. at 310.

***Defendants' direct involvement and knowledge.*** The TAC does not allege that Defendants merely should have known about the fraud. It alleges they personally directed and approved the practices that constituted it. Romano approved the $10 million fire sale and directed shipment practices. ¶¶297-300. Jackson personally participated in undocumented side deals. ¶¶302-06. Hughes directed unauthorized and premature shipments, participated in rebate structures, and rewarded improper token sales. ¶¶308-11. The FE and CW-1 allegations support their scienter. *Trade Desk,* 2026 WL 790911, at *11-13 (finding scienter from FEs who did not directly report to defendants).

Apart from personal involvement, the Executive Defendants had unrestricted access to information revealing the fraud. FE-2 prepared monthly sales reports discussed in meetings with Hughes. ¶53. Romano and Hughes were routinely updated on excess CPE 250 inventory through semi-weekly calls beginning in January/February 2023. ¶134. The Salesforce database provided transparent, real-time visibility into orders, shipments, and revenues. ¶¶52, 57, 59, 70, 77, 87, 93, 327. "Hold For Release" orders were identifiable in Salesforce because they had "HFR" in their titles and notes stating hold for release or customer not ready (¶¶59, 73, 327). *See In re Doximity, Inc. Secs. Litig.,* 2025 WL 1449598, at *9 (N.D. Cal. May 13, 2025) (Wise, J.).

***Insider trading and compensation.*** During the Class Period, Romano sold 20% of his holdings for over $14 million, Jackson sold 23% of his holdings for $4.6 million, and Hughes sold 41% of his holdings for $6.8 million. ¶¶318-20. These sales were "dramatically out of line" with their light prior trading history (*id.*). *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009). And Jackson made a large, uncharacteristic one-day sale of over 550,000 shares days after the September 6, 2023 disclosure and after he had publicly assured investors that ChargePoint's "inventory issue" was "behind us" and that margin headwinds would "go away

011214-11/3502847 V7

going forward." ¶319.

Defendants' assertion that it is futile to compare Class Period sales to prior trading due to a September 28, 2021 lock-up preventing them from transacting is belied by the record. In reality, both CFO Jackson and CEO Romano engaged in modest sales of ChargePoint stock in June and July 2021, respectively. SAC ¶¶267, 270.

Defendants contend some of the sales were purportedly to cover tax liabilities. MTD at 21. Even accepting this as true, the Executive Defendants still personally and concretely benefited from the artificially inflated stock price. *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *16 (S.D.N.Y. Mar. 25, 2013). Likewise, Defendants' insider trading plans do not negate a scienter inference. For example, Romano adopted his 10b5-1 plan during the Class Period while in possession of material nonpublic information (¶318 n.23), and "it is equally as plausible that, after observing the success" of ChargePoint's unsustainable sales practices, "[the Executive Defendants] set up the plan to avoid the appearance of improper sales." *See In re Questcor Sec. Litig.*, 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013); *see also In re The Trade Desk, Inc. Sec. Litig.*, 2026 WL 790911, at *12 n.8 (noting scienter arguments regarding 10b5-1 plans are "better decided on a more complete factual record"). While the non-discretionary nature of sales could be a later defense, at the pleading stage, the allegations of significant and suspiciously timed sales suffice. *UTStarcom*, 617 F. Supp. 2d at 976 n.16.

Defendants' stock-heavy executive compensation also supports scienter. During the Class Period, a significant majority (70%-92%) of their compensation was derived from stock awards, bonuses, or commissions. ¶¶312-16. This compensation created a non-generic motive to use unsustainable sales practices and artificially inflate ChargePoint's share price. *Extreme Networks*, 2026 WL 817221, at *13 (finding fact that defendant earned over "$1.1 million in cash" through executive bonus supported scienter).

***Defendants' public statements***. Romano and Jackson repeatedly emphasized ChargePoint's record breaking revenue numbers and attributed them to organic demand. *E.g.,* ¶¶146, 162, 176. Such statements and detailed answers to analyst questions about the Company's sales, supply chains, and inventory practices (*e.g.,* ¶¶201, 233) strongly suggest they either knew of what they

spoke or were deliberately reckless in speaking on a subject without being appropriately informed. *See Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at \*12 (C.D. Cal. Feb. 27, 2015).

