Sara B. Brody (SBN 130222)
sbrody@sidley.com
Jaime A. Bartlett (SBN 251825)
jbartlett@sidley.com
Matthew P. Henry (SBN 308878)
mhenry@sidley.com
Chaddy G. Georges (SBN 335546)
cgeorges@sidley.com
SIDLEY AUSTIN LLP
101 California Street
Suite 3500
San Francisco, CA 94111

*Attorneys for Defendants*
*ChargePoint Holdings, Inc., Pasquale Romano,*
*Rex S. Jackson, and Michael Hughes*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| FAROOQ KHAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CHARGEPOINT HOLDINGS, INC., et al.,<br><br>Defendants. | Case No. 5:23-cv-06172-NW<br><br>**DEFENDANTS CHARGEPOINT HOLDINGS, INC., PASQUALE ROMANO, REX S. JACKSON, AND MICHAEL HUGHES'S REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Assigned to: Hon. Noël Wise<br><br>Date:   June 17, 2026<br>Time:  9:00 a.m.<br>Place:  Courtroom 3, 5th Floor |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................ 1

ARGUMENT .................................................................................................................... 1

I.    THE OPPOSITION DEMONSTRATES THAT THE
      ALLEGED REVENUE INFLATION FRAUD IS NOT
      BASED ON SUFFICIENTLY PLED FACTS. ........................................................ 1

      A.    The TAC Fails to Plead Supply Disruptions
            that Allegedly Drove the Scheme. ................................................... 2

      B.    Recent Rulings From This District Confirm Plaintiffs'
            Confidential Witnesses Are Inadequate To Plausibly
            Allege Widespread Fraudulent Conduct. ........................................ 3

      C.    The Facts That Are Pled in the TAC Undermine
            the Alleged Fraud Further. ............................................................. 6

      D.    Plaintiffs Have Not Shown a Material Impact on Revenue. ............ 6

II.   THE TAC FAILS TO ALLEGE CONDUCT BY
      THE EXECUTIVE DEFENDANTS. ...................................................................... 8

III.  PLAINTIFFS DO NOT PLEAD DELAYED
      INVENTORY VALUATION. .................................................................................. 9

IV.   THE SCIENTER ALLEGATIONS ARE
      DEFECTIVE IN EVERY RESPECT. .................................................................... 10

V.    PLAINTIFFS DO NOT PLEAD LOSS CAUSATION. ......................................... 13

VI.   PLAINTIFFS' SECTION 20(a) CLAIM FAILS AS WELL. ................................. 15

VII.  THE TAC SHOULD BE DISMISSED WITH PREJUDICE. ................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berson v. Applied Signal Tech.*,
527 F.3d 982 (9th Cir. 2008) ................................................................................................7

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
964 F. Supp. 2d 1128 (N.D. Cal. 2013) .............................................................................14

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
65 F. Supp. 3d 840 (N.D. Cal. 2014), *aff'd* 856 F.3d 605 (9th Cir. 2017) ......................13

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ..............................................................................................15

*City of Providence v Aeropostale, Inc.*,
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ....................................................................11

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) ....................................................................10

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) .........................................................................................3, 8

*In re Dot Hill Sys. Corp. Sec. Litig.*,
594 F. Supp. 2d 1150 (S.D. Cal. 2008) ................................................................................1

*In re Doximity, Inc. Sec. Litig.*,
2025 WL 1449598 (N.D. Cal. May 13, 2025) ....................................................................11

*Eminence Cap., LLC v. Aspeon, Inc.*
316 F.3d 1048 (9th Cir. 2003) ............................................................................................15

*In re Intel Corp. Sec. Litig.*,
792 F. Supp. 3d 1008 (N.D. Cal. 2025) ..............................................................................15

*Kampe v. Volta Inc.*,
2024 WL 308262 (N.D. Cal. Jan. 26, 2024) .................................................................1, 7, 8

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ..............................................................................................13

*Magro v. Freeport-McMoran Inc.*,
2018 WL 3725781 (D. Ariz. Aug. 3, 2018) ........................................................................15

*Metzler Inv. GMVH v. Corinthian Coll., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ............................................................................................15

ii

*Murphy v. Precision Castparts Corp.*,
   2017 WL 3084274 (D. Or. June 27, 2017) ................................................................3, 4, 5

*N.Y.C. Fire Dep't Pension Fund v. Snowflake, Inc.*,
   2026 WL 446309 (N.D. Cal. Feb. 17, 2026) ...............................................................1, 5

*Nathanson v. Polycom, Inc.*,
   87 F. Supp. 3d 966 (N.D. Cal. 2015) ............................................................................14

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ......................................................................................13

*In re Plantronics, Inc. Sec. Litig.*,
   2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ...................................................3, 4, 5, 7

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ......................................................................................12

*Purple Mountain Tr. v. Wells Fargo & Co.*,
   432 F. Supp. 3d 1095 (N.D. Cal. 2020) ........................................................................15

*In re Questcor Sec. Litig.*,
   2013 WL 5486762 (C.D. Cal. Oct. 1, 2013).................................................................11

*Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*,
   111 F. Supp. 3d 1336 (S.D. Fla. 2015) ...........................................................................6

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ........................................................................................12

*Roberti v. OSI Sys., Inc.*,
   2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)...............................................................12

*In re Seagate Tech. Holdings PLC Sec. Litig.*,
   2025 WL 1744505 (N.D. Cal. May 12, 2025) .................................................................9

*Simpson v. AOL TimeWarner Inc.*,
   452 F.3d 1040 (9th Cir. 2006) ......................................................................................10

