Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Email: reed@hbsslaw.com
lucasg@hbsslaw.com

Raffi Melanson (pro hac vice)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1 Faneuil Hall Sq., 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
Email: raffim@hbsslaw.com

Peter Shaeffer (pro hac vice)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
455 N Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Email: petersh@hbsslaw.com

*Lead Counsel for Lead Plaintiffs Shahram Afshani and Paulina Afshani Schwarz*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

FAROOQ KHAN, individually and on behalf of all others similarly situated,

Plaintiff,

v.

CHARGEPOINT HOLDINGS, INC., *et al.*,

Defendants.

Case No. 5:23-cv-06172-NW

**LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Hearing Date: February 24, 2027
Hearing Time: 9:00 A.M.
Courtroom: Courtroom 3, 5th Floor
Judge: Hon. Noël Wise

## TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION .................... 1
STATEMENT OF ISSUES TO BE DECIDED .................... 1
MEMORANDUM OF POINTS AND AUTHORITIES .................... 2
I. PRELIMINARY STATEMENT .................... 2
II. FACTUAL BACKGROUND .................... 3
A. Nature of the Action .................... 3
B. Initial Complaint and Lead Plaintiff Process .................... 4
C. Lead Counsel's Investigation and the Amended Complaint .................... 4
D. The Parties' First Mediation .................... 5
E. Lead Plaintiffs File Second and Third Amended Complaints .................... 5
F. Lead Plaintiffs and Defendants Attend a Second Mediation Session .................... 5
G. Fact Discovery Continues Following the Second Mediation .................... 5
H. Continued Negotiations With the Mediator Result in Settlement Agreement .................... 6
III. THE PROPOSED SETTLEMENT .................... 6
IV. THE SETTLEMENT SHOULD BE PRELIMINARILY APPROVED .................... 8
A. Standards Governing Approval of a Class Action Settlement .................... 8
B. The Court "Will Likely Be Able to" Approve the Proposed Settlement Under Rule 23(e)(2) .................... 10
1. Lead Plaintiffs and Lead Counsel have adequately represented the Settlement Class. .................... 10
2. The proposed settlement is the result of good faith, arm's-length negotiations by informed, experienced counsel who were aware of the risks of litigation. .................... 11
3. The settlement provides adequate relief for the Settlement Class. .................... 11
a. The costs, risks, and delay of trial and appeal support approval of the settlement. .................... 11

b. The proposed method for distributing relief is effective. .............. 15

c. Proposed attorneys' fees, expenses, and Lead Plaintiffs' awards. ........ 16

d. Identification of agreements. ........ 18

4. The proposed Plan of Allocation treats Settlement Class Members equitably and does not confer preferential treatment. ........ 19

C. The Remaining Ninth Circuit Factors Support Preliminary Approval of the Settlement ........ 19

1. Experience and views of counsel support preliminary approval. ........ 20

2. The extent of discovery completed and the stage of the proceedings at which the settlement was achieved support preliminary approval. ........ 20

V. THE PROPOSED SETTLEMENT CLASS SATISFIES RULE 23 ........ 20

A. The Proposed Settlement Class Satisfies Rule 23(a). ........ 21

B. The Proposed Settlement Class Satisfies Rule 23(b). ........ 22

VI. THE PROPOSED NOTICE PROGRAM SATISFIES RULE 23, THE PSLRA, AS WELL AS DUE PROCESS REQUIREMENTS ........ 23

VII. THE PROPOSED CLAIMS ADMINISTRATOR ........ 24

VIII. PROPOSED SCHEDULE OF EVENTS ........ 25

IX. CONCLUSION ........ 25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES


*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) .......... 21, 22, 23

*In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773 (C.D. Cal. Oct. 25, 2016) .......... 13

*AMI – Gov't Emps. Provident Fund Mgmt. Co. Ltd. v. Alphabet Inc.*, 833 F. Supp. 3d 1034 (N.D. Cal. 2026) .......... 21, 22

*In re Apple Inc. Sec. Litig.*, 2024 WL 4246282 (N.D. Cal. Sep. 18, 2024) .......... 19

*Baker v. Romano*, Case No. 1:24-cv-00010-RGA (D. Del.) .......... 8

*In re BofI Holdings, Inc. Sec. Litig.*, 2022 WL 9497235 (S.D. Cal. Oct. 14, 2022) .......... 19

*Borteanu v. Nikola Corp.*, 2025 WL 3295787 (D. Ariz. Nov. 25, 2025) .......... 24

*Burstell v. Romano*, Case No. 1:26-cv-01174-UNA (D. Del.) .......... 8

*In re Celera Corp. Sec. Litig.*, 2015 WL 1482303 (N.D. Cal. Mar. 31, 2015) .......... 9

*In re ChargePoint Holdings, Inc. Derivative Litigation*, Case No. 5:24-cv-00149-NW (N.D. Cal.) .......... 8

*In re ChargePoint Holdings, Inc. Stockholder Derivative Litigation*, Case No. 2026-0938-JTL (Del. Ch.) .......... 8

*In re Doximity, Inc. Sec. Litig.*, 2026 WL 1697594 (N.D. Cal. June 11, 2026) (Wise, J.) .......... 18

*In re Doximity, Inc. Sec. Litig.*, 2026 WL 523407 (N.D. Cal. Feb. 25, 2026) (Wise, J) .......... 8

*In re Doximity, Inc. Sec. Litig.*, Case No. 5:24-cv-02281-NW .......... 8

*In re ECOtality, Inc. Sec. Litig.*, 2015 WL 5117618 (N.D. Cal. Aug. 28, 2015) .......... 20

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) .... 22

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
594 U.S. 113 (2021) .... 14

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) .... *passim*

*Hardy v. Embark Tech., Inc.*,
2023 WL 6276728 (N.D. Cal. Sep. 26, 2023) .... 12

*Hefler v. Wells Fargo & Co.*,
2018 WL 4207245 (N.D. Cal. Sep. 4, 2018) .... 18

*Hefler v. Wells Fargo & Co.*,
2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) .... 13

*Hunt v. Bloom Energy Corp.*,
2024 WL 1995840 (N.D. Cal. May 6, 2024) .... 17

*In re Hyundai & Kia Fuel Econ. Litig.*,
926 F.3d 539 (9th Cir. 2019) .... 9

*Khan v. ChargePoint Holdings, Inc. et al.*,
No. 5:23-cv-06172 (N.D Cal.) .... 4

*Lane v. Facebook, Inc.*,
696 F.3d 811 (9th Cir. 2012) .... 10

*In re LendingClub Sec. Litig.*,
2018 WL 1367336 (N.D. Cal. Mar. 16, 2018) .... 9

*Levitan v. Chizen*,
Case No. 2026-1001-JTL (Del. Ch.) .... 8

*In re LinkedIn User Privacy Litig.*,
309 F.R.D. 573 (N.D. Cal. 2015) .... 11

*Lomont v. Romano*,
Case No. 2026-0682-JTL (Del. Ch.) .... 8

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) .... 14

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) .... 11

*Mild v. PPG Indus., Inc.*,
2019 WL 3345714 (C.D. Cal. July 25, 2019) .... 10

*In re Netflix Privacy Litig.*,
2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) .......... 11

*Norton v. LVNV Funding, LLC*,
2021 WL 3129568 (N.D. Cal. Jul. 23, 2021) .......... 11

*In re Nuvelo, Inc. Sec. Litig.*,
2011 WL 2650592 (N.D. Cal. July 6, 2011) .......... 17

*In re NVIDIA Corp. Deriv. Litig.*,
2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) .......... 20

*In re Portal Software, Inc. Sec. Litig.*,
2007 WL 4171201 (N.D. Cal. Nov. 26, 2007) .......... 23

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
442 F.3d 741 (9th Cir. 2006) .......... 8

*In re RH, Inc. Sec. Litig.*,
2019 WL 5538215 (N.D. Cal. Oct. 25, 2019) .......... 24

*Rodriguez v. W. Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009) .......... 20

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
2025 WL 1243818 (N.D. Cal. Apr. 25, 2025) .......... 21, 22

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
2026 WL 1458903 (N.D. Cal. May 21, 2026) .......... 14

*Sheet Metal Workers' Nat'l Pension Fund v. Bayer Aktiengesellschaft*,
2025 WL 3034317 (N.D. Cal. Oct. 30, 2025) .......... 16, 17

