Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Email: reed@hbsslaw.com
Email: lucasg@hbsslaw.com

Raffi Melanson (pro hac vice)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1 Faneuil Hall Sq., 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
Email: raffim@hbsslaw.com

Peter Shaeffer (pro hac vice)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
455 N Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Email: petersh@hbsslaw.com

*Lead Counsel for Lead Plaintiffs Shahram Afshani and Paulina Afshani Schwarz*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

FAROOQ KHAN, individually and on behalf of all others similarly situated,

Plaintiff,

v.

CHARGEPOINT HOLDINGS, INC., *et al.*,

Defendants.

Case No. 5:23-cv-06172-NW

**DECLARATION OF REED R. KATHREIN IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT**

I, Reed R. Kathrein, hereby declare and state as follows:

1. I am an attorney admitted to practice before this Court. I am a Partner at Hagens Berman Sobol Shapiro LLP ("Hagens Berman"), counsel for Lead Plaintiffs Shahram Afshani and Paulina Afshani Schwarz ("Lead Plaintiffs") and Court-appointed Lead Counsel.[1] I have personal knowledge of the facts set forth herein and, if called upon to testify, I could and would do so truthfully and accurately. I submit this declaration, together with the attached exhibits, in support of Lead Plaintiffs' Motion for Preliminary Approval of Proposed Class Action Settlement.[2]

## I. BACKGROUND

### A. Overview of the Action

2. Lead Plaintiffs assert claims on behalf of a putative class of investors. Lead Plaintiffs allege that during the period between December 7, 2021 and November 16, 2023 (the "Class Period"), Defendants made materially false and misleading statements and engaged in deceptive and manipulative acts in furtherance of a scheme to defraud investors in violation of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, and § 20(a) of the Exchange Act, which caused the price of ChargePoint Securities to trade at artificially inflated prices.

3. Specifically, Lead Plaintiffs allege that Defendants inflated ChargePoint's reported revenue through undisclosed, unsustainable practices that violated Generally Accepted Accounting Principles ("GAAP") and ChargePoint's own revenue recognition policy, while simultaneously misrepresenting the sources of the Company's reported growth as organic customer demand and effective supply chain management.

4. Lead Plaintiffs allege that the scheme unraveled in two stages. On September 6, 2023, ChargePoint disclosed a $28 million inventory impairment charge on a "particular [direct current] DC product," which was its first-generation CPE 250 DC fast charger. Defendants

---

[1] **Exhibit 1** to this Declaration is a true and correct copy of the firm resume of Hagens Berman.

[2] All capitalized terms not defined herein shall have those meanings as set forth in the Stipulation and Agreement of Settlement dated October 28, 2026 ("Stipulation") and its accompanying exhibits, a true and correct copy of which is attached as **Exhibit 2** hereto. Emphasis is added and citations are omitted throughout unless otherwise noted.

allegedly had over-procured this product and carried it on the Company's books at inflated values rather than writing it down as required by ChargePoint's own inventory valuation policy. ChargePoint's stock fell 11% on the news. Then, on November 16, 2023, ChargePoint pre-announced a 30% revenue shortfall from prior guidance, an additional $42 million inventory impairment charge (bringing the total to $70 million), and the immediate departure of both CEO Romano and CFO Jackson. ChargePoint's stock fell 35% on November 17, 2023, to a record low of $2.02 per share.

5. Defendants deny Lead Plaintiffs' allegations and enter into the Settlement without making any admission of wrongdoing.

**B. Initial Complaint and Lead Plaintiff Process**

6. On November 29, 2023, plaintiff Farooq Khan filed a putative class action styled *Khan v. ChargePoint Holdings, Inc. et al.*, No. 5:23-cv-06172 (N.D. Cal.), alleging violations of federal securities laws against ChargePoint, Pasquale Romano, and Rex S. Jackson.

7. On May 16, 2024, Judge Pitts issued an Order Consolidating Cases and Appointing Lead Plaintiffs and Lead Counsel, which appointed Shahram Afshani and Paulina Afshani Schwarz as Lead Plaintiffs and Hagens Berman Sobol Shapiro LLP as Lead Counsel. Dkt. No. 87.

**C. Lead Counsel's Investigation and the Amended Complaint**

8. After Lead Counsel's appointment, counsel conducted a comprehensive investigation into Defendants' allegedly wrongful acts, which included, among other things, the review and analysis of (i) the Company's public filings with the SEC; (ii) research reports from securities and financial analysts; (iii) the Company's press releases, investor presentations, reports, and earnings call transcripts; and (iv) price and volume data for Company securities.

9. Lead Counsel also supervised and directed in-house and outside private investigators who conducted an investigation that involved, *inter alia*, contacting numerous former ChargePoint employees and customers and conducting interviews. Lead Counsel further conferred with an economic consulting firm on loss causation, market efficiency, and damage-related issues. Lead Counsel developed the case entirely on their own, given the litigation was not preceded by the announcement of an SEC investigation or any restatement.

10. On July 19, 2024, Lead Plaintiffs filed their First Amended Class Action Complaint for Violations of the Federal Securities Laws. Dkt. No. 99. On September 17, 2024, Defendants filed a motion to dismiss the First Amended Complaint (the "MTD"). Dkt. No. 106. The MTD was fully briefed and set for hearing on April 28, 2025.

11. On February 24, 2025, this case was reassigned to Judge Wise (the "Court") and the MTD hearing was vacated. Dkt. No. 118. After the parties filed a Joint Case Management Statement on March 17, 2025 (Dkt. No. 119), the Court reset the hearing on the MTD for July 16, 2025. Dkt. No. 120.

**D. The Parties' First Mediation**

12. Prior to the MTD hearing, Lead Plaintiffs and Defendants engaged a third-party mediator, Seth Aronson of Phillips ADR Enterprises, P.C. After the submission of comprehensive mediation statements and other materials, the parties participated in an in-person mediation session with Mr. Aronson on April 29, 2025. During the mediation, Mr. Aronson assessed the strengths and weaknesses of the parties' claims and defenses. Lead Plaintiffs and Defendants did not reach a resolution of the case.