*Executive departures*. The simultaneous removal of the CEO (Romano) and CFO (Jackson) on the same day as the November pre-disclosure is powerful circumstantial evidence the Board concluded they were responsible. ¶¶322-24. This is not the resignation of a single financial manager. *Cf. City of Dearborn Heights,* 856 F.3d at 622. Analysts directly connected the departures to ChargePoint's significant disappointments. ¶324. Under a holistic analysis, the departures support scienter. *See Plantronics,* 2022 WL 3653333, at \*19 (timing of executive departures "lends further support to a finding that the scienter element is met"); *Stary v. Teladoc Health, Inc.*, 2026 WL 878939, at \*14 (S.D.N.Y. Mar. 31, 2026) (executive departure supports inference of scienter).

*Core operations and SOX certifications*. Revenue recognition was not peripheral to ChargePoint's business. ChargePoint was a pre-profit growth company whose market valuation depended on its revenue trajectory. ¶¶151, 165, 177, 188, 203, 214, 234, 325. The practices alleged—deciding what to ship, when, and to whom—were core operational decisions. "[I]t would be 'absurd' to suggest that management was without knowledge." *Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783-86 (9th Cir. 2008); *see also Extreme Networks*, 2026 WL 817221, at \*13-14. Romano and Jackson also signed SOX certifications for every quarterly and annual report (¶¶300, 306). *See Thomas v. Magnachip Semiconductor Corp.,* 167 F. Supp. 3d 1029, 1042-43 (N.D. Cal. 2016) (allegations that "officers signed documents attesting to the accuracy of the false statements" supported scienter).

*Holistic analysis*. Considered together—direct participation, real-time data access, stock sales dramatically out of line with prior trading, stock-heavy compensation, simultaneous CEO/CFO termination, and SOX certifications—the inference of scienter is at least as compelling as any opposing inference. *Tellabs,* 551 U.S. at 323-24. Defendants' competing inference is that the Executive Defendants were ignorant of a multi-faceted, 23-month scheme that touched every aspect of their core business and that they personally directed, approved, and benefited from. That inference is not compelling. This case is not like *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1064 (9th Cir. 2014), upon which Defendants rely (MTD at 22-23), where plaintiffs never plausibly

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT – 22          Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

alleged that management received specific information about the problems at issue. *Id.* at 1064. Here, Plaintiffs allege the Executive Defendants were the ones creating the problems.

## VII. THE TAC ADEQUATELY ALLEGES LOSS CAUSATION

Loss causation requires tracing the loss back to the very facts about which the defendant lied. *Mineworkers' Pension Scheme v. First Solar Inc.,* 881 F.3d 750, 753 (9th Cir. 2018). "[P]laintiffs need only show a 'causal connection' between the fraud and the loss." *In re Genius Brands Int'l, Inc. Sec. Litig.,* 97 F.4th 1171, 1183 (9th Cir. 2024). "Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." *Mineworkers'*, 881 F.3d at 753. "A plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss. That a stock price drop comes immediately *after* the revelation of fraud can help to rule out alternative causes. But that sequence is not a condition of loss causation." *Id.* at 754 (citations omitted). That is precisely what occurred here: the September and November disclosures revealed the financial consequences of the concealed practices — $70 million in impairments and a 30% revenue shortfall — even though the market did not know at the time that these consequences resulted from fraudulent conduct.

*September 6, 2023: Partial corrective disclosure.* ChargePoint disclosed a $28 million inventory impairment and dramatically reduced forward revenue guidance. ¶¶244-45, 274. The impairment partially revealed that inventory Defendants told investors was properly valued was massively impaired—the direct consequence of the CPE 250 over-procurement. ¶¶275-76. The reduced guidance partially revealed that ChargePoint's prior revenue trajectory was unsustainable. ¶277, 279. Analyst reactions confirmed that the stock decline was caused by the specific facts disclosed, not unrelated factors. ¶278. The stock fell 11%. *Id.*

*November 16, 2023: Full corrective disclosure.* ChargePoint disclosed a 30% revenue shortfall below already reduced guidance, an additional $42 million impairment (totaling $70 million), negative 21% gross margins, and the immediate departures of Romano and Jackson. ¶¶257-61, 280. The stock fell 35%. ¶286. Each element traces to the concealed fraud: the 30% revenue shortfall revealed unsustainable revenue levels (¶282); the additional impairment revealed

011214-11/3502847 V7

systemic inventory mismanagement (¶283); the simultaneous CEO/CFO termination was powerful circumstantial evidence the Board held them responsible (¶284); and the negative margins revealed the true, undistorted cost structure (¶285).