*State Teachers Ret. Sys. of Ohio v. ZoomInfo Techs., Inc.*,
   2025 WL 3013683 (W.D. Wash. Oct. 28, 2025) .........................................................8, 9

*Steamfitters Local 449 Pension & Ret. Sec. Funds v. Extreme Networks, Inc.*,
   2026 WL 817221 (N.D. Cal. Mar. 23, 2026)........................................................ *passim*

*In re SVB Fin. Grp. Sec. Litig.*,
   2025 WL 1676800 (N.D. Cal. June 13, 2025)..................................................................7

*In re Trade Desk, Inc. Sec. Litig.*,
   2026 WL 790911 (C.D. Cal. Mar. 17, 2026)...........................................................10, 12

iii

*Veal v. LendingClub Corp.*,
   423 F. Supp. 3d 785 (N.D. Cal. 2019) ....................................................................11, 12

*Yaron v. Intersect ENT, Inc.*,
   2020 WL 6750568 (N.D. Cal. June 19, 2020) ..........................................................7, 11

*York Cty. v. HP Inc.*,
   738 F. Supp. 3d 1182 (N.D. Cal. 2024) ........................................................................8

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ............................................................................1, 12, 15

iv

**INTRODUCTION**

Plaintiffs' third at bat is another strike: the same insufficient facts, deficient scheme claim, contradictory supply constraint and excess inventory theories, reliance on pre-Class Period allegations, and contrived bases for individual liability of the Executive Defendants. The problem with the SAC was not its organization; it was that Plaintiffs had not "pled facts" to sustain their claims. Order at 7. The reorganized TAC fares no better because, as Plaintiffs concede, it relies on the same deficient allegations, shuffled under new subheadings, but identical in substance. The Court understood Plaintiffs' theory and rejected it because the necessary facts were missing. Rearranging the allegations in an effort to convince the Court to second-guess its analysis is not a fix.

Nor was the Court's prior dismissal order "unprecedented." Court after court has granted dismissal where, as here, the complaint rested on lawyer conjecture unsupported by the confidential witnesses, no matter how numerous. Plaintiffs' emphasis on their witness count does not alter the pleading standard. *See, e.g., Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 999-1000 (9th Cir. 2009) ("plethora" of confidential witnesses failed to create an inference of scienter); *Kampe v. Volta Inc.*, 2024 WL 308262 (N.D. Cal. Jan. 26, 2024) (dismissal despite allegations from 9 confidential witnesses); *N.Y.C. Fire Dep't Pension Fund v. Snowflake, Inc.*, 2026 WL 446309 (N.D. Cal. Feb. 17, 2026) (allegations from 48 witnesses did not reflect companywide patterns); *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1163 (S.D. Cal. 2008) (dismissal where "[i]nstead of providing the specificity and particularity demanded by the PSLRA and Ninth Circuit precedents, plaintiffs resort to numerosity and verbosity in their confidential witness allegations").

Plaintiffs' Opposition confirms that the TAC addresses the Court's Order through changes to form and not to substance. The TAC does not plausibly allege a scheme that materially inflated revenue, or that Defendants misled investors about the drivers of revenue or inventory. And, it does not sufficiently allege scienter or loss causation. The TAC should be dismissed with prejudice.

**ARGUMENT**

**I.    THE OPPOSITION DEMONSTRATES THAT THE ALLEGED REVENUE INFLATION FRAUD IS NOT BASED ON SUFFICIENTLY PLED FACTS.**

In finding that Plaintiffs failed to plead either scheme or statement liability under Section 10(b),

1

the Court held that Plaintiffs failed to "plausibly allege the true facts Defendants concealed, or what was false about the impression Defendants created at the time" and, with respect to the challenged statements, did not plead contemporaneous facts showing a contradiction between the challenged statements and reality. Order at 7, 8. Plaintiffs concede that the TAC offers no new facts to address this fatal deficiency. Plaintiffs' Opposition offers only lawyer conjecture and misstatements of the pleading burden. Plaintiffs' Section 10(b) claims premised on alleged revenue inflation should therefore be dismissed.[1]

### A.     The TAC Fails to Plead Supply Disruptions that Allegedly Drove the Scheme.

The Opposition, like the TAC, is rife with legal conclusions posing as facts regarding what allegedly was wrong at ChargePoint during the Class Period. For example, the Opposition asserts that the alleged improper sales practices were "used to bridge the gap between flat organic demand and the Company's aggressive guidance." Opp. at 1. It further argues ChargePoint "faced supply constraints on certain components and products (preventing them from fulfilling legitimate orders)." Opp. at 2; *see also* TAC ¶ 17 (supply constraints made it "impossible" for ChargePoint to meet demand). These assertions are Plaintiffs' conclusions, not facts alleged by confidential witnesses that show what products were impacted, the magnitude or timing of the orders that could not be fulfilled, or when and how demand became "flat." Opp. at 1. The TAC also does not quantify any supposed gap between demand and guidance that the alleged fraud filled.

Because they do not have the facts the Court specifically called on them to provide (Order at 8), Plaintiffs argue that "falsity does not depend on quantifying the supply constraints themselves, or the revenue 'gap' caused by those constraints. . . . . The supply constraints go to motive, not the measure of falsity. . . . Whether supply constraints caused a $10 million or $50 million revenue gap is irrelevant to whether telling the market that growth was organic was false when that growth was driven by channel stuffing, unauthorized shipments, and fire sales." Opp. at 17. This argument misses the point and is contrived by counsel using the very assumption for which no facts are pled—that growth over the 23-month Class Period was not organic. Plaintiffs have proffered allegations about the

---

[1] Many of the challenged statements are inactionable as explained in the Motion at 14-17. Because Plaintiffs fail to adequately plead falsity, the Court need not reach the individual statements.