*In re Splunk Inc. Sec. Litig.*,
2024 WL 923777 (N.D. Cal. Mar. 4, 2024) .......... 8

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) .......... 16

*Thant v. Rain Oncology Inc.*,
2026 WL 1113721 (N.D. Cal. Apr. 24, 2026) .......... 23

*Vataj v. Johnson*,
2021 WL 5161927 (N.D. Cal. Nov. 5, 2021) .......... 17

*Villanueva v. Joyce*,
2025 WL 5089308 (N.D. Cal. Aug. 25, 2025) .......... 22

*In re Wash. Public Power Supply Sys. Sec. Litig.*,
19 F.3d 1291 (9th Cir. 1994) .......... 16

*In re Wells Fargo & Co. S'holder Deriv. Litig.*,
2019 WL 13020734 (N.D. Cal. May 14, 2019) .......... 9, 11, 19, 23

*Wong v. Arlo Technologies*,
2021 WL 1531171 (N.D. Cal. Apr. 19, 2021) .......... 12

*In re Zynga Inc. Sec. Litig.*,
2015 WL 6471171 (N.D. Cal. Oct. 27, 2015) .......... 22

## STATUTES & OTHER AUTHORITIES

15 U.S.C. § 78u-4(a)(4) .......... 2, 6, 18

17 C.F.R. § 240.10b-5 .......... 3

Fed. R. Civ. P. 23 .......... *passim*

Fed. R. Civ. P. 23(a)(1) .......... 21

Fed. R. Civ. P. 23(a)(2) .......... 21

Fed. R. Civ. P. 23(a)(4) .......... 22

Fed. R. Civ. P. 23(e)(1)–(2) .......... 9

Fed. R. Civ. P. 23(e)(1)(B) .......... 9, 20, 21

Fed. R. Civ. P. 23(e)(2) .......... 9, 10, 19

Laarni Bulan and Eric Tam, *Securities Class Action Settlements* – 2025 Review and Analysis (Cornerstone Research 2026), https://www.cornerstone.com/wp-content/uploads/2026/02/Securities-Class-Action-Settlements-2025-Review-and-Analysis.pdf .......... 12

## NOTICE OF MOTION AND MOTION

**TO: ALL PARTIES AND THEIR ATTORNEYS OF RECORD**

**PLEASE TAKE NOTICE** that on February 24, 2027, at 9:00 AM PST, or as soon thereafter as counsel may be heard, Lead Plaintiffs Shahram Afshani and Paulina Afshani Schwarz ("Lead Plaintiffs") will and do hereby move the Court for an Order, pursuant to Rule 23 of the Federal Rules of Civil Procedure: (1) preliminarily approving the proposed settlement ("Settlement") as set forth in the Stipulation;[1] (2) preliminarily certifying a Settlement Class; (3) approving the form and manner of giving notice of the proposed Settlement to the Settlement Class; (4) scheduling a hearing before the Court to determine whether the proposed Settlement, the proposed Plan of Allocation, and counsel's motion for an award of attorneys' fees and litigation expenses, including Awards to Lead Plaintiffs, should be approved; and (5) providing such other and further relief as this Court deems just and proper.

This motion is based on the Memorandum of Points and Authorities below, the Declaration of Reed R. Kathrein and exhibits attached thereto, all prior pleadings in this Action, and such additional evidence or argument as may be requested by the Court.

A [Proposed] Order Granting Lead Plaintiffs' Motion for (I) Preliminary Approval of Class Action Settlement; (II) Certification of the Settlement Class; (III) Approval of Notice to the Settlement Class; and (IV) Scheduling of Fairness Hearing ("Preliminary Approval Order") is also submitted herewith as Exhibit A to the Stipulation.

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether the proposed $11,000,000.00 cash recovery and the other terms of the proposed Settlement of this Action are within the range of fairness, reasonableness, and adequacy to warrant the Court's preliminary approval and the dissemination of notice of its terms to Settlement Class Members.

---

[1] All capitalized terms not defined herein shall have those meanings as set forth in the Stipulation and Agreement of Settlement dated October 28, 2026 ("Stipulation"), a true and correct copy of which is attached as Exhibit 2 to the Declaration of Reed R. Kathrein in Support of Lead Plaintiffs' Notice of Motion and Motion for Preliminary Approval of Proposed Class Action Settlement ("Kathrein Decl."). Emphasis is added and citations are omitted throughout unless otherwise noted.

2. Whether the Court will be likely to certify the Settlement Class.

3. Whether the Court should approve the form and substance of the proposed Notice of Pendency and Proposed Settlement of Class Action ("Notice"), Proof of Claim and Release ("Proof of Claim"), the Summary Notice of Proposed Settlement of Class Action ("Summary Notice"), and the Postcard Notice of Proposed Settlement of Class Action ("Postcard Notice"), appended as Exhibits A-1 through A-4 to the Stipulation, as well as the manner of notifying the Settlement Class of the proposed Settlement and the Agreement.

4. Whether the Court should set a date for a hearing to determine whether the Settlement and the Plan of Allocation should be finally approved and to consider counsel's application for an award of attorneys' fees and payment of expenses, including Awards to the Lead Plaintiffs pursuant to 15 U.S.C. § 78u-4(a)(4) ("Fairness Hearing").

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. PRELIMINARY STATEMENT

Lead Plaintiffs have secured an $11 million all-cash Settlement that will be funded by ChargePoint. That alone sets this Settlement apart. Securities class action settlements are typically funded in whole or in large part by directors' and officers' liability insurance. Since ChargePoint does not have insurance for this action, it is in the unusual situation of paying for the settlement itself. Settlements paid entirely from a defendant company's own balance sheet are rare.

Moreover, $11 million is approximately 11.5% of ChargePoint's $95.3 million in cash and cash equivalents as of July 31, 2026. ChargePoint's cash position's downward trend is stark. ChargePoint's cash fell by roughly a third in six months, from $141.6 million on January 31, 2026 to $95.3 million on July 31, 2026. Its market capitalization has dropped from $7.21 billion on December 7, 2021 (the beginning of the Settlement Class Period) to about $250 million today. Continuing to litigate through class certification, summary judgment, trial, and the appeals that would surely follow would have taken years. During that time, ChargePoint's ability to pay any judgment would likely have kept shrinking. The Settlement Class faced a real risk of winning at trial and recovering little or nothing. This Settlement turns a shrinking pool of potential recovery into a certain, immediate cash payment.

Lead Plaintiffs also reached this result efficiently. Lead Plaintiffs did not have an SEC investigation or a restatement to build on, and developed the case entirely on their own. They interviewed more than three dozen witnesses, filed three amended complaints, and overcame a dismissal order. The Court then denied Defendants' third motion to dismiss on May 21, 2026. With that ruling in hand, Lead Plaintiffs promptly served targeted discovery on Defendants and on third parties, including ChargePoint's auditor. Lead Plaintiffs reviewed and analyzed priority documents ChargePoint produced on an expedited basis, and took part in two in-person mediations with Seth Aronson of Phillips ADR Enterprises, P.C. On September 25, 2026, about four months after the Court sustained the complaint, the Settling Parties accepted Mr. Aronson's double-blind mediator's proposal of $11 million. The result is a meaningful recovery while there is still cash to recover, without the cost and delay of full fact and expert discovery.

The Settlement is therefore the product of arm's-length negotiations conducted by experienced counsel, with the help of a well-respected mediator and with enough information to evaluate the strengths and weaknesses of the claims. Lead Plaintiffs therefore respectfully ask the Court to grant preliminary approval so that notice can be sent to the Settlement Class and a Fairness Hearing can be scheduled.

## II. FACTUAL BACKGROUND

### A. Nature of the Action

Lead Plaintiffs assert claims on behalf of a putative class of investors pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against Defendants.

Lead Plaintiffs allege that between December 7, 2021 and November 16, 2023, inclusive, Defendants inflated ChargePoint's reported revenue through undisclosed, unsustainable practices that violated Generally Accepted Accounting Principles ("GAAP") and ChargePoint's own revenue recognition policy, while simultaneously misrepresenting the sources of the Company's reported growth as organic customer demand and effective supply chain management. Kathrein Decl., ¶ 3.