**E. Lead Plaintiffs File a Second Amended Complaint**

13. Following the mediation, and pursuant to stipulation, the Court vacated the July 16, 2025 hearing date in light of scheduling conflicts and Lead Plaintiffs' intent to seek leave to file a Second Amended Complaint. Dkt. No. 123. Defendants consented, and Lead Plaintiffs filed the Second Amended Complaint on July 22, 2025. Dkt. No. 127.

14. The Second Amended Complaint detailed new factual allegations, including accounts from new former employee witnesses identified through Lead Counsel's investigation, and added Michael Hughes as a Defendant. *Id.*

15. Lead Counsel worked with investigators to interview, in total, more than three dozen individuals in support of the amended complaint.

16. Pursuant to the Court's Order (Dkt. No. 126), Defendants filed the Second MTD on September 17, 2025. Dkt. No. 132. On February 20, 2026, the Court granted the Second MTD with leave to amend. Dkt. No. 149.

**F. Lead Plaintiffs File a Third Amended Complaint**

17. On March 6, 2026, Lead Plaintiffs filed the Third Amended Complaint. Dkt. No. 150. The Third Amended Complaint addressed the deficiencies the Court identified in its order granting the Second MTD. *Id.* Defendants filed the Third MTD on March 20, 2026. Dkt. No. 153. On May 21, 2026, the Court denied the Third MTD after full briefing. Dkt. No. 162.

18. Defendants filed their Answer on June 11, 2026. Dkt. No. 167.

**G. Lead Plaintiffs and Defendants Attend a Second Mediation Session**

19. Following the Court's denial of the Third MTD, Lead Plaintiffs and Defendants agreed to mediate. In preparation, Lead Plaintiffs identified key categories of documents, secured ChargePoint's agreement to produce them on an expedited timeline, and promptly reviewed and analyzed those materials.

20. Pursuant to Lead Plaintiffs' requests, Defendants produced over 3,000 pages of documents, consisting primarily of Board materials, accounting spreadsheets, and internal ChargePoint policies. Lead Plaintiffs also produced documents in response to Defendants' informal requests.

21. After submission of additional comprehensive mediation statements, which included discussion of ChargePoint's documents produced in mediation discovery, Lead Plaintiffs and Defendants participated in a second in-person mediation session with Mr. Aronson on July 27, 2026. The in-person mediation did not resolve the case on that date, although the parties continued to communicate regarding settlement through Mr. Aronson.

**H. Fact Discovery Continues Following the Second Mediation**

22. After the mediation, on July 27, 2026, Lead Plaintiffs served their first set of forty-seven (47) document requests. Lead Plaintiffs also sent proposed custodians and search terms on August 21, 2026. After receiving Defendants' responses and objections on August 26, 2026, Lead Plaintiffs immediately began meet-and-confer discussions regarding their document requests. Lead Plaintiffs and Defendants exchanged multiple letters and engaged in a videoconference meet and confer on September 1, 2026.

23. Lead Plaintiffs also engaged in non-party discovery. Lead Plaintiffs served non-

party document and deposition subpoenas on Rachel Larrenaga, ChargePoint's former in-house counsel, whose allegations in a separate state-court proceeding were detailed in the Third Amended Complaint. Defendants sought to quash the subpoenas or prohibit the discovery sought pursuant to Federal Rules of Civil Procedure 45(d) and 26(c). The parties submitted a joint discovery dispute statement to Magistrate Judge Susan van Keulen on September 4, 2026. Dkt. No. 171. On September 14, 2026, Magistrate Judge van Keulen ordered the parties to meet and confer immediately regarding the scope of the subpoenas in an effort to negotiate a timely compromise and set a discovery hearing for September 23, 2026, if negotiations were unsuccessful. Dkt. No. 172. On September 21, 2026, the parties reached an agreement on the scope of the subpoenas.

24. Lead Plaintiffs also served deposition and document subpoenas on ChargePoint's auditor, PricewaterhouseCoopers ("PwC"), on September 2, 2026.

25. Defendants served forty-four (44) document requests and thirteen (13) interrogatories on August 5, 2026. Lead Plaintiffs served their responses and objections on September 4, 2026.

## I. Continued Negotiations with the Mediator Result in Settlement Agreement

26. In the weeks following the July 27, 2026 mediation, the parties continued discussions with the mediator, Mr. Aronson. On September 25, 2026, the parties accepted Mr. Aronson's double-blind mediator's proposal of $11 million. The parties executed a confidential term sheet to settle the Action on September 28, 2026, which memorialized the key terms embodied in the Stipulation.

27. On October 28, 2026, Lead Plaintiffs and Defendants executed the Stipulation, a true and correct copy of which is attached as Exhibit 2 hereto. Annexed as exhibits to the Stipulation are true and correct copies of the following documents:

| EXHIBIT | DESCRIPTION |
|---|---|
| A | Preliminary Approval Order |
| A-1 | Notice of Pendency and Proposed Settlement of Class Action |

| EXHIBIT | DESCRIPTION |
|---|---|
| A-2 | Proof of Claim and Release |
| A-3 | Summary Notice |
| A-4 | Postcard Notice |
| B | Order and Final Judgment |

## II. INFORMATION ABOUT THE SETTLEMENT

### A. The Settlement Class and Settlement Payment

28. As defined in the Stipulation, the Settlement Class includes "all Persons or entities which, between December 7, 2021 and November 16, 2023, inclusive, purchased or otherwise acquired ChargePoint Common Stock or ChargePoint Call Options, or sold or otherwise disposed of ChargePoint Put Options, and were damaged thereby." *See* Stipulation ¶ 1.45.[3]

29. The Third Amended Complaint defined the class as "[a]ll persons or entities who purchased or otherwise acquired ChargePoint securities from December 7, 2021 to November 16, 2023, inclusive[], and were damaged thereby." Dkt. No. 150 at 8. Judge Pitts, in consolidating the cases, recognized that the use of the term "securities" in the class definition "necessarily encompasses both options and common stock." Dkt. No. 87 at 7. Accordingly, the Settlement Class comprises the same putative class proposed in the Third Amended Complaint.

30. The Settlement requires ChargePoint to pay, or cause to be paid, $11,000,000.00 (the "Settlement Amount"), which amount, plus all interest and accretions thereto, comprises the Gross Settlement Fund. Stipulation ¶¶ 2.1, 2.5.