Defendants argue these disclosures merely revealed poor financial results. MTD at 23-25. But $70 million in impairments on inventory Defendants assured investors was properly valued, a 30% revenue shortfall, dramatic declines in gross margins, and simultaneous CEO/CFO terminations, are not ordinary disappointing results—they are the direct, foreseeable consequences of inflating revenue through improper practices and carrying overvalued inventory well beyond the point it should have been written down. *See, e.g.*, *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (distinguishing *Loos v. Immersion Corp.,* 762 F.3d 880, 890 (9th Cir. 2014) where the falsity is later revealed)).

Defendants also attempt to silo the two impairments, arguing the September charge concerned only the CPE 250 while the November charge stemmed from "executional issues related to multiple product transitions." MTD at 23-24. But Defendants omit what Wilmer said next. In the very same December 2023 earnings call, Wilmer identified the root causes of both impairments: "the extreme supply chain shortages brought on by the COVID pandemic and the surge in demand we experienced from 2022 through the first half of 2023, leaving us with surplus inventory." SAC ¶248. Wilmer's own words tie both impairments to the same systemic inventory mismanagement Defendants had concealed. Moreover, FE-5 identifies the "multiple product transitions" as the very source of the CPE 250's obsolescence.  According to FE-5, ChargePoint's "executional issues" were rooted in a transition failure where sales teams actively pushed the superior Express Plus over the CPE 250, while the impending release of the CPE 280 caused demand for the legacy 250 model to plummet. ¶134. Thus, the November charge was the inevitable financial consequence of the same undisclosed inventory mismanagement revealed in September.

Defendants contend that the Executive Departures are not causally connected to the fraud. But courts have repeatedly found loss causation where stock fell after abrupt executive departures, like those here. *See, e.g., Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 983-85 (N.D. Cal. 2015); *see also Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT – 24                    Case No. 5:23-cv-06172-NW

011214-11/3502847 V7

Supp. 2d 1128, 1145-46 (N.D. Cal. 2013) (loss causation via abrupt executive resignations). Moreover, analysts explicitly connected the departures to the "significant disappointments of FQ3" that unmasked the long-standing, unsustainable revenue trajectory. ¶284.

Defendants further point to the stock's downward trajectory during the Class Period. MTD at 25. This conflates extraneous factor decline (which Defendants do not explain) with fraud-related loss. The relevant inquiry is whether the disclosures on September 6 and November 16 removed artificial inflation caused by the fraud. The statistically significant drops of 11% and 35% on those specific dates (¶273)—confirmed by analysts as directly tied to the disclosed facts, not extraneous market factors (¶ 292)—provide a clear nexus. *See Mineworkers*, 881 F.3d at 753.

## VIII.   THE TAC ADEQUATELY ALLEGES CONTROL PERSON LIABILITY

Because Plaintiffs have adequately alleged a primary violation of Section 10(b) against ChargePoint, and Romano and Jackson do not contest their status as control persons (MTD at 25), the TAC sufficiently alleges Section 20(a) liability against them. *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 605 (N.D. Cal. 2019). As to Hughes, Section 20(a) does not require that the control person made or authorized the specific false statement—it requires that the person was a controlling person of the primary violator. 15 U.S.C. § 78t(a). Hughes was the Chief Commercial and Revenue Officer, reported directly to the CEO, directed the sales organization that executed the improper practices, and personally met with resellers to implement the scheme. ¶¶47-49, 308-11. Finally, because Plaintiffs do not assert a Section 10b-5(b) claim against Hughes, whether he exercised power over the challenged statements is irrelevant to his control person liability.

## IX.   CONCLUSION

The TAC addresses each deficiency the Court identified in its prior Order. Defendants' Motion should be denied. If the Court grants any part of the motion, Plaintiffs respectfully request leave to amend. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

011214-11/3502847 V7

DATED: April 3, 2026

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

*/s/ Lucas E. Gilmore*
Lucas E. Gilmore (250893)
Reed R. Kathrein (139304)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: reed@hbsslaw.com
Email: lucasg@hbsslaw.com

Raffi Melanson (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Sq., 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
Email: raffim@hbsslaw.com

*Lead Counsel and Counsel for Lead Plaintiffs*
*Shahram Afshani and Paulina Afshani Schwartz*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CLASS ACTION COMPLAINT – 26                Case No. 5:23-cv-06172-NW

011214-11/3502847 V7