2

circumstances that could underlie a theoretical fraud—flat demand or a revenue gap due to unfulfilled demand (themselves, contradictory assertions). But, though they rest their claims on these allegations, Plaintiffs have not pled, and admit they cannot plead, specific facts to plausibly support these allegations. Order at 8 (citing *In re Cloudera, Inc.*, 2021 WL 2115303, at *11 (N.D. Cal. May 25, 2021)). Plaintiffs' legal authorities do not establish a lower standard. In *In re Plantronics, Inc. Securities Litigation*, 2022 WL 3653333, at *2 (N.D. Cal. Aug. 17, 2022), an acquisition left the company highly leveraged, which was justified by management's promise of growth and increased revenues; management achieved the promised growth through undisclosed channel stuffing sales practices. In *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *8–9 (D. Or. June 27, 2017), the company set an unprecedented earnings target that incentivized the undisclosed sales practices and concealed the effect of those practices when a key customer's purchasing no longer facilitated such sales. Each of these cases (and *Extreme Networks*, discussed below) alleges a plausible fraud, ***with supporting facts***, that is absent in the TAC.

**B.    Recent Rulings From This District Confirm Plaintiffs' Confidential Witnesses Are Inadequate To Plausibly Allege Widespread Fraudulent Conduct.**

As explained in the Motion, Plaintiffs' case unravels further because the TAC has not adequately alleged that any of the five purportedly wrongful sales practices were widespread so as to materially inflate revenue. Mot. at 6-10; *see also In re Daou Sys., Inc.*, 411 F.3d 1006, 1016-17 (9th Cir. 2005), *abrogated in part on other grounds as recognized by Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023). Once again, the Opposition responds with conclusory assertions to hide the TAC's critical lack of facts, contending the confidential witnesses have all "described the same systemic, top-down scheme to manufacture revenue." Opp. at 1. This is not so, and two recent cases from this District demonstrate why disparate allegations concerning sales practices, even taken together, do not satisfy Plaintiffs' burden to plead widespread improper sales practices, let alone evidence a "systematic, top-down scheme."[2]

---

[2] The Motion addresses the allegation inadequacies as to each individual alleged sales practice and Plaintiffs' flawed attempt to show those practices violated ASC 606, to which the Opposition gives cursory and unpersuasive response. Mot. at 6-10. Because Plaintiffs do not suggest that any of these practices alone led to a material inflation of revenue, this Reply focuses on the failure of the allegations taken together to plead a fraud, not the inadequacies of the individual allegations.

DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT – CASE NO. 5:23-CV-06172-NW

Plaintiffs rely extensively on the denial of a motion to dismiss in *Steamfitters Local 449 Pension & Retirement Security Funds v. Extreme Networks, Inc.*, 2026 WL 817221 (N.D. Cal. Mar. 23, 2026) ("*Extreme Networks II*"), where, like here, plaintiffs brought claims for liability asserting both alleged false or misleading statements about revenue growth and a manipulative sales practices scheme to inflate revenue. *See* Opp. at 9-10. While Plaintiffs focus on the conclusions reached in *Extreme Networks II*, critical takeaways for *this case* are in the court's prior ruling granting the motion to dismiss the first amended complaint ("FAC"). *See* Ex. 8 ("*Extreme Networks I*").

*Extreme Networks I* confirmed that when an alleged fraud is based on concealed practices purportedly inflating revenue, plaintiffs must allege details sufficient to show the alleged conduct was widespread. *Id.* at 18-19. The court in *Extreme Networks I* contrasted *Plantronics* and *Murphy*, explaining "undisputed facts showed that defendants [in those cases] were engaged in unsustainable channel stuffing that materially affected the companies' revenues…In contrast, here, there are no undisputed facts such as an internal report or internal policy that show that channel stuffing was occurring. Thus, to get to the *Plantronics* and *Murphy* analysis, as a baseline, Plaintiffs must at least establish with particularized facts that channel stuffing and other manipulative sales practices were occurring." *Id.* at 15. Though the FAC relied on eleven confidential witnesses (including two FEs specifically directed by executives to engage in the manipulative sales conduct and corroborating facts from the other FEs), the court concluded the allegations were inadequate to allege widespread manipulative sales practices. *Id.* at 16-18. "More particularized allegations regarding specific dates, specific communications, and specific transactions are required." *Id.* at 18-19.

*Extreme Networks I* directly contradicts Plaintiffs' assertion that they are not obligated to tie their alleged instances of conduct together. Opp. at 10. By comparison, the TAC allegations are no more specific or tied to evidence of any widespread conduct than those found inadequate in *Extreme Networks I*. Indeed, *Extreme Networks I* had critical allegations lacking here, including specific instances of the defendants directing the wrongful conduct and details of the magnitude of supply chain constraints allegedly sought to be concealed by the scheme. Ex. 8 at 4, 16-17.