Lead Plaintiffs allege that the scheme unraveled in two stages. On September 6, 2023, ChargePoint disclosed a $28 million inventory impairment charge on a "particular [direct current] DC product," which was its first-generation CPE 250 DC fast charger. *Id.* ¶ 4. Defendants allegedly had over-procured this product and carried it on the Company's books at inflated values rather than writing it down as required by ChargePoint's own inventory valuation policy. *Id.* ChargePoint's stock fell 11% on the news. *Id.* Then, on November 16, 2023, ChargePoint pre-announced a 30% revenue shortfall from prior guidance, an additional $42 million inventory impairment charge (bringing the total to $70 million), and the immediate departure of both CEO Romano and CFO Jackson. *Id.* ChargePoint's stock fell 35% on November 17, 2023, to a record low of $2.02 per share. *Id.* Defendants deny these allegations, and the Settlement, as proposed, is entered into without any admission of wrongdoing by Defendants. *Id.* ¶ 5.

**B. Initial Complaint and Lead Plaintiff Process**

On November 29, 2023, plaintiff Farooq Khan filed a putative class action styled *Khan v. ChargePoint Holdings, Inc. et al.*, No. 5:23-cv-06172 (N.D Cal.), alleging violations of federal securities laws against ChargePoint, Pasquale Romano, and Rex S. Jackson.

On May 16, 2024, Judge Pitts issued an Order consolidating the cases and appointing Shahram Afshani and Paulina Afshani Schwarz as Lead Plaintiffs and Hagens Berman Sobol Shapiro LLP as Lead Counsel. Dkt. No. 87.

**C. Lead Counsel's Investigation and the Amended Complaint**

Following its appointment, Lead Counsel conducted a comprehensive investigation, reviewing ChargePoint's SEC filings, analyst reports, press releases, investor presentations, earnings call transcripts, and securities price and volume data. Kathrein Decl. ¶ 8. Lead Counsel also directed in-house and outside private investigators who contacted and interviewed numerous former ChargePoint employees and customers, and consulted an economic consulting firm on loss causation, market efficiency, and damages. *Id.* ¶ 9.

On July 19, 2024, Lead Plaintiffs filed their First Amended Complaint. Dkt. No. 99. Defendants moved to dismiss on September 17, 2024 (the "MTD"). Dkt. No. 106. After the MTD was fully briefed, the case was reassigned to Judge Wise, and the hearing was reset for July 16,

2025. Dkt. Nos. 118, 120.

**D. The Parties' First Mediation**

Before the MTD hearing, after exchanging comprehensive mediation statements, the parties participated in an in-person mediation on April 29, 2025, with Seth Aronson of Phillips ADR Enterprises, P.C. Kathrein Decl. ¶ 12. Mr. Aronson assessed the strengths and weaknesses of the parties' claims and defenses. *Id.* The case did not resolve. *Id.*

**E. Lead Plaintiffs File Second and Third Amended Complaints**

Following the mediation, the Court vacated the July 16, 2025 hearing, and, with Defendants' consent, Lead Plaintiffs filed the Second Amended Complaint on July 22, 2025. Dkt. Nos. 123, 127. It added new factual allegations, including accounts from newly identified former employees, and added Michael Hughes as a Defendant. Dkt. No. 127. In total, Lead Counsel and its investigators interviewed more than three dozen individuals. Kathrein Decl. ¶ 15.

On February 20, 2026, the Court granted Defendants' Second MTD with leave to amend. Dkt. Nos. 132, 149. On March 6, 2026, Lead Plaintiffs filed the Third Amended Complaint, which addressed the deficiencies the Court identified. Dkt. No. 150. On May 21, 2026, the Court denied Defendants' Third MTD. Dkt. Nos. 153, 162.

**F. Lead Plaintiffs and Defendants Attend a Second Mediation Session**

Following the denial of the Third MTD, the parties agreed to a second mediation. Lead Plaintiffs promptly targeted specific types of documents, (which ChargePoint produced on an expedited basis), and quickly analyzed and reviewed these priority documents. *See* Kathrein Decl. ¶¶ 19-20. After submitting further mediation statements addressing those documents, the parties attended a second in-person mediation with Mr. Aronson on July 27, 2026. *Id.* ¶ 21. The case did not resolve that day, but settlement discussions continued through Mr. Aronson. *Id.*

**G. Fact Discovery Continues Following the Second Mediation**

On July 27, 2026, Lead Plaintiffs served forty-seven document requests and, on August 21, 2026, proposed custodians and search terms. *Id.* ¶ 22. After Defendants served responses and objections on August 26, 2026, the parties exchanged multiple letters and met and conferred by videoconference on September 1, 2026. *Id.* Defendants served forty-four document requests and

thirteen interrogatories on August 5, 2026, to which Lead Plaintiffs responded on September 4, 2026. *Id.* ¶ 25.

Lead Plaintiffs also pursued non-party discovery, serving subpoenas on ChargePoint's auditor, PricewaterhouseCoopers, and on Rachel Larrenaga, ChargePoint's former in-house counsel, whose state-court allegations were detailed in the Third Amended Complaint. *Id.* ¶¶ 23-24. After Defendants sought to quash the Larrenaga subpoenas, the parties submitted a joint discovery letter, Magistrate Judge van Keulen ordered the parties to meet and confer, and the parties reached agreement on the subpoenas' scope on September 21, 2026. Dkt. Nos. 171, 172; Kathrein Decl. ¶ 23.

### H. Continued Negotiations With the Mediator Result in Settlement Agreement

On September 25, 2026, after continued discussions, the parties accepted Mr. Aronson's double-blind mediator's proposal of $11 million, and on September 28, 2026, they executed a confidential term sheet memorializing the key terms embodied in the Stipulation. *Id.* ¶ 26.

## III. THE PROPOSED SETTLEMENT[2]

The Settlement requires ChargePoint to pay, or cause to be paid, $11,000,000.00. The Settlement Amount, plus all interest and accretions thereto, comprises the Gross Settlement Fund. *See* Stipulation ¶¶ 2.1, 2.5. Under the Stipulation, the Settlement Amount shall be deposited into the Escrow Account by October 30, 2026. *Id.* ¶ 2.1. The Settlement Fund will then begin earning interest for the benefit of the Settlement Class. *Id.* ¶ 2.5.

The Settlement Fund shall be used to pay: (i) Taxes and Tax Expenses; (ii) the Notice and Administration Expenses as authorized by the Stipulation; (iii) Attorneys' Fees and Expenses authorized by the Court; (iv) any Awards to Lead Plaintiffs authorized by the Court under 15 U.S.C. § 78u-4(a)(4); and (v) any other fees and expenses authorized by the Court. *Id.* ¶ 2.2.

The remaining amount is the "Net Settlement Fund," which shall be distributed pursuant to the Court-approved Plan of Allocation. *Id.* ¶¶ 1.30, 6.1. Any balance that still remains in the Net

---

[2] For ease of reference, a chart setting forth the N.D. Cal. procedural guidance requirements, along with where the information addressing the requirements can be found in Lead Plaintiffs' preliminary approval papers, is attached as **Appendix A** hereto.

Settlement Fund after reallocation(s) and payment(s) and that is not feasible or economical to reallocate shall be contributed to a non-sectarian, not-for-profit organization(s), which Lead Plaintiffs will propose for final determination by the Court. *Id*. ¶ 4.16; *see also* N.D. Cal. Guid. ¶ 8. The Settlement is not a claims-made settlement, and if approved, none of the Defendants, the Released Defendant Persons, or any entity that paid any portion of the Settlement Amount will have a right to return of any portion of the Settlement Fund for any reason whatsoever. *Id.* ¶ 2.3; *see also* N.D. Cal. Guid. ¶ 1(7).