31. Pursuant to the Stipulation, ChargePoint will pay or cause to be paid the Settlement

---

[3] Excluded from the Settlement Class are: (i) Defendants and the Individual Defendants' Immediate Family Members; (ii) the officers and directors of ChargePoint, at all relevant times; (iii) the affiliates and subsidiaries of ChargePoint, at all relevant times; (iv) ChargePoint and its affiliates' employee retirement and/or benefit plan(s) (i.e., ERISA) and their participants or beneficiaries to the extent they purchased or acquired ChargePoint stock through any such plan(s); (v) any entity in which Defendants have a controlling interest; and (vi) the legal representatives, heirs, successors, or assigns of any such excluded person or entity. Also excluded from the Settlement Class are any Persons or entities who properly excluded themselves by filing a valid and timely request for exclusion in accordance with the requirements set by the Court. *See* Stipulation ¶ 1.45.

Amount into the Escrow Account prior to entry of the Preliminary Approval Order. *Id.* ¶ 2.1, Ex. A ¶ 13. The Settlement Fund will then begin earning interest for the benefit of the Settlement Class. *Id.* ¶ 2.5.

32. Any sums required to be held in escrow shall be held by the Escrow Agent. *Id.* ¶ 2.4. Upon entry of the Preliminary Approval Order, pursuant to the Stipulation, control over the Escrow Account shall be transferred to Lead Counsel (subject to the supervision of the Court) for the benefit of the Settlement Class until the Effective Date. *Id.* ¶ 2.4; Ex. A ¶ 13.

**B. The Settlement Notice**

33. Notice to the Settlement Class and the cost of settlement administration will be paid from the Settlement Fund. Stipulation ¶¶ 2.2, 4.2. The one exception is notice under the Class Action Fairness Act ("CAFA"), which Defendants administer and pay for. *Id.* ¶ 4.3.

34. The Notice, Postcard Notice, and Summary Notice provide that Lead Counsel will file a Fee and Expense Application asking for an award from the Settlement Fund of: (a) attorneys' fees in an amount not to exceed 30% of the Settlement Amount ($3,300,000); (b) reimbursement of out-of-pocket expenses incurred in prosecuting the Action, not to exceed $300,000; and (c) any interest on such amounts at the same rate and for the same period as earned by the Settlement Fund. Stipulation, Ex. A-1 at 2; *id.*, Ex. A-3 at 2; *id.*, Ex. A-4 at 3. Further, as explained in the notices, Lead Plaintiffs also intend to request an award, not to exceed $10,000 for each Lead Plaintiff, for reimbursement of reasonable costs and expenses directly relating to their representation of the Settlement Class under 15 U.S.C. § 78u-4(a)(4) (the "Awards to Lead Plaintiffs"). *Id.* The Court will consider the Fee and Expense Application and the Awards to Lead Plaintiffs separately from the fairness of the Settlement. *Id.* ¶ 7.6.

35. The Settlement Fund shall be used to pay: (i) Taxes and Tax Expenses; (ii) the Notice and Administration Expenses as authorized by the Stipulation; (iii) Attorneys' Fees and Expenses authorized by the Court; (iv) any Awards to Lead Plaintiffs authorized by the Court under 15 U.S.C. § 78u-4(a)(4); and (v) any other fees and expenses authorized by the Court. *Id.* ¶ 2.2.

36. The remaining amount is the "Net Settlement Fund," which shall be distributed pursuant to the Court-approved Plan of Allocation. *Id.* ¶¶ 1.30, 6.1. If any balance remains six (6)

months after the initial distribution, Lead Counsel will ask the Claims Administrator to reallocate it, if economically feasible and reasonable, among Authorized Claimants who cashed their checks in an equitable fashion, after payment of any unpaid costs or fees incurred in administering the Net Settlement Fund for such redistribution. *Id.* ¶ 4.16. Further redistributions may follow if they would be cost-effective. *Id.* Any balance that still remains in the Net Settlement Fund after reallocation(s) and payment(s) and that is not feasible or economical to reallocate shall be contributed to non-sectarian, not-for-profit organization(s), which Lead Plaintiffs will propose for final determination by the Court. *Id.*

37. The Plan of Allocation treats all Settlement Class Members equitably based on the timing of their ChargePoint Securities purchases, acquisitions, and sales. *See infra*, ¶¶ 65-71.

**C. The Releases**

38. Upon the Effective Date of the Settlement, Lead Plaintiffs and each of the Settlement Class Members, on behalf of themselves and their Related Persons, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, waived, relinquished and discharged, and shall forever be enjoined from prosecuting, all Released Claims against each Released Defendant Person, whether or not Lead Plaintiffs or any Settlement Class Member executes and delivers a Proof of Claim. *See* Stipulation ¶ 3.2.

39. Upon the Effective Date of this Settlement, Defendants and each of the Released Defendant Persons shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, waived, relinquished and discharged, and shall forever be enjoined from prosecuting, each and every one of the Released Claims Against Lead Plaintiffs against each Released Plaintiff Person. *Id.* ¶ 3.3.

40. The term “Released Claims” means (i) any claims or causes of action that Lead Plaintiffs or any other member of the Settlement Class asserted in the Action; and (ii) any claims or causes of action, including Unknown Claims, whether arising under federal, state, common, or foreign law, that were or could have been asserted, or could in the future be asserted, in any forum that (a) arise out of the allegations, transactions, facts, matters, occurrences, statements, or omissions that are alleged in the Action, and (b) relate to the purchase, acquisition, sale, disposition,

or holding of ChargePoint Securities. For avoidance of doubt, this release does not cover, include, or release claims relating to Excluded Claims. *Id.* ¶ 1.39.

41. The term "Released Claims Against Lead Plaintiffs" means any claims or causes of action, including Unknown Claims, whether arising under federal, state, common, or foreign law, that were or could have been asserted, or could in the future be asserted, in any forum, that relate to the institution, prosecution, or settlement of the claims against Defendants. For avoidance of doubt, this release does not cover, include, or release claims relating to Excluded Claims. *Id.* ¶ 1.40.

42. The term "Excluded Claims" means (i) any claims asserted in any related Shareholder Derivative Actions and/or any demands on the ChargePoint Board of Directors on or before the date of this Settlement; (ii) any claims of any Person or entity who or which submits a request for exclusion that is accepted by the Court; and (iii) any claims relating to enforcement of the Settlement. *Id.* ¶ 1.20.