Furthermore, the *Extreme Networks II* amended complaint also illuminates Plaintiffs' failures in the TAC. The *Extreme Networks* plaintiffs amended their SAC to allege (1) new facts, based on FE

4

personal knowledge including with contemporaneous notes, that established when and how the scheme commenced during meetings involving the individual defendants and "particularize[d] the SAC sufficiently to allege that illicit channel stuffing was occurring," (2) specific details of timelines and transactions, including dollar amounts, from other FEs, and (3) the specific revenue impact of the practices with respect to defendants' largest distributors." *Extreme Networks II*, 2026 WL 817221, at *8-9. It was the addition of "specific dates, specific communications, and specific transactions" that the court found consistent with *Plantronics* and *Murphy* and, as a result, sufficient to meet the pleading requirements. *Id.* In contrast, the TAC here contains no new facts notwithstanding that the Court already found the allegations inadequate. And, Plaintiffs' deficient allegations of individual instances of sales conduct (*e.g.*, an alleged instance of shipping charger shells before all components were available, or a reseller having excess inventory obtained through unspecified sales), do not demonstrate a plausible widespread scheme simply because in the TAC Plaintiffs have reorganized and repeated them ad nauseum.

A second recent ruling—*Snowflake*, 2026 WL 446309—further affirms that alleged fraud cannot rest on disparate allegations from confidential witnesses. There, plaintiffs relied on 39 former employees and 9 customer witnesses to challenge statements attributing growth in revenue and demand to organic customer consumption and the value of the company's platform rather than manipulative sales practices. The *Snowflake* court found that even taken together, the sales practices described by the 48 confidential witnesses did not speak to companywide trends contradicting the challenged statements and concluded that "[i]n the absence of particularized allegations from which the Court can conclude that the CW testimony reflects companywide patterns, it is entirely plausible that the CW testimony reflects a limited set of customers and that defendants' statements about the company as a whole were not false or misleading." *Id.* at *6 (distinguishing cases where empirical analyses, independent studies, and other sources corroborated companywide conduct).

Plaintiffs' TAC suffers the same deficiencies as *Extreme Networks I*, *Snowflake,* and already found by this Court in the SAC. The Opposition resorts to conclusory and contradictory assertions. For example, Plaintiffs point to FE-2's reference to some instances of wrong products being shipped purportedly resulting in "millions of dollars" of returns. Opp. at 10. Not only is this allegation more

5

general than those found inadequate in *Extreme Networks*, it is contradicted by Plaintiffs' assertion just one paragraph later that ChargePoint did not accept returns. *Id.* at 11. Similarly, Plaintiffs refer to undocumented side deals that purportedly "materially changed the actual terms of transactions" when they have not alleged facts of any specific transaction that was materially changed. *Id.*

**C.     The Facts That Are Pled in the TAC Undermine the Alleged Fraud Further.**

To the extent Plaintiffs did plead facts in the SAC, they were contradictory asserting both inventory supply constraints and inventory excess used to stuff the channel and predated the Class Period without connecting those allegations to the challenged statements or alleged scheme. Order at 9-10. These foundational deficiencies remain in the TAC. Mot. at 4-6.

Plaintiffs' Opposition only emphasizes the TAC pleading failures, stating the "scheme evolved over the Class Period," starting with the alleged shipping practices and fake subscriptions and, *later* "[a]s CPE 250 excess emerged in late 2022 and into 2023, channel stuffing of that specific product became an additional tool." Opp. at 7. On the next page, however, Plaintiffs defend the pre-Class Period allegations claiming that Larrenaga's assertions that excess product was pushed onto resellers *before* December 2021 are consistent with the alleged Class Period channel stuffing. Opp. at 8.[3] Plaintiffs cannot have it both ways—either their channel stuffing allegations are inconsistent with their allegations of supply constraints, or allegations that channel stuffing began in 2021 are inconsistent with the way they contend the scheme evolved over time. Far from corroborating the alleged scheme, Larrenaga's allegations add to the contradictions.

**D.     Plaintiffs Have Not Shown a Material Impact on Revenue.**

Plaintiffs also do not allege sufficient facts to plead a substantial revenue impact of their implausible scheme.[4] A scheme to inflate revenue that has an immaterial impact on revenue cannot defraud investors. Mot. at 11 (citing *Daou*). And a statement about the drivers of revenue growth cannot be misleading if the undisclosed sales practices did not materially inflate revenue when the

[3] Plaintiffs' primary authority in support of reliance on Larrenaga—*Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1374 (S.D. Fla. 2015)—is from out of Circuit and wholly distinguishable, finding that a defendant's own pre-class period conduct was a "relevant but not decisive factor in the scienter analysis" for that defendant.
[4] This is particularly true with regard to the subscription revenue, which would have *no* material impact on revenue, since ChargePoint recognized subscription revenue over the life of the contract, starting at a set point in time after shipment and not based on the date of activation. *See* Mot. at 10.

DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT – CASE NO. 5:23-CV-06172-NW

statements were made. *Id* at 14-15 (citing *Gilead*). With respect to the challenged statements, Plaintiffs cannot rely on an alleged aggregate impact across the whole Class Period to meet their burden. *Id; see also Plantronics*, 2022 WL 3653333, at *13 (a duty to disclose the sales practices only arose once there was inventory accumulation that "significantly" affected revenue); *Yaron v. Intersect ENT, Inc.*, 2020 WL 6750568, at *8 (N.D. Cal. June 19, 2020); Ex. 8 at 15.