As defined in the Stipulation, the Settlement Class includes "all Persons or entities which, between December 7, 2021 and November 16, 2023, inclusive, purchased or otherwise acquired ChargePoint Common Stock or ChargePoint Call Options, or sold or otherwise disposed of ChargePoint Put Options, and were damaged thereby." *See* Stipulation ¶ 1.45. Excluded from the Settlement Class are: (i) Defendants and the Individual Defendants' Immediate Family Members; (ii) the officers and directors of ChargePoint, at all relevant times; (iii) the affiliates and subsidiaries of ChargePoint, at all relevant times; (iv) ChargePoint and its affiliates' employee retirement and/or benefit plan(s) (*i.e.*, ERISA) and their participants or beneficiaries to the extent they purchased or acquired ChargePoint stock through any such plan(s); (v) any entity in which Defendants have a controlling interest; and (vi) the legal representatives, heirs, successors, or assigns of any such excluded person or entity. Also excluded from the Settlement Class are any Persons or entities who properly excluded themselves by filing a valid and timely request for exclusion in accordance with the requirements set by the Court. *Id.*

In consolidating the case, Judge Pitts recognized that the use of the term "securities" in the class definition "necessarily encompasses both options and common stock." Dkt. No. 87 at 7. As such, the Settlement Class comprises the same putative class proposed in the Third Amended Complaint: "[a]ll persons or entities who purchased or otherwise acquired ChargePoint securities from December 7, 2021 to November 16, 2023, inclusive[], and were damaged thereby." Dkt. No. 150 at 8; *see also* Kathrein Decl. ¶ 29; N.D. Cal. Guid. ¶ 1(1).

In exchange for the benefits provided under the Stipulation, all Settlement Class Members will release the "Released Claims." Stipulation, ¶ 1.39. The Settlement's release provision is

tailored to the Settlement Class's claims. Specifically, the release is limited to (1) the actual "claims or causes of action … asserted in the Action"; and (ii) unasserted claims that could have been brought but only if they "arise out of the allegations, transactions, facts, matters, occurrences, statements, or omissions that are alleged in the Action" ***and*** "relate to the purchase, acquisition, sale, disposition, or holding of the ChargePoint Securities." Stipulation, ¶ 1.39; *see also* N.D. Cal. Guid. ¶ 1(2).

The release does not include (i) claims asserted in any related Shareholder Derivative Actions[3] and/or any demands on the ChargePoint Board of Directors on or before the date of this Settlement; (ii) any claims of any Person or entity who or which submits a request for exclusion that is accepted by the Court; and (iii) any claims relating to enforcement of the Settlement. Stipulation, ¶¶ 1.20, 1.39, 1.51. The Settling Parties are not aware of any other pending cases that will be affected by the Settlement or the proposed release. *See* N.D. Cal. Guid. ¶ 1(4).

The proposed release is, therefore, tailored to the conduct at issue in this Action and is consistent with release provisions approved by this Court and courts in this District. *See, e.g.*, *In re Doximity, Inc. Sec. Litig.*, Case No. 5:24-cv-02281-NW, Prelim. Approval Mot. at 17, Dkt. No. 98 (N.D. Cal. Dec. 29, 2025) (seeking similar release); *In re Doximity, Inc. Sec. Litig.*, 2026 WL 523407 (N.D. Cal. Feb. 25, 2026) (Wise, J) (granting preliminary approval); *In re Splunk Inc. Sec. Litig.*, 2024 WL 923777, at *3 (N.D. Cal. Mar. 4, 2024) (approving similar release); *see generally Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 747-48 (9th Cir. 2006) (a class release may release claims not asserted in the action as long as they arise from the same set of factual allegations).

## IV. THE SETTLEMENT SHOULD BE PRELIMINARILY APPROVED

### A. Standards Governing Approval of a Class Action Settlement

[3] "Shareholder Derivative Actions" refers to *In re ChargePoint Holdings, Inc. Derivative Litigation*, Case No. 5:24-cv-00149-NW (N.D. Cal.); *Baker v. Romano*, Case No. 1:24-cv-00010-RGA (D. Del.); *Burstell v. Romano*, Case No. 1:26-cv-01174-UNA (D. Del.); *Lomont v. Romano*, Case No. 2026-0682-JTL (Del. Ch.); *In re ChargePoint Holdings, Inc. Stockholder Derivative Litigation*, Case No. 2026-0938-JTL (Del. Ch.); and *Levitan v. Chizen*, Case No. 2026-1001-JTL (Del. Ch.).

As a matter of public policy, settlement is a strongly favored method for resolving disputes, particularly "complex class action litigation." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019). Settlement of complex cases contributes to the efficient utilization of scarce judicial resources and achieves the speedy resolution of justice. *See, e.g.*, *In re Wells Fargo & Co. S'holder Deriv. Litig.*, 2019 WL 13020734, at *3 (N.D. Cal. May 14, 2019).

Rule 23(e) requires judicial approval of class action settlements in two stages: (i) preliminary approval (followed by notice to the class) and (ii) final approval. *See* Fed. R. Civ. P. 23(e)(1)–(2); *see also In re Celera Corp. Sec. Litig.*, 2015 WL 1482303, at *3 (N.D. Cal. Mar. 31, 2015).

A court grants preliminary approval to authorize notice to the class upon a finding that it "will likely be able to" approve the Settlement as fair, reasonable, and adequate at the final hearing. Fed. R. Civ. P. 23(e)(1)(B). Courts grant preliminary approval when the proposed settlement "[follows] serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." *In re LendingClub Sec. Litig.*, 2018 WL 1367336, at *2 (N.D. Cal. Mar. 16, 2018).

At final approval, the Court will be asked to determine whether the Settlement is "fair, reasonable, and adequate." *See* Fed. R. Civ. P. 23(e)(2). Rule 23(e)(2) provides that the Court should consider whether:

> the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

*Id.* In addition, the Ninth Circuit uses the following factors for preliminary approval, several of which overlap with Rule 23(e)(2): "[1] the strength of the plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status

throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed and the stage of the proceedings; [and] [6] the experience and views of counsel." *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *see also Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (discussing the *Hanlon* factors).[4] Each of these factors supports approval of the Settlement and, thus, preliminary approval is appropriate here.

**B. The Court "Will Likely Be Able to" Approve the Proposed Settlement Under Rule 23(e)(2)**

**1. Lead Plaintiffs and Lead Counsel have adequately represented the Settlement Class.**

Lead Plaintiffs and Lead Counsel have adequately represented the Class as required by Rule 23(e)(2)(A). The Settlement is the result of approximately two and a half years of diligent prosecution of this action on behalf of the Class. *See supra* § II.

The Ninth Circuit tasks trial courts with resolving two questions to determine "legal adequacy": "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020. Judge Pitts previously found Lead Plaintiffs and Lead Counsel adequate to represent the Settlement Class, and no evidence to the contrary has since emerged. *See* Dkt. No. 87 at 7. Lead Plaintiffs have since communicated diligently with counsel, produced documents and answered interrogatory responses, and reviewed the merits of the Settlement, and Lead Counsel have vigorously litigated the case, including defeating a motion to dismiss, reviewing documents, and propounding and negotiating discovery requests. *See* Kathrein Decl. ¶¶ 8-25. Likewise, Lead Plaintiffs and Lead Counsel have no interests antagonistic to other Settlement Class Members: Lead Plaintiffs' claims are typical of the Settlement Class's claims and Lead Plaintiffs' interest in obtaining the largest possible recovery for ChargePoint investors is aligned with that of the Settlement Class. *See Mild v. PPG Indus., Inc.*, 2019 WL 3345714, at *3 (C.D. Cal. July 25, 2019).

---

[4] The seventh ("presence of a governmental participant") and eighth ("the reaction of the class members to the proposed settlement") *Hanlon* factors are inapplicable here.

**2. The proposed settlement is the result of good faith, arm's-length negotiations by informed, experienced counsel who were aware of the risks of litigation.**

Rule 23(e)(2)(B) asks whether a proposed settlement is procedurally adequate (*i.e.*, "negotiated at arm's length"). Here, the proposed Settlement was achieved only after two formal mediations with Mr. Aronson—an experienced mediator with considerable knowledge, experience, and expertise in the field of federal securities law—and follow-up communications regarding a potential resolution of the litigation. *See supra* § II. Lead Counsel and Defendants' Counsel prepared and presented submissions to Mr. Aronson concerning their respective views on the merits of the Action, along with supporting evidence obtained through targeted discovery, and the negotiations were at all times adversarial and performed at arm's length. *Id.* The protracted negotiations under the supervision of a neutral experienced mediator are evidence that the Settlement was "the product of non-collusive, arms' length negotiations." *See In re Netflix Privacy Litig.*, 2013 WL 1120801, at *4 (N.D. Cal. Mar. 18, 2013).