43. The term "Shareholder Derivative Actions" refers to *In re ChargePoint Holdings, Inc. Derivative Litigation*, Case No. 5:24-cv-00149-NW (N.D. Cal.); *Baker v. Romano*, Case No. 1:24-cv-00010-RGA (D. Del.); *Burstell v. Romano*, Case No. 1:26-cv-01174-UNA (D. Del.); *Lomont v. Romano*, Case No. 2026-0682-JTL (Del. Ch.); *In re ChargePoint Holdings, Inc. Stockholder Derivative Litigation*, Case No. 2026-0938-JTL (Del. Ch.); and *Levitan v. Chizen*, Case No. 2026-1001-JTL (Del. Ch.). *Id.* ¶ 1.51.

44. The term "Released Defendant Persons" means all Defendants and any Persons or entities affiliated or connected with any of them, including all of their respective current and former officers, directors, managers, employees, contractors, consultants, accountants, attorneys, experts, auditors, insurers, financial advisors, professional advisors, investment bankers, representatives, affiliated persons and entities, control persons, sponsors, parents, subsidiaries, beneficiaries, heirs, successors, predecessors, assigns, principals, agents, Immediate Family Members, Related Persons, associates, partners, divisions, joint venturers, executors, trustees, trustors, general or limited partners or partnerships, limited liability companies, members, personal or legal representatives, estates, administrators, or entities in which Defendants have a controlling interest. *Id.* ¶ 1.41.

45. The term "Released Plaintiff Persons" means Lead Plaintiffs, all other plaintiffs in

the Action, their respective attorneys, including Lead Counsel, and the Settlement Class. *Id.* ¶ 1.42.

**D. The Anticipated Recovery Under the Settlement**

46. This $11,000,000.00 Settlement amounts to an estimated average recovery of $0.02 per share of ChargePoint Common Stock, $0.004 per affected ChargePoint Call Option underlying share, and $0.009 per affected ChargePoint Put Option underlying share, before the deduction of Court-approved fees and expenses and costs of notice and claims administration.

47. Lead Counsel will request attorneys' fees in an amount not to exceed 30% of the Settlement Amount ($3,300,000) and payment of expenses not to exceed $300,000. Further, as explained in the Notice, Lead Plaintiffs intend to request an amount not to exceed $10,000 for each Lead Plaintiff pursuant to 15 U.S.C. §78u-4(a)(4) in connection with their representation of the Settlement Class. The costs of the notice and claims administration process are estimated to be no more than $400,000. *See* Declaration of Nicholas Schmidt Regarding Notice Plan ("Schmidt Decl."), ¶ 39. A true and correct copy of the Schmidt Declaration is attached hereto as **Exhibit 3**.

48. The net recovery for Settlement Class Members is estimated to be at least $6,980,000 ($11,000,000 minus all of the foregoing fees and expenses).

49. The $11 million recovery is near the median recoveries in recent securities class actions, as calculated by Cornerstone Research, which conducts annual and semiannual reviews of securities class action settlements. According to Cornerstone Research, for the period from 2016 through 2024, the median settlement was $12.1 million.[4]

50. Lead Plaintiffs' damages expert estimated maximum class-wide damages of between approximately $546.2 million and $696.2 million. These estimates assumed Lead Plaintiffs prevailed on every claim, that each alleged corrective disclosure leading to a statistically significant drop was fully corrective, and that no confounding information required disaggregation. These assumptions would have been vigorously contested by Defendants, who likely would have argued for elimination of all or certain of the corrective disclosure dates or disaggregation. The $11

---

[4] *See* Laarni Bulan and Eric Tam, *Securities Class Action Settlements* – 2025 Review and Analysis (Cornerstone Research 2026), at 1, https://www.cornerstone.com/wp-content/uploads/2026/02/Securities-Class-Action-Settlements-2025-Review-and-Analysis.pdf.

million Settlement thus recovers approximately 1.6% to 2% of the total maximum damages potentially recoverable in this case.

**E. Lead Counsel's Assessment of Legal Risks**

51. Among the factors bearing on the fairness of the compromise reached are Lead Counsel's extensive investigation, the discovery conducted, and legal research of the claims asserted in the Action, which helped Lead Counsel evaluate, refine, and sharpen its understanding of the strengths and weaknesses of Lead Plaintiffs' claims, including:

(a) In drafting the amended complaints and during the Private Securities Litigation Reform Act ("PSLRA") automatic discovery stay, Lead Counsel conducted a comprehensive investigation into Defendants' allegedly wrongful acts, which included, among other things, the review and analysis of (i) ChargePoint's SEC filings, press releases, conference calls, investor presentations, and other public statements made by the Defendants prior to, during, and after the Class Period; (ii) court filings in *Larrenaga v. ChargePoint, Inc.*, No. 22-cv-398534 (Cal. Super. Ct.); (iii) research reports by securities and financial analysts; and (iv) stock price movement and pricing data. Lead Counsel also supervised and directed in-house and outside private investigators who conducted an investigation that involved interviewing over three dozen former employees and researching other sources of information. Lead Counsel further conferred with an economic consulting firm on loss causation-, market efficiency-, and damage-related issues.

(b) In opposing the Defendants' motions to dismiss, Lead Counsel further engaged in extensive legal research relating to the strengths and weaknesses of the claims asserted in this Action.

(c) Following the Court's denial of Defendants' motion to dismiss the Third Amended Complaint, Lead Counsel completed targeted discovery, which included the review of Defendants' production of over 3,000 pages of documents, including Board materials, accounting spreadsheets, and internal ChargePoint policies. Lead Counsel also served document requests and conducted extensive negotiations regarding the scope of discovery before the Settling Parties resolved the Action. Lead Plaintiffs also conducted non-party discovery, issuing subpoenas to

Rachel Larrenaga, ChargePoint's former in-house counsel whose allegations from a state court proceeding were detailed in the Third Amended Complaint, as well as ChargePoint's auditor.

52. Based on publicly available information, documents obtained through Lead Counsel's amended complaint investigation and targeted requests to Defendants, discovery negotiations, research and analysis conducted in connection with the numerous MTD briefs that were filed in the Action, and discussions with experts, Lead Counsel believes that Lead Plaintiffs would have been able to prove their claims at trial.