Plaintiffs contend that the TAC "presents multiple, overlapping indicators of material revenue inflation." Opp. at 12. First, the Court need not accept the FE allegations—or Plaintiffs' extrapolations therefrom—as facts supporting revenue inflation. This is because even if the FEs were in a position to know about sales practices, none are adequately alleged to have knowledge about the Company's revenue accounting for the sales they discuss. *See Kampe*, 2024 WL 308262, at *13 (court could not reasonably infer that a confidential witness from the sales group was in a position to have reliable information about the company's accounting practices and whether it prematurely recognized revenue in violation of ASC 606).[5] And, Plaintiffs' conclusions go well beyond what the confidential witnesses even allege. For example, according to Plaintiffs, FE-1 identified "up to $500,000" in prematurely *shipped* product in one quarter.[6] From that assertion, Plaintiffs conclude that "if" a fraction of the 23 other team members was involved in "comparable activity" it would generate "millions of dollars of prematurely *recognized revenue* per quarter." Opp. at 12 (emphasis added). This is an assertion made from whole cloth. FE-1 does not allege their team members were engaged in comparable activity nor are there any facts on which to conclude they would or could have prematurely shipped products of a similar magnitude or value, or what percentage, if any, of those prematurely shipped products would have been recognized as revenue. Plaintiffs' reliance on the alleged inventory with resellers is also

[5] Plaintiffs' attempt to bolster their confidential witnesses misses the mark. *See* Opp. at 14-16. The issue is not solely whether they have personal knowledge of all the facts they report, but that none of the confidential witnesses can or do claim to have any knowledge about ChargePoint's accounting or financial reporting during the Class Period. Plaintiffs ignore that in *In re SVB Financial Group Securities Litigation*, all the FEs "previously worked in risk management and/or accounting." 2025 WL 1676800, at *13 n.8 (N.D. Cal. June 13, 2025) (Wise, J.). And the issue in *Berson v. Applied Signal Technology* was whether the FEs would have been in a position to know about the issuance of "stop-work orders," which the Ninth Circuit reasoned "would have had the very obvious effect of putting numerous employees out of work" and was not knowledge limited to a specific role or department. 527 F.3d 982, 985 (9th Cir. 2008).

[6] As has been pointed out, Plaintiffs' citation to the high end of FE-1's estimate of the amount of prematurely *shipped* product overstates the amount of prematurely *recognized revenue* FE-1 even alleges, which ranged from $8K to $100K. *See* Mot. at 11 n.6.

7

misleading—no facts alleged demonstrate when any inventory was purchased or the circumstances of its sale to the resellers. Only Plaintiffs' speculation ties that inventory to revenue purportedly generated through improper sales.

In any event, none of the FE allegations support a plausible claim that revenue was inflated in any quarter, let alone the whole Class Period. Mot. at 11-12. Plaintiffs' authority does not relieve them of this pleading burden. In *Daou*, specific allegations of revenue accounting and reporting practices sufficiently demonstrated how the revenue adjustments "affected the company's financial statements and whether they were material in light of the company's overall financial position." *Daou*, 411 F.3d at 1018 (alleging millions of dollars of prematurely recognized revenue with respect to a specific contract for a specific quarter and providing the amount of alleged revenue inflation). These are the very allegations missing here. *State Teachers Ret. Sys. of Ohio v. ZoomInfo Techs., Inc.*, 2025 WL 3013683 (W.D. Wash. Oct. 28, 2025) is also distinguishable on both facts and law. On the facts, the confidential witnesses included a former revenue accountant and multiple former Revenue Operations department employees, and the allegations included the number of new customers obtained through the alleged wrongful practices. *ZoomInfo* is also inconsistent with *Kampe*, 2024 WL 308262, at *11-12 and *Daou* and should be disregarded for that reason as well.

## II.    THE TAC FAILS TO ALLEGE CONDUCT BY THE EXECUTIVE DEFENDANTS.

Plaintiffs' scheme claim should be dismissed for the additional failure to "adequately allege conduct by the Executive Defendants that furthered the deceptive scheme beyond their alleged misstatements;" it does "not support individual liability" as to those defendants. Order at 10; Mot. at 17-19. Plaintiffs' Opposition cites caselaw that does not save their deficient allegations:

- The scheme claim in *York County v. HP Inc.* survived where an executive "approved steep discounts to inflate sales;" Plaintiffs omit that the executive in that case was knowingly dealing with gray market sub-distributors as part of a known scheme (uncovered following a "years-long investigation" by the SEC) to flood international markets with cheaper products and boost sales volume. 738 F. Supp. 3d 1182, 1194-95, 1207 (N.D. Cal. 2024). That is a far cry from the lone $10 million dollar "fire sale" to standard resellers alleged here, which Plaintiffs still have not even pled to be inherently deceptive or leading to improper revenue recognition.

- Contrary to Plaintiffs' assertion, the *Extreme Networks II* court did not "credit[] allegation of verbal-only agreements" (Opp. at 13); there is only one passing reference in that case to "verbal-only agreements," which were explicitly to avoid auditor scrutiny and did not factor into the court's analysis. 2026 WL 817221, at *5.

8

- In *ZoomInfo*, the "undisclosed sales tactics" of "abandoning due diligence to sell to risky customers, suppressing unpleasant market data, and coercing renewals from customers unlikely to pay" go beyond ordinary business conduct such as the rebates purportedly negotiated by Hughes. The *ZoomInfo* FEs actually interacted with the defendants related to the alleged conduct and, unlike here, were not speculating about how sales practices "would have been" approved. 2025 WL 3013683, at *18-19.

- Finally, Plaintiffs invoke *In re Seagate Technology Holdings PLC Securities Litigation*, 2025 WL 1744505 (N.D. Cal. May 12, 2025) to suggest that Romano and Jackson's statements furthered the scheme, but Plaintiffs have not pled that any statement was false or misleading and, in any event, the Court already rejected this theory on the same facts in the SAC. Order at 10.