**3. The settlement provides adequate relief for the Settlement Class.**

Pursuant to Rule 23(e)(2)(C), the Court also must consider whether "the relief provided for the class is adequate, taking into account" four relevant factors that are addressed below.

**a. The costs, risks, and delay of trial and appeal support approval of the settlement.**

The factors presented by Rule 23(e)(2)(C)(i) are satisfied because the $11,000,000 recovery provides a significant and immediate benefit to the Settlement Class, especially in light of the costs, risks, and delay posed by continued litigation.[5] "Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015). "[A] cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). At the preliminary approval stage, the Court must only "determine whether the settlement falls 'within the range of possible approval.'" *In re Wells Fargo & Co.*, 2019 WL 13020734, at *4.

[5] Rule 23(e)(2)(C)(i) essentially incorporates the first three traditional *Hanlon* factors. *See Norton v. LVNV Funding, LLC*, 2021 WL 3129568, at *5 (N.D. Cal. Jul. 23, 2021).

The $11 million recovery is near the median recoveries in recent securities class actions, as calculated by Cornerstone Research, which conducts annual and semiannual reviews of securities class action settlements. According to Cornerstone Research, for the period from 2016 through 2024, the median settlement was $12.1 million. *See* Kathrein Decl. ¶ 49.[6]

Lead Plaintiffs' damages expert estimated maximum class-wide damages of between approximately $546.2 million and $696.2 million. *Id.* ¶ 50. These estimates assumed Lead Plaintiffs prevailed on every claim, that each alleged corrective disclosure leading to a statistically significant drop was fully corrective, and that no confounding information required disaggregation. *Id*. These assumptions would have been vigorously contested by Defendants, who likely would have argued for elimination of all or certain of the corrective disclosure dates or disaggregation. *Id.* The $11 million Settlement thus recovers approximately 1.6% to 2% of the total maximum damages potentially recoverable in this case. *Id.* As a percentage of estimated damages, the recovery falls within the range of possible approval. *See, e.g.*, *Hardy v. Embark Tech., Inc.*, 2023 WL 6276728, at *8 (N.D. Cal. Sep. 26, 2023) (granting preliminary approval to settlement recovering 1.1% of damages); *Wong v. Arlo Technologies*, 2021 WL 1531171, at *9 (N.D. Cal. Apr. 19, 2021) (granting preliminary approval to settlement recovering 2.35% of damages).

Critically, the potential recovery must be balanced against whether ChargePoint would be able to satisfy any judgment ultimately obtained. Kathrein Decl. ¶ 63. ChargePoint's market capitalization has dropped from $7.21 billion on December 7, 2021 (the beginning of the Settlement Class Period) to about $250 million as of the date of this motion. *Id.* Based on its last quarterly filing, ChargePoint had $95.3 million in cash and cash equivalents as of July 31, 2026, down from $141.6 million as of January 31, 2026. *Id.*, Ex. 4. Per ChargePoint's recent 8-K, the Company, and not any insurers, is funding the Settlement. *See id.*, Ex. 5.

Viewed in this light, reasonableness of the Settlement Amount is readily apparent: $11 million is approximately 11.5% of ChargePoint's $95.3 million in cash and cash equivalents as of

---

[6] *See* Laarni Bulan and Eric Tam, *Securities Class Action Settlements* – 2025 Review and Analysis (Cornerstone Research 2026), at 1, https://www.cornerstone.com/wp-content/uploads/2026/02/Securities-Class-Action-Settlements-2025-Review-and-Analysis.pdf

July 31, 2026, an exceptional result given ChargePoint's financial state and ability to pay. *Id.* ¶ 64. In contrast, if Lead Plaintiffs were to continue litigating the case, and ChargePoint continued to financially deteriorate, then Lead Plaintiffs would face the very real possibility that the class would recover little to nothing at all. *Id.*

Moreover, "'securities class litigation is notably difficult and notoriously uncertain.'" *Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *13 (N.D. Cal. Dec. 18, 2018) (citation omitted). While Lead Plaintiffs at all times remained confident in their ability to ultimately prove their legal claims at trial, they would be required to prove all elements of their claims to prevail, while Defendants needed to succeed on only one defense to potentially defeat the entire action. Here, Defendants have advanced, and likely would continue to advance, arguments disputing almost all aspects of Lead Plaintiffs' case.

***Deceptive and Manipulative Acts.*** Defendants have argued that ChargePoint did not violate GAAP and that the challenged revenue recognition practices had no material effect on revenue. For example, Defendants have contended that internal records show ChargePoint booked consistent return reserves throughout the Class Period, so its reported revenue already accounted for returns and could not have been inflated by its sales practices. Kathrein Decl. ¶ 54. Defendants have also cited the absence of any revenue restatement. *Id.* They have further asserted that ChargePoint followed its inventory valuation policy in the quarters before the impairments and that its inventory reserve analyses supported the impairments' timing. *Id.* Finally, Defendants have noted that PwC, ChargePoint's auditor, reviewed these policies and calculations in its audits. *Id.*

***Falsity.*** Defendants have argued that the Lead Plaintiffs' challenged statements were nonactionable due to Lead Plaintiffs' failure to identify any revenue "gaps" or improper practices leading to widespread and substantial revenue inflation. *Id.* ¶ 55. Had the case continued, it's possible that the scope of potentially actionable statements would be narrowed after further discovery. *Id.*

***Scienter.*** A defendant's state of mind is "the most difficult element of proof and one that is rarely supported by direct evidence." *In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773, at *3 (C.D. Cal. Oct. 25, 2016). Defendants have argued that ChargePoint's internal documents show that the

Executive Defendants were not aware of a pervasive and material scheme to inflate revenue. Kathrein Decl. ¶ 56. Rather, ChargePoint's internal controls identified potential revenue recognition issues that were reviewed and addressed by management and/or accounting. *Id.* Defendants have also pointed to the lack of significant insider sales by Romano, Jackson, and Hughes that were not either mandatory sell-to-cover transactions or trades made pursuant to Rule 10b5-1 plans as undermining any motive for fraud. *Id.*

***Loss Causation and Damages.*** Defendants have argued that the decline in ChargePoint's stock price was due to news of the Company's poor financial health rather than the revelation of the fraud. *Id.* ¶ 57; *see also Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) ("disappointing financial results" are "insufficient to establish loss causation as a matter of law"). Defendants have also contended that none of the alleged corrective disclosures on September 6, 2023 and November 16, 2023 detailed unauthorized shipments, channel stuffing, premature software activations, undocumented reseller side deals, or any restatement of revenue. Kathrein Decl. ¶ 57. Defendants have asserted that such a mismatch between the challenged statements and corrective disclosures would prevent certification of the class under *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113 (2021). *Id.* In any event, proving loss causation and establishing damages would require an "uncertain battle of the experts." *See SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 2026 WL 1458903, at *5 (N.D. Cal. May 21, 2026) (noting "risks related to 'battle of the experts' favored settlement approval").

***Class Certification.*** No class has yet been certified. If the case continued, Defendants could oppose class certification entirely or oppose the certification of the entire class period or definition of the class. Even if class certification were granted, because Rule 23(c)(1) allows a class certification order to be altered or amended at any time prior to a decision on the merits, Defendants could have moved to decertify the class or shorten the Class Period up until the time the jury reached a verdict. Kathrein Decl. ¶ 58.

Barring the Settlement, this case would require the expenditure of substantial additional sums of time and money to complete fact and expert discovery, brief class certification and summary judgment, and try the case, with no guarantee that the Settlement Class would receive

any additional benefit. *Id.* ¶ 61. Even if Lead Plaintiffs met their burdens with respect to falsity, materiality, scienter, class-wide reliance under the "fraud on the market" presumption, loss causation, the measure of per-share damages (if any), and control person liability, the case would still be far from over. *Id.* Defendants would have had the opportunity to challenge an individual class member's membership in the class, challenge the presumption of reliance as to each class member (including Lead Plaintiffs), and challenge the amount of damages due each class member. *Id.* Such a process would have been lengthy, complex, and extremely costly. *Id*. Moreover, Defendants would almost certainly file an appeal—a process that would further extend the litigation for years and risk reversal of any verdict. *Id*. ¶ 62. Conversely, the Settlement confers a substantial and immediate benefit on the Settlement Class, and avoids the risks associated with obtaining a wholly speculative (though potentially larger) sum in the future. *Id.*

Given the risks of continued litigation in the face of ChargePoint's financial precarity, and the time and expense that would be incurred to prosecute Action through trial and beyond, the $11,000,000 Settlement is a meaningful recovery that is in the Settlement Class's best interests.