53. Lead Plaintiffs, however, would be required to prove all elements of their claims to prevail, while Defendants needed to succeed on only one defense to potentially defeat the entire Action. Here, Defendants advanced, and likely would have continued to advance, arguments disputing almost all aspects of Lead Plaintiffs' case.

54. ***Deceptive and Manipulative Acts.*** Defendants maintained that ChargePoint complied with GAAP and that the revenue recognition practices at issue did not materially affect its reported revenue. Specifically, Defendants pointed to internal records reflecting that ChargePoint maintained steady return reserves during the Class Period, arguing that its reported revenue therefore already reflected returns and was not inflated by the challenged revenue recognition practices. Defendants further emphasized that ChargePoint never restated its revenue. In addition, Defendants argued that, in the quarters preceding the impairments, ChargePoint adhered to its inventory valuation policy and that its inventory reserve analyses justified when the impairments were taken. Defendants also highlighted that PwC, ChargePoint's auditor, examined these policies and calculations as part of its audits.

55. ***Falsity.*** Defendants contended that the statements Lead Plaintiffs challenged were not actionable because Lead Plaintiffs could not point to any revenue "gaps" or improper practices that caused broad and significant inflation of revenue. Further discovery may also have reduced the number of statements that could potentially support liability.

56. ***Scienter.*** Defendants argued that ChargePoint's internal records demonstrate that the Executive Defendants had no knowledge of any widespread, deceptive effort to inflate revenue. Instead, Defendants asserted that ChargePoint's internal controls flagged possible revenue

recognition concerns, which management and/or the accounting team then examined and resolved. Defendants have also pointed out that Romano, Jackson, and Hughes did not engage in significant insider sales that were not either mandatory sell-to-cover transactions or trades made pursuant to Rule 10b5-1 plans, weakening any inference of a motive to commit fraud.

57. ***Loss Causation and Damages*.** Defendants asserted that ChargePoint's stock price fell because the market learned of the Company's weak financial condition, not because any fraud was revealed. Defendants emphasized that neither of the alleged corrective disclosures, on September 6, 2023 and November 16, 2023, described unauthorized shipments, channel stuffing, premature software activations, undocumented side deals with resellers, or any revenue restatement. On that basis, Defendants argued that the disconnect between the challenged statements and the corrective disclosures bars class certification under *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113 (2021).

58. ***Class Certification*.** No class has yet been certified. If the case continued, Defendants could oppose class certification entirely or oppose the certification of the entire class period or definition of the class. Even if the Court granted class certification, Rule 23(c)(1) allows a class certification order to be altered or amended at any time prior to a decision on the merits. Defendants, therefore, could have moved to decertify the class or shorten the Class Period up until the time the jury reached a verdict.

59. Lead Plaintiffs and Lead Counsel carefully considered such risks throughout the settlement discussions with the Defendants and Mr. Aronson. The Settlement eliminates these and other risks, enabling the Settlement Class to recover a substantial sum of money, while avoiding continued litigation and the unpredictability of a jury trial.

60. Sidley Austin LLP—a reputable and experienced national law firm—vigorously represented Defendants during the Action. Defendants' counsel were therefore equally well-informed regarding the case and their representation of Defendants was no less rigorous than Lead Counsel's representation of the Settlement Class. Because the Settlement is the product of serious, informed, and non-collusive negotiations among experienced counsel and a highly qualified mediator, it merits preliminary approval.

**F. Lead Counsel's Assessment of Practical Risks**

61. Barring the Settlement, this case would require the expenditure of substantial additional sums of time and money at trial and beyond, with no guarantee that any additional benefit would be provided to the Settlement Class. Even if Lead Plaintiffs succeeded at trial and met their burdens with respect to falsity, materiality, scienter, class-wide reliance under the "fraud on the market" presumption, loss causation, the measure of per-share damages (if any), and control person liability, the case would still be far from over. In this respect, Defendants would have had the opportunity to challenge an individual Settlement Class Member's membership in the Settlement Class, challenge the presumption of reliance as to each class member (including Lead Plaintiffs), and challenge the amount of damages due to each Settlement Class Member. Such a process would have been lengthy, complex, and extremely costly.

62. Moreover, Defendants would almost certainly file an appeal—a process that would further extend the litigation for years and risk reversal of a verdict for Lead Plaintiffs. Conversely, the Settlement confers a substantial and immediate benefit on the Settlement Class and avoids the risks associated with obtaining a wholly speculative (though potentially larger) sum in the future.

63. Hanging over all of this uncertainty is the question of collectability: whether ChargePoint would be able to satisfy any judgment ultimately obtained. ChargePoint's market capitalization has dropped from $7.21 billion on December 7, 2021 (the beginning of the Settlement Class Period)[5] to about $250 million as of the date of this declaration.[6] Based on its last quarterly

---

[5] ChargePoint's pre-split common stock closed at $21.78 per share on December 7, 2021. *See* ChargePoint Holdings, Inc. (CHPT) Stock Historical Prices & Data, Yahoo! Finance, https://finance.yahoo.com/quote/CHPT/history/?period1=1638748800&period2=1639180800 (reporting a split-adjusted close of $435.60). Yahoo! Finance adjusts historical prices for ChargePoint's 1-for-20 reverse stock split, which took effect July 28, 2025. *See* **Exhibit 4** at 12 (a true and correct copy of excerpts from ChargePoint's Form 10-Q dated September 4, 2026 for the quarterly period ended July 31, 2026). The unadjusted (pre-split) closing price is therefore $435.60 ÷ 20 = $21.78. ChargePoint had 331,027,104 shares of common stock outstanding as of November 30, 2021. *See* ChargePoint Form 10-Q dated December 15, 2021, for the quarterly period ended October 31, 2021, at cover page, *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001777393/ce6b99a9-78e4-4cf9-995a-76b5d8dbae0e.html. Multiplying $21.78 by 331,027,104 shares gives a market capitalization of $7,209,770,325 as of December 7, 2021.