## III.    PLAINTIFFS DO NOT PLEAD DELAYED INVENTORY VALUATION.

The inventory write down allegations also suffer from the same failure to plead facts demonstrating falsity. None of Plaintiffs' confidential witness allegations, even as reorganized and re-pled in the TAC, show any delay in the write down, because none of them allege when the value of the inventory was actually impaired nor when it should have been written down. Mot. at 12-14.

Plaintiffs do not directly address the specific deficiencies identified in the Motion. Instead, the Opposition summarizes again the TAC's inventory allegations (substantively identical to the deficient SAC allegations) and then stubbornly concludes that these allegations "establish[] that the point of loss recognition was reached well before September 2023." Opp. at 18. But simply saying this does not make it a well pled fact, and the Opposition does not support this conclusory assertion any more than the TAC does. The confidential witness allegations cited in the TAC and the Opposition—softening demand for CPE 250s, accumulation and discussion of excess CPE 250s, and offering of promotional pricing on the CPE 250—merely demonstrate ordinary business conduct. These allegations, taken alone or in combination, do not show that an inventory impairment was required before September 2023, or even that an inventory impairment was the subject of any internal discussions before September 2023. *See* Mot. at 12-14; Opp. at 18-19; ¶¶ 95, 131-39.

Plaintiffs misdirect and accuse Defendants of trying to impose a "requirement that Plaintiffs present a full 'net realizable value' model or pinpoint the exact day the accounting line should have moved." Opp. at 18-19. Not so. Defendants have explained that if Plaintiffs contend statements about ChargePoint's inventory were false because of a delay in taking inventory impairments, they must allege facts that actually support the existence of such a delay. Mot. at 12-14. No one has said that

9

Plaintiffs must allege facts showing the "exact day" the inventory was impaired. They must allege facts showing that it was impaired *prior to* the challenged statements. Without such facts Plaintiffs have not shown that the challenged statements were false when made. *See City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *14 (N.D. Cal. Dec. 17, 2019) (specific time references needed to allege each challenged statement was false *when made*).

## IV.     THE SCIENTER ALLEGATIONS ARE DEFECTIVE IN EVERY RESPECT.

The TAC fails for the additional independent reason that Plaintiffs have not alleged any facts to show scienter. Mot. at 19-23. And, the Opposition offers only distinguishable caselaw and confused argument in response.

***First,*** Plaintiffs do not plead that any Executive Defendant was aware of a fraudulent scheme or information contrary to the challenged statements. Plaintiffs deliberately attempt to sidestep this requirement arguing the Executive Defendants purportedly had "direct involvement" in a disparate array of sales practices. Opp. at 20. But, Plaintiffs have not actually pled the Executive Defendants' involvement in alleged wrongful conduct. Mot. at 17-19; Sec. II, *supra*. In any event, pleading scienter is distinct from the requirement that Plaintiffs allege deceptive acts by the individuals in furtherance of a scheme. *Simpson v. AOL TimeWarner Inc.*, 452 F.3d 1040, 1048 n.5 (9th Cir. 2006) (distinguishing scienter from deceptive acts in furtherance of a scheme), *vacated on other grounds, sub nom Avis Budget Grp., Inc. v. Cal. State Teachers' Ret. Sys.*, 552 U.S. 1162 (2008).

Furthermore, *In re Trade Desk, Inc. Securities Litigation* is inapt—scienter was found there through a holistic analysis of allegations that included confidential witnesses who attended weekly meetings led by the defendants where information contrary to positive public statements (*e.g.*, lagging product adoption and defects) was discussed. 2026 WL 790911, at *13 (C.D. Cal. Mar. 17, 2026). Here, in contrast, no confidential witness alleges attending any meeting with any Executive Defendant where information contrary to the public statements was discussed. And, CW-1's alleged interactions with Jackson and Hughes relate to sales practices that are not themselves improper and for which CW-1 has no basis to say led to improperly inflated revenue.

In arguing that Jackson and Romano knew the challenged statements were false, Plaintiffs do not address any of the caselaw cited in the Motion and instead rely on *In re Doximity, Inc. Securities*

10

*Litigation*, where a defendant allegedly had actual access to user metrics data on a dashboard that the defendant requested be created. *See* 2025 WL 1449598, at *9 (N.D. Cal. May 13, 2025). No such facts are alleged here. Rather, Plaintiffs blatantly misstate the TAC, arguing that Hughes and Romano were routinely updated about CPE 250 inventory in 2023, and that certain information was visible in Salesforce. *See* Opp. at 20. In fact, the TAC admits the Executive Defendants ***did not attend*** the weekly meeting. ¶ 134. (FE-5 assumes, with no actual knowledge, that they were apprised of the discussions). And, "mere access to internal data and reports does not establish knowledge by the executives." *Yaron*, 2020 WL 6750568, at *9. Plaintiffs do not identify specific information any Executive Defendant reviewed, much less explain how it contradicted the challenged statements. *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 814 (N.D. Cal. 2019) (no scienter based on "general awareness" and "hands-on management style").