**b. The proposed method for distributing relief is effective.**

The method for distributing relief to eligible claimants and for processing claims includes standard, well-established, and effective procedures for processing claims and efficiently distributing the Net Settlement Fund. *See* Kathrein Decl. ¶¶ 65-71. The notice plan includes sending via direct mail the Postcard Notice or via email the Summary Notice to all Settlement Class Members who can be identified with reasonable effort, supplemented by publication of the Summary Notice once in *Investor's Business Daily* and once on the *PR Newswire*. *See id.* ¶¶ 79-82; Ex. 3 (Declaration of Nicholas Schmidt Regarding Notice Plan ("Schmidt Decl.")) ¶ 22. The long-form notice also will be posted on the Settlement website. *Id.* ¶ 81.

The claims process also includes a standard claim form that requests the information necessary to calculate a claim amount pursuant to the Plan of Allocation. *See* Kathrein Decl. ¶ 69. The Plan of Allocation will govern how Settlement Class Members' claims will be calculated and, ultimately, how money will be distributed to Authorized Claimants. *See infra* § IV.B.4. The Plan of Allocation was prepared with the assistance of an expert damages consultant and is based

primarily on the expert's review and analysis estimating the amount of artificial inflation in the price of ChargePoint Common Stock and Call options, as well as artificial deflation in Put Options, during the Settlement Class Period. Kathrein Decl. ¶ 66. The Claims Administrator will review and process the claims under the supervision of Lead Counsel, will provide claimants with an opportunity to cure any deficiencies in their claim(s) or request review of the denial of their claim(s) by the Court, and will then mail or wire Claimants their *pro rata* share of the Net Settlement Fund upon approval of the Court. Schmidt Decl., ¶¶ 32-36.

**c. Proposed attorneys' fees, expenses, and Lead Plaintiffs' awards.**

Rule 23(e)(2)(C)(iii) addresses "the terms of any proposed award of attorney's fees, including timing of payment." Lead Counsel intends to seek an award of attorneys' fees of no more than 30% of the Settlement Fund ($3,300,000) and expenses in an amount not to exceed $300,000, plus interest on both amounts. *See* Kathrein Decl. ¶ 96; N.D. Cal. Guid. ¶ 6. Lead Counsel will request that any award of fees and expenses be paid within five (5) business days of the time the Court makes its award, subject to the Court's standing order under which between 10%-25% of the fees are withheld until after the filing of the post-distribution accounting. Stipulation ¶ 7.2; NW Civil Standing Order § N. Approval of the requested attorneys' fees is separate from approval of the Settlement, and the Settlement may not be terminated based on any ruling with respect to attorneys' fees. Stipulation ¶ 7.6.

Although the Ninth Circuit in *Staton v. Boeing Co.*, 327 F.3d 938, 968 (9th Cir. 2003), stated that "25% of the common fund" was a "benchmark award for attorney fees," a guiding principle for fee awards in this Circuit remains the idea that they must be "reasonable under the circumstances." *See In re Wash. Public Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1295 n.2 (9th Cir. 1994). Courts may adjust the percentage of the common fund as appropriate under the circumstances, and consider such factors as: (1) the result achieved; (2) the risk of litigation; (3) the complexity of the case and skill required; (4) the contingent nature of the litigation; and (5) awards made in similar cases. *See, e.g., Sheet Metal Workers' Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2025 WL 3034317, at *2-3 (N.D. Cal. Oct. 30, 2025) (citing *Vizcaino v.*

*Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002)).

These factors support a 30% fee award. As detailed above, the $11 million Settlement is an excellent result for the Settlement Class when faced with the risks of continuing litigation in light of ChargePoint's financial precarity. As noted above, the $11 million settlement represents approximately 11.5% of ChargePoint's last reported cash and cash equivalents ($95.3 million). The skill and quality of Lead Counsel's work is further reflected by the fact that Lead Counsel overcame a dismissal order and subsequent round of motion to dismiss briefing. Kathrein Decl. ¶¶ 16-17. This litigation was also not preceded by the announcement of an SEC investigation or any restatement, meaning Lead Counsel developed their case entirely on their own. *Id.* ¶ 9. Lead Counsel's work was also on a fully contingent basis. *Id.* ¶ 100.

A 30% fee award is also consistent with fees awarded in comparable securities class actions with similar contingency fee risks. *See, e.g., In re Nuvelo, Inc. Sec. Litig.*, 2011 WL 2650592, at *2-3 (N.D. Cal. July 6, 2011) (awarding 30% of $8.9 million fund in a securities class action with a recovery of 2% of estimated damages); *Hunt v. Bloom Energy Corp.*, 2024 WL 1995840, at *6, 8 (N.D. Cal. May 6, 2024) (awarding 30% of the common fund in a securities class action settlement with a recovery of 5.2% of the estimated maximum damages).

Moreover, the proposed attorney fee award here is based on a lodestar of approximately $2.68 million through October 27, 2026 and accounts for time expended over the course of this litigation. *See* Kathrein Decl. ¶ 97. A fee award of up to 30% of the Settlement Fund would result in a multiplier of approximately 1.2. *Id.*; N.D. Cal. Guid. ¶ 6. Such multipliers are frequently applied in securities class action cases involving a common fund. *Hunt*, 2024 WL 1995840, at *9 (noting in securities class action cases, "courts … have approved multipliers ranging from 1.0 to 4.0"); *Vataj v. Johnson*, 2021 WL 5161927, at *9 (N.D. Cal. Nov. 5, 2021) (approving 2.5 multiplier in securities case).

Lead Counsel also intends to seek payment of their litigation expenses in an amount not to exceed $300,000 which includes expert costs, mediation fees, and online legal and factual research, among other costs. Kathrein Decl. ¶ 98; *Hunt*, 2024 WL 1995840, at *9 ("An attorney who has created a common fund for the benefit of the class is also entitled to reimbursement of reasonable

litigation costs from that fund.”).

Finally, Lead Counsel also intends to seek an award of up to $10,000 for each Lead Plaintiff, pursuant to 15 U.S.C. § 78u-4(a)(4), as reimbursement for their costs and expenses related to their representation of the Settlement Class. Kathrein Decl. ¶ 99; N.D. Cal. Guid. ¶ 7. The Lead Plaintiffs have actively and effectively fulfilled their obligations to the Settlement Class. Lead Plaintiffs have: (i) participated in discussions with Lead Counsel concerning the prosecution of the Action and strengths and weaknesses of the claims; (ii) reviewed significant pleadings; (iii) collected and produced relevant documents; (iv) served written discovery responses; and (v) reviewed the terms of the Settlement and authorized Lead Counsel to settle the case. *Id.; see also In re Doximity, Inc. Sec. Litig.*, 2026 WL 1697594, at *2 (N.D. Cal. June 11, 2026) (Wise, J.) (awarding Lead Plaintiff reimbursement for time expended).

If preliminary approval is granted, Lead Counsel will provide more detailed information in their forthcoming applications for attorneys’ fees and expenses, which will be filed with the Court prior to the Fairness Hearing.

**d. Identification of agreements.**

In addition to the Stipulation, Lead Plaintiffs and Defendants have entered into a confidential Supplemental Agreement regarding requests for exclusion (“opt-outs”) from the Settlement Class. *See* Stipulation ¶ 10.6. This agreement establishes certain conditions under which Defendants may terminate the Settlement if the opt-outs received exceed an agreed-upon threshold. The existence of the Supplemental Agreement “does not by itself render the Settlement unfair.” *See Hefler v. Wells Fargo & Co.*, 2018 WL 4207245, at *11 (N.D. Cal. Sep. 4, 2018).

As is standard in securities class actions, the Supplemental Agreement is identified in the Stipulation, but its terms are confidential to avoid creating incentives for a small group of class members to opt out solely to leverage the threshold to exact an individual settlement. Lead Plaintiffs and Defendants are willing to file this confidential Supplemental Agreement (with a motion to seal) should the Court wish to examine it. There are otherwise no agreements requiring identification under Rule 23(e)(3). Kathrein Decl., ¶ 91.