[6] *See* ChargePoint Holdings, Inc. (CHPT), Yahoo! Finance, https://finance.yahoo.com/quote/CHPT/.

filing, ChargePoint had $95.3 million in cash and cash equivalents as of July 31, 2026, down from $141.6 million as of January 31, 2026.[7] Per ChargePoint's Form 8-K disclosing the proposed Settlement, the Company, and not any insurers, is funding the Settlement.[8]

64. Nonetheless, despite ChargePoint's financial precarity, Lead Plaintiffs secured a cash payment of $11 million, which is approximately 11.5% of ChargePoint's $95.3 million in cash and cash equivalents as of July 31, 2026. If Lead Plaintiffs were to continue litigating this case, and ChargePoint continued to financially deteriorate, then Lead Plaintiffs would face the very real possibility that the class would recover little to nothing at all.

**G. The Proposed Plan of Allocation of the Settlement Fund**

65. The Plan of Allocation is detailed in the Notice of Pendency and Proposed Settlement of Class Action (the "Notice"). *See* Stipulation, Ex. A-1. The Notice also will be posted online at www.ChargePointSecuritiesLitigation.com.

66. The Plan of Allocation was prepared with the assistance of Lead Plaintiffs' damages expert and is based on the expert's analysis estimating the amount of artificial inflation in the price of ChargePoint Common Stock and ChargePoint Call Options, as well as artificial deflation in ChargePoint Put Options, during the Settlement Class Period.

67. Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund, which is the Gross Settlement Fund less: (i) Taxes and Tax Expenses; (ii) the Notice and Administration Expenses as authorized by the Stipulation; (iii) Attorneys' Fees and Expenses authorized by the Court; (iv) any Awards to Lead Plaintiffs authorized by the Court; and (v) any other fees and expenses authorized by the Court. Stipulation ¶¶ 1.30, 6.1.

68. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the sum of all Authorized Claimants' Recognized Claims, multiplied by the total amount of the Net Settlement Fund. *See* Notice at 17, ¶ 24.

---

[7] *See* Ex. 4 at 6.

[8] *See* ChargePoint Form 8-K dated September 30, 2026. A true and correct copy of the Form 8-K is attached hereto as **Exhibit 5**.

69. The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on a "Recognized Loss Amount" formula. *Id.* at 14-17, ¶¶ 11-23. A Claimant's recovery under the Plan of Allocation will depend upon a number of factors, including, *inter alia*, the timing of the purchase and sale of any ChargePoint Security, the types of ChargePoint Securities purchased and sold, the declines that occurred in the price of ChargePoint Common Stock and ChargePoint Call Options (or in the case of ChargePoint Put Options, the increase in price) following the alleged corrective disclosures, and the number and value of claims submitted by Claimants. *See id.* at 15, ¶¶ 15-16. Settlement Class Members will provide information on their transactions in the Claim Form.

70. To have a "Recognized Loss Amount," a Claimant must have held the securities or positions over at least one corrective disclosure date. *Id.* at 15, ¶ 16. Consistent with the PSLRA's 90-day look-back provision, 15 U.S.C. § 78u-4(e), "Recognized Loss Amounts" for ChargePoint Common Stock are also limited by the stock's average price during the 90-day look-back period. *See id.* at 16 n.2.

71. This is a widely accepted approach to the fair distribution of settlement funds in securities class action settlements. The Plan of Allocation, moreover, does not grant Lead Plaintiffs or any other Settlement Class Member preferential treatment. Rather, the Net Settlement Fund will be allocated to Authorized Claimants—including Lead Plaintiffs—based on the type of ChargePoint Security and the relative size of their Recognized Claims determined by the factors described above. Lead Counsel believes that the Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members who submit valid claims.

**H. The Claims Administrator**

72. Lead Counsel proposes that the Court appoint Epiq Class Action and Claims Solutions, Inc. ("Epiq") as the Claims Administrator for the Settlement in order to provide all notices approved by the Court to Settlement Class Members, to process Claim Forms, and to administer the Settlement. Epiq is a recognized leader in legal administration services for class action settlements and legal noticing programs.

73. Following the execution of the term sheet, Lead Counsel conducted a competitive

selection process and selected Epiq to administer the notice program and Settlement. Specifically, Lead Counsel sent a request for proposal and cost estimate to five reputable and experienced notice and claims administrators, all of which proposed notice to the Settlement Class in substantially the same manner as presented here. Lead Counsel chose Epiq based on its estimated costs in comparison to its competitors. In the past two years, Lead Counsel has retained Epiq five times in connection with class notice, claims processing, or settlement administration matters.

74. Epiq has successfully administered numerous large, complex securities cases, including cases involving settlement amounts exceeding $500 million. *See* Schmidt Decl. ¶ 3.

75. Epiq estimates that there are 300,000 Settlement Class Members. *Id.* ¶ 29. This number is only an estimate and can be larger or smaller based on the number of Settlement Class Members identified by Nominees as beneficial owners of ChargePoint Securities during the Settlement Class Period.

76. Based on Epiq's experience, it estimates that 25% of the 300,000 estimated Settlement Class Members, or 75,000, will file claims or have claims filed on their behalf. *Id.* ¶ 29. This estimate is consistent with other Epiq-administered settlements, where the number of notices mailed was similar to the number of notices that Epiq estimates mailing here. *Id.*

77. At this time, only an estimate of the total Notice and Administration Expenses can be provided, as the costs are highly dependent on a number of factors, including how many notices are ultimately mailed and how many claims are ultimately received. Epiq estimates that the total Notice and Administration Expenses for the Action may be no more than $400,000. *Id.* ¶ 40. These costs and expenses represent well under 5% of the total value of the settlement. *Id.*

### I. There Are No Reversions to the Defendants

78. Under the terms of the Stipulation, no portion of the Settlement Amount will revert to Defendants. *See* Stipulation ¶ 2.3.

## III. THE NOTICE PROGRAM

### A. The Notice Distribution Plan

79. In accordance with the proposed Preliminary Approval Order, attached as Exhibit A to the Stipulation filed herewith, Lead Counsel will cause the Claims Administrator to mail the

Postcard Notice by First-Class Mail to each Settlement Class Member who can be identified with reasonable effort. *See* Stipulation, Ex. A ¶ 15(b); *id.* Ex. A-4 (the "Postcard Notice"); Schmidt Decl. ¶¶ 14-20 . Epiq will also provide Postcard Notice to the brokerage firms and other nominees who regularly act as nominees for beneficial purchasers of stock. *Id.* ¶ 17. Lead Counsel will also cause Epiq to email a copy of the Summary Notice to potential Settlement Class Members who can be identified through reasonable effort. *See* Stipulation, Ex. A ¶ 15(b); *id.* Ex. A-3 (the "Summary Notice"); Schmidt Decl. ¶ 15.