***Second***, Plaintiffs again fail to tie executive compensation and stock sales to scienter. ChargePoint was a public company for only nine months prior to the Class Period, and its officers were subject to lock-up agreements for a significant portion of that window, making that period a poor comparator for the nearly two-year Class Period.[7] Mot. at 21. In opposition, Plaintiffs rely on a slew of inapt cases to no avail. *In re UTStarcom, Inc. Securities Litigation* involved individual defendants selling nearly $40 million worth of stock, including two defendants selling over 98% of their respective stock holdings, during the first two years of the class period—far more than is at issue here, by both metrics. 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009). *City of Providence v Aeropostale, Inc.* involved "elections to sell stock" to cover tax liability, not mandatory sales as here. 2013 WL 1197755, at *16 (S.D.N.Y. Mar. 25, 2013). Plaintiffs cite *In re Questcor Securities Litigation* to challenge Romano's trading plan, but the court there acknowledged that "the Ninth Circuit has held that trades made pursuant to trading plans do not by themselves support an inference of scienter," concluding that one defendant's plans did "not negate the suspicious nature of the sales as a whole." 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013) (citations omitted). Here, no facts pled reflect anything "suspicious" about the sales other than that they occurred during the Class Period. Plaintiffs' citation to a footnote

---

[7] Plaintiffs' halfhearted rebuttal includes a curious citation to the SAC rather than the TAC (presumably because the TAC does not contain the allegations to which they refer). *See* Opp. at 21.

DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT – CASE NO. 5:23-CV-06172-NW

in *Trade Desk* is also ineffective; the defendant there had sold $48 million of stock the day before the alleged corrective disclosure, and thus the sale was suspicious as to timing and magnitude. 2026 WL 790911, at *12.

*Extreme Networks II* does not help Plaintiffs as to compensation. Unlike there, Plaintiffs here allege no specific compensation tied to the alleged fraud—only standard executive equity awards and commissions, which are precisely the kind of generic motives the Ninth Circuit has held insufficient. *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012).

***Third***, Plaintiffs' patchwork of fallback theories all fall flat. Plaintiffs cannot infer scienter merely because Romano and Jackson spoke in detail about ChargePoint's business. *Veal*, 423 F. Supp. 3d at 814. And, *Roberti v. OSI Systems, Inc.* involved detailed factual statements contradicting important data to which defendants had access. 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015). Here, Plaintiffs identify no specific data or disputed internal information that rendered Romano or Jackson's statements false when made. As to executive departures, Plaintiffs admit that at most, analysts connected the departures to "ChargePoint's significant disappointments" —not to any fraud or intentional wrongdoing by Romano or Jackson. Opp. at 22. Plaintiffs' perfunctory attempt at a core operations argument comes nowhere near the specific admissions or witness accounts required to plead that theory. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014); *see also* Mot. at 21-22. Plaintiffs state the company's revenue trajectory was core to the business, but have alleged no facts regarding the impact of any alleged sales practices on revenue or how such information flowed to the Executive Defendants. Opp. at 22. Then, Plaintiffs simply conclude that "deciding what to ship, when, and to whom" were "core operational decisions" notwithstanding no alleged facts to show the Executive Defendants monitored the shipping practices or product inventory levels, let alone were involved in the day-to-day decision making around shipping. And, the SOX-certification theory remains deficient because Plaintiffs have not demonstrated any knowledge of a widespread improper revenue recognition scheme. Mot. at 21-22.

***Lastly***, even considered holistically, Plaintiffs' allegations do not give rise to a cogent and compelling inference of scienter. Plaintiffs' "holistic" inference is, in actuality, a series of weak inferences that fare no better when considered together. *See Zucco*, 552 F.3d at 1008 ("Compiling a

12

large quantity of otherwise questionable allegations" does not "transform" them into a viable inference of scienter.); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 65 F. Supp. 3d 840, 861 (N.D. Cal. 2014) (applying holistic analysis to theories including GAAP violations, core operations, insider trading, and executive departure, finding allegations "painted a picture of corporate mismanagement and unrealized optimism" but not scienter), *aff'd* 856 F.3d 605 (9th Cir. 2017). Plaintiffs' attempt to distinguish *In re NVIDIA Corp. Securities Litigation* falls flat—just as there, Plaintiffs here have not credibly alleged any Executive Defendant had actual knowledge of a fraudulent scheme or contradictory information rendering their statements false. 768 F.3d 1046, 1064 (9th Cir. 2014); Mot. at 20. And, Plaintiffs' contention of an improper "competing inference" that "the Executive Defendants were ignorant of a multi-faceted, 23-month scheme" is circular. Opp. at 22. That framing assumes the ultimate conclusion (the existence of a scheme), which is Plaintiffs' burden to plead and which they have not pled.

## V.   PLAINTIFFS DO NOT PLEAD LOSS CAUSATION.

The TAC's loss causation allegations suffer the same fatal flaw as the loss causation allegations in the SAC, namely that they fail to show that the stock drops on September 6 and November 16, 2023 were caused by any alleged fraud, as opposed to being caused solely by the poor financial results disclosed on those days. *Loos v. Immersion Corp.*, 762 F.3d 880, 887-88 (9th Cir. 2014); Mot. at 23-25. In arguing otherwise, Plaintiffs contend that the disclosures on September 6 and November 16 were "not ordinary disappointing results" but were instead "the direct, foreseeable consequences of inflating revenue through improper practices and carrying overvalued inventory well beyond the point it should have been written down." Opp. at 24. But Plaintiffs have not adequately alleged *any* revenue inflation, much less material revenue inflation that would inevitably lead to a 30% revenue miss, nor have they adequately alleged any delay in taking inventory impairments. *See* Secs. I.D, III, *supra*; Mot. at 11-14. Plaintiffs have therefore not shown that the stock drops were based on anything other than poor financial results. This conclusion is reinforced by the analyst reports Plaintiffs themselves cite (*see* Opp. at 2-25; ¶ 292), and the overall downward trend of ChargePoint's stock price during the Class Period. *See* Mot. at 25.