**4. The proposed Plan of Allocation treats Settlement Class Members equitably and does not confer preferential treatment.**

Rule 23(e)(2)(D) asks whether the Plan of Allocation treats class members equitably relative to each other. *See also* N.D. Cal. Guid. ¶ 1(5). Drafted with the assistance of Lead Plaintiffs' expert damages consultant, the Plan of Allocation is fair, reasonable, and adequate, and it does not improperly grant Lead Plaintiffs or any other Settlement Class Member "preferential treatment." Kathrein Decl. ¶¶ 65-71; *see also In re Wells Fargo & Co.*, 2019 WL 13020734, at *4 (granting preliminary approval and noting settlement "does not improperly grant preferential treatment to class representatives or segments of the class"). Specifically, the Plan of Allocation provides formulas for calculating the recognized claim of each Settlement Class Member, based on the timing of the purchases and sales of ChargePoint Securities and the decline that occurred in the price of ChargePoint Common Stock and ChargePoint Call Options (or in the case of ChargePoint Put Options, the increase in price) following the alleged corrective disclosures. *See* Kathrein Decl., ¶ 69. Each Authorized Claimant, including Lead Plaintiffs, will receive a *pro rata* distribution pursuant to the Plan of Allocation. *Id.* No preferential formula for distribution will apply to Lead Plaintiffs. *Id.* ¶ 71.

The Net Settlement Fund will be allocated to Authorized Claimants as follows: (a) at least 90% of the Net Settlement Fund will be allocated collectively to ChargePoint Common Stock; and (b) no more than 10% of the Net Settlement Fund will be allocated to options on ChargePoint Common Stock. *See* Stipulation, Ex. A-1 at 20, ¶ 23. Courts have approved plans of allocation addressing holders of common stock and/or options in a similar fashion. *See, e.g.*, *In re Apple Inc. Sec. Litig.*, 2024 WL 4246282, at *4 (N.D. Cal. Sep. 18, 2024) (approving plan of allocation involving common stock and options); *In re BofI Holdings, Inc. Sec. Litig.*, 2022 WL 9497235, at *12 (S.D. Cal. Oct. 14, 2022) (same).

**C. The Remaining Ninth Circuit Factors Support Preliminary Approval of the Settlement**

Each of the relevant *Hanlon* factors that are not co-extensive with the Rule 23(e)(2) analysis above (*i.e.*, the fifth and sixth *Hanlon* factors) also supports preliminary approval.

**1. Experience and views of counsel support preliminary approval.**

The opinion of experienced counsel (the sixth *Hanlon* factor) as to the merit of class settlement after arm's-length negotiation is entitled to considerable weight. *See In re ECOtality, Inc. Sec. Litig.*, 2015 WL 5117618, at *3 (N.D. Cal. Aug. 28, 2015). Lead Counsel has significant experience in securities and other complex class action litigation and has negotiated numerous other substantial class action settlements throughout the country. *See* Kathrein Decl., Ex. 1 (Lead Counsel's firm resume). Lead Counsel investigated and drafted three amended complaints; opposed Defendants' motions to dismiss; negotiated a targeted production of documents for mediation; propounded discovery requests and negotiated the scope of discovery; and reached a settlement after arm's-length negotiations in front of an experienced mediator. *See supra* § II. Based on this work, Lead Counsel had gained a strong understanding of the strengths and weaknesses of the claims by the time the Settlement was reached. *See In re NVIDIA Corp. Deriv. Litig.*, 2008 WL 5382544, at *4 (N.D. Cal. Dec. 22, 2008) ("[S]ignificant weight should be attributed to counsel's belief that settlement is in the best interest" of the class).

**2. The extent of discovery completed and the stage of the proceedings at which the settlement was achieved support preliminary approval.**

The fifth *Hanlon* factor supports preliminary approval of the Settlement. The Settlement was reached after the parties exchanged documents targeted for mediation. *See supra* § II.F. Along with the substantive operative complaint developed through an extensive investigation that included the interviews of over three dozen witnesses, thorough motion to dismiss briefing, and exchanges of detailed mediation statements, it is clear that the Settling Parties had a thorough understanding of arguments and evidence that would be presented at trial. Kathrein Decl. ¶¶ 8-25. As such, Lead Plaintiffs' decision to enter into the Settlement was based on their understanding of the strengths and potential weaknesses of their claims and Defendants' defenses. *See supra* § II; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009).

## V. THE PROPOSED SETTLEMENT CLASS SATISFIES RULE 23

In determining whether to grant preliminary approval, the Court should also evaluate whether it "will likely be able to" certify the proposed Settlement Class at final approval. Fed. R.

Civ. P. 23(e)(1)(B). The proposed Settlement Class consists of "all Persons or entities which, between December 7, 2021 and November 16, 2023, inclusive, purchased or otherwise acquired ChargePoint Common Stock or ChargePoint Call Options, or sold or otherwise disposed of ChargePoint Put Options, and were damaged thereby." *See* Stipulation ¶ 1.45. Defendants and various corporate insiders are excluded from the Settlement Class. *Id.*

The Ninth Circuit has long recognized that courts may certify class actions "for settlement purposes only." *See Hanlon*, 150 F.3d at 1018-19. A settlement class, like other certified classes, must satisfy all the requirements of Rules 23(a) and (b), although Rule 23(b)(3)'s manageability concerns are not at issue. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 593 (1997).

**A. The Proposed Settlement Class Satisfies Rule 23(a)**

First, the proposed class members are sufficiently numerous. The "numerosity" requirement is satisfied if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, ChargePoint Securities were traded on the New York Stock Exchange, with approximately 483.5 million damaged shares during the Settlement Class Period. Kathrein Decl., ¶ 92. Since ChargePoint has "'millions of shares trading on a national exchange,' numerosity can be inferred." *AMI – Gov't Emps. Provident Fund Mgmt. Co. Ltd. v. Alphabet Inc.*, 833 F. Supp. 3d 1034, 1041 (N.D. Cal. 2026).

Second, commonality is satisfied, as "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Rule 23(a)(2) is "construed permissively" and "[a]ll questions of fact and law need not be common to satisfy the rule." *Hanlon*, 150 F.3d at 1019. "So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *See SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 2025 WL 1243818, at *3 (N.D. Cal. Apr. 25, 2025) (quoting *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014)). Here, there are numerous common questions of law and fact, including: (i) whether Defendants omitted or misrepresented material facts; (ii) whether Defendants engaged in deceptive and manipulative acts in furtherance of a scheme to defraud investors; (iii) whether Defendants acted with scienter; (iv) whether the prices of ChargePoint's Securities were artificially inflated or maintained during the Class Period; and (v) whether Defendants' misrepresentations and omissions and scheme

caused class members to suffer economic losses. Courts routinely certify classes involving such common questions. *See, e.g.*, *Alphabet Inc.*, 833 F. Supp. 3d at 1041; *Wells Fargo & Co.*, 2025 WL 1243818, at *3.

Third, Lead Plaintiffs' claims are typical of the claims of other proposed class members. *See Amchem*, 521 U.S. at 625 (common-issues test readily met in securities cases). Differences in the amount of damage and date of purchase also will not defeat class certification. *See In re Zynga Inc. Sec. Litig.*, 2015 WL 6471171, at *7 (N.D. Cal. Oct. 27, 2015). Here, Lead Plaintiffs' claims arise from the same events or course of conduct that give rise to claims of other Settlement Class Members, and the claims asserted are based on the same legal theory. *See Alphabet Inc.*, 833 F. Supp. 3d at 1041 ("Plaintiffs are typical because, like all other class members, they purchased Alphabet stock at allegedly artificially inflated prices").

Fourth, Lead Plaintiffs will "fairly and adequately protect the interests of the class." *See* Fed. R. Civ. P. 23(a)(4). Lead Plaintiffs have claims that are typical of, and coextensive with, those of the Settlement Class. Lead Plaintiffs have also retained counsel highly experienced in securities class action litigation who have successfully prosecuted many securities class actions and have spent many hours vigorously prosecuting this Action. Kathrein Decl. ¶ 95. Thus, Lead Plaintiffs are adequate representatives of the Settlement Class, and Lead Counsel are qualified, experienced, and capable of prosecuting this case. *Alphabet Inc.*, 833 F. Supp. 3d at 1041.