80. Settlement Class Members are identified from the transfer agent's record of ownership of ChargePoint Securities and through brokers and custodians that hold securities in "street name." Schmidt Decl. ¶ 16. Epiq will also provide notice to brokerage firms and other nominees who purchased, acquired, and/or sold ChargePoint Securities for the beneficial interest of others during the Settlement Class Period. *Id.* ¶ 17. Within seven days of receiving notice, those nominees must take one of three steps: (a) request copies of the Postcard Notice from Epiq and forward them to beneficial owners within ten calendar days; (b) request an electronic version of the Summary Notice and email it to beneficial owners within ten calendar days; or (c) send Epiq the names, mailing addresses, and email addresses of beneficial owners, so that Epiq can mail or email notice directly. *See* Notice at 12; Schmidt Decl. ¶ 17

81. The Postcard Notice and Summary Notice direct Settlement Class Members to the Settlement Website, www.ChargePointSecuritiesLitigation.com. The Settlement Website will post downloadable copies of the Preliminary Approval Order and of the Stipulation and its Exhibits, including the long-form Notice and the Proof of Claim and Release. Schmidt Decl. ¶ 23. Settlement Class Members may also submit Proofs of Claim online through the Settlement Website. *Id.* In addition, not later than 24 days after the Court's entry of the Preliminary Approval Order, Epiq will cause the Summary Notice to be published once in *Investor's Business Daily* and transmitted once over the *PR Newswire*. *See* Stipulation, Ex. A, ¶ 15(d).

82. Lead Counsel believes that this method of notice will provide Settlement Class Members with a full and fair opportunity to consider the proposed Settlement.

**B. The Notice Contents Are Adequate**

83. As more fully explained in the accompanying Motion for Preliminary Approval of Proposed Class Action Settlement, the notice program satisfies the requirements of due process, Rule 23(c)(2), and the PSLRA (15 U.S.C. §78u-4(a)(7)).

84. The proposed forms of notice describe the terms of the Stipulation and the Settlement Class's recovery; the factors that Lead Plaintiffs and their counsel considered in determining that the Settlement is fair, adequate, and reasonable; the maximum attorneys' fees and expenses that may be sought; the procedure for objecting to the Settlement and the deadline to do so; the procedure for participating in the Settlement and instructions on how to complete and submit a Proof of Claim to the Claims Administrator and the deadline to do so; the proposed Plan of Allocation for the settlement proceeds; and the date, time, and place of the Fairness Hearing. The Notice also provides contact information for Lead Counsel and the Claims Administrator, as well as information regarding the case-specific website.

85. In addition, the notices include critical information required by the Northern District of California's Procedural Guidance for Class Action Settlements such as:

(a) Contact information for Lead Counsel to answer questions. *See* Notice at Question Nos. 17 and 24; Summary Notice at 3.

(b) The address for a website, maintained by the claims administrator or class counsel, that lists key deadlines and has links to the notice, claim form, preliminary approval order, motions for preliminary and final approval and for attorneys' fees, and any other important documents in the case. *See* generally Notice, Summary Notice, and Postcard Notice.

(c) Instructions on how to access the case docket via PACER or in person at any of the court's locations. *See* Notice at Question No. 24.

(d) The date and time of the final approval hearing, clearly stating that the date may change without further notice to the class. *See* Notice at Question No. 19; Summary Notice at 1; Postcard Notice at 3.

(e) A note to advise class members to check the settlement website or the Court's PACER site to confirm that the date has not been changed. *See* Notice at Question No. 19.

86. All blank placeholders found in the Notice, Proof of Claim Form, Summary Notice, and Postcard Notice will be filled in once the Court sets those dates and the documents are finalized prior to mailing and publication.

## IV. OBJECTIONS AND EXCLUSIONS

87. The notice program instructs potential Settlement Class Members how and when to object to the Settlement, the proposed Plan of Allocation, or Lead Counsel's motion for an award of attorneys' fees and expenses and awards to Lead Plaintiffs. *See* Notice at Question No. 18; Summary Notice at 2; Postcard Notice at 3. Objections must be received or filed, not simply postmarked, on or before the established objection deadline, and must be signed by the objector even if filed by counsel. *Id.* The Notice makes clear that the Court can only approve or deny the Settlement and cannot change its terms. *See* Notice at Question No. 18. Settlement Class Members who object remain Settlement Class Members. *See, e.g.*, Summary Notice at 3. Those who do not object in the manner and within the time provided are deemed to have waived their objections, unless the Court orders otherwise. Notice at Question No. 18. Objectors who wish to be heard at the Fairness Hearing must also submit a Notice of Intention to Appear. Notice at Question No. 21.

88. The notice program also instructs Settlement Class Members how to exclude themselves from the Settlement Class and the deadline for doing so. *See* Notice at Question No. 13; Summary Notice at 2; Postcard Notice at 3. A Settlement Class Member who wishes to be excluded must mail or deliver a written Request for Exclusion from the Settlement Class so that it is received, not simply postmarked, no later than the exclusion deadline. *Id.*

89. The Notice explains the consequences of exclusion. Excluded Settlement Class Members are not eligible to receive any payment from the Settlement Fund. Notice at Question No. 14. Exclusion is also the only option that lets a Settlement Class Member pursue any other lawsuit against Defendants or the other Released Defendant Persons concerning the Released Claims. *Id.* at 4, Question No. 23. Settlement Class Members who do not timely request exclusion will be bound by all determinations and judgments in the Action, whether favorable or unfavorable, and will release the Released Claims whether or not they submit a Proof of Claim. *Id.* at Question Nos. 12-13.

90. Lead Plaintiffs and Defendants have agreed, out of an abundance of caution, to a Supplemental Opt-Out Agreement (the "Supplemental Agreement") providing Defendants with the option to terminate the Settlement if Settlement Class Members who request exclusion from the Settlement Class meet the conditions set forth in the Supplemental Agreement. Stipulation ¶ 10.6.