Faced with a clear deficiency in the SAC identified by the Court (*see* Order at 7 n.5), and

13

unremedied in the TAC, Plaintiffs once again muddle the issues. First, they try to blur the distinction between the two inventory impairments. *See* Opp. at 24. However, to the extent Plaintiffs contend that the November impairment, like the September impairment, was related to the value of the CPE 250s, this claim is directly contradicted by Wilmer's statement that the November impairment was related to "multiple" product transitions and "differ[ed] from" the September impairment which related to "a single first-generation DC charger." SAC ¶ 248; Mot. at 23-24. To the extent Plaintiffs contend that the November impairment was related to the value of other inventory but had the same "root cause" as the September CPE 250 impairment, this claim is directly at odds with one of the foundational theories of the TAC. Namely, Plaintiffs try to reconcile their contradictory assertions of supply constraints and excess inventory by claiming it was the CPE 250 alone that was overstocked, and all other products were understocked. *See, e.g.*, Opp. at 2 ("ChargePoint simultaneously faced supply constraints on certain components and products (preventing it from filling legitimate orders), while accumulating excess inventory of *one specific legacy product*—the CPE 250.") (emphasis added); TAC at p. 46 ("**The Excess Inventory Was Concentrated in One Product—the CPE 250 DC Charger.**"). This attempted reconciliation falls apart if Plaintiffs now contend, in trying to salvage their loss causation argument, that products besides the CPE 250 were also overstocked.

Plaintiffs are also wrong that Romano and Jackson's departures support loss causation. Opp. at 24-25. The two cases Plaintiffs cite in support of this claim are inapposite, as both involved executive departures *accompanied by explicit acknowledgments that the executives had engaged in wrongdoing. See Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 983 (N.D. Cal. 2015) (CEO "accept[ed] responsibility and submit[ed] [a resignation] letter" after the Audit Committee "found certain irregularities" in the CEO's expense reports); *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1134–35 (N.D. Cal. 2013) (CEO "submitted numerous inaccurate expense reports" and admitted he "did not live up to [his own] standards and principles of trust, respect and integrity"). In this case, on the other hand, neither the Company, the departing executives, nor the cited analyst reports ever suggested Romano or Jackson had engaged in any wrongdoing. *See, e.g.*, ¶ 284 ("Fox Advisors explicitly connected the leadership departures to the *financial disappointments*.") (emphasis added). Their resignations are therefore

14

insufficient to establish loss causation. *See, e.g.*, *Magro v. Freeport-McMoran Inc.*, 2018 WL 3725781, at \*9 (D. Ariz. Aug. 3, 2018) (resignations that "were not unusual or accompanied by any admission of wrongdoing" did not support loss causation).

## VI.   PLAINTIFFS' SECTION 20(a) CLAIM FAILS AS WELL.

Plaintiffs' control person claim fails because they have not pled an underlying violation and have not pled that Hughes was a control person. Mot. at 25. Plaintiffs' conclusory allegations about Hughes' role at ChargePoint and that he purportedly met with resellers are insufficient to establish a Section 20(a) claim. *Id.*; *Purple Mountain Tr. v. Wells Fargo & Co.*, 432 F. Supp. 3d 1095, 1106 (N.D. Cal. 2020). Plaintiffs do not explain how meeting with resellers (which is insufficient to even plead deceptive conduct, Mot. at 19) shows that Hughes "exercised actual power or control over the primary violator" for the scheme claim. *City of Dearborn Heights*, 856 F.3d at 623.

## VII.   THE TAC SHOULD BE DISMISSED WITH PREJUDICE.

District courts may deny leave to amend for reasons including "repeated failure to cure deficiencies by amendments previously allowed" and "futility of amendment." *Zucco*, 552 F.3d at 1007 (citations omitted). A court's "discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Metzler Inv. GMVH v. Corinthian Coll., Inc.*, 540 F.3d 1049, 1072 (9th Cir. 2008) (citations omitted) (affirming dismissal of TAC with prejudice where plaintiff "points to no additional facts" to cure deficiencies); *In re Intel Corp. Sec. Litig.*, 792 F. Supp. 3d 1008, 1024 (N.D. Cal. 2025) (dismissing SAC with prejudice where plaintiffs failed to add particularized facts and "largely us[ed] leave as an opportunity to repeatedly challenge the Court's prior order" dismissing FAC). Even Plaintiffs' own authority shows why leave to amend should be denied here. *See Eminence Cap., LLC v. Aspeon, Inc.* 316 F.3d 1048, 1053 (9th Cir. 2003) (granting leave because it ***was "not a case*** where plaintiffs took 'three bites at the apple' by alleging and re-alleging the same theories in an attempt to cure pre-existing deficiencies") (emphasis added). Plaintiffs are on their third bite at the apple in this case and have shown no reason they should be given a fourth.

Date: April 13, 2026                          Respectfully submitted,

                                              By: */s/ Jaime A. Bartlett*
                                                  Sara B. Brody (SBN 130222)
                                                  sbrody@sidley.com
                                                  Jaime A. Bartlett (SBN 251825)
                                                  jbartlett@sidley.com
                                                  Matthew P. Henry (SBN 308878)
                                                  mhenry@sidley.com
                                                  Chaddy G. Georges (SBN 335546)
                                                  cgeorges@sidley.com
                                                  SIDLEY AUSTIN LLP
                                                  101 California Street
                                                  Suite 3500
                                                  San Francisco, CA 94111

                                              *Attorneys for Defendants*
                                              *ChargePoint Holdings, Inc., Pasquale Romano,*
                                              *Rex S. Jackson, and Michael Hughes*

16