**B. The Proposed Settlement Class Satisfies Rule 23(b)**

Rule 23(b)(3) requires that common questions of law or fact predominate over individual questions, and that a class action is superior to other available methods of adjudication. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

First, there are multiple common questions of law and fact that predominate over individual questions because Defendants' alleged misconduct affected all Settlement Class Members in the same manner, and issues relating to Defendants' liability are common to all class members. *See, e.g.*, *Villanueva v. Joyce*, 2025 WL 5089308, at *3 (N.D. Cal. Aug. 25, 2025) ("In securities class actions, the common questions of whether misrepresentations were made and whether Defendants had the requisite scienter predominate over any individual questions of reliance and damages.")

(citation modified). Second, a class action is the superior method available to fairly and efficiently adjudicate this case, which will resolve the claims of a large, geographically dispersed class of investors. *Amchem*, 521 U.S. at 625 (predominance readily met in securities cases).

## VI. THE PROPOSED NOTICE PROGRAM SATISFIES RULE 23, THE PSLRA, AS WELL AS DUE PROCESS REQUIREMENTS

Rule 23(c)(2)(B) requires the Court to "direct to class members the best notice that is practicable under the circumstances." *See also* N.D. Cal. Guid. ¶ 3. The notice must describe "the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *See In re Wells Fargo & Co.*, 2019 WL 13020734, at *9. Similarly, the Private Securities Litigation Reform Act of 1995 ("PSLRA") requires "sufficient notice" so class members can "weigh the risks and rewards of proceeding to trial or participating in the proposed settlement." *See In re Portal Software, Inc. Sec. Litig.*, 2007 WL 4171201, at *7 (N.D. Cal. Nov. 26, 2007).

Recent Rule 23(c) amendments permit more cost-efficient notice, including "electronic means, or other appropriate means." *See* Fed. R. Civ. P. 23(c)(2)(B). While Lead Plaintiffs have given the Court the option of approving distribution by first-class mail of the full long-form Notice (Stipulation, Ex. A-1), they advocate for shorter, more cost-effective notices to be sent to Settlement Class Members. Specifically, Lead Plaintiffs propose to give interested parties notice in three ways: (i) individual copies of the Postcard Notice (*id.*, Ex. A-4) will be sent by first-class mail to all potential Settlement Class Members who may be identified through reasonable efforts; (ii) individual copies of the Summary Notice (*id.*, Ex. A-3) will be emailed to potential Settlement Class Members for whom valid email addresses are available; and (iii) publication of the Summary Notice in *Investor's Business Daily* and transmittal on *the PR Newswire*. *See* Schmidt Decl., ¶¶ 14-22 . The Postcard and Summary Notices also advise Settlement Class Members how to access and request copies of the long-form Notice and the Proof of Claim and Release on the Settlement website (www.ChargePointSecuritiesLitigation.com) or by contacting the Claims Administrator. Kathrein Decl. ¶ 81. In recent years, courts have approved notice being effectuated through postcard mailings and other cost-effective means. *See, e.g.*, *Thant v. Rain Oncology Inc.*, 2026 WL 1113721,

at *3 (N.D. Cal. Apr. 24, 2026) (granting final approval to notice plan that included email and postcard notice, publication over *Global Newswire*, and a settlement website); *Borteanu v. Nikola Corp.*, 2025 WL 3295787, at *2, n.1 (D. Ariz. Nov. 25, 2025) (postcard notice need not contain every required disclosure on its face, so long as it clearly directs recipients to a class action website where the long-form notice is available).

The form and substance of the notice program, including the Postcard Notice and Summary Notice, are sufficient. *See* N.D. Cal. Guid. ¶ 3. The proposed forms of notice collectively describe the terms of the Stipulation and the Settlement Class's recovery; the factors that Lead Plaintiffs and Lead Counsel considered in determining that the Settlement is fair, adequate, and reasonable; the maximum attorneys' fees and expenses that may be sought; the procedure for objecting to the Settlement and the deadline to do so; the procedure for participating in the Settlement and instructions on how to complete and submit a Proof of Claim to the Claims Administrator and the deadline to do so; the proposed Plan of Allocation for the settlement proceeds; and the date, time, and place of the Fairness Hearing. Kathrein Decl. ¶ 84; *see also In re RH, Inc. Sec. Litig.*, 2019 WL 5538215, at *2 (N.D. Cal. Oct. 25, 2019). The Notice also provides contact information for Lead Counsel and the proposed Claims Administrator, as well as information regarding the website created for the case. Kathrein Decl. ¶¶ 84-85.

The Settling Parties have agreed that, no later than 10 days following the filing of the Stipulation, Defendants shall serve the notice required under the Class Action Fairness Act, 28 U.S.C. § 1715 (2005) *et seq.* ("CAFA"). *See* Stipulation ¶ 4.3. The Settling Parties are not aware of any other such required notices to government entities or others. *See* N.D. Cal. Guid. ¶ 10.

## VII. THE PROPOSED CLAIMS ADMINISTRATOR

Lead Counsel proposes that Epiq Class Action and Claims Solutions, Inc. ("Epiq") serve as the Claims Administrator in order to provide all notices approved by the Court to Settlement Class Members, to process Proofs of Claim, and to administer the Settlement. Kathrein Decl. ¶ 72; *see also* N.D. Cal. Guid. ¶ 2(1). Epiq is a recognized leader in legal administration services for class action settlements and legal noticing programs in the country. Kathrein Decl. ¶ 72.

Lead Counsel selected Epiq in a competitive selection process. *Id.* ¶ 73. Specifically, Lead

Counsel sent a request for proposal and cost estimate to five reputable and experienced notice and claims administrators, all of which proposed notice to the Class in substantially the same manner as presented here. *Id.*; *see also* N.D. Cal. Guid. ¶ 2(1). Lead Counsel chose Epiq based on their estimated costs in comparison to their competitors. *See* Kathrein Decl., ¶ 73. In the past two years, Lead Counsel has retained Epiq five times in connection with class notice, claims processing, or settlement administration matters. *See id.*; *see also* N.D. Cal. Guid. ¶ 2(a).

Epiq estimates that approximately 75,000 claims will be received, based on an estimated 25% response rate, which Epiq finds reasonable and typical. *See* Schmidt Decl. ¶ 29.

At this time, only a rough estimate of the total Notice and Administration Expenses can be provided as the costs are highly dependent on how many Postcard Notices are ultimately mailed as well as emails sent, and how many claims are ultimately received and processed. *See* Schmidt Decl. ¶¶ 37-40. Epiq will send the Postcard Notice and/or Summary Notice to all individuals and entities who can be identified with reasonable effort. *Id.* ¶¶ 14-21. It estimates that Notice and Administration Expenses for the Litigation may be no more than $400,000. *Id.* ¶ 39. These costs and expenses, which are necessary in order to fully and properly administer notice and claims administration, represent well under 5% of the total value of the Settlement. *Id.* ¶ 39; *see also* N.D. Cal. Guid. ¶ 2(2). All Notice and Administration Expenses will be paid from the Settlement Fund. Stipulation ¶ 1.32.

## VIII. PROPOSED SCHEDULE OF EVENTS

As part of preliminarily approving the Settlement, the Court must also set dates for certain future events (*i.e.*, the Fairness Hearing, mailing and publication of notices, and deadlines for submitting claims or objecting to the Settlement). Lead Plaintiffs respectfully propose the schedule set forth in **Appendix B** hereto, as agreed to by the Settling Parties and set forth in the proposed Preliminary Approval order.

## IX. CONCLUSION

For the reasons set forth above, Lead Plaintiffs respectfully request that the Court preliminarily approve the proposed Settlement and enter the Preliminary Approval Order.

DATED: October 29, 2026

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: */s/ Reed R. Kathrein*
Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Email: reed@hbsslaw.com
lucasg@hbsslaw.com

Raffi Melanson (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1 Faneuil Hall Sq., 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
Email: raffim@hbsslaw.com

Peter Shaeffer (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
455 N Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Email: petersh@hbsslaw.com

*Lead Counsel for Lead Plaintiffs Shahram Afshani and Paulina Afshani Schwarz*