91. As is standard practice in securities class actions, the Supplemental Agreement is identified in the Stipulation, but its terms are confidential to avoid creating incentives for a small group of class members to opt out solely to leverage the threshold to exact an individual settlement. Lead Plaintiffs and Defendants are willing to file this confidential Supplemental Agreement (with a motion to file under seal) should the Court wish to examine it. There are otherwise no agreements requiring identification under Rule 23(e)(3).

## V. THE PROPOSED SETTLEMENT CLASS

92. The proposed Settlement Class satisfies Rule 23. First, the proposed class members are sufficiently numerous. ChargePoint Securities were traded on the NYSE, with approximately 483.5 million damaged shares during the Settlement Class Period.

93. Second, there are questions of law or fact that are common to the class. Those questions include: (i) whether Defendants omitted or misrepresented material facts; (ii) whether Defendants engaged in deceptive and manipulative acts in furtherance of a scheme to defraud investors; (iii) whether Defendants acted with scienter; (iv) whether the prices of ChargePoint Securities were artificially inflated or maintained during the Settlement Class Period; and (v) whether Defendants' misrepresentations and omissions caused class members to suffer economic losses.

94. Third, Lead Plaintiffs' claims are typical of the claims of other proposed class members. Lead Plaintiffs' claims arise from the same events or course of conduct that give rise to claims of other Settlement Class Members, and the claims asserted are based on the same legal theory.

95. Fourth, Lead Plaintiffs will fairly and adequately protect the interests of the Settlement Class. Lead Plaintiffs' claims are coextensive with those of the Settlement Class, and

Lead Plaintiffs have also retained counsel highly experienced in securities class action litigation who have successfully prosecuted many securities class actions.

## VI. ATTORNEYS' FEES AND LITIGATION EXPENSES

96. For their efforts on behalf of the Settlement Class, Lead Counsel will apply for a fee award calculated as a percentage of the common fund to compensate them for the services they have rendered on behalf of the Settlement Class. Lead Counsel will apply to the Court for an award of attorneys' fees in an amount not to exceed 30% of the Settlement Amount ($3,300,000, plus interest earned at the same rate as the Settlement Fund).

97. Lead Counsel's current total lodestar as of the date of this Declaration is approximately $2.68 million. The anticipated requested fee results in a multiplier of approximately 1.2 to counsel's current total lodestar ($3.3M/$2.68M). Lead Counsel's current total lodestar does not include, among other things, time that will be spent responding to Settlement Class Members' inquiries or work related to drafting the final approval motions.

98. Lead Counsel also will apply for payment of expenses from the Settlement Fund in an amount not to exceed $300,000. These expenses were paid or incurred in connection with the institution, prosecution, and resolution of the claims against Defendants. These expenses include expert costs, mediation fees, and online legal and factual research, among other costs.

99. Lead Counsel also intends to seek an award of up to $10,000 for each Lead Plaintiff, pursuant to 15 U.S.C. § 78u-4(a)(4), as reimbursement for Lead Plaintiffs' time and expenses expended representing the Settlement Class. Lead Counsel believes this amount is fully supported by the work undertaken throughout the Action, which included time spent: (i) participating in discussions with Lead Counsel concerning the prosecution of the Action and strengths and weaknesses of the claims; (ii) reviewing significant pleadings; (iii) collecting and producing relevant documents; (iv) serving written discovery responses; and (v) reviewing the terms of the Settlement and authorizing Lead Counsel to settle the case.

100. Throughout the litigation, Lead Counsel worked on a fully contingent basis.

101. Approval of the requested attorneys' fees is separate from approval of the Settlement, and the Settlement may not be terminated based on any ruling with respect to attorneys'

fees. *See* Stipulation ¶ 7.6.

## VII. *CY PRES* AWARD

102. The Net Settlement Fund shall be distributed pursuant to the Court-approved Plan of Allocation to Authorized Claimants. Any balance that still remains in the Net Settlement Fund after reallocation(s) and payment(s) and that is not feasible or economical to reallocate shall be contributed to non-sectarian, not-for-profit organization(s) as may be deemed appropriate by the Court. *Id.* ¶ 4.16.

## VIII. TIMELINE

103. In connection with preliminary approval of the Settlement, Lead Plaintiffs are requesting that the Court establish: (i) dates by which notice of the Settlement will be distributed to Settlement Class Members; (ii) a date by which Settlement Class Members who wish to object to any aspect of the Settlement, Plan of Allocation and/or request for attorneys' fees and expenses must submit that objection; (iii) a date by which Settlement Class Members may exclude themselves from the Settlement Class; and (iv) a date on which the Court will hold the Fairness Hearing.

104. The following is the schedule being proposed here:

| EVENT | PROPOSED TIME FOR COMPLIANCE | EXAMPLE DATES[9] |
|---|---|---|
| Deadline to begin mailing of the Postcard Notice and emailing of the Summary Notice ("Notice Date") | 14 days after entry of the Preliminary Approval Order | April 7, 2027 |
| Deadline for publishing the Summary Notice | 10 days after the Notice Date | April 16, 2027 (April 17, 2027 falls on a Saturday) |
| Deadline for filing papers in support of final settlement approval, Plan of Allocation, | 35 days before the Fairness Hearing | June 16, 2027 |

[9] The "Example Dates" are representative dates that would apply if the Court entered the Preliminary Approval Order on March 24, 2027 and set the Fairness Hearing for July 21, 2027.

| EVENT | PROPOSED TIME FOR COMPLIANCE | EXAMPLE DATES[9] |
|---|---|---|
| and request for attorneys' fees and expenses | | |
| Deadline for filing an objection to the Settlement, Plan of Allocation or request for attorneys' fees and expenses<br><br>Deadline for submitting a request for exclusion from the Settlement Class | 21 days before the Fairness Hearing | June 30, 2027 |
| Deadline for submitting Proofs of Claim | 90 days after the Notice Date | July 6, 2027 |
| Deadline for filing reply memoranda in support of final settlement approval, Plan of Allocation, and request for attorneys' fees and expenses, and in response to any objections to the Settlement | 7 days before the Fairness Hearing | July 14, 2027 |
| Fairness Hearing | At the Court's convenience | July 21, 2027 |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: October 29, 2026 at Berkeley, California.

/s/ *Reed R. Kathrein*
REED R. KATHREIN